JUDGE FORREST

RECEIVED
2012 APR 11 PM 8:33
U.S. COURT OF APPEALS
U.S. CIRCUIT COURT

### UNITED STATES DISTRICT COURT
### SOUTHERN DISTRICT OF NEW YORK

POLICEMEN'S ANNUITY AND
BENEFIT FUND OF THE CITY OF
CHICAGO,

                       Plaintiff,

   - against-

BANK OF AMERICA, NA (as Trustee
Under Various Pooling and Servicing
Agreements), and U.S. BANK NATIONAL
ASSOCIATION (as Trustee Under Various
Pooling and Servicing Agreements),

                       Defendants.

**CASE NO.  12 CV 2865**

**CLASS ACTION COMPLAINT**

**JURY TRIAL DEMANDED**



RECEIVED
APR 11 2012
U.S.D.C. S.D. N.Y.
CASHIERS

### SUMMARY OF THE ACTION

1.    Plaintiff Policemen's Annuity and Benefit Fund of the City of Chicago ("Chicago Police") brings this action, on its own behalf and on behalf of a class, against Defendants Bank of America, NA ("BOA") and U.S. Bank National Association ("U.S. Bank") in their capacity as the Trustee for 41 substantially similar trusts (as listed in Exhibit A) in which Plaintiff and class members invested (collectively the "Covered Trusts"), and that own residential Mortgage Loans that were originated or acquired by Washington Mutual Bank ("WaMu") or its affiliates and then bundled together and sold to investors as Washington Mutual Bank (WaMu) mortgage backed securities (the "WaMu MBS").  BOA is the successor-in-interest by merger to the original Trustee for the Covered Trusts, LaSalle Bank National Association ("LaSalle").  U.S. Bank succeeded BOA as Trustee of the Covered Trusts.  A list of Plaintiff's investments in six of the Covered Trusts — WaMu Mortgage Pass-Through Certificates Series 2006-AR12 Trust, WaMu Mortgage Pass-Through Certificates Series 2006-

AR16 Trust,  Washington Mutual Mortgage Pass-Through Certificates WMALT Series 2006-5 Trust, Washington Mutual Mortgage Pass-Through Certificates WMALT Series 2006-AR1 Trust, WaMu Mortgage Pass-Through Certificates Series 2007-HY1 Trust, and WaMu Mortgage Pass-Through Certificates Series 2007-HY7 Trust — is attached as Exhibit B.   Plaintiff purchased and sold WaMu MBS at a loss as a result of Defendants' wrongdoing, and, along with the class members (collectively, the "MBS holders"), was a beneficiary of the Covered Trusts that held the Mortgage Loans.

2.      As the Trustee for the Covered Trusts, Defendants owed the MBS holders certain contractual duties, as well as duties imposed by the federal Trust Indenture Act of 1939, as amended, (the "TIA"), 15 U.S.C. §77aaa, *et seq.*, with respect to the Mortgage Loans held by the Covered Trusts.  These duties were spelled out in the Covered Trusts' Governing Agreements, which are substantially similar.  A copy of one of those Governing Agreements, the Pooling and Servicing Agreement ("PSA") for Washington Mutual Mortgage Pass-Through Certificates WMALT Series 2006-5 Trust, is attached as Exhibit C.  The PSA is incorporated by reference into this Complaint as if set forth fully herein.

3.      The purpose of having a Trustee in MBS securitizations such as these is to ensure that there is at least one independent party to the Governing Agreements who, unlike the MBS holders, did not face collective action, informational, or other limitations, and as a result could effectively protect the trusts and their beneficiaries, the MBS holders.  Thus, the Governing Agreements, as modified by the TIA, imposed critical duties on Defendants as Trustees that directly impacted the value of the MBS.

4.      In order for the WaMu MBS to in fact be backed by Mortgage Loans – *i.e.*, to have any value – the Covered Trusts had to take title to the underlying Mortgage Loans for

which they provided due consideration, and which were, in theory, conveyed to them.   The Governing Agreements establish the terms of the conveyance of the Mortgage Loans to the Trustee on behalf of the Covered Trusts and the MBS holders, and those terms are intended to ensure that the Trustee in fact takes title to the Mortgage Loans.   Among other things, the Governing Agreements require that the Trustee, or its agent, take physical possession of the Mortgage Files, and that the Mortgage Note and the Mortgage are properly endorsed and assigned to the Trustee.   To ensure that the Mortgage Loans were properly conveyed to the Covered Trusts, the Governing Agreements also required the Trustee or its agent to review the loan files for each of the Mortgage Loans and to certify that the documentation for each of the loans was accurate and complete.

5.      Just as fundamental in an MBS securitization as the Covered Trusts properly taking title to the Mortgage Loans is the quality of the Mortgage Loans to which the Covered Trusts purportedly receive title.   For that reason, the Governing Agreements contain representations and warranties attesting to the quality of the Mortgage Loans conveyed to the Covered Trusts.   Ratings agencies assess the quality of the MBS based on those representations and warranties, and notably, the ratings agencies must be informed in the event of their breach. The Governing Agreements therefore require the securitization's Sponsor (or Seller), in this case, affiliates of WaMu, to cure, substitute, or repurchase any Mortgage Loans that materially breach those representations and warranties, or that do not have complete Mortgage Files, including on account of inadequate assignments or endorsements.   Significantly, the Governing Agreements also require the Trustee, among others, to enforce the Seller's obligation to cure, substitute, or repurchase such Mortgage Loans.

6.     As described more fully below, however, Defendants regularly disregarded their contractual and statutory duties to ensure that there were no missing, defective or incomplete documents, and that defective loans were removed from the mortgage pools supporting the WaMu MBS.

7.     Defendants are familiar with the damage that arises when Mortgage Loans are not adequately transferred to securitization Trusts.  For example, in *Frost v. LaSalle Bank, N.A.*, No. 4D09-2668, 2010 WL 2862149 (Fla. App., 4th Dist. May 24, 2010), the court reversed an order entering summary judgment in LaSalle's favor in a foreclosure action on the grounds that there was no proof LaSalle held the mortgage note with a valid endorsement on the date it brought the foreclosure action.   In this regard, the Court observed that the copies of the Note and Mortgage attached to the complaint identified WaMu as the original lender and that "the Note was bare with respect to the presence of an endorsement."  Nor did the complaint "have attached to it an assignment of the Mortgage or Note."  *Id.* at *1.  Indeed, LaSalle contradicted its own assertion of ownership by including an affidavit in support of its motion for summary judgment stating that Bank of America, as successor by merger to LaSalle as Trustee was the owner of the Note, not LaSalle.  Further, the Court found that the fact that the Note attached to the complaint contained no endorsement but the Note attached to the motion for summary judgment contained a bearer endorsement created "a reasonable inference that the signature and endorsement were placed on the original Note" at a time when WaMu had no rights in the Note, "thereby making the endorsement unauthorized and the signature a forgery."  *Id.* at *10-*11.

8.     In addition, various government investigations, along with a lawsuit brought by a trustee of other WaMu MBS Trusts, have shown that WaMu and/or its affiliates routinely breached the representations and warranties it made regarding the Mortgage Loans it securitized.

When Defendants learned of these violations, they had the duty to notify MBS holders of them. Moreover, once there were events of default and/or the rights of MBS holders to full and timely payment of their principal and interest were impaired, Defendants had the duty to act as a prudent person to exercise all of their powers under the Governing Agreements to protect MBS holders.

9.      Defendants have had considerable knowledge of the defects in the Mortgage Loans, the breaches of the Seller's representations and warranties, and the harm that this has caused MBS holders.  As discussed herein, Defendants knew:

- from at least their review of the Mortgage Loan Files, and from their attempts to foreclose on Mortgage Loans, that the Mortgage Loans had not been properly transferred to the Covered Trusts;

- from at least its review of the Mortgage Loan Files, and from its attempts to foreclose on Mortgage Loans, that the Mortgage Loan Files were incomplete;

- from at least the high rate of delinquent and defaulted Mortgage Loans in the Covered Trusts, from the many investigations and suits detailing the high number of defective loans in WaMu securitizations, and from newspaper articles reporting similar facts, that many of the Mortgage Loans in the Covered Trusts did not comply with the Seller's representations and warranties concerning their underwriting quality; and

- from at least the Covered Trusts' poor performance, and from their attempts to foreclose on Mortgage Loans, that MBS holders were being harmed by the defects in the Covered Trusts' Mortgage Loans.

