# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| POLICEMEN'S ANNUITY AND BENEFIT FUND OF THE CITY OF CHICAGO,<br><br>                      Plaintiff,<br><br>   - against-<br><br><br>BANK OF AMERICA, NA (as Trustee Under Various Pooling and Servicing Agreements), and U.S. BANK NATIONAL ASSOCIATION (as Trustee Under Various Pooling and Servicing Agreements),<br><br>                    Defendants. | **CASE NO. 1:12-CV-02865-KBF**<br><br><br><br><br><br>**JURY TRIAL DEMANDED** |

## PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

## TABLE OF CONTENTS

I.  INTRODUCTION ..................................................................................................1

II.  STATEMENT OF FACTS ....................................................................................3

    A.  The Trustee's Critical Duties Under the TIA and the PSAs ................3

    B.  The Covered Trusts Have Suffered Significant Losses As A Result Of Defendants' Breaches Of Their Duties As Trustee..................5

III.  ARGUMENT ..........................................................................................................7

    A.  Plaintiff Has Adequately Alleged Standing..............................................7

        1.  Plaintiff Has Standing To Bring Claims Against Defendants On Behalf Of Class Members Who Purchased Certificates From The Same Covered Trusts As Plaintiff............................8

        2.  Plaintiff Has Standing To Bring Claims Against Defendants On Behalf Of Class Members Who Purchased MBS From WaMu Trusts That Were Substantially Similar To WaMu Trusts From Which Plaintiff Purchased And For Which Defendants Served As Trustee......................................10

    B.  The Complaint States Claims for Breach of Contract ........................13

        2.  The Trustee's Duty to Give Notice of Incomplete Mortgage Files and the Seller's Breaches of Representations and Warranties................................................................16

        3.  The Trustee's Duties to Enforce the Seller's Repurchase Obligations in an Event of Default............................20

        4.  The Complaint Adequately Alleges Losses Caused By Defendants' Breaches of Their Contractual Duties..................21

    C.  The Complaint States A Claim For Violation Of The TIA..................22

        1.  The TIA Claim Succeeds On The Merits ..................................22

        2.  The TIA Applies To The Certificates ......................................22

    D.  The Complaint States A Claim For Violation Of The Implied Covenant Of Good Faith And Fair Dealing ........................................39

    E.  The Complaint Adequately Pleads Claims Against Defendant U.S. Bank ..........................................................................41

**IV. CONCLUSION**.........................................................................................................42

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Ashcroft v. Iqbal*,
556 U.S. 662, 129 S. Ct. 1937 (2009) ...........................................................17, 29

*Bank of N.Y. v. Tyco Int'l Group, S.A.*,
545 F. Supp. 2d 312 (S.D.N.Y. 2008) ...........................................................12, 34

*Bay Center Apartments Owner, LLC v. Emery Bay PKI, LLC*,
C.A. No. 3658-VCS, 2009 WL 1124451 (Del. Ch. Apr. 20, 2009) .......................28

*Bell Atl. Corp. v. Twombly*
("*Twombly*"), 550 U.S. 544 (2007)....................................................................18

*Bluebird Partners, L.P. v. First Fidelity Bank, N.A. New Jersey*,
85 F.3d 970 ........................................................................................13, 36, 52

*BNP Paribas Mtg. Corp. v. Bk. of Am., N.A.*,
778 F. Supp. 2d 375 (S.D.N.Y. 2011) .......................................................29, 32, 34

*Boykin v. Keycorp*,
521 F.3d 202, 208-09 (2d Cir. 2008) ..................................................................50

*Cassese v. Washington Mutual, Inc.*,
262 F.R.D. 179 (E.D.N.Y. 2009)..................................................................22, 23, 24

*Cassese v. Washington Mutual, Inc.*,
711 F. Supp. 2d 261 (E.D.N.Y. 2010) ..................................................................57

*CSI Investment Partners II, L.P. v. Cendant Corp.*,
507 F. Supp. 2d 384 (S.D.N.Y. 2007) ..................................................................23

*De La Mota v. The U.S. Dept. of Ed.*,
412 F.3d 71, 80 (2d Cir. 2005) ............................................................................50

*Deutsche Bank National Trust Co. v. Federal Deposit Insurance Corp., et al.*,
No. 1:09-cv-01656, (D.C.C. Sept. 8, 2010)......................................................17, 30

*Dunlap v. State Farm Fire & Cas. Co.*,
878 A.2d at 442 ..................................................................................................52

*Fort Worth Employees' Retirement Fund v. J.P. Morgan Chase & Co.*,
No. 09-cv-3701-JPO (S.D.N.Y. May 15, 2012) .............................................passim

*Genesee Cnty. Emps. Ret. Sys. v. Thornburg Mortg/Sec. Trust 2006-3,*
    825 F. Supp. 2d 1082 (D.N.M. 2011)...................................................................18

*HSMY, Inc. v. Getty Petroleum Mktg., Inc.,*
    417 F. Supp. at 621 ...........................................................................................52

*In re Bear Stearns Mtg. Pass-Through Certificates Litig.,*
    No. 08 CIV. 8093 (LTS)(KNF), 2012 WL 1076216 (S.D.N.Y. Mar. 30, 2012)........19, 21, 45

*In re Nat'l Century Fin. Enters., Inc. Inv. Litig.,*
    No. 2:03-md-1565, 2006 WL 2849784 (S.D. Ohio Oct. 3, 2006)...........................31

*In re Nat'l Century Fin. Enters., Inc.,*
    No. 2:03-md-1565, 2012 WL 685495 (S.D. Ohio Mar. 2, 2012)............................30

*In re Washington Mutual Mortgage-Backed Securities Litigation,*
    276 F.R.D. 658 (W.D. Wash. 2011) ....................................................................20

*Kuroda v. SPJS Holdings, L.L.C.,*
    971 A.2d 872 (Del. Ch. 2009) ....................................................................25, 28, 29

*Mills v. Foremost Ins. Co.,*
    511 F.3d 1300 (11th Cir. 2008) ..........................................................................23

*Monaco v. Bear Stearns Companies, Inc.,*
    No. CV 09–05438 SJO (JCX), 2011 WL 4059801 (C.D. Cal. Sept. 12, 2011) ....................56

*Patane v. Clark,*
    508 F.3d 106 (2d Cir. 2007) ...............................................................................18

*Philip A. Templeton, M.D., PA v. EmCare, Inc.,*
    No. 11-808-SLR, 2012 WL 2196138 (D. Del. June 15, 2012) ........................54, 56

*Pierce v. Int'l Ins. Co. of Illinois,*
    671 A.2d 1361 (Del. 1996)..................................................................................52

*QVT Fund LP v. Eurohypo Capital Funding LLC I,*
    No. 5881, 2011 WL 2672092 (Del. Ch. 2011) ....................................................52

*Ret. Sys. Of Miss. v. Merrill Lynch & Co.,*
    277 F.R.D. 97 (S.D.N.Y. 2011)...........................................................................19

*Retirement Board of the Policemen's Annuity and Benefit Fund of the City of
    Chicago v. Bank of New York Mellon,*
    No. 1:11-cv-05459, 2012 WL 1108533 (S.D.N.Y. Apr. 3, 2012).  ......................34

*Trust for Certificate Holders of Merrill Lynch Mortgage Pass-Through
    Certificates Series 1999-C1 v. Love Funding Corp.,*
    No. 04-cv-9890, 2005 WL 2582177 (S.D.N.Y. Oct. 11, 2005) ............................................. 38

*United States Securities and Exchange Commission v. Option One Mortgage
    Corp. n/k/a Canyon Corp.,*
    No. 8:12-cv-00633-JST (C.D. Cal. Apr. 24, 2012) ................................................. 39

*VLIW Tech., LLC v. Hewlett-Packard Co.,*
    840 A.2d 606 (Del. 2003) ...................................................................................... 24, 25

**STATUTES, RULES AND REGULATIONS**

Fed. R. Civ. P. 8 ........................................................................................................... 17

Fed. R. Civ. P. 8(a) ..................................................................................................... 57

Fed. R. Civ. P. 12(b)(6) ....................................................................................... 25, 28

15 U.S.C. § 77aaa, *et seq*…………………………………………………………Passim

# I.  **INTRODUCTION**

With the Covered Trusts[1] suffering billions of dollars of losses on their watch, and as a result of their misconduct, Defendants, mortgage-backed securities ("MBS") Trustees, offer up a litany of excuses in defense of their wholesale failure to discharge critical contractual and statutory duties owed to Certificate holders.  In particular, Defendants failed to ensure that title to the underlying mortgage loans was transferred to the Covered Trusts, and to enforce the Covered Trusts' right to have Washington Mutual ("WaMu") repurchase mortgage loans that did not comply with its representations and warranties concerning their quality.  Defendants' duties thus directly impacted the strength of the collateral backing, or securing, of the Certificates, and, in turn, determined the Certificates' performance.  Certificate holders, who had limited rights under the Pooling and Servicing Agreements ("PSAs") that governed the Covered Trusts, depended on Defendants to protect their interests, in large part by fulfilling the foregoing duties.  Defendants' failure to do so, especially in light of the Covered Trusts' poor performance and WaMu's poor record, cannot be justified.

To excuse their misconduct, Defendants ask the Court to join them in an elaborate fiction that stems from the complex PSAs.  In this fiction, Defendants have no duties and MBS are not even debt.  Accordingly, Defendants' primary response to Plaintiff's breach of contract claim is to point the blame elsewhere.  They insist that "nearly every" contractual duty that has been breached with respect to the Covered Trusts belonged to one of the various Washington Mutual entities that were the other participants in the securitizations at issue.  This argument, like Defendants' entire fiction, rests on a self-serving, and distorted reading of the PSAs that collapses under light scrutiny.

---

[1]      Capitalized terms have the meanings set forth in the Corrected Complaint ("Complaint") (ECF No. 24).

Next, Defendants assert that even those duties that were indisputably theirs – to give Certificate holders notice of defaults and, in an Event of Default, to exercise their rights under the PSAs as a prudent person would – could not have been breached because they never triggered "the express contractual conditions" that create an Event of Default.  But that trigger simply involves Defendants giving the Servicer written notice of its failure to perform its obligations under the PSA.  Courts have long held that "a party may not insist upon performance of a condition precedent when its non-performance has been caused by the party [it]self."  *Bank of N.Y. v. Tyco Int'l Group, S.A.*, 545 F. Supp. 2d 312, 324 n.81 (S.D.N.Y. 2008).

Finally, in an admission that reveals the Defendants' hubris and the limited regard with which they viewed Certificate holders, Defendants assert that they were justified in shirking their duties to Certificate holders because they were not paid enough to take action.  In fact, however, the tens of millions of dollars in revenues pocketed by the Trustee Defendants from WaMu securitizations is anything but "pocket change."  Even if it could be so characterized, it is the compensation the Trustee Defendants negotiated for themselves in return for their promise to perform the critical duties that have been breached here.  Nor is it the fault of Certificate holders, who did not participate in those negotiations.

