USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: _December 7, 2012_

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------ X
                                           :

POLICEMEN'S ANNUITY AND BENEFIT     :
FUND OF THE CITY OF CHICAGO,         :
                                             :

                             Plaintiff,      :

                                               :

                     -v-                          :

                                               :

BANK OF AMERICA, NA (as Trustee      :
Under Various Pooling and Servicing   :
Agreements), and U.S. BANK NATIONAL  :
ASSOCIATION (as Trustee Under Various  :
Pooling and Servicing Agreements),      :

                                               :

                           Defendants.    :

                                               :
------------------------------------------------------------------ X

                 12 Civ. 2865 (KBF)

              OPINION & ORDER

KATHERINE B. FORREST, District Judge:

      Plaintiff Policemen's Annuity and Benefit Fund of the City of Chicago

("plaintiff" or "PABF") brings this putative class action against defendants Bank of

America, N.A. ("BofA") and U.S. Bank National Association ("U.S. Bank" and, with

BofA, "defendants") in their capacity as trustees for forty-one trusts of residential

mortgage-backed securities ("MBS").  Plaintiff alleges that defendants breached

their contractual duties under the trusts' respective Pooling and Servicing

Agreements ("PSAs"), as well as the implied covenant of good faith and fair dealing,

and violated the Trustee Indenture Act of 1939 ("TIA"), 15 U.S.C. § 77aaa et seq.

The gravamen of the corrected class action complaint (the "Complaint") is that defendants failed to take certain actions required by the PSAs, which caused a decline in the value of plaintiff's MBS[1] and thus damaged plaintiff.

Defendants have moved to dismiss the Complaint. The motion was fully submitted as of July 20, 2012. The Court heard oral argument on the motion on August 6, 2012.

For the reasons that follow, defendants' motion to dismiss is GRANTED IN PART and DENIED IN PART.

I.    BACKGROUND[2]

A.    The Parties

Plaintiff PABF, a state governmental pension fund organized under Illinois law, provides retirement benefits to its members and their beneficiaries and, in that capacity, "relies heavily upon the performance of its investments."  (Compl. ¶ 13, ECF No. 24.)  PABF purchased certificates in five of the 41 trusts at issue in this action (the five purchased trusts, the "Trusts") (id. ¶ 1, Ex. B), but no longer holds an interest in any of the Trusts (Oral Arg. Tr. ("Tr.") 69:22-70:1, Aug. 6, 2012, ECF No. 40).

---

[1] The Court uses the terms "MBS," "certificates," and "securities" interchangeably throughout this Opinion.

[2] The facts are taken from the Complaint and the documents attached thereto or incorporated by reference therein, and are construed in the light most favorable to plaintiff.  See Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007); Chambers v. Time Warner, Inc., 282 F.3d 147, 153 (2d Cir. 2002); In re Citigroup ERISA Litig., 662 F.3d 128, 135 (2d Cir. 2011) (on a motion to dismiss, a court may consider "documents incorporated by reference in the complaint and documents upon which the complaint 'relies heavily'").

Defendant BofA is a U.S. national banking association with its principal place of business in Charlotte, North Carolina.  (Compl. ¶ 15.)  In early October 2007, BofA acquired LaSalle Bank National Association ("LaSalle")--the Trusts' original Trustee.  (Id. ¶¶ 1, 15.)  Through that acquisition, BofA succeeded LaSalle as Trustee.  (Id. ¶ 15.)

Defendant U.S. Bank is a U.S. national banking association with a principal place of business in Minnesota.  (Compl. ¶ 16.)  In or about July 2008, U.S. Bank succeeded BofA as Trustee for certain of the Trusts.  (Id.)[3]

B.    MBS Securitization

Although "[t]he features of residential mortgage-securitization trusts are well known in the recent annals of litigation," BlackRock Fin. Mgmt. Inc. v. Segregated Account of Ambac Assur. Corp., 673 F.3d 169, 173 (2d Cir. 2012), reviewing the process here is helpful to resolution of the instant motion.

MBS are securities entitling the holder to income payments from pools of residential mortgage loans held by a trust.  Those mortgage loans are "securitized" when they are converted into "bond-like instruments, the MBS, that trade over the counter in capital markets."  (Compl. ¶ 17.)  There are four major players involved in an MBS securitization: the mortgage originator/underwriter, the seller, the depositor, and the securitization underwriter.  (See id. ¶¶ 19-22.)

---

[3] Upon its acquisition of Countrywide Financial ("Countrywide"), BofA resigned as Trustee for the Trusts that contained loans originated by Countrywide, thereby necessitating a new trustee for those trusts.  (Compl. ¶ 16.)

For the MBS securitizations here, Washington Mutual Bank ("WaMu") and its affiliates played all four roles.  WaMu originated the mortgage loans through its own mortgage lending arm, or through certain "correspondent" mortgage lenders. (Compl. ¶ 19.)[4]  The seller (a WaMu affiliate) acquired the mortgages from WaMu, grouped them into "loan pools," and then sold/transferred them to the depositor-- here, WaMu Asset Acceptance Corp. ("WAAC").  (Id. ¶ 20.)  To effect the transfer, the seller and depositor entered into an agreement, the Mortgage Loan Purchase Agreement ("MLPA").  (Id.)  The MLPA contains the seller's representations and warranties about the quality of the mortgages in the loan pool as well as an agreement from the seller to cure, substitute, or repurchase any mortgages that do/did not comply with the representations and warranties.  (Id.)

After the seller-to-depositor transfer, the depositor then transferred the mortgage loan pool into the trust, created specifically for the securitization.  (Compl. ¶ 21.)  The trust then issued certificates to the underwriter--here, WaMu Capital Corp. ("WCC")--who then marketed and sold the certificates to investors, including plaintiff.  (Id. ¶ 22.)  In purchasing certificates, investors essentially acquired the right to receive cash flows generated from the principal and interest payments of the mortgagors.  (Id. ¶ 23.)  Once the loans were deposited into the trust, they were overseen by a servicer (here, WaMu (see PSA at 112)), who "service[d] and administer[ed] the Mortgage Loans" by, inter alia, collecting the principal and interest payments and distributing those remittances to certificate-holders

---

[4] Correspondent mortgage lenders originate and close mortgage loans in their own name (frequently through obtaining a line of credit) and then resell those loans individually (rather than in a pool) to the true lenders/banks.

pursuant to a payment schedule, colloquially referred to as a "waterfall."  (PSA at 92, 112.)

Each MBS securitization trust comprises various "tranches"--slices or levels-- of MBS.  Each tranche bears its own distinct characteristics--i.e., priority of payment, credit rating, level of credit risk, type of credit enhancement, etc.  (Id. ¶ 23.)  Certificate-holders in the various tranches are paid according to the waterfall.  Certificate-holders who hold "senior" tranches--i.e., tranches with higher credit ratings and higher payment priority--receive their allotted percentage of the incoming cash flows first (they are the "top" of the waterfall); tranches lower in payment entitlement are paid out in a predetermined order, descending from "mezzanine," or mid-level, tranches to the "equity," or lower level, tranches.  The certificate-holders of more subordinated tranches may or may not receive the hoped-for/expected amount of the cash flows, as they are lower in the waterfall's payment schedule.

The value of the certificates, then, depends upon, inter alia, the mortgagors' ability to repay the loan principal and interest.  (See Compl. ¶ 25.)  In other words, mortgagors' defaults on their loans affect payments to certificate-holders (depending on the tranche in which they are invested)--e.g., lower tranches may receive only a percentage (or none) of the expected principal and interest payments if the trusts' underlying mortgages experience a significant rate of default.  (Id.)  Such reduced payments likely equate with a reduction in the value of the MBS.  (See id.)

C.    The PSAs[5]

Plaintiff alleges that the Trustee had specific duties in connection with the Trusts, emanating from the PSAs.  (See Compl. ¶ 27.)  The PSA is a lengthy document, imposing myriad duties upon the Trustee (and others).  Only the Trustee's duties pertinent to the instant motion are discussed below.

Section 2.05 of the PSA provides the Trustee authorization "to appoint on behalf of the Trust any bank or trust company . . . as Custodian of the documents or instruments referred to in this Section 2.05, in Section 2.12 or in Section 2.15, and to enter into a Custodial Agreement for such purpose."  (WMALT Series 2006-5 Trust PSA ("PSA") (Compl. Ex. C, ECF No. 24-3) at 102.)[6]  The "Custodian" for the Trusts is defined as "[t]he Initial Custodian and any other custodian which is appointed by the Trustee with the consent of the Servicer . . . [who] shall act as agent on behalf of the Trustee."  (Id. at 47.)  The "Initial Custodian" is defined as Washington Mutual fsb ("WaMu fsb").  (Id. at 59.)  Despite appointment of a Custodian, however, the PSA makes clear that with respect to the duties set forth in PSA §§ 2.05, 2.12 and 2.15, "the Trustee shall be and remain liable for the acts and omissions of any such Custodian to the extent (and only to the extent) that it would

---

[5] Plaintiff attaches the PSA for Washington Mutual Mortgage Pass-Through Certificates WMALT Series 2006-5 Trust as Exhibit C to the Complaint.  (Compl. ¶ 27 & Ex. C.)  Plaintiff asserts that the PSAs for the Trusts are "substantially similar, and impose the same duties on the Trustee at issue here."  (Id. ¶ 27.)  Any capitalized terms not defined herein have the same meaning as in the WMALT Series 2006-5 Trust PSA.

