## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| POLICEMEN'S ANNUITY AND BENEFIT FUND OF THE CITY OF CHICAGO, LABORERS' PENSION FUND AND HEALTH AND WELFARE DEPARTMENT OF THE CONSTRUCTION AND GENERAL LABORERS' DISTRICT COUNCIL OF CHICAGO AND VICINITY, IOWA PUBLIC EMPLOYEES' RETIREMENT SYSTEM, and ARKANSAS PUBLIC EMPLOYEES' RETIREMENT SYSTEM,<br><br>                          Plaintiffs,<br><br>        - against-<br><br>BANK OF AMERICA, NA (as Trustee Under Various Pooling and Servicing Agreements), and U.S. BANK NATIONAL ASSOCIATION (as Trustee Under Various Pooling and Servicing Agreements),<br><br>                          Defendants. | Case No. 1:12-cv-2865-KBF |

## DEFENDANTS' JOINT MEMORANDUM IN SUPPORT OF MOTION TO DISMISS SECOND AMENDED CLASS ACTION COMPLAINT

MUNGER, TOLLES & OLSON LLP
Marc T.G. Dworsky
Kristin Linsley Myles
Jacob S. Kreilkamp
355 South Grand Avenue, 35th Floor
Los Angeles, California 90071-1560
tel: 213- 683-9100
fax: 213-687-3702
marc.dworsky@mto.com,
kristin.myles@mto.com,
jacob.kreilkamp@mto.com

SIDLEY AUSTIN LLP
David F. Graham
One South Dearborn Street
Chicago, Illinois 60603
tel:  312-853-7000
fax:  312-853-7036
dgraham@sidley.com

SIDLEY AUSTIN LLP
Isaac S. Greaney
Jackie A. Lu
787 Seventh Avenue
New York, New York 10019
tel:  212-839-5300
fax:  212-853-5599
igreaney@sidley.com,
jlu@sidley.com

Attorneys for Defendant
BANK OF AMERICA, N.A.

MORGAN, LEWIS & BOCKIUS LLP
Michael S. Kraut
John M. Vassos
101 Park Avenue
New York, New York  10178
tel: 212-309-6000
fax: 212-209-6001
jvassos@morganlewis.com,
mkraut@morganlewis.com

Attorneys for Defendant U.S. BANK
NATIONAL ASSOCIATION

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ................................................................................... 1

II.   BACKGROUND ..................................................................................... 3

    A.   The Trustee's Duties Differ from Those of an Ordinary Trustee, and Are Limited to Duties Expressly Set Forth in the PSA ................................. 3

    B.   The Contracts for these Trusts Mandate a Narrow, Ministerial Trustee Role ........................................................................................................ 7

        1.   The Express Duties of the Trustee ............................................. 7

        2.   Duties Not Assumed by the Trustee Under the PSAs for the Trusts ........ 9

            a.   The Trustee Has No Duty to Enforce the Seller's Obligations Regarding Loan-Level Representations and Warranty Breaches or Document Delivery Duties ........................ 9

            b.   The Trustee Has No Pre-Default Duty to Investigate Unless Properly Directed To Do So By Certificateholders ............ 10

        3.   It is Undisputed That Certificateholders Did Not Direct the Trustees to Assume Duties Beyond the Limited Functions Expressly Set Forth in the PSAs ........................................... 11

III.  ANALYSIS ............................................................................................ 13

    A.   The SAC Fails to State a Claim for Breach of Contract ..................... 13

        1.   Plaintiffs Do Not Allege Facts Constituting a Breach of the Duty to Provide Notice of Missing Documents or Seller Breaches ......... 14

            a.   The Contracts Impose an Actual Knowledge Standard and Disclaim Any Duty to Investigate ........................... 15

            b.   In the December 7 Order, the Court Applied a Constructive Knowledge and an Inquiry Notice Standard, Not An Actual Knowledge Standard ................................................ 16

            c.   Analyzed Under the Proper Legal Standard, the SAC Fails to Allege Actual Knowledge ...................................... 18

                (1)   Plaintiffs' Expanded Allegations of Public Data Regarding Other Trusts Are Still Insufficient ............ 18

                (2)   Plaintiffs' New Theory Concerning Exception Reports Cannot Support Actual Knowledge of Missing Loan Documents ................................ 19

            d.   Courts Enforce Parties' Agreements Disclaiming a Duty to Investigate ........................................................... 21

# TABLE OF CONTENTS
(continued)

**Page**

e.    RMBS Investor Groups Reject a Pre-Default RMBS Trustee Duty to Investigate ........................................................... 23

f.    Plaintiffs Cannot Allege Any Damages from the Alleged Failure to Provide Notice ............................................................. 24

2.    Plaintiffs Have Failed to Allege a Post-Event of Default Duty to Pursue Litigation Against the Seller .............................................. 24

a.    Plaintiffs Have Not Alleged An Event of Default ....................... 25

b.    The "Prevention Doctrine" Is Inapplicable ................................. 26

(1)    Certificateholders Could Have Provided the Servicer with Notice Under Section 7.01(ii) .................... 27

(2)    Plaintiffs' Allegations that the Servicer Would Have Failed to Cure Are Speculative and Implausible ............ 27

(3)    The Prevention Doctrine Is an Implied Contractual Duty Expressly Disclaimed by the Contracts ................. 29

c.    Plaintiffs Also Have Failed to Allege that Any Prudent Trustee Would Have Used Trust Assets to Pursue Costly and Duplicative Litigation ............................................................ 30

B.    PLAINTIFFS HAVE FAILED TO ALLEGE A VIOLATION OF THE TIA .............................................................................................................. 32

1.    Plaintiffs Have Failed to Allege a Violation of Section 315 of the TIA ................................................................................................................ 32

2.    The Certificates Are Exempt From The TIA ........................................... 33

a.    A Pass-Through MBS Is a Certificate of Interest ....................... 33

b.    The TIA Does Not Apply to Certificates of Interest in Multiple Mortgages ..................................................................... 35

c.    The SEC Has Treated Pass-through Certificates as Exempt Under Section 304(a)(2) and Has the Power to Exempt Securities Under Section 304(d) .................................................. 37

3.    Applying the TIA to RMBS Would Be Unworkable .............................. 39

IV.    CONCLUSION ................................................................................................... 41

# TABLE OF AUTHORITIES

**Page(s)**

### FEDERAL CASES

*Adams v. Crystal City Marriott Hotel*,
No. 02 Civ.10258 PKL, 2004 WL 744489 (S.D.N.Y. Apr. 6, 2004) .......................................5

*Anderson News, L.L.C. v. American Media, Inc.*,
680 F.3d 162 (2d Cir. 2012).............................................................................................28

*Banque Arabe et Internationale D'Investissement v. Maryland Nat'l Bank*,
850 F. Supp. 1199 (S.D.N.Y. 1994)....................................................................................17

*Barnhart v. Walton*,
533 U.S. 212 (2002)...........................................................................................................39

*Bell Atlantic Corp. v. Twombly*,
550 U.S. 544 (2007)...........................................................................................................28

*Brass v. Am. Film Techs., Inc.*,
987 F.2d 142 (2d Cir. 1993)................................................................................................5

*CFIP Master Fund, Ltd. v. Citibank, N.A.*,
738 F. Supp. 2d 450 (S.D.N.Y. 2010).................................................................................5

*Cmty. Health Ctr. v. Wilson-Coker*,
311 F.3d 132 (2d Cir. 2002)..............................................................................................39

*Consolidated Edison, Inc. v. Northeast Utilities*,
426 F.3d 524 (2d Cir. 2005)..............................................................................................29

*Craig v. Bank of N.Y.*,
No. 00 CIV 8154(SAS), 2002 WL 1543893 (S.D.N.Y. July 12, 2002) ...............................6

*Davis v. Mich. Dep't of Treasury*,
489 U.S. 803 (1989)...........................................................................................................35

*Dynamis Therapeutics, Inc. v. Alberto-Culver Int'l Inc.*,
C.A. No. 09-773-GMS, 2010 WL 3834405 (D. Del. Sept. 24, 2010) .................................13

*El Paso County, Texas v. Bank of New York Mellon*,
No. A-12-CA-705-SS, 2013 WL 285705 (W.D. Tex. Jan. 22, 2013) .................................37

*Ellington Credit Fund, Ltd. v. Select Portfolio Servicing, Inc.*,
No. 08 Civ. 2437 (RJS), 2011 WL 6034310 (S.D.N.Y. Dec. 5, 2011)................................4

**TABLE OF AUTHORITIES**
**(continued)**

**Page(s)**

*Elliott Assoc. v. J. Henry Schroder Bank & Trust Co.*,
838 F.2d 66 (2d Cir. 1988)..............................................................................passim

*Gerstle v. Gamble-Skogmo, Inc.*,
478 F.2d 1281 (2d Cir. 1973)...................................................................................39

*Gottlieb v. Carnival Corp.*,
436 F.3d 335 (2d Cir. 2006)......................................................................................35

*Gravatt v. City of New York*,
226 F.3d 108 (2d Cir. 2000)......................................................................................16

*In re Enron Corp. Secs., Derivative & "ERISA" Litig.*,
Nos. H-01-3624 & 03-5808, 2008 WL 744823 (S.D. Tex. Mar. 19, 2008) ........................6, 9

*In re Prudence-Bonds Corp.*,
76 F. Supp. 643 (E.D.N.Y. 1948) ..............................................................................7

*Janese v. Fay*,
692 F.3d 221 (2d Cir. 2012).....................................................................................16

*John Wiley & Sons, Inc. v. Kirtsaeng*,
654 F.3d 210 (2d Cir. 2011).....................................................................................35

*Lanvin v. Data Sys. Analysts, Inc.*,
443 F. Supp. 104 (E.D. Pa. 1977) .............................................................................34

*LaScala v. Scrufari*,
479 F.3d 213 (2d Cir. 2007)................................................................................15, 16

*MASTR Asset Backed Securities Trust 2006-HE3 ex rel. U.S. Bank Nat'l Ass'n v. WMC
Mortgage Corp.*,
2012 WL 4511065 (D. Minn. Oct. 1, 2012) ..............................................................14, 17

*Meckel v. Cont'l Res. Co.*,
758 F.2d 811 (2d Cir. 1985)................................................................................4, 6, 9

*Morgan Guaranty Trust Co. of N.Y. v. Bay View Franchise Mortgage Acceptance Co.*,
No. 00 CIV. 8613 (SAS), 2002 WL 818082 (S.D.N.Y. Apr. 30, 2002)..........................14, 17

*Natural Res. Def. Council, Inc. v. Muszynski*,
268 F.3d 91 (2d Cir. 2001).......................................................................................35

*Olin Corp. v. E.I. DuPont De Nemours and Co.*,
No. 05-CV-100S(SC), 2006 WL 839415 (W.D.N.Y. Mar. 27, 2006)...................................13

**TABLE OF AUTHORITIES**
**(continued)**

**Page(s)**

*Peak Partners, L.P. v. Republic Bank*,
191 F. App'x 118 (3d Cir. 2006) ........................................................4, 9

*Retirement Board of the Policemen's Annuity and Benefit Fund of Chicago v. The Bank of New York Mellon*,
No. 11 Civ. 5459 (WHP), 2012 WL 1108533 (S.D.N.Y. Apr. 3, 2012) ...........37, 40

*Ryder Entergy Dist. Corp. v. Merrill Lynch Commodities, Inc.*,
865 F.2d 492 (2d Cir. 1989)........................................................24

*Semi-Tech Litigation, LLC v. Bankers Trust Company*,
353 F. Supp. 2d 460 (S.D.N.Y. 2005)........................................24, 26, 32

*Tcherepnin v. Knight*,
389 U.S. 332 (1967)........................................................34

*Welborn v. Bank of New York Mellon*,
Civil Action No. 12-220-JJB, 2013 WL 149707 (M.D. La. Jan. 14, 2013) ...................37, 39

*Wells Fargo Bank Minn., N.A. v. Nassau Broad. Partners, L.P.*,
No. 01 Civ. 11255 (HB), 2003 U.S. Dist. LEXIS 18285 (S.D.N.Y. Oct. 10, 2003) ...............6

*Williams v. Citibank, N.A.*,
565 F. Supp. 2d 523 (S.D.N.Y. 2008)........................................................13

*Zaccaro v. Shah*,
746 F. Supp. 2d 508 (S.D.N.Y. 2010)........................................................16

**STATE CASES**

*AG Capital Funding Partners, L.P. v. State St. Bank and Trust Co.*,
896 N.E.2d 61 (N.Y. 2008)........................................................4, 6, 9, 22

*HGCD Retail Services v. 44-45 Broadway Realty Co.*,
37 A.D.3d 43 (N.Y. Sup. Ct. 2006) ........................................................29

*Magten Asset Mgmt. Corp. v. Bank of N.Y.*,
No. 600410/10, 2007 WL 1326795 (N.Y. Sup. Ct. May 8, 2007)............................6, 7, 9, 21

*Mobile Commc'ns Corp. of Am. v. MCI Commc'ns Corp.*,
No. 8108, 1985 WL 11574 (Del. Ch. Aug. 27, 1985) ........................................................27

*NAMA Holdings, LLC v. World Mkt. Ctr. Venture, LLC*,
948 A.2d 411 (Del. Ch. 2007)........................................................13

19920272.1

**TABLE OF AUTHORITIES**
**(continued)**

                                                                          **Page(s)**

*Racepoint Partners, LLC v. JPMorgan Chase Bank, N.A.*,
   928 N.E.2d 396 (N.Y. 2010)..................................................................22, 23

*Thor Properties, LLC v. Chetrit Group LLC*,
   936 N.Y.S.2d 196 (N.Y.A.D. 1 Dept. 2012)..........................................29, 30