Despite all of that, Defendants failed to take any action to protect the MBS holders, as it was required to do.

10.      The Mortgage Loans in the Covered Trusts have experienced high levels of payment delinquencies, delays in foreclosure actions and credit losses which would not have occurred but for the negligence of Defendants and their failure to perform their responsibilities

under the Governing Agreements and TIA.  By failing to perform their duties, Defendants have caused MBS holders to suffer millions of dollars in losses.

**JURISDICTION AND VENUE**

11.     This Court has jurisdiction over this action pursuant to 28 U.S.C. §1331 for violations of the TIA and supplemental jurisdiction over the contract claims.  It also has jurisdiction pursuant to 28 U.S.C. §1332(a).

12.     Venue is proper in this District under 28 U.S.C. §1391(b).

**PARTIES**

13.     Plaintiff Policemen's Annuity and Benefit Fund of the City of Chicago ("Chicago Police") is a state governmental pension fund authorized by statute under the laws of Illinois with the mission of providing retirement benefits to its members and their beneficiaries.  Chicago Police relies heavily upon the performance of its investments to fund benefits.  It invested in and sold WaMu MBS as provided in Exhibit A.

14.     Other class members purchased the same or substantially similar WaMu MBS as Plaintiff.  All WaMu MBS purchased by Plaintiff and all other class members have or had Defendants as Trustee, the same Depositor, the same Servicer, affiliates of WaMu as Seller, substantially similar Governing Agreements, and substantially similar underlying and other characteristics and deficiencies.  Defendants owed Plaintiff and all other class members the same duties, and, as set forth herein, systematically failed to perform those duties—for all MBS holders in the 41 trusts.  Accordingly, the systematic violations of duty and pattern of wrongdoing by Defendants and the other parties to the Governing Agreements are part of a common scheme and course of conduct.  Thus, the class' claims against Defendants share the

same character as, and are indeed virtually identical to, Plaintiff's claims against Defendants, and Plaintiff has standing, and is an appropriate class representative, to pursue these claims.

15.     Defendant BOA is a national banking association organized and existing under the laws of the United States with its principal offices in Charlotte, North Carolina.  In or about October 1, 2007, BOA acquired LaSalle, which was serving as Trustee for the Covered Trusts, and became successor Trustee by merger to LaSalle.  BOA does business throughout the United States and its principal office in New York State is in New York County.  As the Trustee for the Covered Trusts, LaSalle and BOA owed the MBS holders certain statutory and contractual duties with respect to the Mortgage Loans owned by the Covered Trusts, which duties LaSalle and BOA violated.

16.     Defendant U.S. Bank is a national banking association organized and existing under the laws of the United States with its principal offices in Minnesota.  Following BOA's acquisition of Countrywide in July 2008, BOA resigned as Trustee for those Covered Trusts that contained Mortgage Loans originated by Countrywide and was succeeded as Trustee by Defendant U.S. Bank.  Subsequently, in December 2010, Defendant U.S. Bank acquired BOA's securitization trust business and succeeded BOA as Trustee for the remaining Covered Trusts as well.  U.S. Bank does business throughout the United States and its principal office in New York State is in New York County.  As the Trustee for the Covered Trusts, U.S. Bank owed the MBS holders certain statutory and contractual duties with respect to the Mortgage Loans owned by the Covered Trusts, which duties U.S. Bank violated.

## FACTUAL ALLEGATIONS

**I.      The Securitization Process For The WaMu MBS**

17.     WaMu, acting on its own and through its network of corporate affiliates, managed the securitization of the Mortgage Loans in the Covered Trusts, and in countless other MBS trusts.  Mortgage securitizations involve the conversion of illiquid whole loans into bond-like instruments, the MBS, that trade over the counter in capital markets.  By 2006, WaMu was the second largest non-agency issuer of MBS in the United States, behind Countrywide.  Indeed, between 2000 and 2007, WaMu and its subprime affiliate, Long Beach Mortgage Company ("Long Beach"), securitized over $77 billion in subprime home loans and billions more in other high risk home loans.

18.     WaMu controlled almost every aspect of the creation and issuance of the MBS – from origination and pooling of the underlying Mortgage Loans, through the securitization of the loans and the sale of the MBS representing interests in the Mortgage Loans to Plaintiff and Class members.

19.     The first step in creating the MBS was the origination of mortgages to borrowers purchasing homes.  WaMu originated or acquired from various "correspondent" mortgage lenders throughout the country billions of dollars of home loans.

20.     Second, certain WaMu affiliates, referred to as a "Seller," would group the mortgages that WaMu had originated and purchased into a large pool, and then transfer, or sell, that pool to a "Depositor."  WaMu Asset Acceptance Corp. ("WAAC"), a special purpose entity, formed for the sole purpose of acquiring Mortgage Loans from the Seller and transferring the Mortgage Loans into the issuing Trusts, served the role of Depositor for the Covered Trusts. Depositors exist primarily to provide an intermediary between the Seller and the Trust in the chain of title to the Mortgage Loans because – if the Seller goes into bankruptcy, as many did and WAAC nearly did – the bankruptcy estate can rescind direct transfers made by the Seller.

Thus, the Seller and the Depositor enter into a Mortgage Loan Purchase Agreement ("MLPA"), which governs the mechanics of the transfer, and states that the Mortgage Loan Files must be complete and may not have defective documents, such as imperfect assignments or endorsements.   In the MLPA, the Seller also: (i) makes representations and warranties concerning the quality of the Mortgage Loans in the mortgage pool, (ii) promises to cure, substitute or repurchase mortgages that do not comply with those representations and warranties, or that do not have a valid transfer, and (iii) states that the Trustee will ultimately have the right to enforce those representations and promises.

21.     Third, the Depositor transferred the pool of mortgages to the Trustee, for the benefit of the Trust and the MBS holders, and in exchange the Trustee transferred the MBS to the Depositor.   As discussed in greater detail below, the Governing Agreements set forth the terms of this transfer and the operation of the Trust.   The Governing Agreements impose certain duties on the Trustee, in addition to those duties imposed by the TIA and Delaware law.   They also establish the Trust as a Real Estate Mortgage Investment Conduit ("REMIC") under the Internal Revenue Code, which enables the Trust to avoid tax liability on income generated from the underlying Mortgage Loans – if the Trust gains valid title over the underlying Mortgage Loans within three months of its creation and if certain other criteria are met.   Qualifying as a REMIC is critical to the Trust's ability to make the payments promised to MBS holders. Importantly, the Governing Agreements also refer to and incorporate the MLPA.

22.     Fourth, the Depositor sold the MBS to an underwriter, in this case, WaMu Capital Corp. ("WCC"), another affiliate.   The Depositor remits the money from that sale to the Seller, which may use it to originate or purchase more mortgages.   Meanwhile, the underwriter markets

and sells the MBS to investors.  At this point in the securitization process, the Seller is also sometimes referred to as the Sponsor.

23.      MBS entitle their holders to the cash flows generated from the Trust's pool of Mortgage Loans.  The Trust, or securitization transaction, is structured such that the risk of loss is divided among different levels, or "tranches."  Each tranche of the Trust has a different level of credit risk and reward (the interest or yield), including different levels of credit enhancement. One form of credit enhancement is overcollateralization, which means that the total principal balance of the Mortgage Loans in the Trust exceeds the aggregate amount of securities issued and sold by the Trust.  Another example of credit enhancement is excess interest, which means that the amount of interest collected on the underlying Mortgage Loans for each payment period is expected to be greater than the interest distributable to the MBS holders and the expenses payable by the Trust during that period.

24.      Following the sale of the MBS, the Servicer is responsible for the collection of payments from the underlying mortgagors, including through foreclosure if necessary.  Those payments are then distributed to the MBS holders in accordance with the tranche structure.

25.      Thus, the value of the MBS, and their credit rating, depend primarily on the riskiness of the underlying mortgages, which is reflected in the Seller's representations and warranties concerning the quality of loans in the pool and, secondarily, to the extent that borrowers default on their payments, on the Trust's ability to foreclose on the collateral and recover the unpaid loan balance.  If the loans underlying the MBS suffer payment defaults in excess of the assumptions built into their credit enhancement and securities' ratings, or the underlying properties' mortgages cannot be effectively foreclosed and the properties sold following default, the securities will be re-rated and the value of the MBS will decline.