Defendants follow in a long line of indenture trustees who have disclaimed any duties even as the trusts they are responsible for collapse and their beneficiaries, the securities holders, are powerless to protect themselves.  Congress enacted the Trust Indenture Act of 1939 ("TIA") to address that very problem, and to provide minimum federal protections to investors in debt securities "because previous abuses by indenture trustees had adversely affected 'the national public interest.'"  *Bluebird Partners, L.P. v. First Fidelity Bank, N.A. New Jersey*, 85 F.3d 970. 974 (2d Cir. 1996) (quoting 15 U.S.C. § 77 bbb(a)).  Specifically, Congress and the SEC cited

insurmountable collective action requirements and trustees' unwillingness "to perform even the negligible duties which the indenture place[d] upon them" as reasons such minimum federal protections were required.  (Report on the Study and Investigation of the Work, Activities, Personnel and Functions of Protective and Reorganization Committees dated June 18, 1936 ("SEC Report") at 31-32) (Attached as Exhibit A to the Schwartz Declaration submitted herewith).  Concluding that such inaction threatened security holders with "[i]rreparable loss . . . clearly traceable to the trustee's inaction" (*id.* at 45), the SEC determined that "certain minimum standard[s]" needed to be prescribed to protect investors.  (*Id.* at 6).

The TIA arose from and incorporates these recommendations.  It imposes mandatory duties on indenture trustees that override any conflicting provisions in a trust's governing agreements.  Defendants do not dispute that if they breached certain obligations under the PSAs, they also breached their obligations under the TIA.  They contend, however, that because the MBS in this case are styled "certificates" they must be equity rather than debt, and that the TIA does not apply to them.  Judge Pauley has already rejected this fiction in litigation brought by Certificate holders in various Countrywide MBS and Judge Pauley's reasoning should be adopted here.

As set forth more fully below, Defendants' breaches of their contractual and TIA duties have resulted in enormous losses to Certificate holders.  Accordingly, Defendants' motion to dismiss should be denied in all respects.

## II. STATEMENT OF FACTS

### A.    The Trustee's Critical Duties Under the TIA and the PSAs

Defendants succeeded LaSalle Bank National Association as Trustee for the 41 Covered Trusts in which Plaintiff and Class members invested.  Those Trusts are substantially similar,

and own residential mortgage loans that were originated or acquired by Washington Mutual Bank or its affiliates ("WaMu") and then bundled together and sold to investors as WaMu mortgage-backed securities ("WaMu MBS"). Defendants owed Plaintiff and other WaMu MBS holders certain duties, both pursuant to the TIA and the Covered Trusts' substantially identical Governing Agreements, the PSAs.

Indeed, as described more fully in the complaint, the purpose of having a Trustee in an MBS securitization is to ensure that there is at least one independent party to the Governing Agreements who, unlike the MBS holders, did not face collective action, informational, or other limitations, and as a result could effectively protect the trusts and their beneficiaries. As Defendants acknowledge in their Corrected Joint Memorandum in Support of Motion to Dismiss ("Mem.," ECF No. 21 at 4), all the other participants in the WaMu securitizations at issue here were WaMu affiliates. Therefore, the Governing Agreements, as modified by the TIA, imposed critical duties on the Trustee Defendants that directly impacted the value of the MBS.

First, the Trustee had the duty to receive the Mortgage Files from the Depositor and review them within 45 days of closing to ensure that all relevant documents had been delivered. (¶¶ 31-36).[2] The Trustee's receipt and examination of the Mortgage Files is fundamental to an MBS securitization. In order for the MBS to be backed by Mortgage Loans – *i.e.*, to have any value – the Covered Trusts must take title to the mortgages that are conveyed to them. Although the Trustee was permitted to delegate the receipt and examination of the Mortgage Files to a Custodian, the Trustee remained liable if these duties were not performed at all or were performed in a negligent fashion. (PSA § 2.05, ECF No. 24-3 at 102).

In the event a Mortgage File was found to be incomplete, the Trustee was obligated to so notify the Servicer. (¶ 39). Upon receiving notice from the Trustee, the Servicer was obligated

---

[2]    All cites to ¶__ are to the Complaint.

4

to notify the Seller "and take appropriate steps on behalf of the Trust to enforce the Seller's obligation . . . to correct and cure such defect." (*Id.*).  Failure on the part of the Servicer to perform its duties in this and any other respect within sixty days of receiving notice from the Trustee constituted an Event of Default under the PSA and required the Trustee to exercise its prudent person obligations and enforce the Seller's obligation to repurchase defective mortgage loans. (¶¶ 41, 93).

In addition to its duty to receive and examine Mortgage Files, the Trustee was also obligated to enforce the Seller's obligation to repurchase Mortgage Loans in the Trusts to the extent the loans failed to comply with the Seller's representations and warranties, which attest to the quality of the Mortgage Loans that were being conveyed to the Trusts.  As was the case with respect to defects in the Mortgage Files, upon discovery of a breach of the Seller's representations and warranties, the Trustee is required to notify the Servicer, who is then obligated to notify the Seller of the breach "and take appropriate steps on behalf of the Trust to enforce the Seller's obligation . . . to cure such breach in all material respects or repurchase or substitute for the affected Mortgage Loan or Mortgage Loans or any property acquired in respect thereof . . . ." (¶ 40).  Once again, failure on the part of the Servicer to perform its duties in this respect within sixty days of receiving notice from the Trustee or from any other Party to the PSA, or after the Servicer learned of such a breach on its own, constituted an Event of Default under the PSA and required the Trustee to exercise its prudent person obligations and enforce the Seller's obligation to repurchase defective mortgage loans. (¶¶ 41, 93).

**B.    The Covered Trusts Have Suffered Significant Losses As A Result Of Defendants' Breaches Of Their Duties As Trustee**

As set forth at length in the complaint, the WaMu MBS at issue here have suffered enormous losses. (¶ 48).  A series of investigations and lawsuits have revealed that the Mortgage

Loans WaMu securitized were of exceedingly poor quality and frequently violated the representations and warranties that WaMu had made.  (¶¶ 45-47).  As described by the Majority and Minority Staff Report of the Permanent Subcommittee on Investigations of the U.S. Senate's Committee on Homeland Security and Government Affairs (the "Senate Staff Report"), WaMu "polluted the financial system with mortgage backed securities which later incurred high rates of delinquency and loss."  (¶ 45).  Shockingly, the Senate Staff Report found that WaMu "securitized loans that it had identified as likely to go delinquent, without disclosing its analysis to investors to whom it sold the securities, and also securitized loans tainted by fraudulent information, without notifying purchasers of the fraud that was discovered and known to the bank."  (*Id.*)  Likewise, widespread evidence exists of substantial irregularities in the transfer of the Mortgage Loans to the Trusts that have precluded or delayed the Trusts from foreclosing on the Mortgage Loans causing significant losses to Certificate holders.  (¶¶ 50-63).

Notwithstanding the widespread public knowledge of breaches of representations and warranties and defective Mortgages in connection with WaMu MBS, the Trustee Defendants have taken no action to enforce the Seller's obligations to repurchase defective loans in the Covered Trusts.  (¶¶ 49, 68).  The Trustee Defendants' conduct in this regard stands in stark contrast to that of Deutsche Bank, which serves as Trustee for other WaMu MBS Trusts, and which has commenced litigation against JP Morgan Chase, the successor in interest to WaMu, based on the adverse public disclosures regarding WaMu MBS detailed in the complaint.  (*See Deutsche Bank National Trust Company v. Federal Deposit Insurance Corp., et al.*, No. 1:09-cv-01656, ECF No. 32 ("*Deutsche Bank* Complaint") (D.C.C. Sept. 8, 2010), attached as Exhibit B to the Schwartz Declaration).     Defendants' refusal to act has had a significant, negative impact on the performance of the Covered Trusts.  As detailed in the complaint, the Covered

Trusts have reported tens or even hundreds of millions of dollars in recognized losses to date and staggering delinquency rates, indicating that substantial additional losses are likely. (¶ 48). For example, the five trusts in which Plaintiff invested have reported recognized losses of more than $667 million and delinquency rates as high as 30%. (*Id.*)

### III.    ARGUMENT

Pursuant to Fed. R. Civ. P. 8, a complaint need only "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 1949 (2009) (quoting *Bell Atl. Corp. v. Twombly* ("*Twombly*"), 550 U.S. 544, 570 (2007)). Moreover, "[a]sking for plausible grounds . . . does not impose a probability requirement at the pleading stage; it simply calls for enough fact[s] to raise a reasonable expectation that discovery will reveal evidence" to prove the claim. *Twombly*, 550 U.S. at 556. Under this standard, "[o]nly a statement of facts so conclusory that it fails to give notice of the basic events and circumstances on which a plaintiff relies should be rejected as legally insufficient under [Rule] 12(b)(6)." *Patane v. Clark*, 508 F.3d 106, 116 (2d Cir. 2007).

### A.    Plaintiff Has Adequately Alleged Standing

When a plaintiff has standing to bring a claim against a defendant on its own behalf, it also has standing to bring the claim against the defendant on behalf of a similarly situated class. Thus, under that rule, "named plaintiffs regularly litigate not only their own claims but also claims of other class members based on transactions in which the named plaintiffs played no part." *Fort Worth Employees' Retirement Fund v. J.P. Morgan Chase & Co.*, No. 09-cv-3701-JPO, ECF. No. 170 at 15 (S.D.N.Y. May 15, 2012) (internal quotations omitted).

Class action standing does not require a named plaintiff to "literally suffer the same actual injury that each class member suffered . . . [which] would, of course, be impossible." *Id.*

7

at 16. Rather, a plaintiff need only "show that he is within the class of persons who were concretely affected by injurious conduct *by the defendant* such that that plaintiff has the necessary stake in litigating the case." *Id.* (internal quotations omitted) (emphasis added). Further, in determining whether a plaintiff has made that showing, it is "important not to collapse the standing inquiry into the class certification inquiry." *Id.* at 17.

Defendants recognize that Plaintiff, as a Certificate holder, has standing to bring claims against them on its own behalf. Under the foregoing principles, Plaintiff also has standing to bring breach of contract and related statutory claims against Defendants on behalf of the proposed class.

1.   **Plaintiff Has Standing to Bring Claims Against Defendants on Behalf of Class Members Who Purchased Certificates from the Same Covered Trusts as Plaintiff**

Defendants argue, incorrectly, that Plaintiff only has standing to bring claims on behalf of class members who purchased MBS from the same tranches within a given trust that it purchased – in other words, that standing is tranche-based. (Mem. at 12-13).

Several courts in this District have recently rejected that argument. They held that a plaintiff has standing to bring claims on behalf of class members who purchased MBS from the same trust as the plaintiff, even though the plaintiff purchased different tranches within that trust than the class members purchased. *Fort Worth*, No. 09-cv-3701, ECF No. 170 at 27; *In re Bear Stearns Mtg. Pass-Through Certificates Litig.*, No. 08 CIV. 8093 (LTS)(KNF), 2012 WL 1076216, at *24 (S.D.N.Y. Mar. 30, 2012). Likewise, courts in this District have rejected the concept of tranche-based standing more indirectly, in the context of motions for class certification. *See, e.g. Pub. Emps.' Ret. Sys. Of Miss. v. Merrill Lynch & Co.*, 277 F.R.D. 97, 108-09 (S.D.N.Y. 2011). Courts in other districts have also rejected the concept of tranche-

8

based standing. *Genesee Cnty. Emps. Ret. Sys. v. Thornburg Mortg/ Sec. Trust 2006-3*, 825 F. Supp. 2d 1082, 1152 (D.N.M. 2011).