[6] The main duty set forth in PSA § 2.05 is WAAC's duty to "deliver to and deposit with, or cause to be delivered to and deposited with, the Trustee or the Initial Custodian the Mortgage Files, which shall at all times be identified in the records of the Trustee or the Initial Custodian, as applicable, as being held by or on behalf of the Trust."  (PSA at 102.)

have been liable for such acts and omissions hereunder had such acts and omissions been its own acts and omissions."  (<u>Id.</u> at 102.)

Section 2.05 allows the Initial Custodian to "perform responsibilities of the Trustee on the Trustee's behalf with respect to the delivery, receipt, examination, custody and release of the Mortgage Files related to the Mortgage Loans."  (<u>Id.</u>) Although PSA § 2.05 absolves the Trustee for "responsibility for the acts or omissions of the Initial Custodian" in that regard, the Trustee remains liable for "its own negligent action, its own negligent failure to act or its willful misconduct."  (<u>Id.</u>)

Here, the Trustee (at the time, LaSalle) entered into a Custodial Agreement with WaMu fsb to act as Custodian "on behalf of the Trust and to perform the function of Custodian."  (<u>See, e.g.</u>, Custodial Agreement WaMu Mortgage Pass-Through Certificates Series 2006-AR16 Trust at 1 (Aff. of Irina Palchuk ("Palchuk Aff.") Ex. B, ECF No. 22).)  In that agreement, the Trustee designated to WaMu fsb, as Custodian, the duties set forth in section 2.05 of the PSA.  (<u>Id.</u> at 2-6.)  The Custodial Agreement limited the Custodian's duties to those "specifically set forth" in that agreement, and explicitly noted that the Custodian would be regarded as making no representations and having no "responsibilities as to the validity, sufficiency, value, genuineness, ownership or transferability of any Mortgage Loans."  (<u>Id.</u> at 8.)  The Custodial Agreement also required the Custodian to indemnify the Trustee for any suit "arising out of the negligent performance by the Custodian of its duties and responsibilities."  (<u>Id.</u> at 9.)

PSA § 2.07 requires the Trustee to "acknowledge[ ] receipt . . . on behalf of the Trust of the documents . . . referred to in Section 2.05 above, but without having made the review required to be made within 45 days pursuant to this Section 2.07." (PSA at 104.)  The Trustee is also required to

> review (or, with respect to the Mortgage Loans identified in the Initial Custodial Agreement, cause the Initial Custodian to review) each Mortgage File within 45 days after the Closing Date and deliver to the Company [WAAC] a certification or . . . cause the Initial Custodian to deliver to the Company a certification, which satisfies the applicable requirements of this Agreement.

(Id.)  In undertaking that review, the Trustee accepts responsibility to notify the Servicer "promptly" of any loan document in the Mortgage File that was not executed or received.  (Id. at 104-05.)  The Trustee (or Custodian) need only conduct the review as specified in the PSA.  (Id. at 104.)

The PSA further requires that, upon gaining "actual knowledge" of "a breach of any of the representations and warranties [in the MLPA by the Seller] in respect of the Mortgage Loan," the Trustee "give prompt written notice" to WAAC and WaMu (as the Servicer).  (PSA at 107 (Section 2.09).)  The Servicer must then inform the Seller of any breaches of any Mortgage Loan and "take appropriate steps on behalf of the Trustee to enforce the Seller's obligation . . . to cure such breach in all material respects or repurchase or substitute for the affected Mortgage Loan." (Id.)

Article VIII of the PSA independently discusses other matters "[c]oncerning the Trustees."  (PSA at 143.)  Section 8.01 specifies the Trustee's duties "prior to the occurrence of an Event of Default and after the curing of all Events of Default which

may have occurred." (Id.)  That same section makes clear that "the duties and obligations of the Trustee shall be determined solely by the express provisions of this Agreement." (Id. at 144 (§ 8.01(c)(i)).)[7]  The PSA also requires the Trustee to, inter alia, examine all documents (of various types) provided to it to ensure they meet the PSA's requirements and, within ten business days subsequent to "an Event of Default known to the Trustee," provide notice of such default to the various rating agencies.  (PSA at 144 (§ 8.01(b), (d)).)

Prior to an Event of Default, the Trustee does not have any obligation to investigate "facts or matters" contained in documents provided to the Trustee "unless requested in writing to do so by the holders of Certificates evidencing Percentage Interests aggregating not less than 25% of REMIC III."  (PSA at 145 (§ 8.02(iv)).)  Further, the PSA requires the Trustee to have "actual knowledge"--or have received written notice--with respect to "any matter, including without limitation an Event of Default." (Id. (Section 8.02(vi)).)

D.    The Trustee's Alleged Breaches

Plaintiff alleges that the Trustee "failed to perform" the following "critical duties necessary to protect the Covered Trusts, Plaintiff and the Class members":

- "[R]eview[ing] the loan files for missing, incomplete and defective documentation" (Compl. ¶ 69);

- Providing notice of incomplete mortgage files and the Seller's breaches of its representations and warranties as set forth in the MLPA (Pl.'s

---

[7] Section 7.01 defines what occurrences constitute an "Event of Default" under the PSA.  (PSA at 140-42.)

Mem. Law Opp'n Defs. Mot. to Dismiss ("Pl. Opp'n") 16-19, ECF No. 30);

- Enforcing the certificate-holders' "rights to the have the Seller repurchase Mortgage Loans or notify MBS holders of the many defaulted obligations" in the Mortgage Loans (Compl. ¶ 68; <u>see also</u> <u>id.</u> ¶ 71).

(<u>See also</u> Pl. Opp'n at 13, 16, 20.)[8]

## II.   DISCUSSION

### A.   <u>Legal Standard</u>

To survive a Rule 12(b)(6) motion to dismiss, "the plaintiff must provide the grounds upon which [its] claim rests through factual allegations sufficient 'to raise a right to relief above the speculative level.'" <u>ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.</u>, 493 F.3d 87, 98 (2d Cir. 2007) (quoting <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 555 (2007)).  In other words, the complaint must allege "enough facts to state a claim to relief that is plausible on its face."  <u>Starr v. Sony BMG Music Entm't</u>, 592 F.3d 314, 321 (quoting <u>Twombly</u>, 550 U.S. at 570); <u>see also</u> <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678 (2009) (same).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." <u>Iqbal</u>, 556 U.S. at 678.  In applying that standard, the court accepts as true all well-plead factual allegations,

---

[8] The Complaint additionally alleges the Trustee's failure to comply with a purported duty to perfect title to the Mortgage Loans.  (<u>See, e.g.</u>, Compl. ¶¶ 29-34, 50-63, 65-66, 72.)  Plaintiff did not oppose defendants' motion to dismiss this claim.  (<u>See</u> Pl. Opp'n at 13-21.)  Accordingly, plaintiff is deemed to have abandoned the claim, and it is dismissed with prejudice.  <u>See</u> <u>Brandon v. City of New York</u>, 705 F. Supp. 2d 261, 268 (S.D.N.Y. 2010) (Preska, C.J.) (collecting cases).

but does not credit "mere conclusory statements" or "threadbare recitals of the elements of a cause of action." Id. If the court can infer no more than "the mere possibility of misconduct" from the factual averments, dismissal is appropriate. Starr, 592 F.3d at 321 (quoting Iqbal, 556 U.S. at 679).

    B.    Standing

Defendants move to dismiss certain of plaintiff's claims for lack of standing: (1) the claims relating to the 36 trusts in which plaintiff did not make purchases; and (2) the claims relating to tranches of Trusts in which plaintiff did not purchase certificates. (Defs.' Corrected Jt. Mem. Supp. Mot. Dismiss ("Defs. Mem.") 11-12, ECF No. 29.) In ruling on a motion to dismiss for lack of standing, a court "must accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party." Warth v. Seldin, 422 U.S. 490, 501 (1975); W.R. Huff Asset Mgmt. Co., LLC v. Deloitte & Touche LLP ("W.R. Huff"), 549 F.3d 100, 106 (2d Cir. 2008) (same).

Under Article III of the Constitution, a plaintiff only has standing to invoke the jurisdiction of federal courts to resolve actual "cases" or "controversies." U.S CONST. art. III, § 2; Warth, 422 U.S. at 498. Thus, standing is "the threshold question in every federal case." Warth, 422 U.S. at 498. To demonstrate constitutional standing under Article III, a plaintiff must establish: (1) an injury-in-fact; (2) that is fairly traceable to the defendant's allegedly unlawful conduct; and (3) that is likely redressable "by a favorable decision." Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992). "These requirements ensure that a plaintiff

has a sufficiently personal stake in the outcome of the suit so that the parties are adverse." W.R. Huff, 549 F.3d at 107.  An injury-in-fact must be "concrete and particularized," "actual or imminent, not conjectural or hypothetical." Lujan, 504 U.S. at 560.  That requirement seeks assurance that the plaintiff has "personally suffered an injury." W.R. Huff Asset Mgmt. Co., 549 F.3d at 107; see also Lujan, 504 U.S. at 560 n.1 ("By particularized, we mean that the injury must affect the plaintiff in a personal and individual way.").