*Winston v. Mandor*,
   710 A.2d 835 (Del. Ch. 1997)...............................................................13

**FEDERAL STATUTES**

15 U.S.C.A. §77ooo(a)(1)........................................................................6

15 U.S.C.A. § 77bbb................................................................................36

15 U.S.C.A. § 77ccc(1)............................................................................33

15 U.S.C.A. § 77ddd(a)...........................................................................35, 36

15 U.S.C.A. § 77ddd(d)...........................................................................38, 39

15 U.S.C.A. § 77eee(b)............................................................................37

15 U.S.C.A. § 77nnn................................................................................41

15 U.S.C.A. § 77ooo(b)-(c).......................................................................32

15 U.S.C.A. § 77sss(c).............................................................................39

15 U.S.C.A. § 77uuu(a)............................................................................37, 39

**SEC MATERIALS**

*Citytrust*, SEC No Action Letter, 1990 WL 305068 (Dec. 19, 1990)............................38

*Harbor Financial, Inc.*, SEC No Action Letter, 1988 WL 235128 (Oct. 31, 1988)....................38

*Marion Bass Securities, Inc.*, SEC No Action Letter, 1984 WL 45531 (July 9, 1984)................38

*Merrill, Lynch, Pierce, Fenner & Smith, Inc.*, SEC No Action Letter, 1982 WL 30517
   (Oct. 28, 1982) ...............................................................................34

*Mortgage-Backed Income Fund*, SEC No Action Letter, 1979 WL 14524 (Aug. 30, 1979)........36

**TABLE OF AUTHORITIES**
**(continued)**

Page(s)

SEC Div. of Corp. Fin., Manual of Publicly Available Telephone Interpretations (Trust
    Indenture Act of 1939), Nos. 10-11 (July 1997), *available at*
    http://sec.gov./interps/telephone/cftelinterps_tia.pdf ................................................. 37

SEC Div. of Corp. Fin., Trust Indenture Act of 1939, Questions and Answers of General
    Applicability, Section 202.01 (May 3, 2012), *available at*
    http://www.sec.gov/divisions/corpfin/guidance/tiainterp.htm ................................. 37

**STATE STATUTES**

Del. CODE ANN. tit 12 § 3806(e) ........................................................................................ 30

Del. CODE ANN. tit 12 § 3805(a) .................................................................................. 34, 36

**LEGISLATIVE MATERIALS**

112th Cong. 7 (Feb. 16, 2011) ............................................................................................. 24

H.R. Rep. No. 76-1016 (1939) ............................................................................................. 36

S. Rep. No. 248 (1939) ........................................................................................................ 36

**OTHER AUTHORITIES**

*Are There Government Barriers to the Housing Market Recovery?: Hearing Before the*
    *Subcomm. on Insurance, Housing and Community Opportunity of the H. Fin. Servs.*
    *Comm.*, 112th Cong. 7 (Feb. 16, 2011) (written testimony of Ted Tozer, President,
    Ginnie Mae, U.S. Dept. of Hous. & Urban Dev.), *available at*
    http://portal.hud.gov/hudportal/HUD?src=/press/testimonies/2010/2011-02-16b. ........... 23-24

Fed. Reserve Sys., Office of the Comptroller of the Currency, Office of Thrift
    Supervision, *Interagency Review of Foreclosure Policies and Practices* (2011),
    *available at* http://www.federalreserve.gov/boarddocs/rptcongress/ ...................................... 20

19920272.1

## I.     INTRODUCTION

Plaintiffs' Second Amended Complaint fails to cure the defects of its predecessor and should be dismissed in its entirety.  Several of Plaintiffs' claims were dismissed previously by the Court and now stand abandoned.  Plaintiffs continue to press only two claims, each of which they assert under the governing contracts and, alternatively, under the Trust Indenture Act of 1939 ("the TIA").  First, Plaintiffs allege that the Trustee failed to give notice to the Servicer that documents allegedly were missing and that the Seller allegedly had breached its representations and warranties with respect to the mortgage loans at issue.  Second, Plaintiffs allege that the Trustee failed to comply with the "prudent person" standard—a standard that, under the governing contracts, applies only *after* an "Event of Default"—by failing to commence, on investors' ("Certificateholders") behalf, investigations and lawsuits regarding alleged breaches by the Seller.  Plaintiffs' claims are foreclosed by the unambiguous language of both the contracts and the TIA.  Their claims under the TIA fail for the additional reason that residential mortgage-backed securities ("RMBS") are exempt from its purview, irrespective of whether such securities are characterized as equity or debt.

Defendants are mindful of the guidance the Court provided in its December 7, 2012 ruling on Defendants' prior motion to dismiss, and appreciate the opportunity to argue here for reconsideration of portions of that ruling.  Defendants respectfully submit that certain aspects of the Court's prior interpretation of the governing contracts, and Plaintiffs' renewed allegations that spring from that interpretation, are inconsistent with the contracts, the law, and the commercial realities of the underlying RMBS transactions.  Plaintiffs offer a vision of a "watchdog" trustee launching on its own initiative costly investigations and lawsuits—the price of which must be borne by Certificateholders—all based on mere suspicions of loan defects, and without the direction or even approval of Certificateholders.  Plaintiffs' vision of the trustee's role would be a dramatic and unwarranted departure from well-settled law, commercial expectations, and the unambiguous language of these and thousands of other trustee contracts—

-1-

all of which contemplate only a limited and ministerial role for an RMBS trustee (as opposed to a common law trustee, which is subject to generalized fiduciary duties).

The contracts, however, recognize the limited role of an RMBS trustee by expressly disclaiming any duty to conduct a *sua sponte* investigation of facts about the mortgage loans. Indeed, the contracts provide that, although a specified quorum of Certificateholders may *direct* the Trustee to perform such investigations, even then the Trustee is not required to do so unless the Certificateholders agree to foot the bill—and no such direction or agreement is alleged here. The contracts also have strict conditions precedent that must be satisfied before an Event of Default can occur, and thus, before the "prudent person" standard can apply.  Those contractual preconditions were not satisfied here, and the so-called "prevention doctrine" that Plaintiffs invoke to overcome that dispositive fact is both disclaimed by the contracts and inapplicable here in any event.

Judicially noticeable filings that Plaintiffs submitted in a separate lawsuit they commenced five years ago against Washington Mutual Bank ("WaMu")—a suit that alleged the same flaws with the same securitizations that Plaintiffs challenge here—demonstrate that these contractual provisions have been used exactly as intended: Plaintiffs and other Certificateholders pursued their own investigations and lawsuits, and elected until recently not to direct the Trustee to incur expenses replicating the same exercise.  Plaintiffs achieved a $26 million settlement in their lawsuit against WaMu, and other suits are ongoing.  It is significant that the original Plaintiff in the instant action, Policemen's Annuity and Benefit Fund of the City of Chicago ("Chicago Police"), has been unable to recruit a single *current* Certificateholder to join this lawsuit—a consequence, no doubt, of the fact that these contracts provide current Certificateholders with control over the Trustee's potential expenditure of Trust assets, and that current Certificateholders' control would be vitiated if the Court were to adopt Plaintiffs' proposed revision to the contract terms.  That also is likely why groups that represent the interests of mortgage investors have rejected Plaintiffs' vision of such an expansive, costly, and interventionist RMBS trustee role.

The Court's holdings, if confirmed, would disrupt the settled expectations and negotiated agreements of parties to thousands of RMBS trusts.  They also would threaten a new generation of lawsuits against RMBS trustees seeking to hold them accountable for the alleged failings of other parties to the trusts, whether the Seller, Servicer, or some other party, whose behavior the trustee never guaranteed and was not paid to guarantee.  Such market disruptions are neither necessary nor warranted.  Plaintiffs' claims should be dismissed in their entirety.

## II.   BACKGROUND

In its December 7 Order, the Court indicated that it would allow Certificateholders, based on allegations of general public information equally available to Certificateholders themselves, to state a claim under the contracts for the Trustee's alleged failure: (a) to investigate facts about the specific mortgage loans at issue here; (b) to provide notice of the results of those investigations to the Servicer; and (c) to pursue litigation on Certificateholders' behalf—without any direction from Certificateholders to take any of these extraordinary and costly steps, all of which, under the contracts, must be paid for with Trust assets or by Certificateholders. Defendants respectfully submit that this interpretation of the contracts, and the interventionist trustee role heralded by that interpretation, proceed from a misapprehension about the legal and commercial role of the RMBS Trustee.

In this Background section, Defendants describe the role of an RMBS trustee to show how narrow that role is, and how different it is from the role of a traditional common law trustee. This background places in context the specific contractual provisions setting forth (i) the Trustee's duties and obligations, (ii) duties and obligations the Trustee expressly did *not* assume, and (iii) express contractual protections for Certificateholders.

## A.   The Trustee's Duties Differ from Those of an Ordinary Trustee, and Are Limited to Duties Expressly Set Forth in the PSA.

The transactions at issue are typical of RMBS transactions.  A Sponsor—here, WaMu or its affiliate—indirectly sold beneficial interests in mortgage loans to Certificateholders, who

purchased certificates of ownership in an RMBS Trust.  In these transactions, it is widely

recognized that the trustee is a service provider whose duties are specifically defined by contract,

typically in the form of a pooling and servicing agreement, or PSA.[1]

Courts have recognized that the inapt use of the term "trustee" to describe the role of an

RMBS trustee (or any other corporate trustee) can create confusion and misperceptions about the

duties subsumed within that role.  One court labeled an indenture trustee a "different legal

animal" than an ordinary trustee.  *Peak Partners, L.P. v. Republic Bank*, 191 F. App'x 118, 122

(3d Cir. 2006).  Both the Second Circuit and the New York Court of Appeals are in accord.  *See*

*Meckel v. Cont'l Res. Co.*, 758 F.2d 811, 816 (2d Cir. 1985); *AG Capital Funding Partners, L.P.*

*v. State St. Bank and Trust Co.*, 896 N.E.2d 61, 66-67 (N.Y. 2008).  As the New York Court of

Appeals noted in *AG Capital*, under New York and federal case law, "the corporate trustee has

very little in common with the ordinary trustee."  896 N.E.2d at 66-67.  The rights and duties of a

trustee under a corporate indenture are defined "not by the fiduciary relationship, but exclusively

by the terms of the agreement."  *Id*.  The trustee's status "is more that of a stakeholder than one

of a trustee."  The Second Circuit has explained that, whereas an ordinary trustee is charged with

both contractual and common law duties, including the duty of undivided loyalty to trust

beneficiaries, and a broad duty of care and good faith:

> [A]n indenture trustee is not subject to the ordinary trustee's duty of
> undivided loyalty.  Unlike the ordinary trustee, who has historic
> common-law duties imposed beyond those in the trust agreement, an
> indenture trustee is more like a stakeholder whose duties and obligations
> are exclusively defined in the terms of the indenture agreement.

*Elliott Assoc. v. J. Henry Schroder Bank & Trust Co.*, 838 F.2d 66, 71 (2d Cir. 1988); *see also*

*Ellington Credit Fund, Ltd. v. Select Portfolio Servicing, Inc.*, No. 08 Civ. 2437 (RJS), 2011 WL

6034310, at *16 (S.D.N.Y. Dec. 5, 2011) (Sullivan, J.) (observing, in a case involving mortgage-

backed securities governed by a PSA, that "[m]uch of the common law of trusts, and its

corresponding fiduciary obligations, are not applicable to commercial trusts.  Rather the duties of

---

[1]      The securitization transactions relating to the Trusts are described at greater length on pages 2-10
of Defendants' Corrected Joint Motion to Dismiss the Corrected Complaint, ECF No. 29.

an indenture trustee are generally 'strictly defined and limited to the terms of the indenture.'"
(quoting *Elliott*, 838 F.2d at 71)).

Because the Trustee, prior to an Event of Default (as defined in the PSA), performs only the narrow duties expressly enumerated in the PSA, it is paid a commensurately small fee. In this case, for example, Plaintiffs have not disputed that the Trustee earned a mere $281 for its work in January 2013 as trustee of the 2006-AR16 Trust.[2] That trivial fee, compared with the $1.5 billion in principal balance when the trust closed, makes economic sense precisely because the governing contract confines the Trustee's duties to an extremely narrow role and grants the Trustee broad protections from liability. As Judge Rakoff noted in describing a similar transaction, the trustee's compensation, which the court described as "pocket change in comparison to all other economic aspects of [the] transaction," is itself evidence of the limited role contemplated for the trustee. *CFIP Master Fund, Ltd. v. Citibank, N.A.*, 738 F. Supp. 2d 450, 474 (S.D.N.Y. 2010).

The limited role of the corporate or indenture trustee means that, as long as the trustee fulfills the duties expressly set out in the governing contract, no additional duties or liabilities may be imposed based on implied obligations or assumptions about the role that different types of trustees might perform in other contexts, including in common law trustee roles. As the Second Circuit made clear in *Elliott*, "so long as the trustee fulfills its obligations under the express terms of the governing agreement, it owes the [plaintiff] debenture holders no additional, implicit pre-default duties or obligations except to avoid conflicts of interest." 838 F.2d at 66,

---

[2]    The Servicer prepares monthly distribution reports, which set forth the monthly principal and interest payments for the Certificates, as well as information about the underlying loans, for the Trusts. Exhibit A to the Declaration of John Vassos ("Vassos Decl.") is an example of such a report. These reports are available to Certificateholders on a website pursuant to PSA §§ 4.02(b) and 4.05. On a motion to dismiss, a court may consider materials "attached to the complaint as an exhibit or incorporated in it by reference ..., matters of which judicial notice may be taken ..., or documents either in plaintiff['s] possession or of which plaintiff[ ] had knowledge and relied in bringing suit." *Adams v. Crystal City Marriott Hotel*, No. 02 Civ.10258 PKL, 2004 WL 744489, at *3 (S.D.N.Y. Apr. 6, 2004) (*quoting Brass v. Am. Film Techs., Inc.*, 987 F.2d 142, 150 (2d Cir. 1993)). The Court therefore may consider the distribution reports in deciding this motion. The Court also may consider the PSAs and other publicly filed documents referenced herein, which are available on the website of the Securities and Exchange Commission.