**II.      Defendants' Duties As Trustee For The Covered Trusts**

26.      The purpose of having a Trustee in an MBS securitization is to ensure that there is at least one independent party to the Governing Agreements who, unlike the MBS holders, does not face collective action, informational, or other limitations, and as a result can effectively protect the trusts and the MBS holders.  Thus, the Governing Agreements imposed critical duties on Defendants, as Trustee, that directly impacted the value of the MBS.

27.      The Covered Trusts' Governing Agreements set forth the Trustee's duties.  The Covered Trusts, including those that issued the MBS purchased by Plaintiff, are governed by a PSA and certain related agreements that the PSA references and incorporates.   All of the Governing Agreements are substantially similar, and impose the same duties on the Trustee at issue here.  Accordingly, this Complaint primarily refers to one of the PSAs as a representative example, and attaches that PSA, for Washington Mutual Mortgage Pass-Through Certificates WMALT Series 2006-5 Trust, as Exhibit C hereto.

28.      While the Governing Agreements set forth certain rights and responsibilities in connection with the Covered Trusts, recognizing that previous abuses by trustees had adversely affected the national interest, Congress enacted the TIA to provide minimum federal protections to investors which are deemed to be incorporated into those Governing Agreements.

A.      The Trustee's Duties And Obligations Under The Governing Agreements

i.      *The Trustee's Duty To Properly Take Title To The Mortgage Loans Conveyed to the Trust*

29.      In order for the MBS to in fact be backed by Mortgage Loans – *i.e.*, to have any value – the Covered Trusts must take title to the mortgages that are conveyed to them for due consideration.   The Governing Agreements establish the terms of the conveyance of the Mortgage Loans to the Trustee, on behalf of the Trust and the MBS holders, and those terms are

intended to ensure that the Trustee, on behalf of the Trust, in fact takes title to the Mortgage Loans.

30.    The first part of this conveyance involves the Depositor making various assignments to the Trustee (including among other things, its rights under the MLPA, the document through which the Depositor acquired the Mortgage Loans from the Seller), as set forth in PSA Section 2.04 ("Conveyance of Mortgage Pool Assets; Security Interest"), which provides in relevant part:

> The Company [WAAC] does hereby irrevocably sell, transfer, assign, set over and otherwise convey to the Trust, without recourse, all the Company's right, title and interest in and to the Mortgage Pool Assets.

The PSA defines Mortgage Pool Assets to include the Mortgage Loans as well as the payments received on the Mortgage Loans (excluding servicing fees).

31.    Significantly, the Trustee or its agent must take physical possession of the Mortgage Files, including the Mortgage Note and the Mortgage, properly endorsed and assigned to the Trustee.  As set forth in PSA Section 2.05, WAAC is required to "deliver to and deposit with, or cause to be delivered to and deposited with, the Trustee .  .  . the Mortgage Files, which shall at all times be identified in the records of the Trustee .  .  .  as being held by or on behalf of the Trust."  The PSA defines the Mortgage File to include:

> (i)      The original Mortgage Note endorsed (A) in blank, without recourse, (B) to the Trustee, without recourse, or (C) to the Trust, without recourse, and all intervening endorsements evidencing a complete chain of endorsements from the originator to the endorser last endorsing the Mortgage Note .  .  . *provided*, *however*, that in the event that either (a) Washington Mutual Bank or Washington Mutual Bank fsb is the Seller of the Mortgage Loan or (b) Washington Mutual Mortgage Securities Corp. is the Seller of the Mortgage Loan and purchased the Mortgage Loan from Washington Mutual Bank or Washington Mutual Bank fsb, then

the Mortgage Note need not be endorsed in blank or to the Trustee or the Trust as provided above, but, if not so endorsed, shall be made payable to, or properly endorsed to, Washington Mutual Bank or Washington Mutual Bank fsb, as applicable.  .  .

(iii)    (1)(x)   the original recorded Mortgage with evidence of recording thereon for the jurisdiction in which the Mortgaged Property is located (which original recorded Mortgage, in the case of a MOM [MERS] Loan, shall set forth the MIN [Mortgage Identification Number] and shall indicate that the Mortgage is a MOM Loan), (y)   unless the Mortgage Loan is a MERS Loan, an original assignment of the Mortgage duly executed and acknowledged in recordable form (A) in blank, (B) to the Trustee or (C) to the Trust, and (z)   unless the Mortgage Loan is a MOM Loan, recorded originals of all intervening assignments evidencing a complete chain of assignment from the originator to the person executing the assignment described in clause (y); or

(2)(x)   a copy (which may be in electronic form) of the Mortgage (which Mortgage, in the case of a MOM Loan, shall set forth the MIN and shall indicate that the Mortgage Loan is a MOM Loan) which represents a true and correct reproduction of the original Mortgage and which has either been certified (i) on the face thereof by the public recording office in the appropriate jurisdiction in which the Mortgaged Property is located, or (ii) by the originator, the Seller, the Servicer or the escrow or title company which provided closing services in connection with such Mortgage Loan as a true and correct copy the original of which has been sent for recordation, (y) unless the Mortgage Loan is a MERS Loan, an original assignment of the Mortgage duly executed and acknowledged in recordable form (A) in blank, (B) to the Trustee or (C) to the Trust, and (z)   unless the Mortgage Loan is a MOM Loan, true and correct copies, certified by the applicable county recorder or by the originator, the Seller or the Servicer as described above, of all intervening assignments evidencing a complete chain of assignment from the originator to the person executing the assignment described in clause (y); *provided*, *however*, that in the event that either (a) Washington Mutual Bank or Washington Mutual Bank fsb is the Seller of the Mortgage Loan or (b) Washington Mutual Mortgage Securities Corp. is the Seller of the Mortgage Loan and purchased the Mortgage Loan from Washington Mutual Bank or Washington Mutual Bank fsb, then the Mortgage File need not include an assignment of the Mortgage executed in blank or to the Trustee or the Trust as provided in clause (X)(iii)(1)(y) or (X)(iii)(2)(y) above, as applicable, but the Mortgage File shall, unless the Mortgage Loan was originated by

13

Washington Mutual Bank or Washington Mutual Bank fsb, include a complete chain of assignments of the related Mortgage from the originator of such Mortgage Loan to Washington Mutual Bank or Washington Mutual Bank fsb, as applicable; and

(iv)  For any Mortgage Loan that has been modified or amended, the original instrument or instruments effecting such modification or amendment.

32.     In addition, PSA Section 2.07 ("Acceptance by Trustee") reinforces that the Trustee or its agent was required to take physical possession of the Mortgage Loans and the accompanying loan files for the exclusive use and benefit of all current and future MBS holders. It provides in relevant part:

> The Trustee acknowledges receipt . . . on behalf of the Trust of the documents (or certified copies thereof as specified in Section 2.05) referred to in Section 2.05 above . . . .

33.     Likewise, PSA Section 2.11 ("Acknowledgement of Transfer of Mortgage Pool Assets") states that:

> The Trustee hereby acknowledges and accepts on behalf of the Trust the transfer and assignment pursuant to Section 2.04 to the Trust of the Mortgage Pool Assets . . . and declares that as of the Closing Date it  .  .  .  holds and shall hold any documents constituting part of the Mortgage Pool Assets, and the Mortgage Pool Assets, as Trustee, in trust, upon the trust herein set forth . . . .

34.     Similarly, PSA Section 8.08 ("Successor Trustee") provides in relevant part that:

> The predecessor shall deliver to the successor trustee all Mortgage Files, related documents, statements and all other property held by it hereunder, and the Servicer and the predecessor trustee shall execute and deliver such instruments and do such other things as may reasonably be required for more fully and certainly vesting and confirming in the successor trustee all such rights, powers, duties and obligations.

14

     ii.    *The Trustee's Duty To Review The Mortgage Loan Files Conveyed To The Covered Trusts And To Identify Files With Missing, Defective Or Incomplete Documents*

35.    To ensure that the Mortgage Loans were properly conveyed to the Covered Trusts, the Governing Agreements also required the Trustee or its agent to review the loan files for each of the Mortgage Loans and to certify that the documentation for each of the loans was accurate and complete.  This duty overlaps with and forms part of the requirements that the Trustee must satisfy to properly take title to the Mortgage Loans.