While the Western District of Washington did reach the opposite result in *In re Washington Mutual Mortgage-Backed Securities Litigation*, 276 F.R.D. 658 (W.D. Wash. 2011), *Fort Worth* noted that decision, along with the other two decisions relied on by Defendants (Mem. at 13), and, after an extensive analysis, refused to follow them. No. 09-cv-3701, ECF No. 170 at 12, 23. The decisions cited by Defendants involved securities fraud claims, and concluded that because tranches may have somewhat different characteristics, statements made in offering documents could be read as applying differently to each tranche, such that purchasers of one tranche were ultimately not injured by the same misrepresentation, or misconduct, as purchasers of another tranche. *Id.* at 23.

*Fort Worth* first questioned the soundness of that conclusion, along with its relevance to standing, where, notwithstanding that tranches may have different characteristics, "the alleged misstatements do not concern these particular characteristics." *Id.* For example, it indicated that this conclusion would not apply where the alleged misrepresentation or misconduct relates to "general practices" across a trust, as opposed to specific characteristics of a tranche. *Id.* at 24. Further, *Fort Worth* explained that, due to the structure of MBS trusts, "a drop in value of one tranche affect[s] the value of all of the tranches . . . [t]hus a purchaser of one tranche is allegedly in fact injured by misstatements that pertain only to another tranche." *Id.* at 26.

But *Fort Worth* finally concluded that, for the purposes of standing, it was not necessary to determine whether specific misrepresentations or misconduct applied to one tranche and not another. Instead, it determined that a plaintiff who has purchased from one tranche has the same "personal stake" as a purchaser from any other tranche if "the tranches are tied to the same

alleged misrepresentations" or misconduct.  *Id.* at 25; *Bear Stearns*, 2012 WL 1076216.  In other words, a plaintiff has the requisite personal stake to bring claims on behalf of the purchaser of any tranche if the same misconduct on the part of defendant has an effect on the various tranches.

The Complaint here alleges, and Defendants do not dispute, that each WaMu Trust had a PSA that applied to all tranches, and that as Trustee of a WaMu MBS Trust, Defendants owed the same contractual and statutory duties to purchasers of its various tranches.  (¶¶ 2, 26-27).  Moreover, the Complaint alleges that the same precise misconduct on the part of Defendants injured the various tranches in a Trust, namely Defendants' failure to perform their contractual and statutory duties.  (¶¶ 10, 74).  As that misconduct also stemmed from one set of duties that applied to the various tranches, and had no relation to the characteristics of any tranche, it cannot be viewed as a separate act for each tranche.  Thus, whether one applies the *Fort Worth* standard, or the standard from the securities fraud cases Defendants cite, assuming it is even possible to import that standard to this contract-based case, Plaintiff has standing to bring claims against Defendants on behalf of class members who purchased MBS in the same WaMu Trusts as Plaintiff, irrespective of which tranche they purchased.

2.  **Plaintiff Has Standing to Bring Claims Against Defendants on Behalf of Class Members Who Purchased MBS from WaMu Trusts that Were Substantially Similar to WaMu Trusts from Which Plaintiff Purchased and for Which Defendants Served as Trustee**

In addition, Defendants argue, again without merit, that Plaintiff does not have standing to bring claims against them on behalf of class members who purchased MBS in Covered Trusts from which Plaintiff did not purchase MBS – in other words, that standing is trust-based.

Defendants ground this argument in flawed logic.  They note that a plaintiff typically lacks individual standing to "sue for a breach of contract to which that plaintiff is not a party," and imply that, as a result, even where a plaintiff is a party to a contract with a defendant, it also

lacks standing to sue that defendant in a class capacity for breach of substantially similar contracts. (Mem. at 11-12). This incorrectly transplants a principle of individual standing to the class context, and leads to unsupportable positions -- for instance, that a plaintiff must have shared in the exact same injury as class members in order to bring a class action would mean that there can be virtually no class actions for breach of contract.

Not surprisingly, Defendants do not cite a single case which supports that position. (Mem. at 11-12). The primary case they rely on, *Cassese v. Washington Mutual, Inc.*, 262 F.R.D. 179, 182, 185 (E.D.N.Y. 2009), actually held that plaintiffs who had contracted for mortgages with a Washington Mutual entity had standing to bring a class action for breach of contract against the entity and its corporate parent, even though plaintiffs were not parties to the other class member's mortgage contracts. The only standing limitation *Cassese* mentioned was, as discussed above, that plaintiffs cannot bring claims "against defendants with whom they have had no interactions." *Id.* at 184. Likewise, *CSI Investment Partners II, L.P. v. Cendant Corp.*, 507 F. Supp. 2d 384, 389-91 (S.D.N.Y. 2007), offers no support to Defendants, as it involved an individual action, and actually upheld plaintiff's claim for breach of contract over a motion for summary judgment. The other cases Defendants cite do not even involve breach of contract claims.

In effect, Defendants attempt to force from the foregoing cases a standing principle for class-wide breach of contract claims that resembles standing principles for class-wide securities fraud claims, in particular claims under Section 11 of the Securities Act. They do so because most of the cases that find that standing is limited to the trusts from which a plaintiff purchased MBS, involve securities fraud claims and apply the concomitant standing principles. (*See* Mem. at 12). For example, the misconduct that creates standing to bring a securities fraud claim is

11

often a misrepresentation contained in a specific document that relates to one security, such that "alleged misstatements by the same defendant" in documents related to another security may not enter into the standing analysis. *See Fort Worth*, No. 09-cv-3701, ECF No. 170 at 19-20.  By contrast, the misconduct that creates standing to bring a contract claim is not contained in a specific document, but rather is some actual practice of the defendant. *E.g. Cassese*, 262 F.R.D. at 184; *Mills* v. *Foremost Ins. Co.,* 511 F.3d 1300, 1307 (11th Cir. 2008) (named plaintiff had standing to bring class-wide breach of contract claims permitted where the defendant engaged in a common course of conduct). As this case involves breach of contract and related statutory claims, Defendants' attempt to import securities fraud standing principles that depart from, and address different concerns than, breach of contract standing principles must fail.[3]

Just as the plaintiffs and class members in *Cassese* entered into substantially similar, albeit distinct, contracts with Washington Mutual, here Plaintiff and class members purchased MBS from substantially similar WaMu Trusts, that had substantially similar PSAs and had Defendants serving as Trustee.  (¶¶ 3, 26-27).  Indeed, Defendants concede this is the case.  (*See* Mem. at 3 n.1) (describing PSAs for the Covered Trusts as containing "substantially similar language").  Further, just as the plaintiffs in *Cassese* alleged that Washington Mutual owed the same relevant duties under the various mortgages and inflicted similar injuries on class members by breaching those duties through a common course of misconduct, Plaintiff here alleges that Defendants owed the same obligations to MBS purchasers in all of the Covered Trusts, that they breached those obligations through a common course of misconduct, and thereby caused a similar injury to all class members.  (¶¶ 10, 74).  Plaintiff accordingly has standing to bring

---

[3]     Although TIA is a securities statute, it regulates the conduct of trustees and imposes duties that are similar to contract or fiduciary duties.

breach of contract and related statutory claims against Defendants on behalf of purchasers in all of the Covered Trusts.

**B.      The Complaint States Claims for Breach of Contract**

To survive a motion to dismiss for failure to state a breach of contract claim, the plaintiff must have pled: (1) the existence of a contract, whether express or implied; (2) a breach of an obligation imposed by that contract; and (3) damage suffered by the plaintiff as a result.  *See VLIW Tech., LLC v. Hewlett-Packard Co.*, 840 A.2d 606, 612 (Del. 2003).  "In deciding a motion to dismiss, the trial court cannot choose between two differing reasonable interpretations of ambiguous provisions."  *Id.* at 615.  Rather, "[d]ismissal, pursuant to Rule 12(b)(6), is proper only if the defendants' interpretation is the *only* reasonable construction as a matter of law."  *Id.* (emphasis in original).  "Ambiguity exists 'when the provisions in controversy are reasonably or fairly susceptible of different interpretations.'"  *Id.*, quoting *Vanderbilt Income and Growth Assocs., L.L.C. v. Arvida/JMB Managers, Inc.*, 691 A.2d 609, 613 (Del. 1996).  As discussed below, the Complaint adequately alleges each of those elements.

**1.      The Trustee's Duty to Review Mortgage Files**

Pointing to carefully excerpted language in the PSAs and ignoring other provisions that are unhelpful, Defendants argue that with respect to four of the five trusts in which Plaintiff invested, the Initial Custodian, Washington Mutual Bank, fsb, assumed the trustee's obligation to review the mortgage loan files, and to provide required certifications stating, in essence, that the loan files were or were not complete.  (*See* Mem. at 5-8, 19-21).  Further, Defendants contend that the trustee is not liable for any failure by the Initial Custodian in connection with the

performance of these duties.[4]  *Id.*  At the same time, Defendants concede, without explanation, that this argument does not apply to the WMALT 2006-5 trust.  (Mem. at 7 n.3, 19 n.5).

Defendants' arguments do not support dismissal of Plaintiff's claim.  First, the language of the five PSAs governing the trusts in which Plaintiff invested, including the PSA for the WMALT 2006-5 trust, is identical with respect to delivery and examination of mortgage files. Accordingly, if the language in the WMALT 2006-05 PSA does not relieve the trustee of responsibility and liability for receiving and examining the mortgage files with respect to that trust, which Defendants concede by not moving to dismiss this portion of Plaintiff's claims, the identical language of the other four PSAs cannot do so.

Second, to the extent Defendants' argument is grounded in the Custodial Agreement executed by LaSalle and Washington Mutual Bank in connection with the closing of the 2006 AR-16 trust, which Defendants have asked the Court to take judicial notice of even though it is not cited in the complaint and is not publicly available, this Custodial Agreement, on its face, applies only to the 2006 AR-16 trust, not the others.

In any event, nothing in the language of the PSAs or the Custodial Agreement for the 2006 AR-16 trust permits this Court to find, as a matter of law, that the Trustee did not have liability in connection with the delivery and examination of the loan files for these five trusts.  At best, the language of the Custodial Agreement, read together with the PSAs, is ambiguous on this point.

---

[4]      Defendants' accusation that Plaintiff excised references to the Custodian or Initial Custodian in quoting relevant provisions of the PSA (Mem. at 20-21) is belied by the allegations of the Complaint. Each of the relevant paragraphs begins by making clear that these duties were to be performed by the trustee "or its agent."  (¶¶ 31-32, 35-36).  As explained below, the PSAs make clear that any Custodian appointed by the Trustee, including the Initial Custodian, is the agent of the trustee.  (PSA, ECF NO. 24-3 at 16).  The issue on this motion is whether the trustee remained liable for those duties if they were performed negligently or not at all.