It is also well-settled that the standing requirement cannot be dispensed with by styling the complaint as a class action.  Lewis v. Casey, 518 U.S. 343, 357 (1996) ("That a suit may be a class action . . . adds nothing to the question of standing . . . ."). Each named plaintiff in a class action "must allege and show that [s/he] personally [has] been injured, not that injury has been suffered by other, unidentified members of the class to which [s/he] belong[s] and purport[s] to represent." Id.; see also Blum v. Yaretsky, 457 U.S. 991, 999 (1982) ("It is not enough that the conduct of which plaintiff complains will injure someone.  The complaining party must also show that he is within the class of persons who will be concretely affected.").  Thus, a court must address the "threshold question" of Article III standing before it ever reaches the question of class certification.  See Pub. Emps.' Ret. Sys. of Miss. v. Merrill Lynch & Co. Inc., 714 F. Supp. 2d 475, 480-81 (S.D.N.Y. 2010); In re Salomon Smith Barney Mut. Fund Fees Litig., 441 F. Supp. 2d 579, 607 (S.D.N.Y. 2006).

However, the Second Circuit recently addressed the related, but distinct issues of Article III standing and "class standing" in NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co., 693 F.3d 145 (2d Cir. 2012). In NECA-IBEW, the plaintiff brought a putative class action alleging violations of sections 11, 12(a)(2), and 15 of the Securities Act of 1933 (the "Securities Act") in connection with seventeen MBS offerings. NECA-IBEW, 693 F.3d at 148. The plaintiff, who had purchased certificates in only two of the offerings, sought to assert claims on behalf of purchasers in all seventeen offerings on the basis that all offerings were made pursuant to the same Shelf Registration Statement. Id. at 148, 149. The district court held that the plaintiff lacked standing to assert claims with respect to the offerings in which it did not purchase as well as the tranches in which it did not purchase certificates. Id. at 154-55.

The Second Circuit reversed, and set forth a two-part test for determining on whose behalf a plaintiff has "class standing." "[I]n a putative class action, a plaintiff has class standing if he plausibly alleges (1) that he 'personally has suffered some actual . . . injury as a result of the putative illegal conduct of the defendant,' and (2) that such conduct implicates 'the same set of concerns' as the conduct alleged to have caused injury to other members of the putative class by the same defendants." Id. at 162 (citations omitted). The first part of the inquiry is a question of the plaintiff's Article III standing. See id. at 158, 162. The second part, however, depends on the "nature and content" on which the action is focused. See id. at 162.

13

Under that new test, the Second Circuit concluded in <u>NECA-IBEW</u> that the plaintiff had Article III standing by virtue of its own injury relating to the diminution in value of its certificates and had class standing to pursue claims on behalf of purchasers of certificates in offerings (or trusts) "backed by loans originated by originators common to those backing the" offerings in which plaintiff purchased because the alleged misrepresentations about origination guidelines contained in the offering documents implicated the "same set of concerns" as the plaintiff's.  <u>Id.</u> at 162, 164.

       1.    <u>Article III Standing</u>

PABF has plausibly alleged Article III standing: (a) a diminution in value of the certificates it purchased (b) as a result of defendants' purported breaches of the PSAs that is (c) redressable through this breach of contract action as well as under various provisions of the Trust Indenture Act.  <u>See</u> <u>Lujan</u>, 504 U.S. at 560-61.

The fact that PABF sold its certificates prior to commencing this action does not alter that conclusion.  Plaintiff asserts that the decline in the value of its certificates means that it sold the certificates at a loss and thereby suffered damages.  (<u>See</u> Tr. 72:8-13, 72:25-73:3.)  The Court finds that alleged damage sufficient to meet the injury-in-fact requirement for the Trusts in which plaintiff made purchases and the tranches in which plaintiff purchased certificates.

2.     Class Standing[9]

a.     Trust Standing

The Court finds that under <u>NECA-IBEW</u>, plaintiff only has class standing as to the five Trusts in which it purchased certificates.  Here, the "nature and focus" of the action is the Trustee's failure to perform its obligations under the PSAs for the respective Trusts.[10]  Each Trust has its own, distinct PSA.  And although plaintiff alleges that the PSAs are "substantially similar, and impose the same duties on the Trustee" (Compl. ¶27), the structure of the Trusts means that a breach of the Trustee's duties with respect to one Trust does not necessarily implicate the same "set of concerns" that certificate-holders in another Trust would have.

Each Trust is backed by a group of mortgage loans and, critically, the set of loans underlying each Trust is unique--<u>i.e.</u>, each loan is only "in" (or "backs the MBS of") one Trust.  (Tr. 61:13-14.)  The value of a particular certificate is tied to the mortgage loans underlying the trust that issued that certificate.  For example, if

---

[9] The Court addresses plaintiff's "class standing" in light of the Second Circuit's decision in <u>NECA-IBEW</u>.  However, if facts develop during discovery relevant to the class standing inquiry, they can be raised at the class certification stage.

[10] Plaintiff argues that in addition to the question of whether defendants complied with their obligations under the PSAs, "this case will center on whether the originators complied with their underwriting guidelines in originating the loans underlying the Trusts."  (<u>See</u> Pl.'s Notice New Authority Opp'n Defs. Mot. Dismiss ("Pl. Supp. Mem.") 8, ECF No. 42.)  The former is, based upon the Complaint, the focus of the "nature" of this action; the latter is certainly not--indeed, it was the focus of the wholly separate <u>In re WaMu</u> litigation pursued by PABF (represented by the same counsel as this action) in the Western District of Washington.

In addition, the question of whether the originators complied with the underwriting guidelines may not even be addressed where the Court is looking at what the <u>Trustee</u> itself did.  In other words, even if the originators complied with their guidelines, the Trustee could have breached its duties.  The Court will not make the far leap needed to accept plaintiff's argument that compliance with the origination guidelines is a "focus" of this action.

mortgage-holders in Trust A default on their principal or interest payments, the value of the certificates in Trust A backed by loans underlying Trust A tied to those specific mortgages may decline.[11]  However, the Trust A loan defaults will not "infect" the value of the certificates issued by Trust B.  See <u>NECA-IBEW</u>, 693 F.3d at 163.  Moreover, any diminution in value of the certificates in Trust A caused by an alleged breach of the Trustee's duties likewise will not "infect" the value of the certificates in Trust B.  Thus, to the extent that the Trustee breached its duties, and such breach can be found to have caused a diminution in the value of a trust's MBS, there is no indication that the alleged breach would "infect" the value of MBS from any other Trust and vice-versa.  See <u>id.</u>

That each Trust has a unique loan composition (and is administered under a unique (even if similar) PSA) convinces the Court that the "same set of concerns" is not implicated across all 41 trusts.  An example in <u>NECA-IBEW</u> underscores that finding: the Second Circuit surmised that where there was a "series of corporate debt offerings, issued over the course of a year, all of which contained an identical misrepresentation about the issuing company's impending insolvency," that "misrepresentation would infect the debt issued from every offering in like manner, given that all of it is <u>backed by the same company</u> whose solvency has been called into question." <u>NECA-IBEW</u>, 693 F.3d at 163 (emphasis added).  Here, the 41 trusts (as admitted by plaintiff) are backed by different loans (many of which were originated by different originators).  (<u>See</u> Pl.'s Notice New Authority Opp'n Defs.

---

[11] This example accepts the proposition that each loan is only in one trust, and one loan group within each trust.  (Tr. 61:13-15.)

Mot. Dismiss ("Pl. Supp. Mem.") 8-9, ECF No. 42.)  The Complaint's allegations
(e.g., what was "actually known" about the quality of the loans in each trust,
whether an Event of Default occurred, etc.) examined against the unique
composition of each trust demonstrates that the "concerns" would be varied--not the
"same."  Holders of MBS in one of the thirty-six trusts in which plaintiff did not
purchase MBS cannot be said to have the "same set of concerns" as holders of MBS
in one of the five Trusts plaintiff did.  Id. at 162.

      Accordingly, PABF has class standing to pursue claims on behalf of
purchasers of MBS in the five Trusts in which plaintiff purchased certificates.

b.    <u>Tranche Standing</u>

      With respect to whether plaintiff has standing to pursue claims on behalf of
purchasers in <u>tranches</u> other than those in which they invested, the Court finds
that PABF has class standing to pursue claims on behalf of (i) purchasers of MBS
tied to the same loan group as PABF's MBS; or (ii) purchasers of MBS
cross-collateralized by the loan group backing PABF's MBS.