71.  Under well-established law, the corporate trustee's duties are those that appear within the four corners of the governing agreement.  *Id*.  The Second Circuit reaffirmed that rule in *Meckel v. Continental Resources Co.*, 758 F.2d 811 (2d Cir. 1985), holding that the duties and obligations of a corporate trustee are exclusively defined by the terms of the governing agreement.  *Id.* at 816.  *Elliott* and *Meckel* are binding law in this Circuit and consistently have been followed by decisions in this District limiting the duties of a corporate trustee to those set forth expressly in the governing agreement.[3]

In the Second Amended Complaint ("SAC"), Plaintiffs allege that "[t]he purpose of having a Trustee in an MBS securitization" is to ensure that there is an independent party who can "effectively protect the trusts and the MBS holders."  SAC ¶¶ 3, 29.  This unsupported proclamation confuses the post-default role of an indenture trustee with the pre-default role explained by the Second Circuit in *Elliott* and *Meckel*.  In fact, the Court rested its holding in *Elliott*—that indenture trustees do not have contractual duties beyond those expressly set forth in the indenture agreement—on the "special relationship that the trustee already has with both the issuer and the debenture holders under the indenture."  838 F.2d at 71; *see also In re Enron Corp. Secs., Derivative & "ERISA" Litig.*, Nos. H-01-3624 & 03-5808, 2008 WL 744823, at *8 n.22 (S.D. Tex. Mar. 19, 2008) (absent an Event of Default, a trustee has virtually no obligations to investors, "though it performs administrative tasks for the [issuer] company, such as mailing

---

[3]       *See, e.g., Wells Fargo Bank Minn., N.A. v. Nassau Broad. Partners, L.P.*, No. 01 Civ. 11255 (HB), 2003 U.S. Dist. LEXIS 18285, at *9 (S.D.N.Y. Oct. 10, 2003) (governing agreement defined the scope of trustee's responsibilities); *Craig v. Bank of N.Y.*, No. 00 CIV 8154(SAS), 2002 WL 1543893, at *4 (S.D.N.Y. July 12, 2002) (citing *Elliott* for the proposition that a corporate trustee's duties are limited to those outlined in the governing agreement); *accord Magten Asset Mgmt. Corp. v. Bank of N.Y.*, No. 600410/10, 2007 WL 1326795, at *6 (N.Y. Sup. Ct. May 8, 2007) (dismissing claim that corporate trustee had extra-contractual duties and citing *Meckel* for noting that a corporate trustee's duties are exclusively defined within the governing agreement).

Although Defendants believe that the TIA does not apply here, if the Court disagrees, it is noteworthy that the PSA provisions and common law described in this section are consistent with Section 315(a)(1) of the TIA, which states that "prior to default … the indenture trustee shall not be liable except for the performance of such duties as are specifically set out in such indenture." 15 U.S.C.A. §77ooo(a)(1).  "New York state and federal case law are consistent" with this provision of the TIA.  *AG Capital Funding Partners*, 896 N.E.2d at 66-67 ("[P]rior to default … the indenture trustee shall not be liable except for the performance of such duties as are specifically set out in such indenture.").

-6-

notices or selecting bonds for redemption" (brackets in original) (citation omitted)); *Magten Asset Mgmt. Co. v. Bank of N.Y.*, No. 600410/10, 2007 WL 1326795, at *6 (N.Y. Sup. Ct. May 8, 2007) (quoting *Elliott*, 838 F.2d at 71) ("Given the relationship the indenture trustee has with both the securities issuers and holders, courts have 'consistently rejected the imposition of additional duties on the [indenture] trustee.'").[4]

**B.    The Contracts for these Trusts Mandate a Narrow, Ministerial Trustee Role.**

**1.    The Express Duties of the Trustee**

Consistent with the settled law cited above, the PSAs for the 19 trusts at issue in the SAC ("the Trusts") provide that absent an Event of Default: (1) the duties and obligations of the Trustee are defined and delimited solely by the express provisions of the PSA; (2) the Trustee is not liable except for the performance of such duties and obligations as are specifically set forth in the PSA; and (3) no implied obligations shall be read into the PSA against the Trustee.  Affidavit of Irina Palchuk, Ex. A at 109, § 8.01 (a), (c)(i) & (ii).[5]

To ensure that potential investors in the Trusts understood the specific role of the Trustee, the Prospectus Supplement for the Trust included a section, entitled "*Material Duties of the Trustee*," stating that "[t]he trustee will have the following material duties under the [PSA]":

- to authenticate and deliver the certificates, pursuant to the order of the depositor;

- to maintain a certificate register and, upon surrender of certificates for registration of transfer or exchange, to authenticate and deliver new certificates;

- to make the required distributions to Certificateholders on each Distribution Date, in accordance with the monthly distribution report prepared by the administrative agent;

- to deliver or make available to Certificateholders the monthly distribution

---

[4]    Courts have recognized for at least 65 years that indenture trustees do not have undivided loyalties, but rather owe duties to multiple parties, some of which have different interests.  *See, e.g., In re Prudence-Bonds Corp.*, 76 F. Supp. 643, 646 (E.D.N.Y. 1948) ("Where we have a corporate trustee, the rights involved are not alone the rights of a bondholder but of all parties to the Trust Agreement.  Thus the Debtor, the Corporate Trustee and the Bondholders have rights which must be protected.").

[5]    Citations to the "Palchuk Affidavit" are to the Affidavit of Irina Palchuk submitted in support of Defendants' Corrected Joint Motion to Dismiss the Corrected Complaint, filed on June 21, 2012, ECF No. 29.  Defendants will submit to the Court a courtesy copy of this affidavit along with the courtesy copy of this brief.

19920272.1

reports and any other reports required to be delivered by the trustee under the pooling agreement;

● in the event that the trustee has received notice from [Washington Mutual Bank] that the remaining Class Principal Balance of a class of certificates is to be paid on a specified Distribution Date, to send a notice to that effect to the holders of that class of certificates; and

● to act as successor servicer, or to appoint a successor servicer, to the extent described under "*Events of Default Under the Pooling Agreement.*"[6]

Palchuk Aff., Ex. E at S-27.  In the SAC, Plaintiffs do not allege that the Trustee breached any of these duties.

The PSAs also provide that the Trustee: (1) must notify the Servicer if it "finds any document or documents required to be included in the Mortgage File for a Mortgage Loan pursuant to the definition of 'Mortgage File' not to have been executed and received;" and (2) like the Depositor and Servicer, must notify the others "upon discovery" of a breach of a representation or warranty by the Depositor or Seller that "materially and adversely affects the value of the related Mortgage Loans or the interests of the Trust in the related Mortgage Loans." Palchuk Aff., Ex. A at 69, 70, §§ 2.07, 2.09.

Significantly, and again in keeping with the Trustee's limited duties, the Trustee is not "deemed to have knowledge or notice of any matter, including without limitation an Event of Default, unless *actually known* by a Responsible Officer" or unless written notice referencing the PSA or the Certificates is received at the Trustee's Notice Address.  *Id.* at 111, § 8.02(vi) (emphasis added).  Accordingly, despite Plaintiffs' claim to the contrary, the Trustee *cannot* be charged with constructive knowledge (*i.e.*, what it should have known or could have discovered upon inquiry) of missing documents or of Seller breaches of representations and warranties.

Only after an Event of Default has occurred—and then only if the Event of Default remains uncured—is the Trustee required to "exercise such of the rights and powers vested in it

---

[6]    Plaintiffs cannot deny having read the Prospectus Supplements, given that the Chicago Police Second Amended Consolidated Class Action Complaint in their Western District of Washington action devoted more than 20 pages to specific alleged misstatements in the Prospectus Supplements, on which investors purportedly relied.  Second Amended and Consolidated Complaint for Violations of Sections 11, 12 and 15 of the Securities Act of 1933 at 46-69, *In re Wash. Mut. Mortg. Backed Sec. Litig.*, No. C09-0037 (MJP) (W.D. Wash. Apr. 1, 2010), ECF No. 164, Palchuk Aff., Ex. C.  Tellingly, nowhere in the 84-page complaint in that case did Chicago Police attribute any blame to the Trustee for its losses.

by this Agreement, and use the same degree of care and skill in its exercise as a prudent person would exercise or use under the circumstances in the conduct of such person's own affairs." *Id.* at 143, § 8.01(a).

**2.      Duties *Not* Assumed by the Trustee Under the PSAs for the Trusts**

In addition to defining and delimiting the Trustee's duties, the PSAs also identify certain duties that the Trustee did *not* assume, including, as shown below, any duty to enforce the Seller's obligations relating to breaches of its representations and warranties or document delivery obligations, or to initiate its own investigations prior to an Event of Default.[7]  The PSA further provides that "no implied covenants or obligations shall be read into this Agreement against the Trustee."  Palchuk Aff., Ex. A at 109, § 8.01(c)(ii).  This provision reinforces the observations discussed above from cases such as *CPIP*, *Peak Partners*, *AG Capital*, *Elliott*, *Meckel*, *In re Enron*, and *Magten*—because the RMBS trustee performs a ministerial role for multiple parties, no implied duties, which might upset the careful balance of duties vis-à-vis all parties to the trust, may be read into the agreement.

**a.      The Trustee Has No Duty to Enforce the Seller's Obligations Regarding Loan-Level Representations and Warranty Breaches or Document Delivery Duties.**

Contrary to the allegations of the SAC, the PSAs assign to the Servicer the sole responsibility for enforcing material breaches of representations and warranties by the Seller and breaches of the Depositor's obligation to deliver complete Mortgage Files to the Custodian. Under the PSAs, the Servicer—not the Trustee—must "take appropriate steps on behalf of the Trust to enforce the Seller's obligation ... to cure" any Seller breaches of representations and warranties in the MLPA or to "repurchase or substitute" any affected Mortgage Loan.  Palchuk

---

[7]      In the earlier Complaint, Plaintiff Chicago Police alleged that the Trustee breached a duty by "negligently review[ing] the loan files for missing, incomplete, and defective documentation," Complaint ¶ 69, by "failing to detect … obvious defects in the documentation of the Mortgage files," *id.* ¶ 70, and by breaching duties to "review the Mortgage Loan Files," "to review the endorsements to the original Mortgage Notes," and "to identify those Mortgage Loans for which there was missing, defective and or incomplete documentation," *id.* ¶ 90.  Plaintiffs have abandoned those theories in the SAC.

19920272.1

Aff., Ex. A at 72-73, § 2.09.  Similarly, under the PSAs, the Servicer—not the Trustee—must "take appropriate steps on behalf of the Trust to enforce [the] Seller's obligation ... to cure" mortgage loan document delivery breaches or "repurchase or substitute" any affected Mortgage Loan.  *Id*. at 73, § 2.09.  The PSAs also provide that "[i]n no event shall the Trustee … be held liable for the acts or omissions of the Servicer."  *Id.* at 111, § 8.02(vii).

**b.      The Trustee Has No Pre-Default Duty to Investigate Unless Properly Directed To Do So By Certificateholders.**

Section 8.02 of the PSAs expressly provides that, absent direction from Certificateholders evidencing percentage interests of at least 25% of the Trust[8] or the occurrence of an Event of Default, the Trustee has *no* duty to investigate.  Palchuk Aff., Ex. A at 110, § 8.02(iv).  Under Section 8.02, the required percentage of Certificateholders may instruct the Trustee to perform additional actions if the Certificateholders agree to indemnify the Trustee for its liability and expenses (either directly or, if permitted under the PSA, from Trust assets) incurred in performing such additional actions.  The reason for this is simple: investigations can be expensive, and the only funds available for such an investigation are Trust assets that belong to all the Certificateholders.  Accordingly, 25% of Certificateholders may "request in writing" that the Trustee perform an investigation, and the Trustee may require reasonable indemnity as a condition to proceeding.  Palchuk Aff., Ex. A at 110-11, § 8.02(iv).  The Trustee cannot be liable for investigating or following any other direction given by 25% of Certificateholders.  *Id.* at 110, § 8.01(c)(iii).

The requirement that Certificateholders directing the Trustee offer indemnity is critical to the economics of the transaction and protects the Trustee, who, as a low-paid service provider, is not expected to risk or expend its own funds:

> No provision of this Agreement shall require the Trustee or the Delaware Trustee to expend or risk its own funds or otherwise incur any financial liability in the performance of its duties hereunder (except for the giving of required notices), or in the exercise of any of its rights or powers, if it shall have reasonable grounds for believing the repayment of such funds

---

[8]      For convenience, Defendants will refer to this quorum as "25% of Certificateholders."

> or adequate indemnity against such risk or liability is not reasonably assured to it.

*Id.* at 111, § 8.02(vii).  This transaction structure also protects Certificateholders by enabling them to direct how the Trustee or other service providers incur expenses of the Trusts.[9]

### 3. It is Undisputed That Certificateholders Did Not Direct the Trustees to Assume Duties Beyond the Limited Functions Expressly Set Forth in the PSAs.

Although 25% of the Certificateholders may direct the Trustee under the PSAs to take extraordinary actions—such as asserting repurchase claims against responsible parties or obtaining and then investigating loan origination files or custodial files—they also may choose to preserve Trust assets, investigate on their own, or pursue a different path entirely.  The Trustee must respect those decisions.  In the SAC, Plaintiffs do not allege that they—or any other Certificateholders—directed the Trustee to investigate anything at a time when the Plaintiffs were still Certificateholders and thus had standing to issue such an instruction.  For reasons set forth below, Plaintiffs also failed to allege that an Event of Default occurred, so no implied post-Event of Default duty to investigate could have been triggered.