36.    Accordingly, as set forth in PSA Section 2.07, the Trustee or its agent  had to create a "Certification" as follows:

> The Trustee shall review . . . each Mortgage File within 45 days after the Closing Date and deliver to [WAAC] a certification . . . to the effect that, except as noted, all documents required . . . pursuant to the definition of "Mortgage File" and Section 2.05 have been executed and received, and that such documents relate to the Mortgage Loans identified in the Mortgage Loan Schedule.

     iii.    *The Trustee's Duty To Enforce The Seller's Obligation To Cure, Substitute Or Repurchase Mortgage Loans*

37.    Just as fundamental in an MBS securitization as the Covered Trusts properly taking title to the Mortgage Loans is the quality of the Mortgage Loans to which the Covered Trusts purportedly receive title.  For that reason, the Governing Agreements contain representations and warranties attesting to the quality of the Mortgage Loans conveyed to the Covered Trusts.  Ratings agencies assess the quality of the MBS based on those representations and warranties, and notably, the ratings agencies must be informed in the event of their breach.

38.    The Governing Agreements therefore require the Seller to cure, substitute, or repurchase any Mortgage Loans that materially breach the Seller's representations and warranties concerning the quality of the Mortgage Loans conveyed to the Covered Trusts, or that

did not have complete Mortgage Files, including on account of inadequate assignments or endorsements.   Significantly, they also require the Trustee, among others, to enforce that obligation of the Seller's.

39.     This requirement is embodied in several provisions of the Governing Agreements, including PSA Section 2.07, which states in relevant part that:

> If the Trustee finds any document or documents required to be included in the Mortgage File for a Mortgage Loan pursuant to the definition of "Mortgage File" not to have been executed and received, the Trustee shall promptly so notify the Servicer. . . . Upon notice from the Trustee . . . that any document required to be included in the Mortgage File for a Mortgage Loan has not been executed and received, the Servicer shall promptly notify the Seller of such defect and take appropriate steps on behalf of the Trust to enforce the Seller's obligation, pursuant to Section 2.4 of the Mortgage Loan Purchase Agreement, to correct or cure such defect or repurchase or substitute for such Mortgage Loan, in accordance with and subject to the time limitations set forth in such Section 2.4 . . . .

40.     Moreover, the Trustee also has the duty to enforce the Seller's respective obligations to cure, substitute or repurchase defective Mortgage Loans at any point that a breach of the Seller's representations and warranties concerning the Mortgage Loans set forth in the MLPA is discovered.   As set forth in PSA Section 2.09 ("Representations and Warranties of the Seller Concerning the Mortgage Loans"):

> Upon discovery by [WAAC], the Servicer or the Trustee (in the case of the Trustee having actual knowledge thereof) of a breach of any of the representations set forth in Section 3.1 of the Mortgage Loan Purchase Agreement . . . that materially and adversely affects the value of the related Mortgage Loans or the interests of the Trust in the related Mortgage Loans, the party discovering such breach shall give prompt written notice to the others. . . .   The Servicer shall promptly notify the Seller of such breach and take appropriate steps on behalf of the Trust to enforce the Seller's obligation, pursuant to Section 3.3 of the Mortgage Loan Purchase Agreement, to cure such breach in all material respects or

16

repurchase or substitute for the affected Mortgage Loan or Mortgage Loans or any property acquired in respect thereof . . . .

B.    The Trustee's Duties And Obligations Under The TIA

41.    Under the TIA, a trustee must "give to the indenture security holders. . . notice of all defaults known to the trustee, within ninety days after the occurrence thereof. . . ."  15 U.S.C. §77ooo(b) (citing 15 U.S.C. §77mmm(c)).  Defendants consequently had to inform MBS holders of breaches of the Governing Agreements within ninety days after their occurrence.

42.    In case of default, the TIA mandates that a trustee must exercise "such of the rights and powers vested in it by such indenture, and to use the same degree of care and skill in their exercise, as a prudent man would exercise or use under the circumstances in the conduct of his own affairs."  15 U.S.C. §77ooo(c).

43.    As set forth below, Defendants are liable to Plaintiff and Class members for failing to exercise their rights and powers under the Governing Agreements.

III.    **The Covered Trusts Suffer From Serious Defects**

A.    Serious Defects Plague WaMu MBS Securitizations

44.    The MLPAs, which are incorporated into and made part of the Governing Agreements for the Covered Trusts, contain significant representations and warranties by the Seller concerning the underwriting of the Mortgage Loans, the loan to value ratios for the Mortgage Loans, and compliance of the loans with local, state and federal laws.  For example, Article 3 of the MLPA for the WMALT Series 2006-5 Trust contains the following representations of the Seller:

> (ii)    [E]ach Mortgage relating to a Mortgage Loan . . . is a valid and enforceable . . . first lien on an unencumbered estate . . . .;
>
>                             ***

(iii)   Immediately upon the transfer and assignment contemplated herein, the Purchaser shall have good title to, and will be the sole legal owner of, each Mortgage Loan, free and clear of any encumbrance or lien (other than the lien under this Agreement);

(iv)   Except as set forth on Schedule III to the Term Sheet, if applicable, as of the day prior to the Cut-Off Date, all payments due on each Mortgage Loan had been made and no Mortgage Loan had been delinquent (i.e., was more than 30 days past due) more than once in the preceding 12 months (or such shorter period as had elapsed from the date of acquisition of the Mortgage Loan by the Seller or, if earlier, from the date of origination or acquisition of the Mortgage Loan by Washington Mutual Bank or Washington Mutual Bank fsb) and any such delinquency lasted for no more than 30 days;

(v)   As of the Closing date, there is no offset, defense or counterclaim to any Mortgage Note, including the obligation of the Mortgagor to pay the unpaid principal or interest on such Mortgage Note . . .;

*** 

(vii)   Each Mortgage Loan at the time it was made complied with all applicable local, state and federal laws, including, without limitation, usury, equal credit opportunity, disclosure and recording laws, and predatory and abusive lending laws applicable to the originating lender;

*** 

(xvi)   As of the Closing Date, each Mortgage and Mortgage Note is the legal, valid and binding obligation of the maker thereof and is enforceable in accordance with its terms, except only as such enforceability may be limited by laws affecting the enforcement of creditors' rights generally and principles of equity;

*** 

(xix)   Prior to origination or refinancing, an appraisal of each Mortgaged Property was made by an appraiser on a form satisfactory to Fannie Mae or Freddie Mac;

(xx)  The Mortgage Loans have been underwritten substantially in accordance with the applicable Underwriting Standards[, which are defined as "the published underwriting standards of the Seller, or, if such Mortgage Loan was underwritten pursuant to underwriting standards other than the published underwriting standards of the Seller, then such other underwriting standards];

*** 

(xxii)  The Seller used no adverse selection procedures in selecting the Mortgage Loans from among the outstanding mortgage loans of the same type originated or purchased by it which were available for sale to the Purchaser and as to which the representations and warranties in this Section 3.1 could be made;

*** 

(xxviii) No Mortgage Loan is a High Cost/Covered Loan, and no Mortgage Loan originated during the period of October 1, 2002 through March 6, 2003 is governed by the Georgia Fair Lending Act;

(xxvii) No Mortgage Loan is subject to the Home Ownership and Equity Protection Act of 1994 or Section 226.32 of Regulation Z, is a "high-cost" loan or a "predatory" loan as defined under any state or local law or regulation applicable to the originator of such Mortgage Loan or which would result in liability to the purchaser or assignee of such Mortgage Loan under any predatory or abusive lending law, or, without limiting the generality of the foregoing, is a "covered" loan under the laws of the states of California, Colorado, or Ohio; and

(xxix)  No Mortgage Loan has a Closing Date Loan-to-Value ratio greater than 100%.