In this regard, the Custodial Agreement cited by Defendants does not use the term "Initial Custodian." Rather, it designates Washington Mutual Bank fsb as the "Custodian" and states that the Custodian is being appointed by the trustee "pursuant to the terms of the [PSA]." (Custodial Agreement at 1, ECF No. 22-5). Section 2.05 of the PSAs, which relates to delivery of the mortgage files, provides:

> The Trustee is authorized, with the Servicer's consent, to appoint on behalf of the Trust any bank or trust company approved by each of the Company and the Servicer as Custodian of the documents or instruments referred to in this Section 2.05 or in Section 2.12 or in Section 2.15, and to enter into a Custodial Agreement for such purpose; *provided, however*, that **the Trustee shall be and remain liable for the acts and omissions of any such Custodian to the extent (and only to the extent) that it would have been liable for such acts and omissions hereunder had such acts and omissions been its own acts and omissions**.

(PSA § 2.05, ECF No. 24-3 at 102) (first emphasis in original, second emphasis added). The PSA defines "Custodian" to include "[t]he Initial Custodian and any other custodian which is appointed by the Trustee with the consent of the Servicer, as provided in Article II hereof, pursuant to a Custodial Agreement." (PSA, ECF No. 24-3 at 47). Further, the PSA states that "*[a]ny* Custodian so appointed shall act as agent on behalf of the Trustee." (*Id.*) (emphasis added). Thus, the limiting language with respect to the trustee's liability for the acts of the Initial Custodian cited by Defendants is inconsistent with the foregoing provisions of the PSA which make clear that *any* Custodian appointed by the trustee is the trustee's agent and that notwithstanding its delegation of duties to a Custodian, the trustee remains responsible for any acts and omissions of the Custodian. Faced with these apparently contradictory provisions concerning the trustee's liability, this Court cannot dismiss Plaintiff's claims. *See Bay Center Apartments Owner, LLC v. Emery Bay PKI, LLC*, C.A. No. 3658-VCS, 2009 WL 1124451, at *8 (Del. Ch. Apr. 20, 2009) (holding that on a Rule 12(b)(6) motion to dismiss the court cannot choose between contradictory terms and that "defendants are only entitled to dismissal if the

interpretation of the contract on which their theory of the case rests is the *only* reasonable construction as a matter of law") (internal quotations omitted) (emphasis in original).

Moreover, Defendants' attempt to explain away the foregoing contradictory provisions of the PSA as "mak[ing] perfect sense" (*see* Mem. at 7), is unavailing.  To the contrary, what makes "perfect sense" is that the trustee, having delegated its duties to an agent, remains responsible in the event its agent performs these duties negligently or not at all.  It is well-settled that "[i]n analyzing a contract on a motion to dismiss under Rule 12(b)(6), the Court must interpret ambiguous provisions in the light most favorable to the nonmoving party." *Kuroda*, 971 A.2d at 881.  In view of the foregoing, Defendants' argument that the trustee has no responsibility for the review of mortgage loan files for completeness must be rejected.

Even if Washington Mutual Bank is considered the Initial Custodian, however, the supposedly limiting language cited by Defendants makes clear that "nothing herein shall relieve the Trustee from liability for its own negligent action, its own negligent failure to act or its willful misconduct." (PSA § 2.05, ECF No. 24-3 at 102).  Thus, as discussed below, Defendants would still be liable if they did not take the necessary steps to cure defects in the Mortgage Files.

### 2.      The Trustee's Duty to Give Notice of Incomplete Mortgage Files and the Seller's Breaches of Representations and Warranties

As Defendants concede, the Trustee had the duty to give notice to the Servicer in the event the Trustee had knowledge that documents required to be contained in the Mortgage File were not executed and received or that a breach of representations and warranties made by the Seller had occurred.  (Mem. at 22-23; PSA §§ 2.07, 2.09).  Defendants nevertheless assert that the Complaint fails to allege a breach of the trustee's duty to give the Seller notice of those deficiencies because it contains no allegations that a responsible officer of the trustee had "direct, timely, and traceable knowledge" of them. *Id.* at 23.  To credit this argument, however, the

Court would have to find that the responsible officers of Defendants have been living under a rock. The Complaint summarizes just some of the numerous public investigations into the serious documentation issues, including robo signing, and widespread breaches of representations and warranties by MBS Sponsors, in particular WaMu, that have occurred in the last several years. (¶¶ 7-8, 44-63). These allegations are sufficient to support a plausible claim that Defendants had actual knowledge of document deficiencies and breaches of representations and warranties triggering their obligation to give notice to the Servicer. *See Ashcroft*, 129 S. Ct. at 1949. Nothing more is required. *See BNP Paribas Mtg. Corp. v. Bk. of Am., N.A.*, 778 F. Supp. 2d 375, 396-97 (S.D.N.Y. 2011) (holding that whether an indenture trustee had actual knowledge is a factual matter not properly resolved on a motion to dismiss).

Indeed, Deutsche Bank National Trust Company, which serves as trustee for other WaMu MBS, commenced litigation against WaMu's successors in interest (JP Morgan Chase Bank and the Federal Deposit Insurance Corporation), citing the Senate Staff Report as providing:

> reason to believe that many of the mortgage loans in the Trusts do not comply with the Representations and Warranties and that WaMu breached the Representations and Warranties, which breaches had a material and adverse effect on the value of the loans or the interests of the Trusts therein.

(*Deutsche Bank* Complaint at ¶ 65). Significantly, Deutsche Bank's complaint noted that because the relevant records were in the exclusive possession of WaMu, Deutsche Bank was "unable to specifically identify particular mortgage loans with respect to which there ha[d] been such breaches of particular Representations and Warranties." (*Id*. at ¶ 66). The inability of *a trustee* of other WaMu securitizations to allege breaches of representations and warranties with respect to particular loans in particular trusts demonstrates that the level of particularity

17

Defendants demand is unreasonable and not required in order to state a plausible claim for relief.[5]

Defendants' reliance on *In re Nat'l Century Fin. Enters., Inc.*, No. 2:03-md-1565, 2012 WL 685495, at *54 (S.D. Ohio Mar. 2, 2012), in support of their assertion that the complaint fails to allege "actual knowledge" is misplaced. That decision involves a motion for summary judgment filed by Credit Suisse, the seller of certain collateralized notes that were issued by National Century Financial Enterprises and purchased by the plaintiff. Among other things, plaintiff asserted a claim for aiding and abetting breach of fiduciary duty against Credit Suisse claiming that fiduciary duties owed to note holders by National Century's officers and the indenture trustee had been breached. In granting summary judgment with respect to this claim, the court held that National Century's officers owed no fiduciary duties to note holders under Ohio law. In addition, although the court agreed that a fiduciary relationship existed between the note holders and the trustee, it found there was no evidence demonstrating that the trustee's duties had been breached because the plaintiff had not presented evidence that the trustee had actual knowledge of an event of default requiring notice to note holders. What Defendants have neglected to tell this Court, however, is that by the time Credit Suisse's motion for summary judgment was adjudicated, the plaintiff's claims against the trustee had been settled. *See In re Nat'l Century Fin. Enters., Inc. Inv. Litig.*, No. 2:03-md-1565, 2006 WL 2849784, at *2 (S.D. Ohio Oct. 3, 2006) (observing that Arizona Noteholders had settled their claims with the trustee). Indeed, in an earlier ruling, the *National Century* court had **denied** the trustee's motion to dismiss plaintiffs' claims that the trustee had breached its duty to deliver notice of events of

---

[5]     Defendant U.S. Bank's contentions that "the Complaint does not allege that any Event of Default occurred in 2011 or thus far in 2012 relating to the Trusts (or since February 2009 with respect to the 2006-5 Trust)," or that "a Responsible Officer of U.S. Bank had actual knowledge of a material breach of the PSA during that timeframe" (U.S. Bank's Supplemental Memorandum of Law in Further Support of Joint Motion to Dismiss ("U.S. Bank Mem."), ECF No. 20 at 5) fail for the same reasons.

default to the servicer.  The court specifically held that resolving the issues of whether events of default had occurred and the trustee had actual knowledge of the alleged events of default thereby triggering its obligation to provide notice "[was] not appropriate on a motion to dismiss and that the complaints sufficiently state a claim for breach of the Trustee's duties regarding events of default." *Id.* at *6.

Finally, contrary to Defendants' contention, Section 8.02(iv) of the PSA, which provides that the trustee is not required "to make any investigation into the facts or matters stated in any resolution, certificate, statement, instrument, opinion, report, notice, request, consent, order, approval, bond or other paper or document, unless requested in writing to do so by the Holders of Certificates evidencing Percentage Interests aggregating not less than 25% of REMIC III," does not absolve the trustee of its duty to give notice when it has actual knowledge.  As an initial matter, Section 8.02(iv) only is applicable ***prior to an Event of Default and after the curing of all Events of Default have occurred***, a fact conveniently omitted from Defendants' quotation of this provision.  (*See* Mem. at 23).  In any event, to the extent that Defendants are arguing that notwithstanding their actual knowledge of widespread documentation and loan defects in WaMu MBS trusts, they were not obligated to notify the Servicer unless directed to do so by Certificate holders, that would render the PSA's reference to "actual knowledge [] superfluous and would read a conflict into the contract."  *BNP Paribas Mort. Corp.*, 778 F. Supp. 2d at 397.  As Judge Sweet held in rejecting a substantially similar argument in *BNP Paribas Mort. Corp.*, Defendants' "attempt to nullify the effects of Section [2.09] and to read out the 'actual knowledge' language is contrary to well-established principles of contract construction."  *Id.* Thus the Complaint adequately alleges the existence and breach of the trustee's duty to give notice of Seller deficiencies.

### 3.    The Trustee's Duties to Enforce the Seller's Repurchase Obligations in an Event of Default

Defendants contend that "the PSA did not assign to the Trustee *any* duty to 'enforce' the Seller's obligations to correct document deficiencies or to cure, replace or repurchase defective loans having mortgage loan document defects or breached representations and warranties." (Mem. at 22-24) (emphasis added).[6]  However, while Defendants are correct that such duties did not lie with the trustee in the first instance, as explained above, the Trustee had the duty to give notice to the Servicer in the event it had knowledge of defects in the Mortgage File or breaches of the representations and warranties.  (Mem at 22-23; PSA §§ 2.07, 2.09).  As set forth above, based on the widespread public disclosure concerning WaMu MBS, Defendants and the Servicer, a WaMu affiliate, clearly knew of the defective mortgages and other breaches.  Further, any failure of the Servicer to remedy these defects within sixty days of receiving notice from the Trustee constituted an Event of Default under the PSAs, PSA § 7.01(a)(ii), which gave rise to the Trustee's "prudent person" duties, including its duty to enforce the repurchase claims against the Seller.  (PSA § 8.01(a)).  Thus, Defendants' contention that they had no duty under *any* circumstances to enforce the Seller's repurchase obligations relating to breaches of representations and warranties and defective loan documentation is meritless.