      Relying on <u>In re Washington Mutual Mortgage-Backed Securities Litigation</u>,
276 F.R.D. 658 (W.D. Wash. 2011) ("<u>In re WaMu</u>"), defendants argue that PABF
only has standing to sue on behalf of purchasers of the same tranches PABF
purchased.  In <u>In re WaMu</u>, PABF, along with two other institutional investors,
brought Securities Act claims, against WaMu, WAAC, and Washington Capital
Corp., alleging misrepresentations and omissions in offering documents related to
the underwriting standards pursuant to which the loans underlying six WaMu

17

trusts (all of which are at issue in this action (<u>see</u> Compl. Ex. A)) were originated. <u>In re WaMu</u>, 276 F.R.D. at 662.  There, Judge Pechman held that PABF lacked standing to represent investors in any tranche in which PABF itself did not invest because each tranche was a separate security (as understood by the Securities Act) in that it "has its own CUSIP, credit rating, risk profile, payment rights, payment priority, principal balance, and interest rate."  <u>Id.</u> at 663.

The <u>In re WaMu</u> decision is distinguishable in two ways.  First, the decision was outside of this Circuit and before <u>NECA-IBEW</u>.  Second, the decision was based largely upon the standing requirements set forth by section 11 of the Securities Act, although the <u>In re WaMu</u> Court found that the determination was "in line with principles of Article III standing."  <u>In re WaMu</u>, 276 F.R.D. at 163 (quoting 15 U.S.C. § 77k(a)), 164.  Thus, this Court does not find the <u>In re WaMu</u> decision persuasive on the question of tranche-based standing in this breach of contract action, particularly in light of the Second Circuit's decision in <u>NECA-IBEW</u>.

What is critical to the tranche-based standing inquiry here is how plaintiff's alleged injury flows within the respective Trusts themselves.  <u>See NECA-IBEW</u>, 693 F.3d at 162-63.  Although the Court is not concerned with whether the Trustee's duties cut across all tranches (under the PSAs terms they do), the question for class standing here is whether a diminution in value to one tranche may affect the value of another thus, implicating the "same set of concerns" for tranche-holders across the Trust.

As discussed above, the value of each MBS is tied to the mortgage loans underlying the Trust of which it is a part.  More specifically, the value of each MBS is tied to a specific subset of the total pool of mortgages backing a Trust, known as a "loan group."  (<u>See</u> WaMu Mortgage Pass-Through Certificates, Series 2006-AR16, Prospectus Supplement to Prospectus Dated Jan. 6, 2006 (Nov. 16, 2006) ("2006-AR16 Pro. Supp.") at S-6-S-7 (Palchuk Aff. Ex. E, ECF No. 22).)[12]  For example, in the 2006-AR16 Trust, there are 1858 mortgage loans that are part of the entire trust.  Those 1858 loans are subdivided into three groups such that Loan Group 1 contains 732 loans; Loan Group 2, 496; and Loan Group 3, 630.  (<u>Id.</u> at S-5.)  Those loan groups, however, back multiple tranches.  (<u>See id.</u> at S-7.)  Accordingly, in the 2006-AR16 Trust, Tranches 1-A1 and 1-A2 are "backed by" (or "tied to") Loan Group 1, meaning that the principal and interest payments from the 732 loans in Loan Group 1 are used to pay certificate-holders of both the 1-A1 and 1-A2 tranches.  (<u>Id.</u>; <u>see also</u> <u>id.</u> at S-8-S-10.)  Thus, when the value of the mortgages in one loan group decreases, it may affect the value of other tranches.  To the extent that the value of the loans in one loan group diminishes, the value of the tranches tied to that loan group can likewise decrease.

This Court considered whether pure "loan group standing" was appropriate here--<u>i.e.,</u> whether PABF only had standing to sue on behalf of purchasers who owned tranches tied to the <u>same</u> loan group as those tranches in which plaintiff

---

[12] The Court considers the 2006-AR16 Prospectus Supplement as a document of which the Court may take judicial notice on this motion, and a document known to PABF in bringing suit.  <u>See</u> <u>ATSI Commc'ns, Inc.</u>, 493 F.3d at 98 ("[W]e may consider . . . legally required public disclosure documents filed by the SEC, and documents possessed by or known to the plaintiff and upon which it relied in bringing suits.").

purchased.  However, after review of the relevant prospectus supplements for the Trusts, the Court revised that view based upon the cross-collateralization between the Trusts' loan groups.  Within MBS trusts, cross-collateralization--where the property securing one loan group is also used to secure another--means that the Servicer may use principal or interest payments collected from loans underlying a certain loan group to pay the certificate-holders in a different loan group where principal or interest payments have been missed or mortgages defaulted upon.[13] This also necessarily means that injuries to tranches that cross-collateralize other tranches may have the ability to injure the cross-collateralized tranches.

The 2006-AR16 Prospectus Supplement states that cross-collateralization occurs "in certain limited circumstances" as between the senior certificates backed by Loan Groups 1 and 2.  (2006-AR16 Pro. Supp. at S-10.)  "None of the senior or subordinate certificates related to loan group 3" were cross-collateralized by Loan Groups 1 and 2, however.  (Id.)  Three prerequisites must occur for cross-collateralization to occur: (1) "the aggregate Class Principal Balance of the Group 1-A or Group 2-A Certificates has been reduced to zero"; (2) "there are still Group L-B Certificates outstanding"; and (3)

> "either (i) the Group L-B Percentage on that date is less than 200% of the Group L-B Percentage of the Closing Date or (ii) the outstanding principal balance of the mortgage loans in either loan group 1 or loan group 2 delinquent 60 days or more averaged over the last six months, as a percentage of the related Subordinate Component Balance, is greater than or equal to 50%."

---

[13] Such a process may prevent certificate-holders from calling a default since those certificate-holders will continue to receive principal and interest payments.

(Id. at S-49-S-50.)  The same cross-collateralization provisions apply to at least three of the other Trusts in which plaintiff invested: WaMu Mortgage Pass-Through Certificates Series 2007 HY-1, WaMu Mortgage Pass-Through Certificates Series 2006 AR-12, WaMu Mortgage Pass-Through Certificates Series 2007 HY-7.  (See WaMu Mortgage Pass-Through Certificates Series 2007 HY-1, Prospectus Supplement to Prospectus Dated January 11, 2007 (Jan. 22, 2007) at S-12, S-56; WaMu Mortgage Pass-Through Certificates Series 2006 AR-12, Prospectus Supplement to Prospectus Dated January 6, 2006 (Sept. 22, 2006) at S-12, S-57; WaMu Mortgage Pass-Through Certificates Series 2007 HY-7, Prospectus Supplement to Prospectus Dated April 17, 2007 (June 21, 2007) at S-12, S-56.)[14]

Here, the "set of concerns" implicated are whether plaintiff's certificates lost value as a result of defendants' alleged breaches of the duties set forth in the PSAs. As discussed above, the loss in a tranche's value arises from, among other things, defaults in loans.  Those loans (like each loan in the Trust) are part of a loan pool backing a number of tranches.  In certain circumstances (discussed above), those loan pools are cross-collateralized by loans from another loan pool.  Thus, the value of the tranches which plaintiff held was tied to the health of loans in one loan group and could be tied to the health of the loans in a second loan group.  Although the Complaint does not allege that cross-collateralization has occurred, defendants were unable to state that cross-collateralization has not occurred in any of the five Trusts at issue.  (See Tr. 103:21-104:1.)  Construing the allegations (and the information in

---

[14] All Prospectus Supplements, other than that for 2006-AR16, were obtained on the SEC's website, http://www.sec.gov, and the Court takes judicial notice of them.  See ATSI Commc'ns, Inc., 493 F.3d at 98.

the documents known to plaintiff in drafting the Complaint) in the light most favorable to plaintiff, the Court cannot exclude the possibility that cross-collateralization has occurred across Loan Groups 1 and 2 in each of the five Trusts.

However, a purchaser of tranches tied to Loan Groups 1 or 2 does not have the "same set of concerns" as purchasers of tranches tied to Loan Group 3: diminution in value of loans in Loan Groups 1 or 2 could only (potentially) affect the value of tranches tied to one of those two loan groups.  There is no potential affect on tranches backed by Loan Group 3 because there is no cross-collateralization for that loan group.