Rather than instruct the Trustee to investigate, the Certificateholders here opted to pursue different relief.  At least 15 different Certificateholders sued WaMu directly, including in class actions on behalf of all Certificateholders of the Trusts, to recover losses that they believed resulted from the inclusion of loans in the Trusts that purportedly did not belong in the Trusts.  Notably, those investors, who collectively purchased more than $440 million in Certificates of the Trusts, included large investors such as Fannie Mae, Freddie Mac, and Allstate, as well as *Plaintiffs themselves*.  Plaintiff Chicago Police, represented by the same counsel that they have in this case, filed a class action against WaMu, alleging that the Trusts contained inappropriate

---

[9]     A related provision, § 10.03, further protects Certificateholders and the Trustee by requiring Certificateholders who wish to file any lawsuit relating to the PSA to demonstrate that they hold 25% of the Certificates and to offer reasonable indemnity to the Trustee.  The Trustee is not required to exercise any express or extraordinary powers "or to make any investigation of matters arising hereunder … at the request, order or direction of any of the Certificateholders unless such Certificateholders have offered to the Trustee reasonable security or indemnity against the costs, expenses and liabilities which may be incurred therein or thereby."  Palchuk Aff., Ex. A at 125, § 10.03.

loans—the same theory that is asserted here.  *Compare, e.g.*, Second Amended and Consolidated Complaint ¶ 9, *In re Wash. Mut. Mortg. Backed Sec. Litig.*, No. C09-0037 (MJP) (W.D. Wash. Apr. 1, 2010), ECF No. 164, Palchuk Aff., Ex. C ("WaMu conducted inadequate due diligence with respect to whether the underlying mortgage loans were originated in conformity with the underwriting guidelines stated in the Offering Documents—ignoring deficient lending documentation and inflated appraisals of the properties collateralizing the mortgages underlying the Certificates."), and *id.* ¶¶ 136-71, *with* SAC ¶ 54 ("WaMu systematically violated both legal requirements and its own underwriting guidelines for the origination and transfer of its mortgage loans, including those which it securitized.").  Chicago Police secured a $26 million settlement for a class of Certificateholders in the WaMu class action and described the "extensive work performed by Plaintiffs' Counsel for the benefit of the Class":

> [T]hey spent considerable time and resources to develop a case presenting expert statistical analysis of mortgage lending practices, due diligence and damages, among other subjects; conducted substantial merits discovery, including the review of 27 million pages of documents and the taking or defending of 54 depositions; and demonstrated to Defendants that they were prepared to pursue this matter through trial and appeals.

Motion and Memorandum of Points and Authorities in Support of Plaintiffs' Application for Award of Attorneys' Fees and Reimbursement of Expenses at 1-2, *In re Wash. Mut. Mortg. Backed Sec. Litig.*, No. C09-0037 (MJP) (W.D. Wash. Dec. 21, 2012), ECF No. 511.  Class counsel re-underwrote thousands of mortgage loans in the Trusts and prepared 11 expert reports. *Id.* at 8-9.  This "extensive work," performed on a contingency basis, led to more than $3.6 million in out-of-pocket expenses and resulted in an award of $4.42 million in attorneys' fees, an amount that Class Counsel claims was "well below the hourly billings that would have resulted from such efforts."[10]  Of course, other Certificateholders who have sued separately also presumably have incurred significant fees and expenses investigating these issues.  And the SAC

---

[10] *Id.* at 10-11; Order Awarding Plaintiffs' Counsel's Attorneys' Fees and Reimbursement of Expenses at 3, *In re Wash. Mut. Mortg. Backed Sec. Litig.*, No. C09-0037 (MJP) (W.D. Wash. Jan. 11, 2013), ECF No. 514.

also alleges that multiple "well-publicized" public investigations of WaMu's origination and securitization practices were ongoing as early as 2007, in addition to the private investigations discussed above.  SAC ¶¶ 52-54.[11]

Despite the "extensive work" Plaintiffs' counsel and other Certificateholders undertook investigating defects in these Trusts, Plaintiffs do not allege that they ever notified the Trustee of any purportedly repurchaseable loans they discovered in the course of their class action litigation.

### III.   ANALYSIS

#### A.   The SAC Fails to State a Claim for Breach of Contract.

The SAC does not cure the defects in the earlier Complaint, including the failure to allege a breach of any contractual Trustee duties.  To state such a claim under Delaware law, a plaintiff must allege "the existence of the contract, the breach thereof, and resultant damage." *Winston v. Mandor*, 710 A.2d 835, 840 (Del. Ch. 1997).  "[T]he clear, literal meaning of the terms in a legally binding agreement should be given effect when those terms establish the parties' common meaning so that a reasonable person in the position of either party would have no expectations inconsistent with the contract language."  *NAMA Holdings, LLC v. World Mkt. Ctr. Venture, LLC*, 948 A.2d 411, 418 (Del. Ch. 2007).

A "court need not accept as true an allegation that is contradicted by documents on which the complaint relies."  *Williams v. Citibank, N.A.*, 565 F. Supp. 2d 523, 527 (S.D.N.Y. 2008); *see also, e.g., Olin Corp. v. E.I. DuPont De Nemours and Co.*, No. 05-CV-100S(SC), 2006 WL 839415 (W.D.N.Y. Mar. 27, 2006) ("If the documents referenced in the complaint contradict the facts alleged by the plaintiff, the documents control and the court need not accept as true the plaintiff's allegations."); *Dynamis Therapeutics, Inc. v. Alberto-Culver Int'l Inc.*, C.A. No. 09-

---

[11]      This list likely is incomplete because regulatory investigations typically are confidential unless and until they result in settlements or publicly-filed actions.  Other Certificateholders who, like Plaintiffs, are fiduciaries to investors in their pension plans, undoubtedly were aware at least of the public ongoing regulatory investigations.  According to Plaintiffs, they would have to have been living under a rock not to know about them.  *See* Pl.'s Mem. Law Opp. Def.'s Mot. Dismiss at 17, ECF No. 30.

773-GMS, 2010 WL 3834405, at *5 (D. Del. Sept. 24, 2010) (same).

The SAC alleges that Defendants violated two purported contractual duties: (1) a pre-Event of Default duty to provide notice to the Servicer of missing loan documents and violations of Seller representations and warranties, and (2) a post-Event of Default "prudent person" duty to "enforce" the Seller's obligations by "su[ing] to enforce the Covered Trusts' rights to have the Seller repurchase Mortgage Loans."  SAC ¶ 79.  As detailed below, both of these claims are defeated by the unambiguous language of the contracts.

1.    **Plaintiffs Do Not Allege Facts Constituting a Breach of the Duty to Provide Notice of Missing Documents or Seller Breaches.**

In the December 7 Order, the Court ruled that Plaintiffs' allegations of "widely publicized" information, SAC ¶ 54, regarding flaws in WaMu's origination practices were sufficient for Defendants to be "chargeable with actual knowledge of both some number of deficient Mortgage Files and the Seller's breaches of … representations and warranties." December 7 Order at 29.  Based on this view, the Court concluded that Plaintiffs had alleged a Trustee failure to provide notice of such information to the Servicer.  *Id.*  The Court reasoned that public information about other WaMu trusts, while obviously not evidence of such defects in the loans in *these* Trusts, could trigger a Trustee duty to investigate potential problems in these Trusts—and that the Trustee's access to "Mortgage Files" meant that such an investigation could have yielded "actual knowledge" of such defects, in turn triggering a duty under Sections 2.07 and 2.09 to give notice to the Servicer of missing documents and Seller breaches.

The Court relied on two cases not cited by the parties in their briefing: *Morgan Guaranty Trust Co. of N.Y. v. Bay View Franchise Mortgage Acceptance Co.*, No. 00 CIV. 8613 (SAS), 2002 WL 818082, at *5 (S.D.N.Y. Apr. 30, 2002), in which Judge Scheindlin held that a "party 'discovers' a breach when it knows *or should know* that the breach has occurred" (emphasis the Court's), and *MASTR Asset Backed Securities Trust 2006-HE3 ex rel. U.S. Bank Nat'l Ass'n v. WMC Mortgage Corp.*, 2012 WL 4511065, at *7 (D. Minn. Oct. 1, 2012), in which the court held that an RMBS Trustee, upon "[l]earning of facts merely suggestive of a breach," is required

-14-

19920272.1

to "pick up the scent and nose to the source"—*i.e.*, investigate the facts.

Following the Court's December 7 order, the Court granted Defendants' request to present arguments for reconsideration of the Court's "actual knowledge" holding in the present Motion.  Plaintiffs, meanwhile, have added in the SAC allegations of additional public information that purportedly triggered the Trustee's actual knowledge, including the commencement of other lawsuits against WaMu and WaMu's earnings reports.  Plaintiffs have also added an allegation that the exception reports Defendants or their agent prepared regarding the loan files triggered Defendants' actual knowledge of missing loan documents.  SAC ¶ 76.  For the reasons that follow, neither these new allegations of public knowledge nor Plaintiffs' similar allegations repeated from their earlier pleading suffice to establish "actual knowledge" of breaches in these particular Trusts, as is required under the PSAs and under well-settled law.

a.   **The Contracts Impose an *Actual* Knowledge Standard and Disclaim Any Duty to Investigate.**

The PSAs expressly provide that Trustee must have *actual knowledge* of any missing loan documents or Seller breaches of representations and warranties before the Trustee has a duty to notify the Servicer.  Section 8.02(vi) states that the Trustee shall not:

> be deemed to have knowledge or notice of *any matter*, including without limitation an Event of Default, unless *actually known* by a responsible officer, or unless written notice thereof referencing this Agreement or the Certificates is received at the Notice Address of such trustee.

Palchuk Aff., Ex. A at 111, § 8.02(vi) (emphasis added).  And Section 2.09 states that:

> Upon discovery by any of the [Seller], the Servicer or the Trustee (*in the case of the Trustee, having actual knowledge thereof*) of a breach of any of the [Seller] representations and warranties … that materially and adversely affects the value of the related Mortgage Loans or the interests of the Trust in the related Mortgage Loans, the party discovering such breach shall give prompt written notice to the others."

*Id.* at 72, § 2.09 (emphasis added).

The difference between "actual" and "constructive" knowledge is well settled in this Circuit and elsewhere.  For example, in *LaScala v. Scrufari*, 479 F.3d 213 (2d Cir. 2007), the

-15-

defendant ERISA plan manager argued that the district court's finding that the plaintiff trustees "knew or should have known" of the defendant's allegedly improper activities triggered the ERISA statute of limitations, barring the claims.  The Second Circuit rejected this argument by emphasizing the distinction between "actual" and "constructive" knowledge: "ERISA § 413(2) requires 'actual knowledge,' and the district court's finding that certain plaintiffs, but not others, had constructive knowledge, even if credited, would not satisfy this provision."  *Id.* at 220 n.1. *See also, e.g., Janese v. Fay,* 692 F.3d 221, 228 (2d Cir. 2012) (limitations period triggered "when a putative plaintiff has 'actual knowledge' of the violation . . . . 'constructive knowledge' of the breach does not trigger the three-year period"); *Gravatt v. City of New York*, 226 F.3d 108, 127 n.17 (2d Cir. 2000) ("'should-have-known' constructive knowledge is insufficient to meet the actual knowledge requirement" under admiralty law); *Zaccaro v. Shah*, 746 F. Supp. 2d 508, 525 (S.D.N.Y. 2010) ("Actual knowledge of the breach of fiduciary duty is required, constructive knowledge will not suffice.").

The contracts also provide that the Trustee has no duty to investigate:  Section 8.02(iv) states that prior to an Event of Default, the Trustee shall not "be bound to make *any investigation* into the facts or matter stated in any resolution, certificate, statement, instrument, opinion, report, notice, request, consent, order, approval, bond, or other paper or document, unless requested in writing to do so" by 25% of Certificateholders, who agree to indemnify the Trustee for the costs, expenses, and liabilities of such investigation.  Palchuk Aff., Ex. A at 111, § 8.02(iv) (emphasis added).

        **b.**      **In the December 7 Order, the Court Applied a Constructive Knowledge and an Inquiry Notice Standard, Not An Actual Knowledge Standard.**

Defendants respectfully submit that the Court's December 7 Order erred by conflating the concept of "actual knowledge" with common notions of "constructive notice" or "inquiry notice" that are not applicable under these contracts.  In so doing, the Court invoked case law that, likewise, does *not* apply an "actual knowledge" standard, but rather a constructive knowledge or

-16-

inquiry notice standard.  Because these cases were not cited by either party in the earlier briefing, Defendants did not have an opportunity to make these points to the Court.[12]

In *Morgan Guaranty*, the issue before the court was when the plaintiff loan purchaser—not a trustee with broad protections and narrow duties—had "discovered" the defendant loan seller's alleged breaches of the loan sale agreement, an inquiry the court undertook in the course of determining whether the notice plaintiff provided of such alleged breaches was "prompt." 2002 WL 818082, at *5.  The court cited no contractual language defining the standard of knowledge for discovery in connection with that transaction, and instead applied a constructive knowledge standard drawn from a case addressing a claim for the rescission of a contract, *Banque Arabe et Internationale D'Investissement v. Maryland Nat'l Bank*, 850 F. Supp. 1199 (S.D.N.Y. 1994).  To rescind a contract, a plaintiff generally must give "prompt notice" of the claim upon discovery of the right to rescind, and *Banque Arabe* identified the required knowledge standard for such discovery as one of inquiry notice: "The principle of promptness is a fairly stringent requirement. … *Even where a party does not have full knowledge of fraud, he can be held to have been delinquent in raising the rescission claim.  A party must assert his right to rescind after having had notice of the fraud and the opportunity to investigate.*" *Id.* at 1211 (emphasis added).  In *Morgan Guaranty*, Judge Scheindlin applied this same principle to the question of "discovery" of the seller's alleged breaches.  2002 WL 818082, at *5.  But that "inquiry notice" principle has no application here, where the contractual standard is one of "actual knowledge."