45.    Notwithstanding the foregoing representations and warranties, in the years following WaMu's failure, public and private investigations, along with numerous reports in newspapers, have made clear that the Mortgage Loans WaMu securitized were of particularly low quality, often with significant violations of the underwriting representations and warranties that WaMu made.  Indeed, according to the Majority and Minority Staff Report of the Permanent

Subcommittee on Investigations of the U.S. Senate's Committee on Homeland Security and Government Affairs (the "Senate Staff Report"), WaMu "polluted the financial system with mortgage backed securities which later incurred high rates of delinquency and loss." *Id.* at 116. In addition, the Senate Staff Report found that WaMu "securitized loans that it had identified as likely to go delinquent, without disclosing its analysis to investors to whom it sold the securities, and also securitized loans tainted by fraudulent information, without notifying purchasers of the fraud that was discovered and known to the bank." *Id.*  The WaMu MBS Trusts consequently suffered high credit losses.

46.     Indeed, the Senate Staff Report found that WaMu was "repeatedly criticized by the bank's internal auditors and reviewers, as well as its regulators, OTS and the FDIC, for deficient lending and securitization practices." *Id.* at 122.  According to the Senate Staff Report, WaMu's "mortgage backed securities were among the worst performing in the marketplace due to poor quality loans that incurred early payment defaults, fraud, and high delinquency rates." *Id.*  Further, according to the Senate Staff Report, WaMu securitized not just poor quality loans, but also loans that its own personnel had flagged as containing fraudulent information.

47.     Investigations of these matters began as early as 2007.  In November 2007, in a suit filed against eAppraiseIT LLC and its parent, title insurance company First American Corp. ("First American"), New York's then Attorney General, Andrew Cuomo, alleged that First American was pressured by WaMu to inflate home values in appraisals.  The following week, the Wall Street Journal disclosed that the SEC had opened an inquiry into whether WaMu had accurately disclosed to buyers of its mortgage backed securities how its loans were appraised.

   B.     The Covered Trusts Have Significant Losses

48.     The Covered Trusts have performed very poorly, reporting tens or even hundreds of millions of dollars in recognized losses to date and staggering delinquency rates, some as high as nearly 50%, indicating that substantial additional realized losses are likely.  For example, (a) WaMu 2006-AR12 has recognized losses of more than $68 million and almost 25% of its remaining loans are more than 90 days delinquent; (b) WaMu 2006-AR16 has recognized losses of almost $70 million and more than 20% of its remaining loans are more than 90 days delinquent; (c) WaMu 2007-HY1 has recognized losses of more than $168 million and almost 25% of its remaining loans are more than 90 days delinquent; (d) WaMu 2007-HY7 has recognized losses of more than $195 million and more than 26% of its remaining loans are more than 90 days delinquent; (e) WMALT 2006-5 has recognized losses of more than $166 million and almost 30% of its remaining loans are more than 90 days delinquent; and (f) WMALT 2006-AR1 has recognized losses of more than $114 million and more then 45% of its remaining loans are more than 90 days delinquent.

49.     These high losses and delinquency rates indicate that many of the underlying Mortgage Loans in the Covered Trusts are not of the quality that WaMu represented and warranted they would be.  Indeed, they are consistent with the public evidence discussed above noting the poor quality of the Mortgage Loans conveyed to WaMu MBS Trusts.  Nonetheless, Defendants failed to take any action to enforce WaMu's obligation to cure, substitute or repurchase defective Mortgage Loans once the fact that WaMu had systematically breached its representations and warranties regarding the quality of the Mortgage Loans conveyed to the WaMu MBS Trusts was known as Defendants were required to do as Trustee.

C.     <u>The Covered Trusts Did Not Perfect Title To The Mortgage Loans</u>

50.     In addition to overwhelming evidence of widespread breaches of representations and warranties concerning the Mortgage Loans conveyed to the WaMu MBS Trusts, there is also substantial evidence of widespread irregularities in the transfer of Mortgage Loans into the Trusts.

51.     MBS Trusts similar to those at issue here have been unable to foreclose on Mortgages due to irregularities in the chain of title.  Defendants are well aware of this problem as they have served as Trustee of certain of these MBS Trusts.  For example, in *Frost v. LaSalle Bank, N.A.*, No. 4D09-2668, 2010 WL 2862149 (Fla. App., 4th Dist. May 24, 2010), the court reversed an order entering summary judgment in LaSalle's favor in a foreclosure action on the grounds that there was no proof LaSalle held the mortgage note with a valid endorsement on the date it brought the foreclosure action.  In this regard, the Court observed that the copies of the Note and Mortgage attached to the complaint identified WaMu as the original lender and that "the Note was bare with respect to the presence of an endorsement."  Nor did the complaint "have attached to it an assignment of the Mortgage or Note."  Indeed, LaSalle contradicted its own assertion of ownership by including an affidavit in support of its motion for summary judgment stating that Bank of America, as successor by merger to LaSalle as Trustee was the owner of the Note, not LaSalle.  Further, the Court found that the fact that the Note attached to the complaint contained no endorsement but the Note attached to the motion for summary judgment contained a bearer endorsement created "a reasonable inference that the signature and endorsement were placed on the Note at a time when WaMu had no rights in the Note, "thereby making the endorsement unauthorized and the signature a forgery."

52.     Further, the Congressional Oversight Panel, which was established as part of the Emergency Economic Stabilization Act of 2008, issued a Report entitled "Examining the

Consequences of Mortgage Irregularities for Financial Stability and Foreclosure."  It recounts widespread foreclosure abuses over the last several years – often in connection with mortgages that have been securitized – and the numerous Federal and State investigations that have detailed this problem.  Many of those abuses, such as forged or back-dated mortgage assignments, or the "robo-signing" of false affidavits used in foreclosure actions, arise from failures in the process of documenting and transferring Mortgage Loans from the originators, to the interim entities in the securitization process, and ultimately into the securitization trusts.  As the Report explains, irregularities in the chain of title between the originator and the Trust can have significant legal consequences that damage the Trusts and MBS holders.

53.    Every county in the country maintains records of who owns land within its borders, of transfers of ownership in real property, and of related mortgages or deeds of trust.  In order to protect ownership interests, take clear title to property, and adjust claims among competing creditors filing liens against the property, fully executed, original documents must be recorded in a county recording office, establishing the source and timing of a person's ownership interests in that property.  These documents must include a description of both the property and the parties that transfer the property.

54.    When an individual purchases a home using a Mortgage Loan, at least the following documents are created: (i) a promissory note establishing the mortgagor's personal liability ("Mortgage Note"), (ii) a mortgage evidencing the lender's interest in the underlying collateral ("Mortgage" or "Deed of Trust"), and (iii) if the mortgage is transferred, proper assignments of the Mortgage Note and the Mortgage.  Without the Mortgage Note, a Mortgage secures no debt; while without the Mortgage, the Mortgage Note is simply an unsecured debt obligation.

55.     As a general matter, there are several methods in which a Mortgage Note can be transferred, including: (i) via a contract and sale, which is governed by the common law of contracts, or (ii) if a Mortgage Note is considered a negotiable instrument (which is not clear as a matter of law), it could be negotiated via Article 3 of the Uniform Commercial Code ("UCC") – Article 3 requires endorsement and the physical delivery of the note.  However, under Delaware law, which applies to the Covered Trusts, the agreement that governs a transfer of debt can establish heightened requirements that must be complied with in order to affect the transfer.  As discussed above, the Governing Agreements dictate the terms of the transfer of the Mortgage Loans (including the Mortgage Note) from the Depositor to the Trustee; and the MLPA governs their transfer from the Seller to the Depositor.  These agreements purport to treat Mortgage Notes as negotiable instruments, but also impose heightened requirements that must be satisfied to complete their transfer.  The Mortgage itself is a transfer of an interest in real property, and must be assigned and recorded in accordance with the law of the place where the property is located.  States generally require a signed writing in order to transfer an interest in real property.

56.     If the Mortgage Note and Mortgage are not properly transferred to the Trust, then the Trust cannot foreclose on a borrower that falls into default.  This is because only the person who (currently) holds both documents has standing to enforce the mortgage in a foreclosure action.  It is therefore significant that a number of Courts have refused to recognize written assignments of the individual notes or mortgages to a securitization trust that occur only after a foreclosure proceeding has begun.

57.     Additionally, if the transfer of a Mortgage is not recorded with the proper county authority, the holder of the Mortgage may then lose its place as the first lien on the underlying property.  This means that if there are junior mortgagees or other creditors who have properly

24

recorded their liens, they will have the right to payment from a sale of the underlying property before the Trust can recover from the foreclosure sale.  As such, even if a note is properly transferred, it has value only if the corresponding mortgage has been properly recorded.