Defendants nevertheless assert that Plaintiff's claims should be dismissed because no Event of Default has occurred.  In this regard, Defendants state that neither of the required triggers for an Event of Default – written notice to the Servicer of its failure to perform from the

---

[6]      Defendants devote an entire section of their Memorandum attempting to refute Plaintiff's allegations that the trustee was required to ensure that the Mortgage File contained the documents necessary to transfer the mortgage notes to the Trusts,  and to evidence an enforceable security interest in the underlying mortgages, on behalf of the Trusts.  (Mem. at 24-26).  Section 2.07 provides that "[i]f the Trustee finds any document or documents required to be included in the Mortgage File for a Mortgage Loan pursuant to the definition of "Mortgage File" not to have been executed and received, the Trustee shall promptly so notify the Servicer . . . ."  (ECF No. 24-3 at 104-05).  As explained above, the trustee remained liable for the custodian's acts and omissions in reviewing the Mortgage File and Defendants failure to notify the Servicer of document defects in the Mortgage Loan Files constituted a breach of its duties under the PSA.

trustee or holders of certificates evidencing interests of not less than 25% of the trusts, and expiration of the sixty-day cure period – have occurred.  However, as Plaintiff has alleged, Defendants were required to give written notice to the Servicer in view of the widely available information that breaches of representations and warranties and document defects existed with respect to WaMu MBS, and the Covered Trusts' poor performance. (¶¶ 48-49. 71-73).  "It has been established for over a century that a party may not insist upon performance of a condition precedent when its non-performance has been caused by the party [it]self." *Tyco Int'l Group* , 545 F. Supp. 2d at 324 n.81; *see also In re Bankers Trust Co.*, 450 F.3d 121, 129 (2d Cir. 2006) (indenture trustee's failure to inspect certificates may not excuse its failure to comply with the duty to give notice of defaults that would have been discovered had the indenture trustee inspected the certificates). Thus, Defendants' contention that no Event of Default had occurred fails under the "prevention doctrine." *See BNP Paribas Mort. Corp.*, 778 F. Supp. 2d at 397 (holding that indenture trustee was precluded from arguing that a condition precedent to its obligations had not occurred when it was the trustee's own breach that caused the failure of this condition).

### 4.    The Complaint Adequately Alleges Losses Caused by Defendants' Breaches of Their Contractual Duties

Defendants' argument that the Complaint fails to allege that their "acts or omissions" (Mem. at 26) caused losses in the Covered Trusts simply repeats their erroneous contention that they did not breach their contractual duties and that Plaintiff has failed to plead breaches with respect to specific mortgages.  As explained at length above, these arguments are unavailing. Moreover, the Complaint clearly alleges that Defendants' breaches caused substantial losses to the Covered Trusts.  (¶¶ 48-49).  In particular, as alleged in the Complaint, Defendants' duties with respect to curing both defects in the Mortgage File and breaches of the Seller's

21

representations and warranties were critical to safeguarding the quality and value of Certificates and their underlying collateral.

**C.    The Complaint States a Claim for Violation of the TIA**

**1.    The TIA Claim Succeeds on the Merits**

The Complaint alleges that Defendants violated two provisions of the TIA: 15 U.S.C. § 77ooo(b) ("notice provision") and 15 U.S.C. § 77ooo(c) ("prudent person provision").   In response to these allegations, Defendants cite no case-law and simply assert that the duties imposed by the TIA "duplicate those contained in the PSA," such that the TIA claim "fail[s] for the same reasons as [the] breach of contract claim."   (Mem. at 28, 29).   But, as Plaintiff has adequately alleged claims for breach of contract, Defendants' lone argument addressing the merits of the TIA claim fails.

Indeed, another court in this District recently held that allegations similar to those at issue here adequately pled violations of the TIA's notice and prudent person provisions by an MBS Trustee.   *Retirement Board of the Policemen's Annuity and Benefit Fund of the City of Chicago v. Bank of New York Mellon*, No. 1:11-cv-05459, 2012 WL 1108533, at *8 (S.D.N.Y. Apr. 3, 2012).   Likewise, Plaintiff has adequately pled that Defendants violated those provisions of the TIA.

**2.    The TIA Applies to the Certificates**

**a.    *Congress Enacted the TIA to Prevent Trustees from Engaging in the Very Misconduct at Issue Here***

Congress enacted the TIA to provide minimum protections to investors in debt securities "because previous abuses by indenture trustees had adversely affected 'the national public interest.'"   *Bluebird Partners*, 85 F.3d at 974 (quoting 15 U.S.C. §77bbb(a)).   The TIA itself and its legislative history make clear that those abuses are the exact same ones at issue in this case.

In this regard, Section 302(a)(2) of the TIA, 15 U.S.C. §77bbb(a)(2), provides in pertinent part that:

>    (1)  Upon the basis of facts disclosed by the reports of the Securities Exchange Commission made to the Congress . . . it is hereby declared that the national public interest and the interest of investors in notes, bonds, debentures, evidences of indebtedness, and certificates of interest or participation therein, which are offered to the public, are adversely affected –

>    (2)  when the trustee does not have adequate . . . duties and responsibilities, in connection with matters relating to the protection and enforcement of the rights of such investors; when, notwithstanding the obstacles to concerted action by such investors, and the general and reasonable assumption by such investors that the trustee is under an affirmative duty to take action for the protection and enforcement of their rights, trust indentures (A) generally provide that the trustee shall be under no duty to take any such action, even in the event of default, unless it receives notice of default, demand for action, and indemnity, from the holders of substantial percentages of the securities outstanding thereunder, and (B) generally relieve the trustee from liability even for its own negligent action or failure to act; . . .

Significantly, the TIA finds that these abuses are "injurious to the capital markets, to investors, and to the general public," and so declares "it . . . to be the policy of this subchapter, ***in accordance with which policy all the provisions of this subchapter shall be interpreted***, to meet the problems and eliminate the practices, enumerated in this section, connected with such public offerings." Section 302(b), 15 U.S.C. §77bbb(b) (emphasis added).

The SEC Report, which was one of the reports referenced in Section 302 that led to the enactment of the TIA and was authored in large part by William O. Douglas and Abe Fortas, essentially describes the relationship between Certificate holders and Defendants. Specifically, the SEC Report observed that due to collective action requirements "both in law and in practice, [the] reliance of the security holder upon the trustee for protection of his investment [wa]s complete." (SEC Report at 3). The SEC concluded, however, that this reliance [was] "unfounded" because trustees "ha[d] taken virtually all of the powers designed to protect the

bondholders, but ha[d] rejected any duty to exercise them" (*id.* at 4) even though the trustee "alone [wa]s capable of effective action." (*Id.* at 5).

Indeed, the SEC Report observed that trustees had "neglected to perform even the negligible duties which the indenture place[d] upon them, ***particularly in matters which [would] result in default of the issuer***," and that "[i]t [wa]s . . . virtually standard practice to provide in indentures that the trustee [could] shut its eyes to the existence of a default unless it [wa]s formally notified of it by holders of a specified percentage of the outstanding bonds," a difficult, if not impossible task. (*Id.* at 31-32, 38) (emphasis added). Even then, the SEC noted there was a "further barrier" because "the trustee h[ad] no obligation to take any action which in its opinion [was] likely to involve it in expense or liability unless the security holders furnish[ed] it with indemnity." (*Id.* at 43). Such inaction, the SEC observed, threatened security holders with "[i]rreparable loss . . . clearly traceable to the trustee's inaction." (*Id.* at 45, 47).

Noting that all of the foregoing had "resulted in injury to thousands of investors," the SEC concluded that "certain minimum standard specifications" needed to be prescribed for the protection of investors in securities such as these "[a]s in the case of other contracts involving persons not capable nor in a position to protect themselves." (*Id.* at 3, 6). According to the SEC, "a more proper balance between the interests of investors and requirements of issuers [could] be had only by enlarging the definition of the trustee's duties in those cases where its failure to take swift and positive action [left] the investors without effective protection of their interests." (*Id.* at 6). Congress codified that balance in the TIA.

      b.    *MBS Certificates are Debt Securities Subject to the TIA*

MBS certificates are debt securities, and as such are subject to the TIA pursuant to 15 U.S.C. § 77ddd(a)(1). There can be no serious dispute on that point.

24

Numerous courts have recognized that MBS certificates are debt.  The Second Circuit found that PSAs governing MBS trusts are "similar to bond indentures," *Greenwich Fin. Servs. Distressed Mortg. Fund 3 LLC v. Countrywide Fin. Corp.*, 603 F.3d 23, 29 (2d Cir. 2010), and that certificates issued under such PSAs are "bonds." *LaSalle Bank Nat. Ass'n v. Nomura Asset Capital Corp.*, 424 F.3d 195, 200 (2d Cir. 2005).  Courts in this district have also repeatedly held that such certificates "are debt securities." *Bank of New York Mellon*, 2012 WL 1108533 at *6; *Ellington Credit Fund, Ltd. v. Select Portfolio Servicing, Inc.*, 837 F. Supp. 2d 162, 182 (S.D.N.Y. 2011); *Trust for Certificate Holders of Merrill Lynch Mortgage Pass-Through Certificates Series 1999-C1 v. Love Funding Corp.*, No. 04-cv-9890, 2005 WL 2582177, at *1 (S.D.N.Y. Oct. 11, 2005); *In re Security Capital Assur. Ltd., Sec. Litig.*, 729 F. Supp. 2d 569, 575 (S.D.N.Y. 2010) (MBS are "debt securities").  Other circuit courts have reached the same conclusion.  *CWCapital Asset Mgt., LLC v. Chicago Prop., LLC*, 610 F.3d 497, 499 (7th Cir. 2010) (finding that Certificates issued under a PSA are "bonds") (Posner, J.).

Notably, Defendants do not cite any contrary authority.  It is worth noting, however, that the SEC – upon whom Defendants rely in other parts of their Memorandum – recently stated that MBS, issued under PSAs as certificates are "debt obligations."  *United States Securities and Exchange Commission v. Option One Mortgage Corp. n/k/a Canyon Corp.*, 8:12-cv-00633-JST, ECF No. 1 at ¶ 20 (C.D. Cal. Apr. 24, 2012) (complaint); *see also* www.sec.gov./litigation/litreleases/2012/lr22344.htm.

Indeed, Certificates have all of the characteristics of debt.  As the Second Circuit has explained, debt instruments typically have "a repayment schedule including periodic interest and principal repayment at maturity," *see Antares Aircraft, L.P. v. Fed. Rep. of Nigeria*, 999 F.2d 33, 34-35 (2d Cir. 1993), and offer "greater interest to compensate for [a] greater risk."  *See*

25

*Fasolino Foods Co., Inc. v. Banca Nazionale del Lavoro*, 961 F.2d 1052, 1057 (2d Cir. 1992). Likewise, Certificates have an initial "Principal Balance," an "Interest Rate," and a "Final Maturity Date," and subordinated Certificates have a greater interest rate, along with a greater risk, than senior Certificates. (*See* PSA, ECF No. 24-3 at 14). Certificates also have a fixed "Distribution Date" on which principal and interest payments are made (*id.* at 48]), and various "Credit Enhancements" to help ensure that those payments are made. (Prospectus Supplement, ECF No. 22-8 at 20). Further, due to all of the foregoing characteristics, Certificates receive credit ratings from Ratings Agencies, and the Trustee or the Servicer must notify the Ratings Agencies of occurrences that affect the credit quality of the certificates, such as an Event of Default or the repurchase of any defective Mortgage Loan. (PSA § 10.11, ECF No. 24-3 at 158-59)

Defendants do not, and cannot, deny that Certificates possess all of the foregoing characteristics of debt. Nevertheless, they argue that Certificates are not debt because they allegedly "(i) do not entitle holders to a sum certain from the Trusts; and (ii) do not provide a right of recourse." (Mem. at 30). That argument has multiple flaws.