The Court, therefore, finds that, to the extent that any of the Trustee's alleged breaches caused diminution in the value of plaintiff's certificates (based on mortgagors' defaults in principal or interest payments), investors holding tranches backed by the same loan group as plaintiff's tranches have the "same set of concerns" as plaintiff in redressing those purported breaches.  See NECA-IBEW, 693 F.3d at 162-63.  At this time, on the information currently before the Court on this motion, the Court finds that plaintiff has class standing to pursue claims on behalf of (i) purchasers in tranches tied to the loan group backing plaintiff's tranches, as well as (ii) purchasers in tranches tied to a loan group cross-collateralized by the loan group backing plaintiff's purchased tranche(s).  See NECA-IBEW, 639 F.3d at 162-63; Me. State Ret. Sys. v. Countrywide Fin. Corp., No. 2:10-cv-0302, 2011 WL 4389689, at *7 (C.D. Cal. May 5, 2011) (based upon the differences of loans comprising each loan group, "the Court must view standing at

the loan group level. . . . [A]ny alleged injury flowing from an alleged misstatement as to one tranche would not necessarily constitute injury to purchasers of different tranches backed by different loan groups.").[15]

C.     Breach of Contract

The gravamen of this action is the Trustees' alleged breaches of the Trusts' PSAs (i.e., breaches of contract).  To state a claim for breach of contract, a plaintiff must plead: (1) the existence of a valid contract; (2) breach of that contract by the defendant(s); and (3) damages as a result of that breach.  VLIW Tech., LLC v. Hewlett-Packard, Co., 840 A.2d 606, 612 (Del. 2003).[16]  "[A] claim may be dismissed if allegations in the complaint or in the exhibits incorporated into the complaint effectively negate the claim as a matter of law."  Malpiede v. Townson, 780 A.2d 1075, 1083 (Del. 2001).  A contract claim may be dismissed "if the defendants' interpretation is the only reasonable construction as a matter of law."  VLIW Tech., LLC, 840 A.2d at 615.

Plaintiff's contract claim here is premised upon three alleged breaches of the PSA: (1) the Trustee's duty to review mortgage files; (2) the Trustee's duty to provide notice of incomplete mortgage files and the Seller's breaches of its representations and warranties in the MPLA (incorporated into the PSA) regarding the quality of the loans in the Trusts; and (3) the Trustee's duty to enforce the

---

[15] To the extent facts develop demonstrating that cross-collateralization has not occurred within the Trusts, the Court will entertain a motion at the appropriate time.  Such facts may also be raised at the class certification stage.

[16] The parties agree that Delaware law applies to the breach of contract claim.

Seller's obligation to repurchase mortgages in an Event of Default.  The Court will address each seriatim.

### 1.   Duty to Review Mortgage Files

Plaintiff argues that the Trustee's duty to review the Mortgage Files emanates from PSA § 2.07.  (See Compl. ¶¶ 35-36.)

As discussed above, PSA § 2.07 requires the Trustee--or the Initial Custodian if so designated--to make a review of the Mortgage File for each mortgage within 45 days of the Trust's Closing Date.  (PSA at 104.)[17]  Subsequent to that review, the Trustee--or the Custodian (if so designated by the Trustee pursuant to the Custodial Agreement)--must deliver a report to certify that the review was conducted.  (Id. at 105.)  However, section 2.07 is explicit that in the event the review function is delegated to the Custodian, the Trustee shall cause the Initial Custodian to perform the Mortgage File review and shall cause the Custodian to deliver a report to WAAC certifying its review.  (PSA at 104.)

Defendants argue that they cannot be liable for a breach of any duty to review Mortgage Files in the Trusts because that duty was expressly delegated to

---

[17] Section 2.07 refers to Initial Custodian and the Initial Custodian Agreement in discussing the Trustee's delegation of the Mortgage File review.  In the same section, it refers to the Custodian and Custodial Agreement in discussing the exception report that would provide notice of any deficiencies in the Mortgage Files.  (Compare PSA at 104 with PSA at 105.)  The PSA defines "Custodian" to encompass "Initial Custodian."  (Id. at 47 ("Custodian: The Initial Custodian and any other custodian which is appointed by the Trustee with the consent of the Servicers . . .").)  Reading the provision so as not to render any part superfluous or ambiguous, the use of the terms "Initial Custodian" and "Custodian" are not contradictory in the context of section 2.07.  (Tr. 11:3:-8.)

With respect to PSA § 2.05, at oral argument defendants' counsel distinguished between the Custodian and the Initial Custodian in that the Trustee "remain[s] liable for the acts and omissions of [the] Custodian to the extent . . . that it would have been liable for such acts and omissions . . . had [they] been its own" (PSA at 102 (emphasis added)), while the Trustee is not "relieve[d] . . . from liability for its own negligent action, its own negligent failure to act or its willful misconduct" for acts delegated to the Initial Custodian (id.).  (See also Tr. 12:19-13:23.)

the Initial Custodian (except as to WMALT 2006-5 (see Defs. Mem. 7 n.3, 19 n.5;

Defs.' Jt. Reply Supp. Mot. Dismiss ("Defs. Reply") 5 n.1, ECF No. 34)).  (Defs. Mem.

19-21.)  Defendants are correct that section 2.07 explicitly states that the duty to

review the Mortgage Files may rest with the Initial Custodian as to the loans

identified in the Initial Custodial Agreement.  (See PSA at 104 (the Trustee "shall"

"with respect to the Mortgage Loans identified in the Initial Custodian Agreement,

cause the Initial Custodian to review[ ] each Mortgage File within 45 days after the

Closing Date"); see also id. at 102 (§ 2.05) (the "Initial Custodian shall perform

responsibilities of the Trustee on the Trustee's behalf with respect to the . . .

examination . . . of the Mortgage files.").)  However, under the language of the PSAs,

the Court finds that the Trustee is not wholly absolved of responsibility--and

therefore, potential liability--based upon the delegation of the Mortgage File review

to the Initial Custodian.

   PSA § 2.05 contains two provisos with respect to the Trustee's liability for

acts committed by the Initial Custodian.  First, section 2.05 expressly allows the

Trustee to appoint the Custodian to act as custodian of the Mortgage Files

"provided, however, that the Trustee shall be and remain liable for the acts and

omissions of any such Custodian to the extent (and only to the extent) that it would

have been liable for such acts and omissions hereunder had such acts and omissions

been its own acts and omissions."  (PSA at 102.)  The structure of that paragraph

makes clear that the proviso applies only to the delegation of the duty to act as a

custodian for the Mortgage Files.  (See id.)  Although that proviso may offer a more

expansive view of the Trustee's liability, PSA § 2.05 can only be read to apply the first proviso to the <u>custodial</u> duties regarding the Mortgage Files--not the review/examination duties for the Mortgage Files.

The second proviso on liability does apply to the duty to review the Mortgage Files: it exculpates the Trustee for "acts or omissions of the Initial Custodian . . . , <u>provided, however</u>, that nothing herein shall relieve the Trustee from liability for its own negligent action, its own negligent failure to act or its willful misconduct." (PSA at 102 (§ 2.05).)  Under that language, the Trustee is not foreclosed from liability for a potential breach of contract claim: section 2.07 requires the Trustee to cause the Initial Custodian to review the Mortgage Files within 45 days of the Closing date and to cause the Custodian to provide a certification regarding the Mortgage File review if the review function has been delegated; therefore, if the Initial Custodian did not perform a review--and the Trustee did nothing to cause it to do so--and if no certification was filed and the Trustee did nothing to ensure that the Custodian delivered such certificate, the Trustee would have breached its obligations under PSA § 2.07.

That being said, although <u>a</u> plaintiff <u>could</u> allege a breach of section 2.07 claim, as yet, PABF has failed to do so with the necessary plausibility.  <u>See</u> <u>Iqbal</u>, 556 U.S. at 678; <u>Twombly</u>, 550 U.S. at 570.  The Complaint recites section 2.07 (Compl. ¶¶ 36, 39), but does not contain any allegations specifying if or how the Trustee failed to meet its obligations thereunder.  Plaintiff simply alleges that "[d]efendants negligently reviewed the loan files for missing, incomplete and

26

defective documentation." (Id. ¶ 69.)[18]  That allegation, however, assumes that the Trustee itself performed the review of the Mortgage Files.  As discussed above, the Trustee did--as was its right under the PSA--delegate the Mortgage File review to the Initial Custodian (for four of the Trusts).  Even for WMALT 2006-5, for which the Trustee did not delegate the Mortgage File review, those allegations are wholly conclusory and do not support a claim.  To take the Mortgage File review claim "across the line from conceivable to plausible," see Twombly, 550 U.S. at 570, plaintiff must allege facts connecting any deficiency in the review of the Mortgage Files to something that the Trustee remained obligated to do, notwithstanding the designation of the review to the Initial Custodian.[19]  In the absence of any such allegations, the claim for breach of PSA § 2.07 cannot stand.

Because liability under PSA § 2.07 is not foreclosed by the Trustee's delegation of any Mortgage File review, plaintiff's claim for breach of PSA § 2.07 is dismissed with leave to replead.

---

[18] Plaintiff hinges the Trustee's failure in this regard on "[t]he fact that there was a missing link in the chain of the endorsements from the originator to LaSalle or the successor Trustees" and "that there was no duly executed and recorded assignment of a mortgage to LaSalle or the successor Trustees." (Id. ¶ 70.)  However, the Mortgage File--as defined by the PSA--did not require loans originated or sold by WaMu to have assignments or endorsements.  (PSA at 61-64.)

[19] Under Iqbal and Twombly, the Complaint's blanket allegations that the Trustee failed to perform its duties under the PSAs--e.g., "Defendants are liable to Plaintiff and Class Members for failing to exercise their rights and powers under the Governing Agreements" (Compl. ¶ 43); and "Despite the Covered Trusts' high default rates and poor performance, Defendants failed to perform critical duties necessary to protect the Covered Trusts, Plaintiff and Class Members" (id. ¶ 64)--do nothing to salvage the claim.