The same distinction renders inapposite the Minnesota case cited by the Court, *WMC Mortgage Corp.*, 2012 WL 4511065—a decision that relied on the inapposite *Morgan Guaranty* decision.  The court in *WMC* explicitly distinguished between "actual" and "constructive" knowledge, holding that the trustee "was *constructively aware* of the breaches before it received the August 2010 report that provided the basis for its *actual knowledge.*"  *Id.* at *7 (emphasis

---

[12]      The *WMC* decision was not issued until after Defendants' prior motion to dismiss was fully briefed and argued.

added).  And, as in *Morgan Guaranty*, the *WMC* decision did not purport to be construing or applying an "actual knowledge" standard.

Nor can an alleged post-Event of Default duty to investigate support allegations of actual knowledge pre-default.  In footnote 22 of the December 7 Order, the Court reasoned that the contracts' purported *post*-Event of Default duty to investigate could support Plaintiffs' allegations of actual knowledge.  According to Plaintiffs' allegations, however, the only events that could *trigger* an Event of Default in this case first require the existence of a *pre*-Event of Default duty to investigate, which Plaintiffs and the Court recognize the Trustee does not have.  Hearing Transcript at 104, Vassos Decl., Ex. B; December 7 Order at 30 n.22.  Because the duty to investigate must be preceded by the Event of Default, and vice versa, the Court's reasoning is circular.

Defendants respectfully submit that the Court should reconsider its reliance on these cases, and instead should apply the relevant authority, summarized below, rejecting a duty to "nose to the source" when the applicable contract *expressly disclaims* any such duty, and confirming the much more limited trustee role embodied by the "actual knowledge" requirement.

> ### c.  Analyzed Under the Proper Legal Standard, the SAC Fails to Allege Actual Knowledge.
>
> #### (1)  Plaintiffs' Expanded Allegations of Public Data Regarding Other Trusts Are Still Insufficient.

Plaintiffs' allegations, individually and in the aggregate, fail to establish that the Trustee had "actual knowledge" of missing loan documents or Seller breaches of representations and warranties with respect to the loans in the specific Trusts on which Plaintiffs sue.  SAC ¶¶ 59, 87.  Plaintiffs cite monthly distribution reports showing "increases in the trends of loan delinquencies," *id.* ¶ 52, and losses in the Trusts, but those reports, prepared by the Servicer using Servicer data, could be explained by many possible causes other than missing documents or Seller breaches, including the cataclysmic downturn in the housing market that led to a collapse in property values across the United States.  The concrete reason(s) for the losses is

immaterial because of the fundamental difference between actual knowledge of mere *losses* and actual knowledge of underlying Seller breaches.  Moreover, the Trustee has no duty to analyze, or even read, such reports; that is not within its province.  Instead, its duty with respect to the reports simply is to make them available to Certificateholders and Rating Agencies, which it did and continues to do.  Palchuk Aff., Ex. A at 93, § 4.05.

Plaintiffs also cite news reports alleging loan underwriting abuses by WaMu and reporting on 2008 lawsuits against WaMu for securities fraud, WaMu's bankruptcy, SAC ¶ 53, and "well publicized" investigations, *id.* ¶ 54.  Again, at best such information could trigger *constructive* knowledge of potential defects in general—not even in *these Trusts*.  The most that such constructive knowledge could have done is, perhaps, to put Defendants on inquiry notice of defects that might exist in other trusts.  This "constructive" and "inquiry notice" theory is insufficient under the contracts.  The Court's own logic in rejecting Plaintiffs' argument for "class standing" for investors who purchased certificates in Trusts other than those in which Plaintiffs invested illustrates the inadequacy of these allegations.  By parity of reasoning, just as "a breach of the Trustee's duties with respect to one Trust does not necessarily implicate the same 'set of concerns' that certificateholders in another trust would have," December 7 Order at 15, a breach of Seller representations or other defects in one Trust could not provide actual knowledge about breaches or other defects in *another* Trust.

An attempt to draft the hypothetical notice that the Trustee allegedly failed to provide to the Servicer also demonstrates the inadequacy of Plaintiffs' allegations.  At best, the Trustee could have written to the Servicer to describe media reports of potential issues with WaMu origination practices, but without any Trust-specific—let alone loan-specific—information.  Such a hypothetical notice could not notify the Servicer of a single loan that was the subject of a breach and therefore merited repurchase, and thus could not constitute the notice described in Sections 2.07 and 2.09.

19920272.1

### (2)   Plaintiffs' New Theory Concerning Exception Reports Cannot Support Actual Knowledge of Missing Loan Documents.

Plaintiffs have abandoned their prior theory that the Trustee or Initial Custodian failed to review mortgage loan documents, and now allege—inconsistently—that Defendants had "actual knowledge" of missing loan documents from the exception reports prepared by the Initial Custodian and delivered to WaMu.  For two reasons, these new allegations do not save Plaintiffs' notice claim.

First, Plaintiffs fail to allege any facts to support their conclusory speculation that the exception reports contained evidence of widespread document defects in the mortgage loan files. Plaintiffs go no further than alleging that because Deutsche Bank, a trustee for *other* trusts, filed a proof of claim asserting such document defects for these *other* trusts, and "given WaMu's well-documented, systemic loan origination and securitization abuses, there is *every reason to believe* that voluminous exception reports documenting Mortgage Loan deficiencies similar to those cited by Deutsche Bank were also provided to WaMu with respect to the Covered Trusts." SAC ¶ 76 (emphasis added).  Plaintiffs' "reason to believe" hypothesis is not an allegation of fact; it is a confession that they have no facts.  Plaintiffs have not alleged that such document defects were present in the exception reports prepared here for *these Trusts*.  *See also* Hearing Transcript at 96, Vassos Decl., Ex. B (Plaintiffs' counsel's concession that they were aware of no document defects in these trusts).

In fact, Plaintiffs' own authority undercuts their speculation.  Plaintiffs cite the Interagency Review of Foreclosure Policies and Practices report published by the Federal Reserve, the OCC, and the OTS.  SAC ¶ 72.  This review found that:

> [w]ith some exceptions, examiners found that notes appeared properly endorsed, and mortgages appeared properly assigned. … Examiners found that servicers generally had possession and control over critical loan documents such as the promissory notes and mortgages.

Fed. Reserve Sys., Office of the Comptroller of the Currency, Office of Thrift Supervision, *Interagency Review of Foreclosure Policies and Practices* 8-9 (2011).[13]  Plaintiffs have failed to

---

[13]       *Available at* http://www.federalreserve.gov/boarddocs/rptcongress/

plead a plausible, non-speculative basis for the Court to conclude that mortgage loan documents were not delivered to the Custodian.

Second, the contracts provide that the exception report itself "shall be deemed to constitute" the required Trustee notice of missing documents.  Palchuk Aff., Ex. A at 69, § 2.07. These reports thus cannot form the basis of a claim for failure to provide notice; the reports *are* the notice.  Accordingly, by asking the Court to infer that WaMu received the exception reports, Plaintiffs plead themselves out of court on this theory.  *See* SAC ¶ 76.[14]

### d.     Courts Enforce Parties' Agreements Disclaiming a Duty to Investigate.

The PSAs' express limitation of the Trustee's duties and its entitlement to indemnity for performing extraordinary services at the direction of Certificateholders is consistent with the role of a typical RMBS trustee discussed above—namely, that a trustee, prior to an Event of Default, performs only narrow express ministerial duties for minimal compensation with broad exculpation.  Courts recognize the limited role of corporate trustees and enforce parties' agreements that expressly provide that a corporate trustee has no duty to investigate.  In *Magten Asset Management Corp. v. Bank of New York,* No. 600410/10, 2007 WL 1326795, at *7 (N.Y. Sup. May 8, 2007), for example, the court recognized that courts "have consistently rejected the imposition of additional duties on the trustee" beyond those in the trust agreement, and held that:

> [w]hether BNY had a duty to investigate NorthWestern's financial
> condition is governed by the standards applied to an indenture trustee's
> pre-default duty.  Neither the law regarding an indenture trustee's duties,
> nor the Indenture, supports Magten's contention that BNY was duty
> bound to examine NorthWestern's financial condition in order to decide

---

interagency_review_foreclosures_20110413.pdf.

[14]     No exception reports were required to be prepared and delivered to the Trustee except at closing and 45 days later.  Palchuk Aff., Ex. A at 69, § 2.07.  U.S. Bank did not become Trustee of any of the Trusts until 2009 or later.  Plaintiffs' attempt to impute the content of the exception reports to U.S. Bank by pleading that the PSAs required a predecessor trustee to deliver documents necessary for U.S. Bank to perform its role as trustee is unavailing.  This is because the exception reports are merely a snapshot reflecting what documents the custodian held in 2006 or 2007 and, therefore, would not be meaningful in 2009 or 2010, given that: (a) the custodians routinely receive loan file documents after closing; and (b) many loans were likely paid off in the interim between the issuance of the exception reports and U.S. Bank's receipt of the loan files.  And further, there is nothing in the documents that requires a re-review of the files to determine whether the documents are there when a successor trustee steps in.

whether NorthWestern had made the admission or was actually able to
pay its debts.

Requiring the Trustee, on its own initiative and without direction or payment, to
undertake a detailed review of loan files based on news reports and other public information—all
of which were equally available to the Certificateholders—would rewrite the terms and structure
of the governing agreements.  Indeed, if, absent Certificateholder direction, a Trustee spent
millions of dollars of Trust assets in an effort to rule out the possibility of breaches of
representations and warranties, the Trustee could be sued for doing so, and would be at risk of
liability in a way that the PSAs intentionally were drafted to prevent.  This concern is not
hypothetical, as Certificateholders have sued service providers to RMBS trusts seeking an
accounting of the "costs, charges, and expenses" for which the service providers obtained or
sought reimbursement from the trusts.  *See Knights of Columbus v. Bank of N.Y. Mellon*, No.
651442/2011 (filed N.Y. Sup. Ct. Aug. 16, 2011) (motion to dismiss pending).[15]

The New York Court of Appeals—the highest court in the jurisdiction with the most
well-developed body of corporate trust law—has rejected an analogous attempt by an investor to
blame a trustee for its losses.  *See Racepoint Partners, LLC v. JPMorgan Chase Bank, N.A.*, 928
N.E.2d 396, 399 (N.Y. 2010).  The investor alleged that the trustee's receipt from the issuer of
inaccurate public filings meant that the trustee had "actual knowledge" of the default and
therefore had a duty to give notice to the issuer and investors.  The court affirmed dismissal,
holding that the indenture agreements:

> do not create contractual duties on the part of the trustee to assure that
> the information contained in any report filed is true and accurate.  That is
> simply not the mission or purpose of the trustee or the contract under
> which it undertakes its duties.

*Id.*  The court noted that its holding was "consistent with the limited, 'ministerial' functions of
indenture trustees" and the terms of the indenture agreement.  *Id.* (quoting *AG Capital Funding
Partners, L.P.*, 896 N.E.2d 61 (N.Y. 2008)).  "Plaintiff's proposed interpretation, on the other

---

[15]     Plaintiffs do not claim—and the Trustees are not aware—that Plaintiffs ever took the position that
Trust assets should be used to investigate such public reports when Plaintiffs held Certificates of the Trust
and therefore had a beneficial interest in those Trust assets.

hand, would require indenture trustees to review the substance of SEC filings, so as to reduce the risk of liability, greatly expanding indenture trustees' recognized administrative duties far beyond anything found in the contract." *Id.* This is precisely what Plaintiffs improperly seek to do here.

      **e.**      **RMBS Investor Groups Reject a Pre-Default RMBS Trustee Duty to Investigate.**

The idea that a trustee under an "actual knowledge" standard should have undertaken its own investigations based on publicly available information is so extraordinary, in fact, that investors—including *Plaintiffs*—have rejected it. Plaintiffs' counsel conceded to this Court that although the Trustee has a duty to give notice to the servicer, the Trustee "*doesn't have to undertake an investigation by itself.*" Hearing Transcript at 104 (emphasis added), Vassos Decl., Ex. B.

Other investors who could stand to gain from a ruling that the Trustee is obligated to investigate have rejected the argument as well. The Association of Mortgage Investors—which holds itself out as "the primary trade association representing investors in mortgage-backed securities, including public pension funds, unions, university endowments, and private retirement systems"—recently argued that "*before an event of default takes place, trustees are under no obligation to determine whether a loan is in breach of representations and warranties.*"[16] Moreover, the President of Ginnie Mae, which guarantees investments in MBS securities and therefore has common interests with Certificateholders, acknowledged the limited role of corporate trustees, advocating that in *future transactions*:

> [t]he role of bond trustees may need to be expanded. *Bond trustees are currently responsible only for distributing monthly principal and interest payments to investors.* We should consider whether bond trustees need the ability to make sure loans are serviced properly, have the authority to require repurchase of defective loans by Issuers and give guidance to servicers on loan level loss mitigation issues.

---

[16] Declaration of Demian A. Ordway in Support of Motion for Leave to File Brief as Amicus Curiae, Ex. A at iv, 10, *MASTR Adjustable Rate Mortgages Trust 2006-OA2 v. UBS Real Estate Sec. Inc.*, No. 12-cv-7322 (HB) (S.D.N.Y. Dec. 13, 2012), ECF No. 38-1 (emphasis added).