58.     Moreover, as the Congressional Oversight Report describes, several other states have acted to prohibit, or limit, the foreclosure of Mortgages with irregularities that are similar to the irregularities in Mortgage Loans underlying the Covered Trusts:

- In New York, the court system now requires that those initiating residential foreclosure actions must file a new affirmation to certify that an appropriate employee has personally reviewed the documents and papers filed in the case and confirmed both the factual accuracy of these court filings and the accuracy of the notarizations contained therein.

- In California, a non-judicial foreclosure state, the attorney general sent a letter to JPMorgan Chase demanding that the firm stop all foreclosures unless it could demonstrate that all foreclosures had been conducted in accordance with California law.  The attorney general also called on all other lenders to halt foreclosures unless they can demonstrate compliance with California law.

- In Arizona, which is also a non-judicial foreclosure state, the attorney general sent letters to several servicers implicated in the robo-signing scandals to demand a description of their practices and any remedial actions taken to address potential paperwork irregularities.  The attorney general wrote that if any employees or agents used any of the questionable practices in connection with conducting a trustee's sale or a foreclosure in Arizona, such use would likely constitute a violation of the Arizona Consumer Fraud Act, and the attorney general would have to take appropriate action.

- In Ohio, in addition to his lawsuit against GMAC, the attorney general filed an *amicus curiae* brief in an individual foreclosure case asking the court to consider evidence that GMAC committed fraud that tainted the entire judicial process and to consider sanctioning GMAC.  The attorney general also sent a letter to 133 Ohio judges asking them for information on any cases involving the robo-signer Xee Moua.  In addition, he asked Wells Fargo Bank to vacate any foreclosure judgments in Ohio based on documents that were signed by robo-signers and to stop the sales of repossessed properties.

- In The District of Columbia, Attorney General Peter Nickles announced that foreclosures cannot proceed in the District of Columbia unless a mortgage deed and all assignments of the deed are recorded in public land records, and that foreclosures relying on MERS would not satisfy the requirement.  MERS

responded the next day by issuing a statement that their procedures conform to the laws of the District of Columbia and encouraged their members to contact them if they experience problems with their foreclosures.

- In Connecticut, the attorney general started investigating GMAC/Ally and demanded that the company halt all foreclosures.  He also asked the company to provide specific information relating to its foreclosure practices.   In addition, the attorney general asked the state Judicial Department to freeze all home foreclosures for 60 days to allow time to institute measures to assure the integrity of document filings.  The Judicial Department refused this request.

59.     Similarly, as a result of a report by New Jersey Legal Services to the New Jersey Supreme Court documenting irregularities in foreclosure proceedings – which was supported by extensive depositions and documentary evidence, including from lawyers and other participants in the foreclosure of securitized loans – New Jersey issued an Administrative Order amending its Court rules, provided a warning to the foreclosure Bar and issued an order to show cause to the major servicers of securitized mortgage loans.   This report explained that many of the foreclosure abuses, such as robo-signing and the use of false affidavits, occurred to compensate for legal defects in the chain of assignments of securitized Mortgage Loans to their Trusts, and generally arose as the securitization participants cut corners to save costs.   As the report explained:

> A foreclosing plaintiff must show (1) that it holds the note, and (2) that the mortgage was either made to it or assigned to it in writing.  N.J.S.A. 46:9-9.  ***Lenders no longer routinely execute or record Assignments of Mortgage when a loan is transferred because they regard it as unnecessary unless there is a default and too costly and time consuming to do in every case.***  See Exhibit Q in which a foreclosure attorney explains in a submission to the Court that; "The assignee performs its due diligence, bulk transfer agreements are executed, money is wired, and on a date certain the proverbial 'switch is flipped' wherein the assignee takes over regardless of the execution of a formal, legal assignment for each and every loan.  By way of example, one large national mortgage servicer recently purchased 1.3 million loans from another large servicer.  Even if it took one minute per assignment to execute (which itself is a stretch) it would take over ten years to execute all the resulting assignments is [sic] same were executed at the rate of 40 hours per week."  ***So typically at the time the lender makes a decision to foreclose it is not the record mortgagee.  To correct that defect, the***

> *attorney for the foreclosing mortgagee or the servicer of the loan will create an*
> *Assignment of Mortgage for the purposes of litigation which is in turn signed*
> *by a robo-signer.  Documents recorded with a public official are self executing*
> *and have special evidential status and therefore are especially pernicious.*
> *Usually the assignment purports not only to assign the mortgage but also the*
> *note or underlying obligation.  The assignment of the note nearly always*
> *contradicts other documents which indicate that the note was transferred at*
> *different times and in different manners or not at all.*

(Emphasis added).

60.     One of the flawed practices for assigning mortgages cited by the New Jersey
Legal Services report was where assignments appeared to have been executed and notarized in
blank -- a practice that appears to have been common for the transfer into the Covered Trusts.

61.     Likewise, a joint report entitled "Interagency Review of Foreclosure Policies and
Practices" issued by the Federal Reserve, the FDIC, the Office of Thrift Supervision and the
Office of the Comptroller further confirmed these abuses.  In the report, the regulators stated:
"The Federal Reserve System, the Office of the Comptroller of the Currency (OCC), the Federal
Deposit Insurance Corporation (FDIC), and the Office of Thrift Supervision (OTS), referred to
as the agencies, conducted on-site reviews of foreclosure processing at 14 federally regulated
mortgage servicers during the fourth quarter of 2010."  Significantly, in the report, the regulators
stated that its review of the mortgage servicers' loan files showed that there may be "***disputes***
***over note ownership or authority to foreclose***."  Report, at 6 (emphasis added).  The regulators
also noted "***concerns about the prevalence of irregularities in the documentation of ownership***
***[that] may cause uncertainty for investors of securitized mortgages***."  *Id.* (emphasis added).

62.     Even more recently, an audit performed at the direction of the City and County of
San Francisco's Office of the Assessor-Recorder, found that a majority of the Mortgage Loans
examined had one or more of the following issues with respect to assignments:

- Two or more conflicting, recorded assignments of the Deed of Trust purporting to transfer ownership of the Deed of Trust to two or more separate entities, thereby undermining the legal validity of either assignment;

- Contradictions between documents filed in the County Recorder's Office and federal securities filings in connection with securitization transactions concerning who is the true, current owner of the loans;

- Assignments improperly executed by an employee of the Servicer or Trustee rather than the original or prior owner of the loan; and

- Assignments with respect to which the assignee also signed as assignor.

63.     In the latter two cases, the audit stated that it was likely that "the chain of title to such loans ha[d] been broken and the written transfers from the original owners . . . d[id] not exist."

## IV.     Defendants Failed To Discharge Their Critical Duties

64.     Despite the Covered Trusts' high default rates and poor performance, Defendants failed to perform critical duties necessary to protect the Covered Trusts, Plaintiff and Class members.

A.     <u>Failure To Ensure Proper Transfer Of The Mortgage Loans To The Covered Trusts</u>

65.     LaSalle breached its contractual duties under the Governing Agreements, and its obligations under the TIA – first and foremost – by failing to ensure that the Mortgage Loans were properly transferred to the Covered Trusts and that those transfers were properly recorded.  BOA, as successor Trustee by merger to LaSalle, is liable to MBS holders for this breach.

66.     The high incidence of Mortgage Loan documentation defects likely explains, in part, why there are so many Mortgage Loans in the Covered Trusts that are 90 days or more delinquent, but not yet foreclosed and sold – neither the Trustee, nor the Servicer acting on its

behalf, can readily foreclose on those loans, if faced with a borrower's objection, as in the cases cited above.

B. <u>Failure To Enforce The Seller's Obligation To Cure, Substitute Or Repurchase Defective Mortgage Loans</u>

67. Defendants have had considerable knowledge of the defects in the Mortgage Loans, the breaches of WAAC's and the Seller's representations and warranties, and the harm that this has caused the MBS holders. As discussed herein, Defendants knew:

- from at least reviewing the Mortgage Loan Files, and/or from their attempts to foreclose on Mortgage Loans, that the Mortgage Loans had not been properly transferred to the Covered Trusts;

- from at least reviewing the Mortgage Loan Files, and/or from their attempts to foreclose on Mortgage Loans, that the Mortgage Loan Files were incomplete;

- from at least the high rate of delinquent and defaulted Mortgage Loans in the Covered Trusts, from the publicly disclosed investigations of WaMu, and from newspaper articles reporting similar facts, that many of the Mortgage Loans in the Covered Trusts did not comply with the Seller's representations and warranties concerning their underwriting quality; and

- from at least the Covered Trusts' poor performance, and from their attempts to foreclose on Mortgage Loans, that MBS holders were being harmed by the defects in the Covered Trusts' Mortgage Loans.