First, Certificates do entitle holders to a sum certain. Certificates are issued in specific "Authorized Denominations," with an "initial Certificate Principal Balance." (PSA § 5.02, ECF No. 24-3 at 29, 136). As the Prospectus neatly explains, "[d]istributions of principal will be made on each distribution date to the class or classes of securities [certificates] entitled to principal until the principal balance of that class has been reduced to zero." (Prospectus, ECF No. 22-8 at 221). The initial Principal Balance of a certificate is, as with any other note or bond, the sum certain to which holders are entitled.

Defendants recognize that if the underlying mortgages perform, under the PSA, the Servicer is contractually obligated to collect whatever money the mortgage loans generate, and the Trustee is contractually obligated to use that money to repay certificate holders their principal balance. *See In re Merrill Lynch Ltd. P'ships Litig.*, 7 F. Supp. 2d 256, 263 (S.D.N.Y. 1997) (finding that debt may be distinguished from equity on the ground that debt instruments entitle their holders to "contractual or legal remed[ies]"). But Defendants insist that because the underlying mortgages may not perform as expected, the certificate holders were never really entitled to anything and that there is no sum certain. (Mem. at 31). This claim stretches the "sum certain" formulation beyond any reasonable bound, and implies that if a security instrument does not guarantee principal repayment against every conceivable eventuality, it cannot be debt.

In fact, there is always a chance that for one reason or another a lender will not be able to repay a creditor – debt instruments offer interest to compensate for that very risk. *Fasolino*, 961 F.2d at 1057. Even *Gilbert v. C.I.R.*, 248 F.2d 399, 402-03, (2d Cir. 1957), on which Defendants rely for the "sum certain" formulation, and which involves an application of the tax code, states that debt may have "some variation" from the sum certain formulation. To that end, *Gilbert* actually analyzes whether the security in question is debt by asking, among other things, if it created "reasonable expectations of repayment regardless of the success of the venture . . . ." *E.g.*, *id.* at 406; *TIFD III-E, Inc. v. U.S.*, 459 F.3d 220, 222 (2d Cir. 2006) (quoting *Gilbert*, among other cases, for the "reasonable expectation" standard, noting that there may be "'some variation'" from the sum certain formulation, and determining that the security in question is debt). Thus the possibility that a borrower will not be able to repay the full amount of its debt

neither undermines its obligation to do so nor erodes the creditor's entitlement to full repayment of principal.

Here, there is no question that Certificate holders had a reasonable expectation of repayment.  Almost all of the Certificates had the highest possible "AAA" credit ratings, and the few that did not still had investment grade ratings, most of them "AA" or "A".  (Prospectus Supplement, ECF No. 22-8 at 106).  The Prospectus Supplement stated that these ratings "are an indication of the likelihood of the payment of principal and interest as set forth in the transaction documentation," and further that they "address the likelihood of the receipt by certificateholders of all distributions with respect to the underlying mortgage loans to which they are entitled."  (*Id.* at 108).

Significantly, the Prospectus Supplement also explained that if there is "a material breach of the representations and warranties" regarding the underlying mortgages, "the breaching party will be required to either cure the breach in all material respects, repurchase the affected mortgage loan or substitute for the affected mortgage loan," and that this remedy would apply as well if "a required document is not in the loan files."  (*Id.* at 61).  Certificate holders therefore had a reasonable expectation that the Certificates were backed by mortgages with the requisite qualities to adequately perform.

In addition, the Prospectus Supplement stated that the ratio of the combined amount of the underlying mortgages in each loan group to the combined value of the respective mortgaged properties was 90% (Prospectus Supplement, ECF No. 22-8 at 89, 93, 97), and to the extent that an individual mortgage loan had a "loan-to-value ratio" greater than 80%, it often had an insurance policy covering defaults in payment.  Given that the initial principal balance of the Certificates was no greater than the combined outstanding principal of the underlying mortgages

(PSA, ECF No. 24-3 at 136), this meant that if the underlying mortgages did not perform, proceeds from foreclosure sales of the mortgaged properties and insurance would have covered the principal balance of the Certificates. Once again, "regardless of the success of the venture," Certificate holders could reasonably expect repayment of their initial principal balance.

Second, as the foregoing discussion demonstrates, Defendants' claim that certificates are not debt because they do not provide recourse is unsupportable. It also overlooks the well recognized category of "nonrecourse debt," in which the borrower "is not personally liable for the debt on default . . . [and] the creditor's recourse is to repossess the related [collateral]." *E.g.*, *Rose v. C.I.R.*, 311 Fed. Appx. 196, 198 n.3 (11th Cir. 2008). Mortgages are typically nonrecourse, and it is difficult to imagine Defendants, who originate countless mortgages, taking the position that nonrecourse mortgages are not debt instruments. Just like the mortgages that back them, Certificates are nonrecourse debt instruments that look to the mortgaged properties – which, based on the loan-to-value ratios in the Prospectus Supplement, could have reasonably been expected to cover the Certificates' initial principal balance – for recourse if the mortgages default.

Another court in this District recently rejected the precise sum certain and nonrecourse arguments that Defendants advance here, and, after conducting a thorough analysis, concluded that MBS certificates issued pursuant to PSAs are debt. *Bank of New York Mellon*, 2012 WL 1108533 at *6. Defendants attempt to distinguish *Bank of New York Mellon* on the ground that the statutory trusts at issue here are legal entities, unlike certain of the common law trusts at issue there, which, according to Defendants, means that the certificates issued by the statutory trusts are equity, while the certificates issued by the common law trusts are debt. (Mem. at 32). If there is a distinction between statutory trusts and common law trusts, it has no bearing on

whether the certificates they issue are debt.  As Defendants acknowledge, some of the MBS trusts at issue in *Bank of New York Mellon* were statutory trusts, just like the Covered Trusts, and the securities they issued were nevertheless admittedly debt subject to the TIA.  *Bank of New York Mellon*, 2012 WL 1108533 at *3, *9.   The relevant inquiry must therefore focus on the nature of the certificates, not the entity that issued them.  Moreover, there is no difference between the certificates issued by the common law trusts, which purported to create "a beneficial interest in the Trust Fund," (*id.* at *4) and the certificates issued by the WaMu Trusts, which purport to create "a beneficial interest in the Trust" (PSA, ECF No. 24-3 at 165), and "represent interests *only* in the assets of the issuing entity [the Trust]."  (*Id.* at 101).

Defendants also insist that *Bank of New York Mellon* incorrectly determined that certificates have a fixed maturity date.  But they merely redeploy their defective sum certain argument, and claim that because there is a risk that Certificate holders will not recover their initial principal balance, there cannot be a fixed maturity date.  (Mem. at 32-33).  Again, the possibility that a Certificate holder might experience a loss does not mean that Certificates are not debt or that they do not have a fixed maturity date.  Indeed, the certificates here have a "Final Maturity Date." (PSA, ECF No. 24-3 at 14).  That maturity date is based on the maturity dates of the underlying mortgages, as those mortgages provide the source of payment for the Certificates.  (*Id.*).  Apart from the possibility that a certificate will experience losses, the only reason that a certificate would stop receiving payments prior to the Final Maturity Date is if the underlying mortgages, which generate the funds for the Certificates, were paid-off earlier than scheduled with "prepayments."  (*See* Prospectus Supplement, ECF No. 22-8 at 14) ("Last Scheduled Distribution Date").   While those prepayments might lead to the early maturation of the Certificate, and thereby affect the certificate's yield, that a Certificate pays its holder the initial

principal balance demonstrates, if anything, that the Certificate is debt. Indeed, the possibility of early maturation is a common feature of debt instruments – for example, with mortgages. For all of the foregoing reasons, the Court should follow the cases discussed above and hold that Certificates are debt.

        c.    *MBS Certificates Do Not Fall Within Any Exemption to the TIA*

Defendants contend that, even if the certificates are debt securities, they are still exempt from the TIA as "certificate[s] of interest or participation in two or more securities having substantially different rights and privileges." 15 U.S.C. § 77ddd(b). Notably, Defendants do not cite a single case in support of that position, and ignore the recent holding in *Bank of New York Mellon* that MBS certificates do not fall within that exemption. 2012 WL 1108533, at *8.

As Defendants correctly point out (Mem. at 33), the TIA addresses "certificates of interest" separately from "notes," "bonds" and "evidences of indebtedness." *Compare* 15 U.S.C. §§ 77ddd(a)(1)(B) & 77ddd(2), *with* 15 U.S.C. § 77ddd(a)(1)(A). This indicates that for purposes of the TIA, the term "certificates of interest" refers to securities with some substantive difference from "notes," "bonds" and "evidences of indebtedness," and not just a different label. The TIA's legislative history affirms as much, and explains that Congress made certificates of interest subject to the TIA under 15 U.S.C. § 77ddd(a)(1)(b) because, "[p]ractical considerations . . . demand their inclusion, [otherwise] adoption of the certificate of interest device would provide too easy a method of avoiding the requirements of the [TIA]." H.R. Rep. No. 1016 (1939).

If adoption of the substantive certificate of interest device is by itself insufficient to exempt securities from the TIA, then affixing the title "certificate of interest" or "certificate" to a security that is substantively a note or a bond is surely insufficient as well. Any other

interpretation is impermissible, as contrary to the TIA's purpose of protecting investors in debt securities from abuses by trustees and protecting the national interest against harm from those abuses – such as the well documented role that the hundreds of billions of dollars worth of MBS certificates have, due in part to the conduct of Defendants and other MBS trustees, played the nation's recent economic crisis.   One of the primary cases on which Defendants rely, *Gilbert*, confirms as much when it states that "statutory terms are not to be interpreted independent of their context and underlying policy."  248 F.2d at 404.  Or, as the Second Circuit explained in holding that a "lender cannot evade the usury statute by a disguise," "courts never permit a form to shield illegality or statutes to be evaded by sham or pretense." *Topping v. Trade Bank of New York*, 86 F.2d 116, 118 (2d Cir. 1936).  This principle is incorporated into the TIA itself, which commands that its provisions "shall be interpreted, to meet the problems and eliminate the practices, enumerated in this section [§ 77bbb]."  15 U.S.C. § 77bbb(b).  Indeed, there would be little point in Congress enacting the TIA, or any other legislation, if its laws could be so easily evaded.  Although Defendants urge that result, they have of course engaged in the very abuses the TIA seeks to eliminate.  Accordingly, given that certificates are indistinguishable from debt, they are subject to the TIA as debt securities under 15 U.S.C. § 77ddd(a)(1)(A), irrespective of their label.