2.    Duty to Provide Notice of Incomplete Mortgage Files and the Seller's Breaches of the MLPA's Representations & Warranties

Plaintiff further alleges that the Trustee breached the PSA by failing to put the Servicer on notice of (a) incomplete Mortgage Files and (b) the Seller's breaches of the MLPA's representations and warranties regarding the quality of the loans in the Trusts (the "Seller's MLPA representations and warranties").[20]  As described above, PSA § 2.07 requires the Trustee to notify the Servicer "promptly" upon "find[ing]" any deficient or missing loan document in any Mortgage File (PSA at 104-05); under section 2.09, the Trustee must "give prompt written notice" of breaches of the Seller's MLPA representations and warranties upon gaining "actual knowledge" of those breaches (id. at 107).  Defendants argue that they cannot be said to have breached these obligations because they never "found" a deficient Mortgage File--i.e., they lacked actual knowledge of a Mortgage File deficiency--and cannot be said to have had "actual knowledge" of the Seller's breaches.  The Court disagrees.

"A party 'discovers' a breach when it knows or should know that the breach has occurred."  Morgan Guar. Trust Co. of N.Y. v. Bay View Franchise Mortg. Acceptance Co., No. 00 Civ. 8613, 2002 WL 818082, at *5 (S.D.N.Y. Apr. 30, 2002) (emphasis added).  Although "[l]earning of facts merely suggestive of a breach

---

[20] Plaintiff, in reliance upon various public documents--namely, the Report of the U.S. Senate's Committee on Homeland Security and Government Affairs, which accused WaMu of "pollut[ing] the financial system with mortgage backed securities which later incurred high rates of delinquency and loss," and securitizing some of the "worst performing" MBS "in the marketplace due to poor quality loans"--alleges that WaMu securitized loans comprising the Trusts that did not meet the representations and warranties made by the Seller in the respective MLPAs.  (Compl. ¶¶ 44-46.) According to plaintiff, that poor loan quality resulted in staggering losses of multiple millions of dollars to the value of the Trusts' MBS.  (Id. ¶¶ 48-49.)

would not require the Trustee to immediately raise a claim," "upon receipt of such notice, it becomes incumbent upon the [Trustee] to pick up the scent and nose to the source." MASTR Asset Backed Secs. Trust 2006-HE3 ex rel. U.S. Bank Nat'l Ass'n v. WMC Mortg. Corp., 2012 WL 4511065, at *7 (D. Minn. Oct. 1, 2012) (quotation marks omitted). If, upon investigation, the breach is confirmed, the trustee must then provide the required notice in the time period required by the operative contract. Id. (quoting Morgan Guar. Trust Co., 2002 WL 818082, at *5).

Under that standard, the Court finds that the Trustee was chargeable with actual knowledge of both some number of deficient Mortgage Files and the Seller's breaches of the MLPA representations and warranties. First, as the Complaint alleges, both public and private investigations as well as Congressional reports had made public the significant document (and other) deficiencies in loans securitized by WaMu. (See, e.g., Compl. ¶¶ 45-47, 52, 58.) As plaintiff asserts, to accept that the Trustee was unaware of those reports and investigations would require the Court to "find that the responsible officers of Defendants had been living under a rock." (Pl. Opp'n at 17.) If the Trustee was indeed "living under a rock," it had no right to do so given its role and responsibilities. Second, the Trustee had complete access to the Mortgage Files. (See PSA at 102 (§ 2.05).) That access, coupled with the widespread, public reporting of deficiencies in WaMu-securitized loans, no doubt would have raised facts "suggestive of a breach" and/or that there may have been missing or deficient documents in the Mortgage Files. The Trustee therefore was required to "pick up the scent and nose to the source"--i.e., to investigate any

suspicions about the loans and Mortgage Files in the Trusts.  See MASTR Asset Backed Secs. Trust 2006-HE3, 2012 WL 4511065, at *7.  At this stage of the proceedings, the Court finds that those allegations (read with the PSAs) plausibly plead that there were facts "suggestive" of deficient Mortgage Files and/or breaches of the Seller's MLPA representations and warranties sufficient to find that the Complaint alleges the Trustee's "actual knowledge" of both.  See id.[21]

Accordingly, the Court denies defendants' motion to dismiss the breach of contract claim relating to the notice of Mortgage File deficiencies or breaches of the Seller's MLPA representations and warranties.[22]

### 3.    Duty to Enforce the Seller's Repurchase Obligations

Plaintiff concedes that although it asserts a claim against the Trustee for failing to "enforce" the Seller's repurchase obligations, the PSA does not impose such an obligation on the Trustee.  (Pl. Opp'n at 20.)  Under the PSA's plain terms, it is the Servicer's duty to force the Seller to repurchase defective or deficient loans.

---

[21] In MASTR Asset Backed Securities Trust 2006-HE3, the Court denied summary judgment against the Trustee on this basis "prior to discovery" because "[i]t is possible that discovery would unearth further information as to precisely what the Trustee knew about the breaches and when . . . ."  2012 WL 4511065, at *7.  The Court finds that the same is true here:  if facts come to light during discovery that belie the Trustee's ability to have gained "actual knowledge," the Court will entertain a motion at the appropriate time.

[22] Defendants' argument that section 8.02(iv) of the PSA only requires the Trustee to investigate upon receiving notice from an appropriate quorum of certificate-holders does not undermine the Court's finding in this regard.  Section 8.02(iv) applies only "prior to an Event of Default and after the curing of all Events of Default which may have occurred."  (PSA at 145 (emphases added).)  Plaintiff here alleges (and argues) that but for the Trustee's failure to provide notice of the Seller's breaches of the MLPA's representations and warranties, an Event of Default would have occurred.  As discussed in Part II.C.3 infra, the Court finds that based upon the Trustee's "actual knowledge" of Mortgage File deficiencies and breaches of the Seller's MLPA representations and warranties, the Trustee could have, inter alia, provided notice to the Servicer of the Mortgage File deficiencies or the Seller's breaches of the MLPA representations and warranties, requiring the Servicer to enforce the Seller's repurchase obligation--and, without such action being taken, remained unremedied for 60 days such that an Event of Default would have occurred.  (See PSA at 141 (§ 7.01(a)(ii)).)  Accordingly, PSA § 8.02 does not absolve the Trustee of its duty to investigate here.

(See PSA at 105 (§ 2.07: "Upon notice from the Trustee or the Custodian that any document required to be included in the Mortgage File for a Mortgage Loan has not been executed and received, the Servicer shall promptly notify the Seller of such defect and take appropriate steps on behalf of the Trust to enforce such Seller's obligation . . . ."); id. at 107 (§ 2.09: upon notice--from, inter alia, the Trustee--of a breach of any the representations or warranties in the MLPA regarding the Mortgage Loans, "[t]he Servicer shall promptly notify the Seller of such breach and take appropriate steps on behalf of the Trust to enforce the Seller's obligation . . . to cure the breach in all material respects or repurchase or substitute for the affected Mortgage Loan . . .").)

Plaintiff argues, however, that the PSA requires the Trustee to "use the same degree of care and skill in its exercise as a prudent person would exercise or use under the circumstances in the conduct of such person's own affairs" upon an Event of Default (see PSA at 143-44 (§ 8.01(a))), and thus, upon learning of the poor quality of the loans, the Trustee should have taken action to enforce the Seller's repurchase obligations.  (Pl. Opp'n at 20-21.)  To that end, the Complaint alleges that despite defendants' knowledge of document deficiencies and the Seller's breaches of the MLPA's representations and warranties, defendants "failed to take any action to protect the MBS holders . . . .  In particular, they did not enforce their rights to have the Seller repurchase Mortgage Loans or notify MBS holders of the many defaulted obligations."  (Compl. ¶ 68.)

As an initial matter, the Complaint does not plead that an Event of Default occurred.  Assuming <u>arguendo</u> that such an Event of Default would have occurred but for the Trustee's failure to provide written notice of the Servicer's failure to perform its duties under the PSA (<u>see</u> PSA at 141 (§ 7.01(a)(ii))), the Complaint is silent on that account as well.  The Court will not, as plaintiff urges, assume that an Event of Default would have occurred in the absence of allegations pleading as much.

Even if the Complaint alleged that an Event of Default would have occurred had the Trustee complied with its duty to provide written notice to the Servicer of the Servicer's failure to perform its duties (which in itself may or may not be plausible even if alleged), the Complaint is devoid of allegations indicating that under the "prudent person" standard set forth in section 8.01(a), the Trustee should (or would) have taken it upon itself to force the Seller to repurchase any defective or deficient Mortgage Loans.  That is simply too distant a leap for this Court to make without plausible allegations that other MBS trusts' trustees have taken similar action in similar circumstances (bolstering the actions a "prudent person" would have taken).  It is not to say, however, plaintiff would be unable to assert plausible allegations in that regard--particularly in light of the <u>Deutsche Bank National Trust Company v. Federal Deposit Insurance Corp.</u> action pending in the United States District Court for the District of Columbia (No. 09 Civ. 1656 (D.D.C. filed Aug. 26, 2009)).