*Are There Government Barriers to the Housing Market Recovery?: Hearing Before the Subcomm. on Insurance, Housing and Community Opportunity of the H. Fin. Servs. Comm.*, 112th Cong. 7 (Feb. 16, 2011) (written testimony of Ted Tozer, President, Ginnie Mae, U.S. Dept. of Hous. & Urban Dev.) (emphasis added).[17]

### f.    Plaintiffs Cannot Allege Any Damages from the Alleged Failure to Provide Notice.

In paragraph 82 of the SAC, Plaintiffs allege that the Servicer actually *had* the same constructive notice of the alleged Seller breaches that Plaintiffs complain the Trustee failed to deliver to the Servicer:

> Alternatively, the Servicer may itself have been deemed to "discover" the breaches of representations and warranties upon receiving the monthly reports published by the Trustee of the Trusts' spiking delinquencies and losses[.]

SAC ¶ 82.  Plaintiffs also allege (as noted above) that the exception reports provided to WaMu "caused the Trustee to 'find' … deficient mortgage files." *Id.* ¶ 10.  By Plaintiffs' allegations, then, the Servicer already had notice of exactly the information Plaintiffs allege that Defendants failed to provide.[18]  These allegations prevent Plaintiffs from alleging "but-for" causation of damages from the alleged failure to give notice.  *See, e.g., Ryder Entergy Dist. Corp. v. Merrill Lynch Commodities, Inc.*, 865 F.2d 492, 493 (2d Cir. 1989) (defendant breached a duty by filing erroneous certification to New York Mercantile Exchange, but no evidence that certification caused any damages); *Semi-Tech Litigation, LLC v. Bankers Trust Company*, 353 F. Supp. 2d 460, 486 (S.D.N.Y. 2005) (indenture trustee breached duties under the TIA, including duty to provide notice, but plaintiffs failed to establish that it would not have suffered its alleged losses had trustee acted differently), *aff'd in relevant part*, 450 F.3d 121 (2d Cir. 2006).

---

[17]    *Available at* http://portal.hud.gov/hudportal/HUD?src=/press/testimonies/2010/2011-02-16b.

[18]    Plaintiffs also allege that even if the Trustee had provided notice to the Servicer of the alleged Seller's breaches, the Servicer never would have carried out its enforcement obligations, undercutting any inference that Plaintiffs' losses were caused by the Trustee's "failure" to provide such notice.  SAC ¶ 82.

2.      **Plaintiffs Have Failed to Allege a Post-Event of Default Duty to Pursue Litigation Against the Seller.**

In the December 7 Order, the Court held that the Corrected Complaint failed to allege the violation of any post-Event of Default duty to enforce the Seller's obligations, or to take other "prudent person" steps to protect the Certificateholders, because Plaintiffs failed (1) to allege an Event of Default, or (2) to allege that if one occurred, a prudent Trustee would have taken the enforcement steps Plaintiffs allege it should have taken.  December 7 Order at 32.  The Court allowed Plaintiff to replead this claim.  Plaintiffs' SAC still fails to allege the violation of any post-Event of Default "enforcement" duties because: (1) it fails to cure the defect cited by the Court in dismissing the prior complaint (specifically, the lack of allegations of an actual Event of Default); (2) the "prevention doctrine" does not apply here to excuse the failure to allege an Event of Default; and (3) Plaintiffs have failed to allege that the Trustee did not act prudently.

a.      **Plaintiffs Have Not Alleged An Event of Default.**

Plaintiffs once again have failed to allege any of the specifically enumerated contractual predicates for an Event of Default based on Servicer failures.  As relevant here, an Event of Default occurs when there is:

> a failure on the part of the Servicer duly to perform in any material respect any other of the covenants and agreements on the part of the Servicer contained in the Certificates or in this Agreement and which continues unremedied for a period of 60 days after the date on which written notice of such failure, requiring the same to be remedied, shall have been given to the Servicer by the Trustee, or to the Servicer and the Trustee by the Holders of Certificates evidencing Percentage Interests aggregating not less than 25% [of the Trust].

Palchuk Aff., Ex. A at 105, § 7.01(ii).  The Event of Default purportedly alleged here thus could not occur without these five predicates being satisfied:

(1) The Seller breaches representations and warranties;

(2) The Servicer receives notice or otherwise becomes aware of the Seller breaches;

(3) The Servicer fails to perform its contractual obligations to enforce the Seller's obligations;

(4) Written notice is provided to the Servicer of its failure to enforce by either the Trustee

*or 25% of Certificateholders*; and

(5) The Servicer does not cure this failure within 60 days.

Because the SAC fails to allege that the notice required in (4)—which is separate from the notice required by Sections 2.07 and 2.09 addressed in Plaintiffs' claim discussed above— occurred, the Servicer was not given its contractual opportunity to cure, and there can be no Event of Default.  Plaintiffs erroneously assert that because the Servicer allegedly had notice of the underlying Seller breaches, "an additional 'notice' was not required for there to have been an 'event of default.'"  SAC ¶ 82.  This analysis is incorrect because Section 7.01(ii) of the PSA expressly requires notice from either the Trustee or 25% of Certificateholders to the Servicer that it has *failed to remedy such breaches and is now on a 60-day clock* before an Event of Default occurs.  The contracts do not allow for mere knowledge of the breaches to substitute for the express warning that triggers the 60-day cure period.

This should be the end of the inquiry.  Plaintiffs have failed, for a second time, to allege any Event of Default, and it follows that they have failed to allege the violation of any Trustee duties that would be triggered by an Event of Default.  *See, e.g., Bankers Trust*, 353 F. Supp. 2d at 482 ("[N]o Event of Default under the indenture occurred while BT served as trustee.  BT therefore had no duty to do the things that the plaintiff argues it should have done in the exercise of prudence"), *aff'd in relevant part*, 450 F.3d 121 (2d Cir. 2006).

### b.     The "Prevention Doctrine" Is Inapplicable.

To save their claim regarding Trustee post-Event of Default duties to "enforce," Plaintiffs allege that "had the Defendants given the Servicer the required notice … an 'event of default' would have occurred," and that "well-established law" prevents defendants from "stand[ing] behind their own failure to give notice as a defense" to their post-default duties to "act prudently" to protect the investors.  SAC ¶ 60.  This argument, based upon the logic of the so-called "prevention doctrine," fails for several reasons.  First, under the PSAs, the Certificateholders themselves could have provided the required notice of failure to remedy to the

Servicer, and Plaintiffs have alleged neither the provision of such notice from the requisite number of Certificateholders, nor any facts showing that Defendants prevented such notice. Second, Plaintiffs' hypothetical allegations that if the Servicer had received the allegedly "prevented" notice, it would not have taken any steps to cure are too speculative and implausible to satisfy Rule 8.  Third, that doctrine presupposes an implied contractual duty that is expressly foreclosed by these contracts.

### (1)    Certificateholders Could Have Provided the Servicer with Notice Under Section 7.01(ii).

"The 'prevention doctrine' provides that a party may not escape contractual liability by reliance upon the failure of a condition precedent where the party wrongfully prevented performance of that condition precedent."  *Mobile Commc'ns Corp. of Am. v. MCI Commc'ns Corp.*, No. 8108, 1985 WL 11574, at *4 (Del. Ch. Aug. 27, 1985).  Plaintiffs have not alleged that the Defendants prevented anything from occurring, because the contracts provide an alternative means for the provision of notice to the Servicer under Section 7.01(ii) — 25% of Certificateholders can provide the predicate notice, instead of the Trustee.  Palchuk Aff., Ex. A at 105, § 7.01(ii).  Plaintiffs have not alleged that Defendants prevented this alternative Certificateholder notice from occurring.  Indeed, Plaintiffs allege that the Trustee was on notice of the alleged loan defects because of *public* information equally available to Plaintiffs, and Plaintiffs even allege that Certificateholders *had notice* of the alleged loan defects in these securitizations.  SAC ¶ 57.  Absent an allegation that Defendants somehow prevented Certificateholders from using the "widely publicized" information at their fingertips (or the results of their own analyses) to put the Servicer on notice of its supposed breaches, this equitable doctrine has no application; the "prevented" condition precedent could have been fulfilled by Certificateholders themselves.

### (2)    Plaintiffs' Allegations that the Servicer Would Have Failed to Cure Are Speculative and Implausible.

Plaintiffs also ask the Court to assume that the Servicer, if put on notice of a potential

Event of Default and its opportunity to cure, would not have taken any steps to remedy its alleged breach.  These allegations are too attenuated and implausible to pass muster under *Twombly* and *Anderson News,* and would ask the prevention doctrine to do too much.  Plaintiffs allege:

> It is apparent from the experience of Deutsche Bank acting as Trustee for other WaMu MBS Trusts, and the fact that senior officers of WaMu Home Loans were well aware of the systemic breaches of representations and warranties in the Covered Trusts, that had the Defendants in this case given the required notice, that the Servicer who was operated by the same people as the Seller, would not have acted to put back the defective loans, and that the Seller would not have repurchased the defective loans. In other words, even if Defendants had given notice as required, an 'Event of Default' would nonetheless have occurred.

SAC ¶ 82.

This chain of hypothetical and counterfactual reasoning, when contrasted with the actual facts alleged here, fails the Rule 8 requirement of a showing of an entitlement to relief.  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 557 (2007) (factual allegations that "sto[p] short of the line between possibility and plausibility of entitle[ment] to relief" are insufficient); *Anderson News, L.L.C. v. American Media, Inc.*, 680 F.3d 162, 182 (2d Cir. 2012) ("For a complaint to be sufficient, the claim asserted must be one that, in light of the factual allegations, is at least 'plausible'").  None of the facts alleged—whether about WaMu officials' knowledge of loan defects, or "the experience" of Deutsche Bank as Trustee of *other* trusts—addresses the contractual language requiring notice to the Servicer of its "failure" to perform its own obligations, "requiring the same to be remedied."  PSA 7.01(ii).  Such notice, in other words, would have alerted the Servicer that it had a 60-day window to perform or face the "terminat[ion of] all the rights … of the Servicer, including its right to the Servicing Fee, under this Agreement."  Palchuk Aff., Ex. A at 105-108, § 7.01.

Plaintiffs have not alleged—and cannot allege—any basis to conclude that the Servicer, in these circumstances, would have failed to perform rather than risk forfeiting its rights under the Agreement.  Allegations that WaMu officials were "aware" of loan defects and did not act are not the same thing as allegations that WaMu officials were aware that their own right to

-28-

payment in the role of Servicer was now on a clock, and that those officials nevertheless did not make, or would not have made, any effort to cure.  Moreover, Plaintiffs ignore the fact that many of these Trusts had loans originated by non-WaMu entities; Plaintiffs' allegation that the Servicer would not have taken any enforcement action against another WaMu entity is particularly irrelevant to these loans.[19]

Plaintiffs' required assumption that the Servicer would not enforce obligations against the Seller would read out of the PSAs the requirement of an opportunity to cure, and in essence convert any Seller breach into an Event of Default.  That result is inconsistent with the structure of the agreement and the intent of the contracting parties, and thus would improperly cause the prevention doctrine to "operate at cross-purposes to th[e] [parties'] intent." *Consolidated Edison, Inc. v. Northeast Utilities,* 426 F.3d 524 , 529; *see also HGCD Retail Services v. 44-45 Broadway Realty Co.*, 37 A.D.3d 43, 53 (N.Y. Sup. Ct. 2006) (when applying the prevention doctrine, "[t]he implied obligation . . . must be consistent with the intent of the parties to the agreement").  Plaintiffs ask the Court to ignore the enforcement mechanism negotiated by the sophisticated parties to these transactions and to appoint the Trustee as a replacement enforcer. At all relevant times, WaMu or an affiliate acted as the Seller and the Servicer, and the Servicer was charged with enforcing the Seller's breaches.  Plaintiffs' allegation that in hindsight the process was unlikely to be effective does not justify their request to the Court to hold the Trustee liable for failing to perform a role it never assumed or was compensated to perform.

**(3)      The Prevention Doctrine Is an Implied Contractual Duty Expressly Disclaimed by the Contracts.**

Plaintiffs' "prevention" theory fails for the additional reason that it is precluded by the PSAs.  The prevention doctrine is an *implied* contractual duty that is "a variant of the implied covenant of good faith and fair dealing."  *Thor Properties, LLC v. Chetrit Group LLC*, 936 N.Y.S.2d 196, 198 (N.Y.A.D. 1 Dept. 2012); *see also Consolidated Edison, Inc. v. Northeast*

---

[19]      For example, loans in the WMALT 2006-AR2 Trust were originated by at least five different companies besides WaMu, and those loans represented at least 67% of the total loans in the Trust. WMALT 2006-AR2 Prospectus Supplement, S-31.