68. Despite all of that, Defendants failed to take any action to protect the MBS holders, as they were required to do. In particular, they did not enforce their rights to have the Seller repurchase Mortgage Loans or notify MBS holders of the many defaulted obligations.

C. <u>Negligent Review Of Loan Files For Missing, Incomplete And Defective Documentation</u>

69. Defendants also breached their contractual duties under the Governing Agreements, by performing their contractual duties in a negligent manner. Particularly, Defendants negligently reviewed the loan files for missing, incomplete and defective documentation.

70.     The fact that there was a missing link in the chain of endorsements from the originator to LaSalle or the successor Trustees, BOA and U.S. Bank, or that there was no duly executed and recorded assignment of a mortgage to LaSalle or the successor Trustees, BOA and U.S. Bank, among other things, would have been obvious to a reasonably competent Trustee performing its contractual duties with due care.  By failing to identify these obvious defects in the documentation of the Mortgage Loan Files, or to require that these defects be corrected, Defendants breached their contractual duties.

D.      Failure To Exercise Rights And To Perform Duties In A Manner That Benefited And Effectively Protected MBS Holders

71.     Defendants are also liable for failing to exercise their powers under the Governing Agreements, and to perform their duties, in a manner that benefited and effectively protected MBS holders.  Defendants have had notice of events, including the many delinquent and defaulted mortgages in the Covered Trusts, indicating that the Seller has not satisfied its material obligations under the Governing Agreements, and that WaMu, as Servicer, has not required the Seller to perform its obligations, and yet Defendants have failed to provide the technical notice of default which they must recognize would require them to exercise additional powers, as Trustee, to protect MBS holders.  Indeed, Defendants have not even provided notice of the defaults to MBS holders as required under the Governing Agreements, so that they could take steps to protect their own interests.  Defendants have thereby effectively denied MBS holders their expected consideration under the Governing Agreements.

72.     Moreover, by failing to ensure that the Covered Trusts simply have good title to the Mortgage Loans, Defendants have impaired their ability to recover losses for those Mortgage Loans where borrowers have ceased making payments, or for those Mortgage Loans that did not

comply with the underwriting criteria described in the Seller's representations and warranties to begin with.

73.     To the extent that Defendants failed to institute suit against WAAC and/or the Seller because such a suit would expose them to liability for their own misconduct under the TIA and Governing Agreements, Defendants violated their duty of loyalty as well as due care.

**V.     Defendants Are Responsible To MBS Holders For The Credit Losses In The Trusts**

74.     Defendants' failure to enforce the Covered Trusts' repurchase rights, and their violations of their other contractual and statutory duties, along with their negligence, have caused the MBS holders to suffer millions of dollars in losses.   Significant documentation deficiencies in the Mortgage Loan Files have delayed foreclosures, contributing to delinquencies in the payments owed to the Covered Trusts, which led to a decline in the value of the WaMu MBS.  In addition, many of the Mortgage Loans conveyed to the Covered Trusts did not comply with WaMu's representations and warranties, but were instead of a lower quality, which led to defaults in the principal and interest payments owed to the Covered Trusts, and to a decline in the value of the WaMu MBS.  Had Defendants performed their duties, in particular had they adequately reviewed the Mortgage Loan Files and enforced WaMu's obligation to cure, substitute, or repurchase Mortgage Loans with document deficiencies or that breached the representations and warranties, the foregoing declines in the value of the WaMu MBS would not have occurred.

**VI.    MBS Holders May Sue Defendants As Trustee**

75.     The Governing Agreements provide certain limitations on the rights of MBS holders, which are not, however, applicable to this lawsuit.  More specifically, PSA Section 10.03 purports to limit the right of MBS holders to bring a lawsuit relating to the Governing

Agreements "unless such Holder previously shall have given the Trustee a written notice of default and of the continuance thereof, as hereinbefore provided, and unless also the Holders of Certificates evidencing Percentage Interests aggregating not less than 25% of REMIC III shall have made written request upon the Trustee to institute such action, suit or proceeding in its own name as Trustee hereunder and shall have offered to the institution acting as Trustee, both in its individual capacity and as Trustee, such reasonable indemnity as it may require against the costs, expenses and liabilities to be incurred therein or thereby, and the Trustee, for 60 days after its receipt of such notice, request and offer of indemnity, shall have neglected or refused to institute any such action, suit or proceeding."

76.     However, PSA Section 10.03 is not applicable to this lawsuit because, under the TIA and Delaware law, "no action" clauses do not apply to actions by MBS holders against Trustees for their own wrongdoing.  This is not a situation where the MBS holders are demanding that Defendants initiate a suit in their own name to enforce the rights and obligations under the Governing Agreements.  Rather, this is an instance where the MBS holders are bringing an action *against* Defendants for breaching their statutory and contractual obligations under the Governing Agreements, and for acting with gross negligence when performing their duties.  Because this is not an "action, suit or proceeding" that Defendants are capable of bringing in their own name as Trustee under the Governing Agreements, PSA Section 10.03 does not apply and does not bar Plaintiff from proceeding with this lawsuit.

77.     Further, PSA Section 8.01(c) states that "[n]o provision of this Agreement shall be construed to relieve the Trustee . . . from liability for its own negligent action, its own negligent failure to act or its own willful misconduct."

**CLASS ACTION ALLEGATIONS**

32

78.     Plaintiff bring this class action on behalf of a class consisting of all current and former investors who acquired the WaMu MBS for the Covered Trusts listed on Exhibit A, for which Defendants served as Trustee, and suffered losses as a result of Defendants' misconduct alleged herein (the "Class").  Excluded from the Class are Defendants, WaMu, WAAC, other WaMu affiliates, and JP Morgan Chase, any of their related entities or affiliates, their officers and directors, their legal representatives, successors or assigns and any entity in which Defendant, WaMu, WAAC, other WaMu affiliates, or JP Morgan Chase has or had a controlling interest.

79.     The members of the Class are so numerous that joinder of all members is impractical.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Defendants and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

80.     Plaintiff's claims are typical of the claims of the members of the Class as they all purchased MBS based upon a Governing Agreement substantially in the form of Exhibit C, and Defendants' misconduct was substantially the same with respect to all persons investing in the Covered Trusts, causing all members to suffer similar harm as a result.  Thus, all members of the Class are similarly affected by Defendants' statutory and contractual breaches, as well as their negligence, that are complained of herein.

81.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and mortgage backed securities litigation.

82.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

- whether Defendants breached their contractual duties to MBS holders under the Governing Agreements by systemically failing to properly review the loan files for the Mortgage Loans and identify Mortgage Loans for which there was missing, defective or incomplete documentation, and by failing to require the Seller to cure those deficiencies;

- whether Defendants violated the TIA by:

  o  failing to timely inform MBS holders of breaches of the Governing Agreements; and

  o  after an event of default, failing to exercise their rights and powers under the Governing Agreements as a prudent person;

- whether Defendants were negligent when carrying out their duties and obligations under the Governing Agreements; and

- whether and to what extent members of the Class have suffered damages as a result of Defendants' breach of their statutory and contractual duties and the proper measure of damages.

83.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all Class members is impracticable.  There will be no difficulty in the management of this action as a class action.

## CAUSES OF ACTION

## FIRST CAUSE OF ACTION

### (Violation of the Trust Indenture Act of 1939, 53 Stat. 1171)

84.     Plaintiff repeats and realleges each and every allegation set forth in the preceding paragraphs above as if fully set forth herein.