Even if the Certificates were true certificates of interest, they would still not be exempt from the TIA under 15 U.S.C. § 77ddd(b), because they would not be certificates of interest in "two or more securities."   Certificates do not provide for a right to, nor do they depend on, proceeds from any specific underlying mortgage, rather they provide for a right to payments from an entire group or pool of mortgage.  (PSA, ECF No. 24-3 at 67) ("Percentage Interest"). Moreover, Certificates do not receive a pro rata share of the proceeds from any mortgage, or

even any group or pool of mortgages. Instead, those proceeds are divided among the Certificate holders through a complex waterfall. Certificates do not even receive all of those proceeds. Further, after the Certificate holders receive the payments they are entitled to each month, the Residual Certificate holder receives any excess that may have been collected. (PSA, ECF No. 24-3 at 91-92). This further demonstrates that the Certificates are debt. But it also shows that if they were certificates of interest, they would provide an interest in the single group or pool of mortgages from which they collect proceeds. Based on the foregoing reasoning, *Bank of New York Mellon* concluded that MBS certificates did not represent an interest in two or more securities, and that they were not exempt from the TIA under 15 U.S.C. § 77ddd(b). 2012 WL 1108533, at *8. Defendants' argument that the underlying mortgages have "substantially different rights" is thus irrelevant. (Mem. at 33-34). It is also inaccurate, as the fact that mortgages may not have the same scheduled payments or relate to the same property is immaterial as compared to the fact that they are all obligated to make interest payments to and face foreclosure from the Covered Trusts. The rights provided by the mortgages are in truth substantially similar.

Likewise, Defendant's assertion that certain provisions of the PSA would be "unworkable" under the TIA is unavailing. (Mem. at 34-35). If any specific TIA provision actually caused difficulties for trusts governed by PSAs, the trusts can seek exemptions on a provision by provision basis. 17 C.F.R. § 4d-7. In any event, the PSAs are easily reconciled with the TIA, as is demonstrated by the examples Defendants suggest are likely to pose problems:

- Defendants suggest that, if the TIA applied to PSAs, the underlying mortgagors would become obligors and would have to fulfill certain duties under 15 U.S.C. §§ 77nnn(a) & 77nnn(d) with regard to the Trusts. (Mem. at 34-35). However, § 77nnn(a), which calls for an obligor to file annual reports, expressly permits the SEC to limit its application to

those obligors who are "necessary and appropriate" to protect investors, and taking into account the "nature of the business" of the obligors. Given that the Covered Trusts which issued the Certificates are the primary obligors, even if the mortgagors were also obligors, it is thus, at best, highly unlikely that they would be required to provide annual reports. Further, unlike § 77nnn(a), which refers to "each person who . . . is to be an obligor," Section 77nnn(d) refers to "the obligor upon the indenture securities." Accordingly, § 77nnn(d) either would not apply to mortgagors, or, if it uses "obligor" in the same sense that § 77nnn(a) does, then mortgagors would be exempt under for the reason discussed above.

- Similarly, Defendants suggest that if mortgagors were obligors, under 15 U.S.C. § 77lll(a), they would be required to provide the names and addresses of Certificate holders to the Trustee. (Mem. at 35). Again, it is highly unlikely that this provision would actually apply to mortgagors. But, even if it did, § 77lll(a) limits the information that must be provided to "information in the possession or control" of obligors, and mortgagors almost certainly have no such information regarding the names and address of Certificate holders.

- Finally, Defendants claim that if the Covered Trusts are treated as the obligors – which they unquestionably are – this would automatically disqualify the Trustee from serving in that capacity, because 15 U.S.C. § 77jjj(a)(5) prohibits obligors from serving as the Trustee. As noted above, Defendants acknowledge that in *Bank of New York Mellon* a statutory trust that issued MBS was admittedly subject to the TIA. The trustee of that trust had substantially similar powers and responsibilites as the Trustee here, and did not run afoul of § 77jjj(a)(5). Additionally, the statutory trust in *Bank of New York Mellon* had a second trustee, similar to the Delaware Trustee here. (PSA, ECF No. 24-3 at 1). To the extent the Trustee actually could not perform certain without violating § 77jjj(a)(5), the Delaware Trustee could perform them.

Accordingly, the Certificates are not exempt from the TIA.

d.   *To the Extent the SEC Has Made Any Informal Interpretation Regarding the Applicability of the TIA to MBS Certificates, They Conflict with the TIA's Unambiguous Language and Make No Attempt to Persuade*

Defendants assert that the SEC has, through informal actions, interpreted the TIA as exempting MBS certificates, and that those interpretations merit some deference. (Mem. at 37). When faced with a question of statutory interpretation, however, a court must independently determine whether the statute at issue is unambiguous. *Chevron, U.S.A., Inc. v. Natural Resources Def. Council, Inc.*, 467 U.S. 837, 842-43 (1984) ("[a] court, as well as [an] agency, must give effect to the unambiguously expressed intent of Congress"). If it is unambiguous, and

34

if an agency's "interpretation is inconsistent with the plain language of the [statute]," then the agency's interpretation is "not entitled to *Chevron* deference" or any other form of deference. *Natural Resources Defense Council v. Abraham*, 355 F.3d 179, 198-99 (2d Cir. 2004).   In interpreting the plain language of a statute, courts apply the traditional cannons of construction and examine "the particular statutory language at issue, as well as the language and design of the statute as a whole, and, where appropriate its legislative history." *Id*. at 198 (internal quotation omitted).   For the reasons discussed above, the TIA unambiguously applies to MBS styled as certificates, and the Court must not defer to any inconsistent SEC action or statement.

Even assuming that the TIA is ambiguous, an informal interpretations by the SEC only merits "respect proportional to its 'power to persuade[.]'" *U.S. v. Mead Corp.*, 533 U.S. 218, 235 (2001) (quoting *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944). The persuasiveness of such an interpretation depends on "its writer's thoroughness, logic, and expertness, its fit with prior interpretations, and any other sources of weight." *Mead*, 533 U.S. at 235.   Under that standard, the Second Circuit has refused to defer to an agency that "offers no explanation of the considerations or reasoning underlying its practice, except perhaps [a] conclusory statement . . . ." *Boykin v. Keycorp*, 521 F.3d 202, 208-09 (2d Cir. 2008); *De La Mota v. The U.S. Dept. of Ed.*, 412 F.3d 71, 80 (2d Cir. 2005).

First, Defendants contend that several SEC "no action" letters conclude that the TIA does not apply to MBS certificates.  (Mem. at 35-36).  As an initial matter, these letters merit no deference, as each one expressly states that it "merely expresses the Division's positions regarding an enforcement action and does not purport to express any ***legal conclusion*** with respect to the questions presented." *See, e.g., Marion Bass Sec., Inc.*, 1984 WL 45531 (SEC No-

Action Letter Jul. 9, 1984) (emphasis added).  In any event none of the letters support the contention that the TIA does not apply to MBS certificates:

- *Bank of Am. Nat'l Trust and Sav. Ass'n*, 1977 WL 14664 (SEC No-Action Letter May 19, 1977), on which Defendants place particular emphasis, does not conclude that the certificates were not debt or that they were exempt from the TIA under 15 U.S.C. § 77(a)(2).  To the contrary, counsel for Bank of America urged that the certificates were exempt from the TIA under 15 U.S.C. § 77ddd(a)(4) – which specifically exempts securities that need not be registered under the Securities Act from the TIA.  *Id.*

- *Harbor Fin., Inc.*, 1988 WL 235128, also does not cite § 77ddd(a)(2) as the basis for the no-action determination.  Similar to *Bank of Am.* the Division of Corporation Finance stated that it would not recommend any enforcement action because of "the exemption from registration under the Securities Act."

- *Citytrust*, 1990 WL 305069, does not even request a no-action determination with respect to the application of the TIA, but rather to the Investment Company Act.

- *Marion Bass Sec., Inc.*, 1984 WL 45531, involved certificates that evidenced interests in a proposed pool that consisted primarily of industrial development bonds, some of which were secured by "real property" and others by "personal property."  *Id.* at *3, *5.  The certificates did not receive a credit rating.  *Id.* at *3.  Nor is there any indication that the certificates made principal or interest payments.

Second, Defendants contend that the Court should defer to a short, conclusory statement from the staff of the Division of Corporation Finance, which they refer to as a "Telephone Interpretation".  (Recon. Mem. at 15-16).  That interpretation is posted on the Division's website, after warnings that statements on the website "are not rules, regulations, or statements of the Commission," "do not necessarily contain a discussion of all material considerations necessary to reach the conclusions stated," and thus "are not binding due to their highly informal nature." (http://sec.gov/divisions/corpfin/cfguidance.shtml).  The Division could not have explained with any greater force that the statement merits no deference.  Notably, as discussed above, after *Bank of New York Mellon*, the SEC stated that MBS certificates are debt.

Third, Defendants argue that the Court may draw an inference regarding the SEC's position on the TIA from MBS certificates that were not qualified under the TIA and that the

SEC did not stop from being offered publicly.  (Mem. at 35).  Assuming that the SEC actually made a decision not to stop those offerings, it was merely applying the unpersuasive interpretation of the Division of Corporation Finance that *Bank of New York Mellon* already found unworthy of deference.  Such a decision, unsupported by any other statement, has no additional power to persuade, and similarly merits no deference.  Nor does that decision merit deference simply owing to its repetition over the passage of time.  Courts regularly deny deference to statements that are "longstanding" and "consistent" if they are not otherwise persuasive.  *St. Martin Evangelical Lutheran Church v. South Dakota*, 451 U.S. 772, 784 n.13 (1981); *S.E.C. v. Sloan*, 436 U.S. 103, 118 (1978) (refusing to defer to an interpretation that an agency held consistently for over 30 years, because the interpretation, "though of long standing, is . . . inconsistent with the statutory mandate").

Nor do any legislative positions that the SEC has taken indicate that the MBS certificates are exempt from the TIA.  When the SEC requested that Congress amend the TIA in the late 1980s in order to "modernize the Act and ensure its future adaptability to market developments," it made clear that its legislative proposal "***continu[ed] to mandate necessary protections for debt holders***."  134 Cong. Rec. S8561-09, 1988 WL 172635, at *14 (Jun. 24, 1988) (emphasis added).  Congress agreed.  In introducing the Trust Indenture Reform Act, Senator Proxmire explained the SEC's intent as follows:  "The Commission's objectives in the proposal are to adjust the requirements of the law to contemporary financing instruments and techniques and to ensure the statute's adaptability to future market developments ***while preserving the act's rigorous standards of investor protection***."  *Id.* at *1 (emphasis added).

The SEC's Memorandum in support of the proposed amendments did cite collateralized mortgage obligations ("CMOs") as an example of the new securities and financing techniques

that had prompted the need for the amendments.  But it did not suggest that these securities should be excluded from the statute's reach.  *Id.* at *15 (stating only that the TIA's requirement for the furnishing of certificates or opinions of engineer or appraisers "[might] not be necessary" for CMOs).  Likewise, Senator Proxmire confirmed that "[t]he Commission's exemptive power would be expanded to allow variation from the act's exact requirements in circumstances where alternative provisions serve reasonable business requirements *without lessening investor protection*."  *Id.* at *1 (emphasis added).

Significantly, the 1990 amendments preserved the TIA's original protections, and made clear that the Commission's exemptive authority could be exercised only "if and to the extent that such exemption is necessary or appropriate in the public interest and consistent with the protection of investors and the purposes fairly intended by this subchapter."  15 U.S.C. § 77ddd(d).  As directed by the statute, pursuant to this amended Section 304(d), the SEC has enacted rules and regulations regarding the procedures under which an exemption could be granted, and it has not addressed, let alone exempted MBS or certificates under those rules.  17 C.F.R. 260.4a-2, 4d-7.