Accordingly, plaintiff's breach of contract claim to enforce the Seller's repurchase obligations is dismissed, with leave to replead.

D.   Claims Under the TIA

1.   Applicability of the TIA

Defendants argue that plaintiff's claim under the TIA fails because the TIA is not applicable to the certificates.  (Defs. Mem. at 29.)[23]  Specifically, defendants argue that mortgage-backed securities are equity--not debt--and thus, because the TIA contains an "equity exemption," the certificates do not fall under the TIA.  Such an argument ignores the true characteristics of MBS--as well as well-established case law (discussed below) recognizing that mortgage-backed securities are debt instruments.

The TIA applies to "a note, bond, debenture, or evidence of indebtedness, whether or not secured" as well as "a certificate of interest or participation in any such note, bond, debenture, or evidence of indebtedness," or "a temporary certificate for, or guarantee of, any such note, bond, debenture, evidence of indebtedness, or certificate."  15 U.S.C. § 77ddd(a)(1)(A)-(C).  Defendants argue that the certificates are none of those instruments, but rather constitute ownership interests in the statutory Trusts themselves.  (Defs. Mem. at 30 (citing PSA at 130-36 (§ 5.01), Ex. A (a certificate constitutes "a beneficial interest in a trust that owns a pool of assets

---

[23] In Ret. Bd. of the Policeman's Annuity & Benefit Fund of the City of Chicago v. Bank of N.Y. Mellon, No. 11 Civ. 5459, 2012 WL 1108533 (S.D.N.Y. Apr. 3, 2012) ("BONY"), the parties "agree[d] that the TIA applies to the mortgage-backed notes issued by the Delaware trust."  Id. at *4 (emphasis added).  Although the Trusts are all Delaware statutory trusts, the parties were not able to reach such an agreement here--and defendants make arguments similar to those that the defendants in the BONY action made with respect to the certificates issued by the New York statutory trusts there.

consisting of, among other things, conventional one- to four-family mortgage loans formed by [WAAC]")).)  At its core, the argument is that the certificates are not "a certificate of interest or participation" in the underlying loans (or notes) backing the Trusts.

The Court finds that the PSA's definition of the certificates cannot, on its own, exempt the certificates from the TIA.  The Court must consider whether the certificates bear characteristics of a debt instrument.  As an initial matter, the Second Circuit has recognized (without analysis) that certificates issued pursuant to PSAs like the ones at issue here are "bonds" (not equity).  See LaSalle Bank Nat'l Ass'n v. Nomura Asset Capital Corp., 424 F.3d 195, 200 (2d Cir. 2005) (referring to commercial mortgage-backed securities as "bonds"); cf. Greenwich Fin. Servs. Distressed Mortg. Fund 3 LLC v. Countrywide Fin. Corp., 603 F.3d 23, 29 (2d Cir. 2010) (referring to PSAs as "trust agreements similar to bond indentures in many respects").  Other courts in this District have used the same nomenclature.  See, e.g., Ellington Credit Fund, Ltd. v. Select Portfolio Servicing, Inc., 837 F. Supp. 2d 162, 182 (S.D.N.Y. 2011) ("[A]s many courts have observed, pass-through certificates are structurally similar in form and function to bonds issued under an indenture."); In re Security Capital Assurance Ltd. Secs. Litig., 729 F. Supp. 2d 569, 575 (S.D.N.Y. 2010) (referring to certificates in residential mortgage-backed securities as "debt securities"); Trust for Certificate Holders of Merrill Lynch Mortg. Passthrough Certificates Series 1999-C1 v. Love Funding Corp., No. 04 Civ. 9890, 2005 WL 2582177, at *1 (S.D.N.Y. Oct. 11, 2005) ("These certificates are essentially

bonds secured by a pool of commercial mortgages that the Trust has purchased from lenders."). And, according to Judge Posner of the United States Court of Appeals for the Seventh Circuit, "[M]ortgage-backed securit[ies] [are] a kind of giant <u>bond</u> . . . that [are] secured by a large number of mortgages . . . ." <u>CWCapital Asset Mgmt., LLC v. Chicago Props., LLC</u>, 610 F.3d 497, 499 (7th Cir. 2010) (Posner, J.) (emphasis added).

Even if the weight of the case law did not point to the certificates as debt instruments, <u>see</u> <u>Jewel Tea Co. v. United States</u>, 90 F.2d 451, 452-53 (2d Cir. 1937) (L. Hand, J.) ("the test cannot be merely the name given to the security"), review of Second Circuit case law elucidates what distinguishes equity from debt. "The classic debt is an unqualified obligation to pay a sum certain at a reasonably close fixed maturity date along with a fixed percentage in interest payable regardless of the debtor's income or lack thereof." <u>Gilbert v. Comm'r</u>, 248 F.2d 399, 402 (2d Cir. 1957). Both public and private bonds also "ha[ve] a repayment schedule including periodic interest and principal repayment at maturity." <u>Antares Aircraft, L.P. v. Fed. Republic of Nigeria</u>, 999 F.2d 33, 34-35 (2d Cir. 1993). In addition, courts consider the eight factors enumerated in IRS Notice 94-47, 1994-19 I.R.B. 9 (Apr. 18, 1994), in "distinguishing between debt and equity," <u>TIFD III-E, Inc. v. U.S.</u>, 459 F.3d 220, 235 & n.15 (2d Cir. 2006):

> (a) whether there is an unconditional promise on the part of the issuer to pay a sum certain on demand or at a fixed maturity date that is in the reasonably foreseeable future; (b) whether holders of the instruments possess the right to enforce the payment of principal and interest; (c) whether the rights of the holders of the instruments are subordinate to rights of general creditors; (d) whether the instruments

> give the holders the right to participate in the management of the
> issuer, (e) whether the issuer is thinly capitalized; (f) whether there is
> identity between holders of the instruments and stockholders of the
> issuer; (g) the label placed upon the instruments by the parties; and
> (h) whether the instruments are intended to be treated as debt or
> equity for non-tax purposes, including regulatory, rating agency, or
> financial accounting purposes.

I.R.S. Notice 94-47.

Defendants argue that the certificates do not bear characteristics of debt--<u>i.e.</u>, that they "do not entitle holders to a sum certain from the Trusts"; "do not provide a right to recourse"; and, despite the "fixed distribution date," the actual distributions are not fixed or guaranteed, but rather are based upon the principal and interest proceeds collected from the mortgagors.  (<u>See</u> Defs. Mem. at 30.)  Plaintiff takes the contrary position, arguing that the certificates are debt instruments with, among other things, an initial "Principal Balance," an "Interest Rate," and a "Final Maturity Date," and credit ratings from rating agencies (<u>e.g.</u>, S&P, Moody's).  (Pl. Opp'n at 26.)

The Court finds that a number of factors clearly indicate that the certificates are debt: the certificates have a fixed maturity date and principal balance (PSA at 37, 68), certificate-holders receive regular principal and interest payments on fixed distribution dates (<u>id.</u> at 48), interest accrues on a periodic basis, the interest is paid off, and the certificates are subject to yield maintenance agreements.  (<u>See</u> Tr. 56:20-24.)  At oral argument, defendants argued that the <u>key</u> characteristic of debt, however, is the "unqualified obligation to pay," which, according to defendants, is absent here because the obligation to pay is contingent upon the mortgagors making their principal and interest payments.  (Tr. 57:2-9.)  The Court is unpersuaded by

that argument: crediting it would ignore that the obligation to pay the certificate-holders <u>always</u> exists; that obligation, however, cannot be <u>met</u> if individual mortgagors default on their principal and interest payments.[24]

Accordingly, the Court finds that the TIA applies.

2.   <u>Violations of the TIA</u>

Plaintiff asserts that defendants violated section 315 of the TIA in that they failed to provide "notice of all defaults known to the trustee, within ninety days after the occurrence thereof . . . ."  (Compl. ¶ 41 (quoting 15 U.S.C § 77ooo(b)), and failed to "exercise their rights and powers . . . as a prudent person would" upon an event of default (<u>id.</u> ¶¶ 42, 86-87 (citing 15 U.S.C. §§ 77ooo(b), (c).)

Defendants argue that the TIA claims fail on their merits for the same reasons that plaintiff's breach of contract claims fail.  (<u>See</u> Defs. Reply at 12.)  Based on the Court's reasoning with respect to the breach of contract claims, one of plaintiff's claims under the TIA withstands defendants' motion and the other is dismissed without prejudice.

First, plaintiff's claim that the Trustee failed to provide notice to certificate-holders of "all defaults known to the trustee"--<u>e.g.</u>, the Seller's purported breaches of the MLPA's representations and warranties (<u>see</u> Compl. ¶ 86)--can withstand defendants' motion to dismiss.  The Court's reasoning that the Complaint adequately pleads that the Trustee had "actual knowledge" of those breaches and

---

[24] By way of example, no one could plausibly argue that a non-recourse loan is "equity" even if the obligor defaults on the loan and the collateral backing the loan is worth nothing (<u>e.g.</u>, a house securing the loan was destroyed by a natural disaster), leaving the issuer with no payments and no way to obtain payment.

thus, could provide the Servicer of such breaches applies with equal force here.  <u>See</u> Part III.C.2., <u>supra</u>.