*Utilities*, 426 F.3d 524, 529 (2d Cir. 2005) (doctrine "creates nothing more than *an implied contractual obligation*, similar to—and perhaps rooted in—the implied covenant of good faith and fair dealing."). But, as this Court has recognized, the PSAs expressly disclaim implied duties: "[N]o implied covenants or obligations shall be read into [the PSA] against the Trustee." Palchuk Aff, Ex. A at 109, § 8.01(c)(ii). The Court held in the December 7 Order that, absent an allegation of facts showing *bad faith*, this clause precludes a claim based upon the implied covenant of good faith and fair dealing. December 7 Order at 39-40; Del CODE ANN. tit 12 § 3806(e) (West 2012). The same logic applies to the "prevention doctrine" theory, which, like the claim for breach of the implied covenant, depends on an implied duty. *Thor Properties,* 936 N.Y.S.2d at 198. And, as with their prior pleading, Plaintiffs do not allege "that defendants acted intentionally or in bad faith." December 7 Order at 40. Accordingly, this claim should be dismissed with prejudice. *Id.*

c. <u>Plaintiffs Also Have Failed to Allege that Any Prudent Trustee Would Have Used Trust Assets to Pursue Costly and Duplicative Litigation.</u>

The Court, in its December 7 Order, required the Plaintiffs, in addition to alleging an Event of Default, to allege "that under the 'prudent person' standard set forth in Section 8.01(a), the Trustee should (or would) have taken it upon itself to force the Seller to repurchase any defective or deficient Mortgage Loans." December 7 Order at 32. Plaintiffs' amendments do little more than parrot the Court's language by pointing to the fact that one other Trustee of WaMu trusts, Deutsche Bank, has pursued claims relating to Seller breaches and loan defects as to other trusts. Such allegations are insufficient to allege that "other MBS trusts' trustees have taken similar actions in similar circumstances," and that not pursuing claims relating to the Seller here means that the Trustee failed to act as a prudent person. *Id.*

Publicly available facts about the Deutsche Bank action demonstrate that the circumstances there were *not* similar. For example, the Deutsche Bank proof of claim states that "during the past 18 months, WAMU has consistently refused to allow the Trustee, bond insurers, and investors with an interest in [Deutsche Bank-administered trusts] to perform any meaningful

-30-

due diligence to determine whether Representations and Warranties were breached."  Vassos
Decl., Ex. C, at 4.  Plaintiffs do not allege similar facts here.  In this respect, Plaintiffs'
arguments are internally inconsistent. Plaintiffs argue that the Trustee should have sued, like
Deutsche Bank, which was denied access to WaMu's files.  At the same time, Plaintiffs also
argue that the Court should charge the Trustee with actual knowledge of Seller's breaches, in
part because of the Trustee's access to WaMu's files.  If Plaintiffs ask the Court to infer that the
Trustee had access to WaMu's files, then Plaintiffs concede that the Trustee and Deutsche Bank
were not similarly situated. On the other hand, if Plaintiffs argue that the Trustee, like Deutsche
Bank, was (or would have been) denied access to WaMu's files upon request, then the Trustee
cannot be said to have had access to them.

Plaintiffs also make no allegations about the actions of any other trustees that administer
thousands of RMBS trusts.  Given the number of different trustees in the market, Plaintiffs'
inability to point to the actions of more than one trustee defeats their allegation that no conduct
other than suing WaMu could be considered "prudent."  Indeed, many of Plaintiffs' allegations
cut *against* its desired conclusion that Defendants were required to undertake costly
investigations and remedial measures here.  Plaintiffs allege that such investigations and
remedial measures were *already undertaken as to these very Trusts* by Certificateholders.  SAC
¶ 57.  Given the limited resources available from the bankrupt WaMu to contribute to a potential
recovery in any of these overlapping suits, a decision not to pursue overlapping claims
reasonably could be viewed as a prudent conservation of Trust resources.  Plaintiffs have not met
their burden of alleging that the *only* prudent course for the Trustee would have been to sue
WaMu.[20]

---

[20]    Plaintiffs acknowledge that the deadline for filing proofs of claims in the WaMu receivership
passed before U.S. Bank became trustee.  Plaintiffs claim, however, that a prudent trustee would have
appealed for the right to file a late-filed claim.  Notably, Plaintiffs do not cite any authority or basis for
believing that a prudent trustee would have done so.  Moreover, Plaintiffs do not plead any reason to
believe that such claims would have been accepted, particularly given that U.S. Bank became Trustee of
17 of the 19 Trusts two years after the filing deadline.  Accordingly, Plaintiffs fail to state a claim that
U.S. Bank failed to act as a prudent person.

Plaintiffs have failed to cure the defects in their contract claim from their original complaint.  The claim should be dismissed with prejudice.

## B.      PLAINTIFFS HAVE FAILED TO ALLEGE A VIOLATION OF THE TIA.

Plaintiffs allege a claim for violation of Section 315 of the TIA.  SAC ¶¶ 100-104.  The Court should dismiss that claim because (i) the duties imposed by Section 315 do not arise unless there is a contractually defined Event of Default and, as detailed above, Plaintiffs do not allege an Event of Default, and (ii) in any event, the Certificates are exempt from the TIA.

### 1.      Plaintiffs Have Failed to Allege a Violation of Section 315 of the TIA.

Pursuant to Section 315 of the TIA, the Trustee is obligated to (i) provide "notice of all defaults known to the trustee, within ninety days after the occurrence thereof" and (ii) "exercise in case of default (as such term is defined in such indenture) such of the rights and powers vested in it by such indenture, and to use the same degree of care and skill in their exercise, as a prudent man would[.]"  *See* 15 U.S.C.A. § 77ooo(b)-(c).  Plaintiffs fail to allege violations of either of these obligations, for the same reason discussed above: Plaintiffs have not alleged an Event of Default.  SAC ¶¶ 48-49.  Because of this pleading failure, the Court need not consider whether the TIA applies to the Trusts.  If the Court concludes—as it did in the December 7 Order—that no Event of Default has been alleged, then the Court may dismiss the TIA claim without further analysis.

Under Section 315 of the TIA, the term "default" is defined by the indenture.  15 U.S.C.A. at § 77ooo(a), (c) (providing that "default" is defined as "such term is defined in such indenture"); *Semi-Tech Litig.,* 353 F. Supp. 2d at 479 (analyzing the definition of default under the indenture in holding that there was no violation of § 315(b)'s notice obligations).  Thus, the Trustee's Section 315 duties — to give notice of defaults, or to act under the prudent person standard — do not arise until there is a default as defined in the PSA.  As discussed *supra*, pursuant to Article VII of the PSA, which is entitled "Default," an Event of Default can result only from one of several specified acts or omissions relating to the duties of the Servicer.

Palchuk Aff., Ex. A at 105-108, § 7.01.  Plaintiffs attempt to allege only one type of Event of Default, SAC ¶ 45, resulting from the Servicer's failure to "perform in any material respect any … of the covenants or agreements … contained in the Certificates or in this Agreement." Palchuk Aff., Ex. A at 105-108, § 7.01(a)(ii).  As detailed *supra* with regard to Plaintiffs' contract claims, Plaintiffs have failed to allege the required predicates for such an Event of Default under the contracts, and the prevention doctrine cannot excuse that failure.  This failure defeats their TIA claims as well.  *See* December 7 Order at 38 (holding that Plaintiff failed to allege an obligation under § 315(c) where the Complaint failed to allege an Event of Default).[21]

## 2.   The Certificates Are Exempt From The TIA.

The Certificates are exempt from the TIA because they do not constitute "debt" securities, and because they are certificates of interest in multiple securities, which are expressly exempted under Sections 304(a)(1) and 304(a)(2) of the TIA, respectively.  In the December 7 Order, the Court determined that the Certificates are debt and on that basis found the TIA applicable.  December 7 Order at 36.  Although Defendants respectfully disagree with the Court's determination, this memorandum will not reargue that point.[22]  However, the Court did not address Defendants' argument that the Certificates are exempt under Section 304(a)(2). Memo. in support of Defs.' Mot. to Dismiss Compl. at 33-34.  As discussed below, Section 304(a)(2) expressly exempts certificates of interest in multiple securities having substantially different rights and privileges, and the SEC has relied on that Section on numerous occasions in determining that pass-through MBS are exempt from the TIA.

---

[21]     In the December 7 Order, the Court held that "plaintiff's claim that the Trustee failed to provide notice to certificateholders of 'all defaults known to the trustee'—*e.g.*, the Seller's purported breaches of the MLPA's representations and warranties (*see* Compl. ¶ 86)—can withstand defendants' motion to dismiss."  December 7 Order at 37.  Defendants respectfully believe that the Court erred and should reconsider this conclusion because, under the terms of the PSA, Seller's breaches never can constitute "defaults" for the purposes of the TIA.

[22]     Defendants preserve and incorporate herein the arguments on pages 29-33 and 12-15 of Defendants' prior moving and reply briefs, respectively, as to why the Certificates constitute equity for the purposes of the TIA.

19920272.1

### a.       **A Pass-Through MBS Is a Certificate of Interest.**

Under the federal securities laws, including the TIA, a certificate of interest is a distinct type of security from a note, bond or stock.  *See* 15 U.S.C.A. § 77ccc(1) (adopting certain definitions of Section 2 of the Securities Act of 1933); *id.* § 77b(a)(1) ("The term 'security' means any note, stock . . . bond, debenture, evidence of indebtedness, *certificate of interest or participation* … or any *certificate of interest or participation in* … any of the foregoing.") (emphasis added)).  The Supreme Court has defined a certificate of interest as a security providing for payment of proceeds "contingent upon an apportionment of profits."  *Tcherepnin v. Knight*, 389 U.S. 332, 339 (1967).

The governing contracts define the Certificates as representing interests in the Trust itself, *see, e.g.,* Palchuk Aff., Ex. A, Exhibit A thereto, and representing "beneficial interests in the assets of the Trust."  *See, e.g., id.* at 65, § 2.04; *see also* Del. CODE ANN. tit 12 § 3805(a) (certificateholders "shall have an undivided beneficial interest in the property of the [Delaware] statutory trust").  Plaintiffs themselves acknowledge that the Certificates entitle the holders to "cash flows generated from the Trust's [underlying] pool of Mortgage Loans."  SAC ¶ 28.  And, in the December 7 Order, the Court described the Certificates as "entitling the holder to income payments from pools of residential mortgage loans held by a trust," the amounts and priority of which payments depend upon the tranche the investor holds.  *See* December 7 Order at 3, 5.  Thus, the Certificates at issue here are quintessential certificates of interest.  *See Tcherepnin*, 389 U.S. at 339; *Merrill, Lynch, Pierce, Fenner & Smith, Inc.*, SEC No Action Letter, 1982 WL 30517, at *1 (Oct. 28, 1982) ("The Certificates would be certificates of interest in a profit-sharing agreement among the certificateholders in each series of the trust because they would entitle the holders to pro rata interests in the income on (*i.e.*, the interest on), and the principal of, a portfolio of certificates of deposit.").[23]

---

[23]       The fact that certificates of interest or participation may not entitle the holders collectively to 100% of the profits of the venture does not render them a different type of security.  *Cf. Lanvin v. Data Sys. Analysts, Inc.*, 443 F. Supp. 104, 109 (E.D. Pa. 1977) (certificate of participation "refers to instruments that give the holder at least some rights to future profits") (emphasis added)).  The parties have the freedom to structure their profit-sharing agreement or venture as they see fit.  That does not

**b.**     **The TIA Does Not Apply to Certificates of Interest in Multiple Mortgages.**

"Statutory analysis begins with the text and its plain meaning, if it has one." *Gottlieb v. Carnival Corp.*, 436 F.3d 335, 337 (2d Cir. 2006) (citing *Natural Res. Def. Council, Inc. v. Muszynski*, 268 F.3d 91, 98 (2d Cir. 2001)); *see also John Wiley & Sons, Inc. v. Kirtsaeng*, 654 F.3d 210, 218 (2d Cir. 2011) ("Statutory interpretation always begins with the plain language of the statute, assuming the statute is unambiguous.") (citation omitted)).  It is also "a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme." *Davis v. Mich. Dep't of Treasury*, 489 U.S. 803, 809 (1989).  Here, whether the Certificates are characterized as "debt" or "equity," under the plain language of Sections 304(a)(1)(B) and 304(a)(2), certificates of interest in multiple residential mortgages are not included in, and are explicitly exempt from, the TIA.  *See* 15 U.S.C.A. § 77ddd(a)(2) (exempting "certificate[s] of interest or participation in *two or more securities* having substantially different rights and privileges") (emphasis added).

Each of the Certificates represents an interest in thousands of different residential mortgages, each with substantially different rights and privileges.  *See* Palchuk Aff., Ex. E at S-5.  As set forth in the SAC and the governing documents, the mortgages were originated by various correspondent mortgage lenders and provided to thousands of individual borrowers. SAC ¶¶ 24-25.  The mortgages involve different payment terms, maturity dates, interest rates, types of loans (purchase, refinance, etc.), and prepayment penalty terms.  *See generally* Palchuk Aff., Ex. E at Appendix B (providing loan characteristics for the mortgage pool).  Moreover, the mortgages, which originate in almost all fifty states, are subject to various state laws with respect to, among other things, security interests in collateral, *id.* at 84-85, foreclosure procedures, *id.* at 86-88, rights of redemption, *id.* at 89, and deficiency judgments, *id.*  Accordingly, under Section 304(a)(2), the Certificates are exempt from the TIA.  Moreover, the re-inclusion provision of Section 304(a)(1)(B), which specifically addresses certificates of interest, applies to only a very

---

change the essence of the transaction: that Certificateholders participate together in the investment.

specific type of certificate of interest, *i.e.*, an interest in a *single* note, debenture or evidence of indebtedness.  15 U.S.C.A § 77ddd(a)(1).  That is a function both of (i) the exemption in Section 304(a)(2) for interests in multiple underlying obligations, and (ii) reciprocally, the precise wording of clause (A), which expressly uses the singular ("*a* note, bond, debenture or evidence of indebtedness"), and of the parallel singular reference in clause (B) ("a certificate of interest in…*any such* note, debenture, or evidence of indebtedness").  *Id.* (emphases added).  Again, in contrast, the Certificates here represent interests in a pool of thousands of residential mortgages, not a single debt obligation of a single obligor.[24]  Palchuk Aff., Ex. E at S-5 (The certificates "represent interests . . . in the assets of the [Trust].");  Del. CODE ANN. tit 12 § 3805(a) (certificateholders "shall have an undivided beneficial interest in the property of the [Delaware] statutory trust").