85.     Congress enacted the Trust Indenture Act of 1939 ("TIA"), 53 Stat. 1171, 15 U.S.C. §77aaa, *et seq.*, to ensure, among other things, that investors in certificates, bonds, and similar instruments have adequate rights against, and receive adequate performance from, the responsible trustees.   15 U.S.C. §77bbb.   The Covered Trusts' Governing Agreements are "indentures," and each of the Defendants is an "indenture trustee," within the meaning of the TIA.   15 U.S.C. §77ccc(7), (10).   Moreover, the TIA applies to and is deemed to be incorporated into the Governing Agreements, and the related MBS.   15 U.S.C. §77ddd(a)(1).   Defendants violated multiple provisions of the TIA.

86.     First, the TIA requires that Defendants inform MBS holders of breaches of the Governing Agreements within ninety days after their occurrence.   15 U.S.C. §77ooo(b) (citing 15 U.S.C. §77mmm(c)).   Here, there were numerous defaults, including the failure of the Seller and Depositor to cure defects in the Mortgage Loan Files and/or to substitute conforming loans for the defective loans in the Covered Trusts.   Given the great importance of those defaults to the MBS holders' interests, Defendants had no good faith reason for failing to provide notice of those defaults.   Accordingly, by failing to provide such notice, Defendants violated the TIA.

87.     Second, in case of default, the TIA requires that Defendants exercise their rights and powers under the Governing Agreements as a prudent person would, under those circumstances, in the conduct of his own affairs.   15 U.S.C. §77ooo(c).   Again, given the obvious

importance of the defaults set forth in the preceding paragraph and herein, which impaired the rights of MBS holders to collect their full principal and interest and which reduced the value of the MBS, any prudent person under those circumstances would have exercised all of his rights to, among other things, obtain complete Mortgage Loan Files, cure any defects in the Mortgage Loan Files and/or substitute conforming loans, and a prudent person would have exercised those rights promptly.  Indeed, with the number of delinquent and defaulting mortgages in the Covered Trusts increasing, as a result, *inter alia*, of such defects, the MBS holders could have been protected from the resulting losses only through the Trustee's exercise of those rights – which were designed precisely to limit the number of delinquent and defaulting mortgages in the Covered Trusts.  By failing to exercise their rights in those circumstances, Defendants violated the TIA.

88.     Defendants are liable to Plaintiff and the Class for damages incurred as a result of their violations of the TIA.

## SECOND CAUSE OF ACTION

### (Breach of Contract)

89.     Plaintiff repeats and realleges each and every allegation set forth in the preceding paragraphs as if fully set forth herein.

90.     As set forth in detail above, the MBS incorporated the Governing Agreements, and the Governing Agreements as a matter of law incorporate the provisions of the TIA.  Under these contracts, and at common law, Defendants owed the MBS holders a duty to perform certain acts, including, without limitation:

(a)     to take all necessary steps to perfect the ownership rights in the Mortgage Notes and collateral for the Covered Trusts, and to ensure that other parties to the

Governing Agreements performed their responsibilities to permit these rights to be perfected;

(b)      to review the Mortgage Loan Files to ensure that the Mortgage Loans were properly documented and publicly filed, and that there were no missing, incomplete or defective documents in the loan files, and where documents were missing, incomplete and defective to take reasonable acts to cause the other parties to the Governing Agreements to correct these Mortgage Loan irregularities;

(c)      to review the endorsements to the original Mortgage Notes to ensure that there was a complete chain of endorsements from the Seller or the originator to the Trustee for the Covered Trusts, and where endorsements were missing, to take reasonable steps to ensure that the endorsements were obtained by or from other parties to the Governing Agreements;

(d)      to review the loan files to ensure that there was a duly executed assignment of mortgage for each of the Mortgage Loans in the Covered Trusts, and where assignments were missing to take reasonable acts to ensure that the necessary assignments were obtained by or from other parties to the Governing Agreements;

(e)      to identify those Mortgage Loans for which there was missing, defective and/or incomplete documentation, and where defective and/or incomplete documentation was identified to take reasonable steps to ensure that the irregularities were corrected by other parties to the Governing Agreements, and that the mortgages and assignments were properly filed in the land records.

91.      Defendants' breach of their duties set forth in the Governing Agreements as described above, meant that Plaintiff and the MBS holders did not receive the consideration they

bargained for, *i.e.*, they did not receive securities that were collateralized by enforceable Mortgage Loans.  These violations reduced collections on the Mortgage Loans in the Covered Trusts, diminished the MBS' value, and caused Plaintiff's and the Class' losses, including on sales of MBS, that Defendants rather than MBS holders should bear.

92.    In addition, once an event of default occurred under the Governing Agreements, or a default occurred under the TIA, Defendants had the obligation to exercise all rights and powers vested in them by the Governing Agreements, and to use the same degree of care and skill in their exercise as a prudent man would, under those circumstances, in the conduct of his own affairs.

93.    An "Event of Default" occurs under several situations defined in the Governing Agreements, including PSA § 7.01(a)(ii):

> Failure on the part of the Servicer duly to observe or perform in any material respect any other of the covenants or agreements on the part of the Servicer contained in the Certificates or in this Agreement which continues unremedied for a period of 60 days after the date on which written notice of such failure, requiring the same to be remedied, shall have been given to the Servicer by the Trustee, or to the Servicer and the Trustee by the Holders of Certificates evidencing Percentage Interests aggregating not less than 25% of REMIC III.

94.    There were material breaches of the Governing Agreements, including by the Servicer to, for example:

(a)    notify the Trustee and others of breaches of the representations and warranties that applied to the mortgages in the Covered Trusts;
(b)    maintain accurate and adequate loan and collateral files in a manner consistent with prudent mortgage servicing standards;
(c)    demand that deficient mortgage records be cured;
(d)    avoid unnecessary servicing fees and overcharging for its services; and
(e)    place the interests of the MBS holders before its own interests.

95.     Defendants, and their responsible officers, had notice of these and other defaults, through, among other things, defaults and delinquencies in the Covered Trusts, foreclosure actions brought on behalf of the Covered Trusts, and, more recently, widespread news coverage of foreclosure fraud.

96.     These Events of Default impaired the rights of MBS holders to collect their full principal and interest, and reduced the value of the MBS.  Accordingly, under those circumstances, a prudent person would have exercised all of its rights to recover for those Events of Default, and would have done so promptly.   By failing to take such action, Defendants breached the Governing Agreements.

97.     Defendants are liable to Plaintiff and the Class for the losses they suffered as a direct result of Defendants' failure to perform their contractual obligations under the Governing Agreements.

### THIRD CAUSE OF ACTION

### (Breach of Implied Covenant of Good Faith and Fair Dealing)

98.     Plaintiff repeats and realleges each and every allegation set forth in the preceding paragraphs as if fully set forth herein.

99.     Delaware law implies an obligation of good faith and fair dealing in all contracts. That obligation requires that no party to a contract do anything that will destroy or injure the right of another party to receive the benefits of the contract.   Defendants breached the implied covenant of good faith and fair dealing in the Governing Agreements.

100.     As set forth above, Defendants had notice that WaMu, WAAC, and the Seller had breached their obligations under the Governing Agreements through:   their review of the Mortgage Loan Files, foreclosure actions in which they were involved, public investigations,

lawsuits, and media coverage.  The public investigations, lawsuits and media coverage also put Defendants on notice that WaMu, WAAC, and the Seller faced significant legal and financial difficulties.

101.    By failing to take action to protect the MBS holders' interests under those circumstances, which indicated that the Covered Trusts' assets and ability to recover losses were being greatly depleted, Defendants frustrated the MBS holders' rights to their consideration under the Governing Agreements.

102.    Defendants are liable to Plaintiff and the Class for the losses they suffered as a direct result of its breach of the covenant of good faith and fair dealing.

<u>**PRAYER FOR RELIEF**</u>

**WHEREFORE,** Plaintiff prays for relief and judgment, as follows:

A.    Awarding compensatory damages and/or equitable relief in favor of Plaintiff and the Class against Defendants for breaches of their statutory and contractual duties in an amount to be proven at trial, including interest thereon;

B.    Awarding Plaintiff its reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

C.    Such other relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all claims so triable.

Dated:  April 11, 2012

SCOTT+SCOTT LLP

_____
Deborah Clark-Weintraub (DW 6877)
Max Schwartz (MS 2517)
Donald A. Broggi
500 Fifth Avenue, 40th Floor
New York, NY 10110
Telephone:  212-223-6444
Facsimile:  212-223-6334

*Counsel for Plaintiff*