Finally, Defendants reliance on *Community Health* is misplaced.  (Mem. at 37-38).  That case involved the Medicaid statute, which the court described as a "vast program[]."  *Id.* at 134.  Moreover the court found that the agency interpretation at issue was consistent with Medicaid's "background principles" and "overall design."  *Id.* at 138-39.  Assuming that the TIA possesses Medicaid's unusual size and complexity, along with the extensive gaps that result therefrom, which it does not, *Community Health* does not support deference in this case, because the interpretation Defendants' urge here undermines the TIA's clear language and purpose, without offering any reason for doing so.  The Court therefore should not defer to any of the SEC's

informal actions, as they make no attempt to persuade, and contradict the language and purpose of the TIA.

**D.    The Complaint States a Claim for Violation of the Implied Covenant of Good Faith and Fair Dealing**

Contrary to Defendants' contention, Plaintiff adequately alleges a cause of action for breach of the implied covenant of good faith and fair dealing. "Under Delaware law, an implied duty of good faith and fair dealing is interwoven into every contract." *Philip A. Templeton, M.D., PA v. EmCare, Inc.*, No. 11-808-SLR, 2012 WL 2196138 at *4 (D. Del. June 15, 2012). "Stated in its most general terms, the implied covenant requires 'a party in a contractual relationship to refrain from arbitrary or unreasonable conduct which has the effect of preventing the other party to the contract from receiving the fruits' of the bargain." *Dunlap v. State Farm Fire & Cas. Co.*, 878 A.2d 434, 442 (Del. 2005), *quoting Wilgus v. Salt Pond Inv. Co.*, 498 A.2d 151, 159 (Del.Ch.1985).    "Parties are liable for breaching the covenant when their conduct frustrates the 'overarching purpose' of the contract by taking advantage of their position to control implementation of the agreement's terms." *Id.* at 442.  Delaware courts imply contract terms when it is necessary to do so "to ensure the parties' reasonable expectations are fulfilled." *Id.*, at 442.

First, Defendants contend that the Complaint fails to allege any specific implied contractual obligation that has been breached that is not in conflict with the express terms of the PSA.  Contrary to Defendants' assertions, Plaintiff alleges the existence of a specific implied contractual obligation.  Specifically, it is established Delaware law that a provision precluding a contracting party from frustrating the purpose of the contract is implied in every contract. *HSMY, Inc. v. Getty Petroleum Mktg., Inc.*, 417 F. Supp. 617, 621 (D. Del. 2006).  Here, Plaintiff

alleges that the "purpose of having a Trustee in MBS securitizations such as these is to ensure that there is at least one independent party to the Governing Agreements who, unlike the MBS holders, did not face collective action, informational, or other limitations, and as a result could effectively protect the trusts and their beneficiaries, as MBS holders." (¶ 3). Plaintiff has also alleged that Defendants' "fail[ure] to take action to protect the MBS holders' interests" notwithstanding the existence of substantial defects in the Mortgage Loan Files and significant breaches of the representations and warranties "frustrated the MBS holders' rights to their consideration under the Governing Agreements" and constituted a breach of the implied covenant of good faith and fair dealing. (¶ 101). Under Delaware law, the foregoing allegations sufficiently set forth a claim for breach of the implied covenant of good faith and fair dealing. *See Dunlap v. State Farm Fire & Cas. Co.*, 878 A.2d 434, 442 (Del. Supr. 2005); *HSMY, Inc. v. Getty Petroleum Mktg., Inc.*, 417 F. Supp. 620, 621 (S.D. Ohio (1976); *QVT Fund LP v. Eurohypo Capital Funding LLC I*, No. 5881, 2011 WL 2672092, at *14 (Del. Ch. 2011). As the court held in *Dunlap*, "the implied covenant of good faith 'is the obligation to preserve the *spirit* of the bargain rather than the letter, the adherence to *substance* rather than form," and requires "'more than literal compliance'" with contract provisions. 878 A.2d at 444, *quoting Pierce v. Int'l Ins. Co. of Illinois*, 671 A.2d 1361, 1366 (Del. 1996). (emphasis in original)

Second, relying on § 8.01(c)(ii) of the PSAs, Defendants contend that Plaintiff's claim for breach of the implied covenant of good faith and fair dealing is barred by the PSAs' provision that "no implied covenants or obligations shall be read into this Agreement against the Trustee." However, this contention is barred by Delaware law. Section 3806(e) of the Delaware Statutory Trust Act provides that "*a governing instrument may not limit or eliminate liability for any act or omission that constitutes a bad faith violation of the implied contractual covenant of good*

40

*faith an fair dealing*." *Id.* (emphasis added). *See Cargill, Inc. v. JWH Special Circumstance LLC*, 959 A.2d 1096, 1112 (Del. Ch. 2008). Accordingly, Plaintiff adequately alleges a claim for breach of the implied covenant of good faith and fair dealing.[7]

**E.      The Complaint Adequately Pleads Claims Against Defendant U.S. Bank**

Defendant U.S Bank makes several additional arguments in support of dismissal in a separate memorandum ("U.S. Bank Mem.") none of which are meritorious. First, U.S. Bank argues that the Complaint fails to allege losses attributable to its conduct because Plaintiff sold all of its certificates at a loss before U.S. Bank became Trustee. (U.S. Bank Mem. at 2; ECF No. 20) In addition, U.S. Bank maintains that it cannot be liable for principal losses in the Covered Trusts prior to the date it became Trustee. *Id.* However, while U.S. Bank has submitted certain documents stating when it became Trustee of Plaintiff's Trusts, it has not presented any evidence regarding the terms of the agreement pursuant to which it acquired BOA's corporate trust business, specifically, any terms relating to issues of successor liability. Accordingly, U.S. Bank's motion to dismiss cannot be granted on this basis. *See Monaco v. Bear Stearns Companies, Inc.*, No. CV 09–05438 SJO (JCX), 2011 WL 4059801, at *19-20 (C.D. Cal. Sept. 12, 2011) (denying motion to dismiss claims against JP Morgan Chase on grounds that plausible successor-in-interest theory of liability existed).[8]

---

[7]      Defendants also contest Plaintiff's breach of the implied covenant of good faith and fair dealing claim on the ground that it is duplicative of Plaintiff's breach of contract claim. Defendants' argument is unavailing. A party alleging breach of the implied covenant of good faith and fair dealing "is permitted to pursue claims in the alternative, even though the alternative theories of liability may share the same damages." *Philip A. Templeton, M.D., PA v. EmCare, Inc.*, *supra*, 2012 WL 2196138 at *5. Additionally, in support of its breach of contract claim Plaintiff specifically alleges that Defendants "frustrated the MBS holders' rights to their consideration under the Governing Agreements," which allegation is distinct from those supporting Plaintiff's breach of contract claim.

[8] To the extent the Court believes that Plaintiff does not have standing to assert claims against U.S. Bank for the reasons stated in U.S. Bank's motion, Plaintiff respectfully submits that any dismissal on this basis should be without prejudice to Plaintiff's right to amend the Complaint to add an additional plaintiff who held or sold WaMu MBS at a loss following the date U.S. Bank became Trustee. *See Cassese v. Washington Mutual, Inc.*, 711 F. Supp. 2d 261, 277 (E.D.N.Y. 2010) (denying motion without prejudice).

U.S. Bank also maintains that it cannot be liable for any damages flowing from the failure to receive and review Mortgage Files because this had to be done long before U.S. Bank became Trustee. (U.S. Bank Mem. at 2-4.) While it is true that the initial review of the Mortgage Files had to be performed by LaSalle (something the Complaint makes clear (¶ 65) notwithstanding U.S. Bank's argument to the contrary), Section 8.08 of the PSA obligates any predecessor trustee to deliver the files to a successor trustee. (¶ 34). In addition, the successor trustee was required to receive from the Servicer and the predecessor trustee "such instruments . . . as may reasonably be required for more fully and certainly vesting and confirming in the successor trustee all such rights, powers, duties and obligations." *Id.* Thus, U,S, Bank, as successor trustee, is liable for breaching its contractual duties under the Governing Agreements to ensure that Loan Files contained complete documentation, as well as for the other breaches set forth in the Complaint.[9] (¶¶ 69-70).

## IV. <u>CONCLUSION</u>

For the foregoing reasons, the Court should deny Defendants' Joint Motion to Dismiss and U.S. Bank's Motion to Dismiss.[10]

---

[9]     As a variation the arguments discussed above, U.S. Bank asserts that Plaintiff has improperly lumped Defendants together and failed to allege "which Defendant breached which duties." (U.S. Bank Mem. at 4). However, the Complaint does nothing of the kind. For example, as explained above, the Complaint clearly states that the duty to review Mortgage Files at closing and within 45 days thereafter was LaSalle's, the trustee at the time, and that Defendant BOA is liable to Plaintiff and Class members for this breach. (¶ 65). But this does not mean that U.S. Bank has no liability for missing, incomplete and defective documentation in Mortgage Files, as it suggests, for the reasons stated above. Moreover, by failing to exercise its powers as Trustee to put back loans that breach the Seller's representations or warranties or as to which complete documentation does not exist, U.S. Bank is liable to Plaintiff and Class members.

[10] Should the Court grant Defendants' Motion to Dismiss, Plaintiff respectfully requests leave to replead under Fed. R. Civ. P. 15.

Dated:  July 6, 2012                    SCOTT+SCOTT LLP


                                        Max R. Schwartz
                                        _____
                                        Deborah Clark-Weintraub (DW 6877)
                                        Max Schwartz (MS 2517)
                                        Donald A. Broggi
                                        500 Fifth Avenue, 40th Floor
                                        New York, NY 10110
                                        Telephone:  212-223-6444
                                        Facsimile:  212-223-6334
                                        Email:  dweintraub@scott-scott.com
                                                mschwartz@scott-scott.com
                                                dbroggi@scott-scott.com

                                        *Counsel for Plaintiff*

**CERTIFICATE OF SERVICE**

I hereby certify that a true and accurate copy of the foregoing was served this 6th  day of

July, 2012 upon the following via ECF.

Kristin Linsley Myles
Munger, Tolles & Olson LLP
560 Mission Street
San Francisco, CA 94105
Email: Kristin.myles@mto.com

Marc T.G. Dworsky
Munger, Tolles & Olson LLP
355 South Grand Avenue, 35th Floor
Los Angeles, CA 90071-1560
Email: Marc.Dworsky@mto.com

David F. Graham
Sidley Austin LLP
One South Dearborn
Chicago, IL 60603
Email: dgraham@sidley.com

*Counsel for Defendant Bank of America NA*

John Michael Vassos
Michael Stephan Kraut
Morgan, Lewis and Bockius LLP
101 Park Avenue
New York, NY 10178
Email: jvassos@morganlewis.com
Email: mkraut@morganlewis.com

*Counsel for Defendant U.S. Bank National Association*

/s/ Max R. Schwartz
Max Schwartz (MS 2517)
500 Fifth Avenue, 40th Floor
New York, NY 10110
Telephone:  212-223-6444
Facsimile:  212-223-6334

*Counsel for Plaintiff*

44