Second, the Court previously found that the Complaint did not adequately alleged that the Trustee needed to act as a "prudent person" upon gaining actual knowledge of the Seller's breaches of the MLPA's representations and warranties (which, if the Servicer had not taken action to rectify those breaches, would have amounted to an Event of Default).  <u>See</u> Part III.C.3., <u>supra</u>.  That reasoning applies with equal force to plaintiff's claim that defendants failed to act as "a prudent person would have" and thus, violated section 315(c) of the TIA.  (<u>See</u> Compl.  ¶ 87.) Accordingly, that prong of plaintiff's TIA claim is dismissed without prejudice.

E.   <u>Breach of the Duty of Good Faith and Fair Dealing</u>

Defendants contend that the Complaint fails to state a claim for breach of the implied covenant of good faith and fair dealing.  The Court agrees.

Under Delaware law, "the covenant is best understood as a way of implying terms in the agreement, whether employed to analyze unanticipated developments or to fill gaps in the contract's provisions."  <u>Dunlap v. State Farm Fire & Casualty Co.</u>, 878 A.2d 434, 441 (Del. 2005) (citations and footnotes omitted).  The covenant is meant to prevent frustration of the "overarching purpose of the contract."  <u>Id.</u> at 442.  A court should rarely read terms into an agreement under the implied covenant, <u>id.</u>, and thus, such a covenant will be found only "when the party asserting the implied covenant proves the other party has acted arbitrarily or unreasonably . . . ."  <u>Nemec v. Shrader</u>, 991 A.2d 1120, 1126 (Del. 2010).

Where a claim for a breach of the implied covenant of good faith and fair dealing is duplicative of a breach of contract claim, it must be dismissed.  See AQSR India Private, Ltd. v. Bureau Veritas Holdings, C.A. No. 4021-VCS, 2009 WL 1707910, at *11 (Del. Ch. June 16, 2009); see also Nemec, 991 A.2d at 1125-26 ("One generally cannot base a claim for breach of the implied covenant on conduct authorized by the agreement." (citation omitted)).  That is the case here.  The Complaint pleads that defendants breached the implied covenant of good faith because they "had notice that WaMu, WAAC, and the Seller had breached their obligations under the Governing Agreements," yet "failed to take action to protect the MBS holders' interests under those circumstances," thereby "frustrat[ing] the MBS holders' rights to their consideration under the Governing Agreements." (Compl. ¶¶ 100-01.)  The breach of contract claim is pled to detail specific failures on defendants' part that also caused "MBS holders [not to] receive the consideration they bargained for."  (Compl. ¶¶ 90-91.)  Given that overlap, the Court dismisses plaintiff's separate claim for breach of the implied covenant of good faith and fair dealing.

Defendants provide an additional basis for dismissal of the claim: that it is barred by the language of the PSA itself.  Section 8.01(c)(ii) specifically states that "no implied covenants or obligations shall be read into this Agreement against the Trustee."  (PSA at 144.)[25]  Plaintiff seeks a way around that clear contractual language by arguing that section 3806(e) of the Delaware Statutory Trust Act

---

[25] Such a provision has been recognized as enforceable.  See, e.g., Ellington Credit Fund, Ltd. v. Select Portfolio Servicing, Inc., 837 F. Supp. 2d 162, 189 (S.D.N.Y. 2011).

prevents a contract from "limit[ing] or eliminate[ing] liability for any act or omission that constitutions a <u>bad faith</u> violation of the implied contractual covenant of good faith and fair dealing."  12 Del. C. § 3806(e) (emphasis added).  The Complaint, however, does not allege that defendants acted intentionally or in bad faith--only that they negligently carried out duties set forth in the PSA.  Thus, section 8.01(c)(ii) of the PSA provides an additional, independent ground to dismiss the claim for breach of the implied covenant of good faith and fair dealing.  <u>See</u> <u>QVT Fund LP v. Eurohypo Capital Funding LLC</u>, C.A. No. 5881-VCP, 2011 WL 2672092, at *14 (Del. Ch. July 8, 2011) (stating that the implied covenant of good faith and fair dealing "cannot override the express terms of a contract").

Accordingly, plaintiff's claim for breach of the implied covenant of good faith and fair dealing is dismissed.

F.   <u>U.S. Bank's Supplemental Arguments</u>

Defendant U.S. Bank argues for dismissal of the claims against it on two independent bases--both of which fail.

First, U.S. Bank asserts that plaintiff sold all of its interests in the Trusts prior to U.S. Bank assuming the role of Trustee and thus, U.S. Bank "cannot be responsible for Plaintiff's losses on the sale of its certificates."  (Supp. Mem. Law U.S. Bank Nat'l Ass'n Further Supp. Jt. Mot. Dismiss ("U.S. Bank Supp. Mem.") at 2, ECF No. 20.)  That argument asks the Court to presume that U.S. Bank did not assume any of its predecessor trustees' liabilities upon becoming Trustee.

Although the Complaint is silent as to whether--and to what extent--U.S. Bank assumed liability for the acts of the predecessor Trustees, the Complaint does allege that U.S. Bank "succeeded" BofA as Trustee for the Trusts that contained Countrywide-originated loans.  (Compl. ¶ 7.)  Construing the Complaint in the light most favorable to plaintiff, the Court finds it plausible that U.S. Bank assumed certain liabilities upon succeeding BofA as Trustee.  Whether and to what extent U.S. Bank assumed liability for its predecessor trustee(s) is information uniquely within U.S. Bank's (and possibly BofA's) possession and at this stage in the proceedings, the Court does not find that plaintiff need plead additional facts regarding U.S. Bank's assumption of liability as successor-trustee-in-interest.  U.S. Bank's assertion that it did not agree to "contractually" "indemnify" BofA "for certain liabilities relating to conduct of LaSalle or Bank of America" (see Supp. Reply Mem. Law U.S. Bank Nat'l Ass'n Further Supp. Jt. Mot. Dismiss ("U.S. Supp. Reply Mem.") at 2, ECF No. 35) is insufficient to overcome the Court's obligation to construe the Complaint's allegations in the light most favorable to plaintiff.  Although U.S. Bank may indeed have a viable motion in the future, in the absence of any facts indicating whether and what liabilities U.S. Bank assumed when it became successor trustee, the Court declines to dismiss the claims against U.S. Bank at this time.

Second, U.S. Bank argues that the Complaint engages in improper "group pleading," failing to identify which duties BofA breached and which U.S. Bank breached.  The type of breaches of the PSA the Complaint alleges indicate that the

Trustee's violations were <u>continuing</u>--<u>i.e.</u>, that the Trustees engaged in repeated failures (by, in essence, doing nothing at all over the course of their respective trusteeships) to meet specific duties under the PSAs.  By specifying the time periods in which BofA and U.S. Bank were Trustees and for what Trusts, the Complaint adequately separates defendants and puts them on individual notice of the duties allegedly breached and when sufficient to overcome Fed. R. Civ. P. 8's pleading requirements.

III.   CONCLUSION

For the aforementioned reasons, defendants' motion to dismiss is GRANTED IN PART and DENIED IN PART.

Plaintiff has standing to pursue claims (a) relating to the five Trusts in which it purchased certificates; and (b) on behalf of purchasers of certificates (i) whose certificates are backed by the loan group that back plaintiff's certificates, or (ii) whose certificates are cross-collateralized by loan groups that back plaintiff's certificates.

The claims for breach of contract relating to the Trustee's duty to review mortgage files and the Trustee's duties to enforce the Seller's repurchase obligations are dismissed without prejudice, with leave to replead.

The claim for breach of contract relating to the Trustee's duty to perfect title to the Mortgage Loans is dismissed with prejudice.

Defendants' motion to dismiss the claim for breach of contract relating to the Trustee's duty to provide notice of deficient Mortgage Files or breaches of the Seller's representations and warranties under the MLPA is denied.

Defendants' motion to dismiss the claims under the Trust Indenture Act is denied as to the Trustee's duty to provide notice of defaults within ninety days of its knowledge of those defaults and it is granted with respect to the Trustee's duty to act as a "prudent person" would "in case of default." The latter prong of plaintiff's TIA claim is dismissed without prejudice, with leave to replead.

The claim for breach of the implied covenant of good faith and fair dealing is dismissed with prejudice.

Plaintiff should inform the Court no later than December 14, 2012, if it will be amending the Complaint. Any amended complaint shall be filed no later than January 4, 2013. Any motion to dismiss any amended complaint shall be filed no later than January 18, 2013, with any opposition thereto filed no later than January 28, 2013. No reply is necessary.

Defendants should notify the Court no later than January 11, 2013, if they plan to move against any amended complaint. If defendants elect not to do so, the Court will promptly schedule an initial pretrial conference.

The Clerk of the Court is directed to terminate the motion at Docket No. 19.


SO ORDERED:

Dated: New York, New York
          December __7__, 2012


_____
Katherine B. Forrest
UNITED STATES DISTRICT JUDGE