Finally, the express Congressional purpose of the TIA and its legislative history support the exclusion of the Certificates.  Section 302 explains that Congress enacted the TIA to address situations where a single obligor, with significant bargaining power, structures its obligations under a debt instrument to the detriment of the investors in the debt instrument.  *See generally* 15 U.S.C.A. § 77bbb.  The legislative history further explains that Congress drafted Section 304(a)(1)(B) to combat the "adoption of the certificate of interest device" whereby a single mortgagor/obligor could evade the requirements of the TIA by executing an ordinary bond and mortgage to a trust company, receiving in exchange "'certificates of participation' in such mortgage which the [mortgagor] then sells to the public."  H.R. Rep. No. 76-1016, at 39, 41 (1939) (discussing exemptions under § 304(a)(1));  S. Rep. No. 248, at 12-13, 15 (1939).  These concerns are not implicated by the Certificates here, where the mortgagors who might fall under the TIA definition of obligor number in the thousands, are primarily individual homeowners, and

---

[24]     Indeed, the pass-through Certificates are exempt from the TIA's requirements regardless of how the multiple underlying mortgages are characterized.  If the underlying mortgages are viewed as securities (*see, e.g.*, *Mortgage-Backed Income Fund*, SEC No Action Letter, 1979 WL 14524 (Aug. 30, 1979)), the Section 304(a)(2) exemption applies (15 U.S.C.A. § 77ddd(a)(2)).  On the other hand, if the underlying mortgages are not viewed as securities, Section 304(a)(1)(B) cannot apply because it applies only to certificates of interest in a single debt instrument that is itself a security.  *See* 15 U.S.C.A. § 77ddd(a)(1).

are not alleged to have had any role at all in the structuring of the transaction.

        **c.**     **The SEC Has Treated Pass-through Certificates as Exempt Under Section 304(a)(2) and Has the Power to Exempt Securities Under Section 304(d).**

Over the last 35 years, the SEC, the agency tasked with enforcement of the TIA,[25] has treated pass-through certificates as exempt from the TIA, specifically relying on Section 304(a)(2). In 1997, the SEC staff published the following in its Manual of Publicly Available Telephone Interpretations: "Certificates representing a beneficial ownership interest in a trust are offered to the public pursuant to a registration statement under the Securities Act. The assets of the trust include a pool of mortgage loans with multiple obligors administered pursuant to a 'pooling and servicing agreement.'… The Certificates are treated as exempt from the Trust Indenture Act under Section 304(a)(2) thereof." SEC Div. of Corp. Fin., *Manual of Publicly Available Telephone Interpretations (Trust Indenture Act of 1939)*, Nos. 10-11 (July 1997). [26] This explicit guidance is further bolstered by the SEC's conduct: the Commission has never issued a stop order with respect to a registered offering of pass-through certificates for failing to

---

[25]     *See* 15 U.S.C.A. § 77uuu(a) ("[T]he [Securities and Exchange] Commission shall have the powers with respect to investigations and hearings, and with respect to the enforcement of, and offenses and violations under, this subchapter and rules and regulations and orders prescribed under the authority thereof[.]"); *El Paso County, Texas v. Bank of New York Mellon*, No. A-12-CA-705-SS, 2013 WL 285705, at *4 (W.D. Tex. Jan. 22, 2013) (noting that the SEC was "expressly granted the right of enforcement" under the TIA); *Welborn v. Bank of New York Mellon*, Civil Action No. 12-220-JJB, 2013 WL 149707, at *5 (M.D. La. Jan. 14, 2013) (noting the SEC's enforcement powers under the TIA and refusing to determine whether Defendants had violated the TIA because to do so "would encroach on the Security [sic] and Exchange Commission's congressional delegated authority to enforce the TIA").

[26]     *Available at* http://sec.gov./interps/telephone/cftelinterps_tia.pdf. Beginning on or about May 3, 2012, the SEC staff stated that it was reconsidering its guidance in light of *Retirement Board of the Policemen's Annuity and Benefit Fund of Chicago v. The Bank of New York Mellon*, No. 11 Civ. 5459 (WHP), 2012 WL 1108533 (S.D.N.Y. Apr. 3, 2012). *See* SEC Div. of Corp. Fin., Trust Indenture Act of 1939, Questions and Answers of General Applicability, Section 202.01 (May 3, 2012) (incorporating the 1997 interpretation), *available at* http://www.sec.gov/divisions/corpfin/guidance/tiainterp.htm. However, in the ensuing nine months since making that statement, the SEC staff has not changed its guidance at all, and therefore the SEC staff's current interpretation remains unchanged from its longstanding position that the TIA is inapplicable to pass-through certificates. *Id.* Moreover, since May 3, 2012, several new public MBS offerings have come to market using the PSA structure. The offering documents for each such offering expressed the depositor's belief that the TIA did not apply to the transaction, and, as before, the SEC did not halt the offerings, which provides further evidence that the SEC staff's position remains unchanged.

comply with the TIA and has published "no action letters" permitting MBS offerings without qualified TIA indentures, which all securities subject to the TIA are required to have.  *See* 15 U.S.C.A. § 77eee(b) (requiring the SEC to issue stop orders with respect to any registered offering if a security lacks a qualified indenture); *Marion Bass Securities, Inc.*, SEC No Action Letter, 1984 WL 45531 (July 9, 1984) (no SEC enforcement action would be recommended if mortgage pass-through certificates issued without a qualifying indenture); *Harbor Financial, Inc.*, SEC No Action Letter, 1988 WL 235128 (Oct. 31, 1988) (no enforcement action would be recommended if pass-through certificate of interest in multiple underlying mortgages issued without a qualifying indenture); *Citytrust*, SEC No Action Letter, 1990 WL 305068, at *4 n.1 (Dec. 19, 1990) ("The P&S Agreement, like pooling and servicing agreements used in pass-through securitizations generally, will not be qualified ... in reliance on Section 304(a)(2) thereof.").

In addition to the exemption for Certificates under Section 304(a)(2), Section 304(d) provides the SEC with the power to exempt securities:

> The Commission may, by rules or regulations upon its own motion, or by order on application by an interested person, exempt conditionally or unconditionally any person, registration statement, indenture, security or transaction, or any class or classes of persons, registration statements, indentures, securities, or transactions, from any one or more of the provisions of this subchapter, if and to the extent that such exemption is necessary or appropriate in the public interest and consistent with the protection of investors and the purposes fairly intended by this subchapter. The Commission shall by rules and regulations determine the procedures under which an exemption under this subsection shall be granted, and may, in its sole discretion, decline to entertain any application for an order of exemption under this subsection.

15 U.S.C.A. § 77ddd(d) (West 2010); *see also id.* § 77sss(a) (West 1998) ("The Commission shall have authority from time to time to make, issue, amend and rescind such rules and regulations and such orders as it may deem necessary or appropriate in the public interest ... to carry out the provisions of this subchapter. . . . For the purpose of its rules or regulations the Commission may classify persons, securities, indentures, and other matters within its jurisdiction and prescribe different requirements for different classes of persons, securities, indentures, or

-38-

matters."). Although there is no formal SEC rule or regulation providing that the TIA does not apply to pass-through MBS, the SEC's "consistent interpretation" of the TIA in this regard led the industry to reasonably believe that such MBS were indeed exempt from the TIA. *Cf. Gerstle v. Gamble-Skogmo, Inc.*, 478 F.2d 1281, 1294 (2d Cir. 1973) ("While defendant's reliance here was on the Commission's consistent interpretation of its own rule, rather than on the terms of the rule itself, it is hard to attach any significance to this distinction when the effect of the Commission's interpretation was to lead counsel reasonably to believe Skogmo would not be allowed to make the references to 'appraisals' which plaintiffs now claim were required."). Accordingly, the TIA should not apply in this context, particularly where the SEC, the agency empowered to exempt securities (15 U.S.C.A. § 77ddd(d)) and enforce the statute (15 U.S.C. § 77uuu(a)), has essentially exempted pass-through MBS from the TIA through written guidance and conduct.[27]

Moreover, Defendants should not be liable for any purported violation of the TIA when the industry has followed in good faith the SEC's consistent interpretation that pass-through MBS were exempt from the TIA's requirements. *See* 15 U.S.C.A § 77sss(c) (West 1998) ("No provision of this subchapter imposing any liability shall apply to any act done or omitted in good faith in conformity with any rule, regulation, or order of the Commission, notwithstanding that such rule, regulation, or order may, after such act or omission, be amended or rescinded or be determined by judicial or other authority to be invalid for any reason."); *cf. Gerstle*, 478 F.2d at 1292-94 (refusing to find defendant liable for failure to disclose in a proxy statement certain appraisals of property where the SEC's policy had long been to omit such information).

---

[27]    The SEC's position on pass-through MBS should be afforded deference, particularly where the TIA is a complex statute which Congress has authorized the SEC to enforce. *See Cmty. Health Ctr. v. Wilson-Coker*, 311 F.3d 132, 138 (2d Cir. 2002) (finding that less formal agency interpretations may be entitled to deference where "the statute itself is very complex," the agency plays an important role in administering the statute, and the agency has given consideration to the relevant issues "over time") (*citing Barnhart v. Walton*, 533 U.S. 212 (2002)); *see also Welborn*, No. 12-220-JJB, 2013 149707, at *5 (M.D. La. Jan. 14, 2013) (recognizing the SEC's congressionally delegated authority to enforce the TIA).

### 3.     <u>Applying the TIA to RMBS Would Be Unworkable.</u>

Acting in reliance on the language of the TIA and the clear guidance of both the regulatory authorities and the leading treatises in the field, the contracting parties to PSAs exercised their freedom to create securities to which the TIA would not apply.  A decision retroactively holding that the TIA applies to the Trusts not only would be unwarranted, but would inject confusion into the administration of the Trusts, as the federal statutory scheme laid out in the TIA simply cannot be mapped onto the PSAs at issue.

When Bank of New York-Mellon filed a motion to reconsider, or in the alternative to certify to the Second Circuit, Judge Pauley's April 3, 2012 decision in *Retirement Board of the Policemen's Annuity and Benefit Fund of the City of Chicago v. Bank of New York Mellon*, No. 11 Civ. 5459 (WHP), 2012 WL 1108533, at *4-6 (S.D.N.Y. Apr. 3, 2012), that PSA certificates are subject to the TIA, a number of amicus curiae filed briefs explaining why "[i]t would be extremely difficult, if not impossible, to force the PSAs into an inconsistent statutory scheme many years into the administration of affected trusts because numerous TIA-mandated indenture provisions, and numerous TIA-permitted options, make little sense or are extremely unclear in the context of the PSAs."  Vassos Decl., Ex. F, at 3.[28]  The Trustee respectfully encourages the Court to review those amicus curiae submissions, which are annexed as Exhibits D-F to the Vassos Declaration, and whose arguments are incorporated herein.

A determination that the TIA applies to PSAs would create confusion.  For example, TIA-qualified indentures impose specified duties on the "obligor" of the indenture securities, including duties to file specific periodic reports with the indenture trustee and the SEC, and to deliver various types of officers' certificates and opinions of counsel.  *See generally* 15 U.S.C.A. § 77nnn.  However, unlike debt transactions, there is no issuer that serves as an obligor in a transaction involving a PSA, and therefore trustees and other parties to the transactions would have no idea which party was required to deliver these documents, what are the consequences for

---

[28]     These amicus curiae briefs were filed in May 2012.  Judge Pauley has not yet ruled on Bank of New York-Mellon's motion.

failing to do so, and how such failures could ever be enforced.  Similarly, the Trustee is required under the TIA to "examine the evidence furnished to it pursuant to Section 314" of the TIA, which identifies information that obligors must provide to the Trustee.  *Id.* § 77ooo. Accordingly, a trustee would run a risk of breaching that duty inadvertently because it does not know which entity a counterparty or a court might deem the "obligor."

A conclusion that the TIA applies to the Trusts would subject the Trustee to undue liability for past conduct unfairly and retroactively, and also would impose on the Trustees new and uncertain duties they did not assume and for which they are not being compensated.

## IV.    <u>CONCLUSION</u>

For the reasons stated above, the Defendants respectfully request that this action be dismissed in its entirety.

//

//

//

//

-41-

DATED:       February 1, 2013          Respectfully submitted,

                                */s/ Kristin Linsley Myles* _____
                                Kristin Linsley Myles

                                Marc T.G. Dworsky
                                Kristin Linsley Myles
                                **MUNGER, TOLLES & OLSON LLP**
                                355 South Grand Avenue, 35th Floor
                                Los Angeles, California 90071-1560
                                tel: 213- 683-9100
                                fax: 213-687-3702
                                marc.dworsky@mto.com, kristin.myles@mto.com

                                David F. Graham
                                **SIDLEY AUSTIN LLP**
                                One South Dearborn Street
                                Chicago, Illinois 60603
                                Tel:  312-853-7000
                                Fax:  312-853-7036
                                dgraham@sidley.com

                                Isaac S. Greaney
                                Jackie A. Lu
                                **SIDLEY AUSTIN LLP**
                                787 Seventh Avenue
                                New York, New York 10019
                                Tel:  212-839-5300
                                Fax:  212-853-5599
                                igreaney@sidley.com, jlu@sidley.com

                                Attorneys for Defendant BANK OF AMERICA, N.A.

DATED:       February 1, 2013          Respectfully submitted,

                                */s/ Michael S. Kraut* _____
                                Michael S. Kraut

                                Michael S. Kraut
                                John M. Vassos
                                **MORGAN, LEWIS & BOCKIUS LLP**
                                101 Park Avenue
                                New York, New York  10178
                                tel: 212-309-6000
                                fax: 212-209-6273
                                jvassos@morganlewis.com, mkraut@morganlewis.com

                                Attorneys for Defendant U.S. BANK NATIONAL
                                ASSOCIATION

19920272.1