# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| POLICEMEN'S ANNUITY AND BENEFIT FUND OF THE CITY OF CHICAGO, LABORERS' PENSION FUND AND HEALTH AND WELFARE DEPARTMENT OF THE CONSTRUCTION AND GENERAL LABORERS' DISTRICT COUNCIL OF CHICAGO AND VICINITY, IOWA PUBLIC EMPLOYEES' RETIREMENT SYSTEM, and ARKANSAS PUBLIC EMPLOYEES' RETIREMENT SYSTEM,<br><br>                            Plaintiffs,<br><br>  - against-<br><br>BANK OF AMERICA, NA (as Trustee Under Various Pooling and Servicing Agreements), and U.S. BANK NATIONAL ASSOCIATION (as Trustee Under Various Pooling and Servicing Agreements),<br><br>                        Defendants. | **CASE NO. 1:12-CV-02865-KBF**<br><br><br><br>**<u>JURY TRIAL DEMANDED</u>** |

## <u>PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' JOINT MOTION TO DISMISS</u>

**TABLE OF CONTENTS**

I.    INTRODUCTION ............................................................................................................. 1

II.   BACKGROUND .............................................................................................................. 4

   A.   The Trustee's Critical Duties Under the TIA and the PSAs ..................................... 4

   B.   The Covered Trusts Have Suffered Significant Losses as a Result of Defendants' Breaches of Their Duties as Trustee. ............................................................................................................. 7

III.   ARGUMENT .................................................................................................................. 9

   A.   The SAC States Claims for Breach of Contract .................................................... 9

       1.   The Court Correctly Ruled that Defendants Had Actual Knowledge ................................ 10

       a.   Defendants' Motion for Reconsideration of the December 7 Order Should Be Denied .... 10

       b.   The Court's December 7 Order Did Not Apply a Constructive Knowledge Standard ...... 12

       c.   The SAC Alleges Facts Constituting a Breach of the Trustee's Duty to Give Notice ........ 17

       d.   Plaintiffs Have Alleged Damages From the Trustee's Failure to Provide Notice. ............. 20

       2.   Defendants Failed to Act Prudently in an Event of Default ............................................. 21

       a.   An Event of Default Occurred ..................................................................................... 21

       b.   Defendants Failed to Act at All, Let Alone to Act Prudently ........................................ 26

   B.   The SAC States a Claim For Violation of the TIA ............................................... 29

       1.   Congress Enacted The TIA To Prevent The Misconduct At Issue Here .......................... 30

       2.   Defendants Violated the TIA ...................................................................................... 31

       a.   Defendants Failed to Give Notice as Required by §315(b) .......................................... 31

       b.   Defendants Failed to Act Prudently as Required by §315(c) ........................................ 33

       2.   The Court Correctly Held That The TIA Applies To Certificates ................................... 34

       a.   MBS Styled As "Certificates" Are Debt ..................................................................... 35

       b.   As Debt Instruments, The TIA Applies To Certificates ................................................ 37

       c.   Section 304(a)(2) Does Not Apply To The Certificates ................................................. 40

       d.   To the Extent the SEC Has Made Any Informal Interpretation Regarding the Applicability of the TIA to MBS Certificates, They Conflict with the TIA's Unambiguous Language as well as the SEC's Own Recent Statements, and Make No Attempt to Persuade . 41

       e.   Applying the TIA to MBS Is Readily Workable .......................................................... 44

IV.   CONCLUSION ............................................................................................................ 45

i

## TABLE OF AUTHORITIES

**Page(s)**

CASES

*Antares Aircraft, L.P. v. Fed. Rep. of Nigeria,*
    999 F.2d 33 (2d Cir. 1993)......................................................................................36, 37

*Ashcroft v. Iqbal,*
    556 U.S. 662, 129 S.Ct. 1937 (2009).........................................................................17

*Banque Arabe Et Internationale D'Investissement v. Maryland Nat'l Bank,*
    850 F. Supp. 1199 (S.D.N.Y. 1994)...........................................................................15

*Barnhart v. Signmon Coal Co., Inc.,*
    534 U.S. 438 (2002)....................................................................................................32

*Bell Atl. Corp. v. Twombly*
    550 U.S. 544 (2007)..............................................................................................17, 19

*Bluebird Partners, L.P. v. First Fid. Bk., N.A. New Jersey,*
    85 F.3d 970 (2d Cir. 1996).....................................................................................30, 34

*Boykin v. Keycorp,*
    521 F.3d 202 (2d Cir. 2008)......................................................................................42

*Chevron, U.S.A., Inc. v. Natural Resources Def. Council, Inc.,*
    467 U.S. 837 (1984)...................................................................................................41

*Consolidated Edison, Inc. v. Northeast Utilities,*
    426 F.3d 524 (2d Cir. 2005).......................................................................................23

*Cruden v. Bank of New York,*
    957 F.2d 961 (2d Cir. 1992).......................................................................................24

*CWCapital Asset Mgt., LLC v. Chicago Prop., LLC,*
    610 F.3d 497 (7th Cir. 2010) ......................................................................................35

*De La Mota v. U.S. Dept. of Educ.,*
    412 F.3d 71 (2d Cir. 2005).........................................................................................42

*Eckstein v. Balcor Film Investors,*
    58 F.3d 1162 (7th Cir. 1995) .....................................................................................13

*Ellington Credit Fund, Ltd. v. Select Portfolio Servicing, Inc.,*
    837 F. Supp. 2d 162 (S.D.N.Y. 2011).......................................................................35

*Fasolino Foods Co., Inc. v. Banca Nazionale del Lavoro,*
    961 F.2d 1052 (2d Cir. 1992)........................................................................36

*General Elec. Capital Corp. v. D'Agostino Supermarkets, Inc.,*
    No. 03-cv-8539-RO, 2005 WL 1683531 (S.D.N.Y. July 18, 2005)........................22

*Gilbert v. C.I.R.,*
    248 F.2d 399 (2d Cir. 1957)........................................................................35

*Gilmore v. Gilmore,*
    No. 09 Civ. 6230 (WHP), 2011 WL 5517832 (S.D.N.Y. Nov. 10, 2011).........................11, 12

*Gravatt v. City of New York,*
    226 F.3d 108 (2d Cir. 2000)........................................................................14

*Greenwich Fin. Servs. Distressed Mortg. Fund 3 LLC v. Countrywide Fin. Corp.,*
    603 F.3d 23 (2d Cir. 2010)........................................................................35

*In re Bankers Trust Co.,*
    450 F.3d 121 (2d Cir. 2006)........................................................................21, 22

*In re Dreier LLP,*
    452 B.R. 391 (Bankr. S.D.N.Y. 2011)........................................................................13

*In re Med Diversified,*
    461 F.3d 251 (2d Cir. 2006)........................................................................35

*In re National Century Financial Enterprises, Inc. Investment Litigation,*
    No. 2:03-md-1565, 2006 WL 2849784 (S.D. Ohio Oct. 3, 2006)........................19, 20

*In re Security Capital Assur. Ltd., Sec. Litig.,*
    729 F. Supp. 2d 569 (S.D.N.Y. 2010)........................................................................35

*Janese v. Fay,*
    692 F.3d 221 (2d Cir. 2012)........................................................................14

*LaSalle Bank Nat. Ass'n v. Nomura Asset Capital Corp.,*
    424 F.3d 195 (2d Cir. 2005)........................................................................35

*LaScala v. Scrufari,*
    479 F.3d 213 (2d Cir. 2007)........................................................................14

*MASTR Adjustable Rate Mortgages Trust 2006-OA2 v. UBS Real Estate Sec. Inc.,*
    No. 12-cv-7322(HB) (S.D.N.Y. Dec. 13, 2012)........................................................................16

iii

*MASTR Asset Backed Secs. Trust 2006-HE3 ex rel. U.S. Bank Nat'l Ass'n v. WMC Mortg. Corp.*,
2012 WL 4511065 (D. Minn. Oct. 1, 2012) ................................................................12, 16, 20

*Mobile Communications Corp. of America v. MCI Comncations Corp.*,
No. 8108, 1985 WL 11574 (Del. Ch. Aug. 27, 1985) ............................................................22

*Morgan Guar. Trust Co. of N.Y. v. Bay View Franchise Mortg. Acceptance Co.*,
No. 00 Civ. 8613, 2002 WL 818082 (S.D.N.Y. Apr. 30, 2002)......................................12, 15

*Natural Resources Defense Council v. Abraham*,
355 F.3d 179 (2d Cir. 2004) ............................................................................................ 41, 42

*Ret. Bd. of the Policemen's Ann. & Ben. Fund of City of Chicago v. Bank of New York Mellon*,
No. 11-cv-5459, 2012 WL 1108533 (S.D.N.Y. Apr. 3, 2012) ..............................................35

*Retirement Board of the Policeman's Annuity and Benefit Fund of the City of Chicago v. The Bank of New York Mellon*,
Civ. No. 11-5459-WHP, Slip. Op. (S.D.N.Y. Feb. 14, 2013) ..............................................43

*S.E.C. v. Sloan*,
436 U.S. 103 (1978) ..............................................................................................................43

*Shrader v. CSX Transp., Inc.*,
70 F.3d 255 (2d Cir. 1995)....................................................................................................11

*St. Martin Evangelical Lutheran Church v. South Dakota*,
451 U.S. 772 (1981) ..............................................................................................................43

*Swierkiewicz v. Sorema N.A.*,
534 U.S. 506 (2002)..............................................................................................................17

*Thor Properties LLC v. Chetrit Group LLC*,
936 N.Y.S.2d 196 (N.Y.A.D. 1 Dept 2012)..........................................................................23

*Topping v. Trade Bank of New York*,
86 F.2d 116 (2d Cir. 1936) ...................................................................................................38

*Trust for Certificate Holders of Merrill Lynch Mortg. Pass-Through Certificates Series 1999-C1 v. Love Funding Corp.*,
No. 04-cv-9890, 2005 WL 2582177 (S.D.N.Y. Oct. 11, 2005)..............................................35

*U.S. v. Mead Corp.*,
533 U.S. 218 (2001) ..............................................................................................................42

*VLIW Tech., LLC v. Hewlett-Packard Co.*,
840 A.2d 606 (Del. 2003) ......................................................................................................10

*WaveDivision Holdings, LLC v. Millennium Digital Media Sys., L.L.C.*,
   No. 2993-VCS, 2010 WL 3706624 (Del. Ch. Sept. 17, 2010) ................................21, 22, 23

*Woodman v. WWOR-TV, Inc.*,
   411 F.3d 69 (2d Cir. 2005)..............................................................................................13

*Zaccaro v. Shah*,
   746 F. Supp. 2d 508 (S.D.N.Y. 2010)..............................................................................14

**STATUTES, RULES, & REGULATIONS**

15 U.S.C.
   §77bbb(a)(2) ................................................................................................................30
   § 77bbb(b) .....................................................................................................30, 33, 38
   §77ddd(a)(1)(b) ...........................................................................................................38
   §77ddd(d).....................................................................................................................44
   §77nnn(a)
   §77nnn(d) .....................................................................................................................45
   §77ooo(a). ....................................................................................................................31
   §77ooo(c) .......................................................................................................................6
   §77sss(c) .......................................................................................................................44
I.R.C. § 860B(a)...............................................................................................................37
I.R.C. § 860C(b)(1)(A) ....................................................................................................37
17 C.F.R. § 260.4d-7 ........................................................................................................44
Trust Indenture Act of 1939 ("TIA")................................................................................1
Fed. R. Civ. P. 8 ....................................................................................................14, 15, 17
Fed. R. Civ. P. 8(a) ............................................................................................................4
Fed. R. Civ. P. 9(b) ..........................................................................................................14
Fed. R. Civ. P. 15..............................................................................................................45

**OTHER AUTHORITIES**

Black's Law Dictionary (9th ed. 2009)............................................................................32
H.R. Rep. No. 1016 (1939) ...............................................................................................38
Richard S. Millerick, ARTICLE: FEDERAL INCOME TAX ASPECTS OF STRIPPED
   MORTGAGE-BACKED SECURITIES, 12 Va. Tax Rev. 219, 230 (Fall 1992) ..................37

## I.   **INTRODUCTION**

In its December 7, 2012 Order ("December 7 Order"), this Court held that the WaMu MBS purchased by Plaintiffs were debt securities subject to the federal Trust Indenture Act of 1939 ("TIA").   In addition, the Court held that Plaintiffs alleged facts sufficient to plead that Defendants' actual knowledge of deficient Mortgage Files and/or breaches of the Seller's representations and warranties with respect to Mortgage Loans in the Covered Trusts.   Further, the Court held that Plaintiffs stated a claim under the PSAs and the TIA for breach of the Trustee's duties to provide notice of these defects.   Plaintiffs were granted leave to replead their claim that the Trustees failed to act prudently by enforcing the Trusts' repurchase rights following an Event of Default.

On January 15, 2013, Plaintiffs filed their second amended complaint (SAC) which named additional Plaintiffs and contained additional allegations regarding the Trustee's duty to enforce the Covered Trusts' put-back rights consistent with the Court's December 7 Order. Specifically, the SAC alleges that Defendants were aware not only of WaMu's systematic underwriting abuses and the corresponding, sharply escalating delinquencies and defaulted mortgages in the Covered Trusts, but also of the Servicer's failure to put back loans to the Seller.[1]   As alleged in the SAC, this knowledge required Defendants to give notice to the

---

[1] SAC ¶ 81. Although some Trusts contained loans originated by non-WaMu entities, Washington Mutual Bank, as sponsor of each of the offerings owned all of the mortgage loans before they were transferred to the trusts. The Prospectus Supplement for each of the Covered Trusts states, "[a]ll of the mortgage loans owned by the Trust have been either originated by the sponsor or purchased by the sponsor from approved mortgage loan correspondent lenders." *See e.g.,* WaMu 2006-AR16 ProSupp, at s-21. Furthermore, because the same entity, Washington Mutual Bank, also served as the servicer for each of the trusts, the depositor, WaMu Asset Acceptance Corp, was required to seek remedy from them in the event of a material breach or missing loan document. See Id. at s-42 ("In the event of a material breach of the representations and warranties made by the sponsor or the depositor, the breaching party will be required to either cure the breach in all material respects, repurchase the affected mortgage loan or substitute for the affected mortgage loan. In the event that a required loan document is not included in the mortgage files for

1

Servicer and to declare an Event of Default if breaches were not cured within 60 days.[2]  Further, the SAC plausibly alleges that the Servicer, a WaMu affiliate, would not have acted to enforce the Trusts' citing, among other things, WaMu's refusal to allow Deutsche Bank access to loan origination files.  The SAC also contains allegations demonstrating that a Trustee acting as a prudent person would have acted to enforce the Trusts' repurchase rights when the Servicer failed to do so.[3]  In this regard, the SAC alleges that Deutsche Bank, as Trustee for 99 other WaMu MBS trusts, has taken action to enforce those trusts' repurchase claims by filing a proof of claim with the FDIC following WaMu's seizure and by bringing an action in federal district court against the FDIC and JP Morgan, as WaMu's successor.[4]

In response, Defendants have filed a combined motion for reconsideration and to dismiss ("Mem.") arguing that the Trustee had no obligation to protect Trust assets or, alternatively, that they could not act to enforce the Trusts' repurchase rights unless directed to do so by 25% of Certificate holders.  Further, contrary to arguments made in other proceedings, including by Defendant U.S. Bank National Association ("U.S. Bank"), Defendants now argue that RMBS are exempt from the purview of the TIA irrespective of whether they are debt or equity.

---

the mortgage loans, the sponsor generally will also be required to either cure the defect or repurchase or substitute for the affected mortgage loan.")  As a result, although the sponsor/servicer may have had a secondary claim against a non-WaMu entity that originated the loans, the governing documents contemplated that the Servicer would never have to seek remedy from a party other than itself as sponsor for each of the Covered Trusts, let along a non-WaMu entity.

[2] *Id.* ("Defendants have attempted to hide behind their own negligence, or failure to provide the technical notice of default which, under the literal language of the PSA, would have otherwise required them as Trustees to exercise additional powers as would a 'prudent person' to fully protect MBS holders.").

[3] *Id.* at ¶ 85.

[4] *Id.* at ¶¶ 85-89.

Defendants' arguments are reminiscent of those made by the feckless trustees whose behavior led to the TIA's enactment following the Great Depression.  In this regard, Defendants assert that RMBS trustees are stakeholders, not watchdogs, who need not act unless directed by Certificate holders who "agree to foot the bill."  *Id.* at 2.  According to Defendants, neither the PSAs nor the TIA required them to do anything to protect the interests of Certificate holders constrained by onerous no-action provisions, notwithstanding widespread public disclosures of systemic underwriting abuses by WaMu that coincided with rapidly accelerating credit losses and delinquencies in the Covered Trusts.  Indeed, so limited were the Trustee's duties according to Defendants, they were not even required to "read" the monthly periodic performance reports for the Covered Trusts they published which reflected hundreds of millions of dollars in credit losses and delinquency rates as high as 50%.  *Id.* at 19.

In fact, however, neither the contracts nor the TIA excuse Defendants' failure to give notice to the Servicer and the Certificateholders, in the first instance, or to enforce the Seller's obligation to repurchase defective loans under the facts and circumstances alleged here. Moreover, Defendants' assertion that *all RMBS* – whether characterized as debt or equity – are exempt from the TIA would undermine Congressional intent and deprive purchasers and holders of RMBS, including the public pension funds who are Plaintiffs in this case, of the uniform, minimum federal protections the TIA was enacted to provide.

As explained below, this Court's prior decision holding that the WaMu MBS are debt securities subject to the TIA, and that the prior Complaint plausibly alleged that Defendants had actual knowledge of document deficiencies and breaches of representations and warranties, are consistent with governing law and should not be reconsidered.  In addition, as required by the December 7 Order, the SAC now plausibly alleges that, as a result of the close corporate

3

relationship between the Servicer and the Seller, among other things, an Event of Default would have occurred but for Defendants' failure to comply with their express contractual duty to provide notice to the Servicer. The SAC also plausibly alleges that a reasonably prudent Trustee would have taken it upon itself to force the Seller to repurchase any defective loans in the Covered Trusts. As these allegations far exceed Plaintiffs' pleading burden under Fed. R. Civ. P. 8(a), Defendants' motion to dismiss should be denied.

## II.  **BACKGROUND**

### A.  **The Trustee's Critical Duties Under the TIA and the PSAs**

Defendants' description of the MBS Trustee as a poorly compensated, ministerial actor is at odds with the facts and the law. MBS Trustees have significant pre- and post-default duties and responsibilities pursuant to statute and contract that directly impact the value of MBS. Moreover, the compensation that an MBS Trustee negotiates with the other parties to the PSA has no bearing on the obligations it has accepted to protect certificate holders.

As described more fully in the SAC, the purpose of having a Trustee in an MBS securitization is to ensure that there is at least one independent party to the Governing Agreements who, unlike the MBS holders, does not face collective action, informational, or other limitations, and as a result can effectively protect the trusts and their beneficiaries. The importance of the MBS Trustee is self-evident in a case such as this in which all the participants in the securitizations at issue – *i.e.*, the originator, Seller, Depositor, underwriter and Servicer – were WaMu affiliates. As alleged in the SAC, WaMu, through its "Home Loans" group, controlled almost every aspect of the creation, issuance and servicing of the MBS at issue in this case – from setting the underwriting criteria and pricing the Mortgage Loans originated by

4

WaMu; through pooling of the underlying Mortgage Loans by its affiliates; through the securitization and underwriting of the loans and the sale of the MBS representing interests in the Mortgage Loans to Plaintiffs and Class members; and then by servicing the loans in the Securitization Trusts. (¶¶23-27). In view of the foregoing, and in recognition of the fact that Certificate holders' ability to protect their own interests are constrained by no-action clauses requiring holders of 25% of the outstanding Certificates to direct the Trustee to act, the Governing Agreements and the TIA impose important pre- and post-default duties on the Trustee for the protection of investors.

First, the Governing Agreements require that the Trustee, or its agent, (i) take physical possession of the Mortgage Files evidencing the Trusts' ownership of the Mortgage Loans purportedly conveyed to the Trust, (ii) review the Mortgage Files to identify any that were incomplete (exceptions), and (iii) certify that the required documentation specified in the Governing Agreements is present. (¶¶4, 34-41). In the event documentation is missing or incomplete, the Trustee or its agent is required to issue an exception report, which constitutes notice to the Servicer. (¶¶ 39-40). In turn, the Servicer is required to ensure that the cure or repurchase of defective loans. (*Id.*). Failure on the part of the Servicer to perform its duties in this respect within sixty days of receiving notice from the Trustee of its failure to do so constituted an Event of Default under the PSA and required the Trustee to exercise its prudent person obligations and enforce the Seller's obligation to repurchase defective Mortgage Loans. (¶41). In the case of an Event of Default, the TIA likewise mandates that a trustee must exercise "such of the rights and powers vested in it by such indenture, and to use the same degree of care

and skill in their exercise, as a prudent man would exercise or use under the circumstances in the conduct of his own affairs."[5]

In addition to its duty to enforce the Seller's obligation to repurchase Mortgage Loans with defective and incomplete Mortgage Files, the Trustee also has significant pre- and post-default duties under the Governing Agreements with respect to breaches of the Seller's representations and warranties. The Governing Agreements contain representations and warranties attesting to the characteristics of the borrower and collateral for the Mortgage Loans conveyed to the Covered Trusts, and that the Mortgage Loans complied with their underwriting criteria. (¶¶6, 42-46). Rating agencies assess the quality of the MBS based on those representations and warranties, and, notably, the ratings agencies must be informed of their breach. (¶6). For this reason, upon discovery of a breach, the Governing Agreements require the Trustee to provide notice, and the Servicer's failure to timely cure the breach after receiving notice from the Trustee of its failure to do so constitutes an Event of Default requiring the Trustee, pursuant to the Governing Agreements and the TIA, to enforce the Seller's obligation to repurchase such Mortgage Loans as a prudent person acting in its own interests would. (¶¶6, 43-46).

The value of MBS, and their credit rating, depend primarily on the riskiness of the underlying mortgages, which is reflected in the Seller's representations and warranties concerning the quality of loans in the pool and, secondarily, to the extent that borrowers default on their payments, on the Trust's ability to foreclose on the collateral and recover the unpaid loan balance. (¶30). If the loans underlying the MBS suffer payment defaults in excess of the assumptions built into their credit enhancement and securities' ratings, or the underlying

---

[5] 15 U.S.C. §77ooo(c).

6

properties' mortgages cannot be effectively foreclosed and the properties sold when borrowers fail to make their monthly mortgage payments, the securities will be re-rated and the value of the MBS will decline. (*Id.*). As a result, an MBS Trustee's compliance with its pre-default duties to provide notice to the Servicer and its post-default duties to enforce the Trusts' repurchase rights with respect to Mortgage Loans with incomplete or defective Mortgage Files or that breach the Seller's representations and warranties is critical to the performance of the Covered Trusts and the price of the MBS.

These duties were in no way "ministerial." As Judge Mukasey explained in *LNC Investments, Inc. v. First Fidelity Bank, National Association*:

> [A]fter an event of default . . . "the indenture trustee's obligations come more closely to resemble those of an ordinary fiduciary, regardless of any limitations or exculpatory provisions contained in the indenture." . . . After an event of default, "it is . . . only the trustee who is able to act swiftly and effectively to assure . . . that the rights of the bondholders to recover what they are owed will ultimately be vindicated.[6]

Unfortunately for Plaintiffs and Class members, Defendants disregarded their critical statutory and contractual duties to ensure that Mortgage Loans with defective Mortgage Files, or those that breached the Seller's representations and warranties, were substituted or repurchased from the Trusts.

## B.    The Covered Trusts Have Suffered Significant Losses as a Result of Defendants' Breaches of Their Duties as Trustee.

As set forth at length in the complaint, the WaMu MBS at issue here have suffered enormous losses. (¶¶8-9, 52, 58-60). Beginning in or about March and April 2008, within 24

---

[6] 935 F. Supp. 1333, 1347 (S.D.N.Y. 1996) (quoting *Beck v. Mfrs. Hanover Trust Co.*, 218 A.D.2d 1, 12, 632 N.Y.S.2d 520, 527 (1st Dep't 1995).

months of all the Certificates' issuance, delinquencies with respect to the Mortgage Loans in the Covered Trusts began to increase as a result of widespread defects in the underlying Mortgage Loans, and credit rating agencies began to downgrade the certificates of certain tranches in the Covered Trusts. (¶8). By June and July 2008, the payment delinquencies, credit losses and ratings downgrades for the Mortgage Loans in the Covered Trusts had sharply accelerated, something the Trustee was necessarily aware of through monthly performance reports it published which included delinquent loans, loans that had gone into foreclosure, and those that had realized losses on the sale of their collateral. (*Id.*).

These mounting losses and delinquencies in the Covered Trusts and accompanying ratings downgrades coincided with a steady stream of revelations concerning WaMu's systemic underwriting abuses. In this regard, a series of investigations and lawsuits has revealed that the Mortgage Loans WaMu securitized were of exceedingly poor quality and frequently violated the representations and warranties that WaMu had made. (¶¶53-57). As described by the Majority and Minority Staff Report of the Permanent Subcommittee on Investigations of the U.S. Senate's Committee on Homeland Security and Government Affairs (the "Senate Staff Report"), WaMu "polluted the financial system with mortgage backed securities which later incurred high rates of delinquency and loss." (¶54). Shockingly, the Senate Staff Report found that WaMu "securitized loans that it had identified as likely to go delinquent, without disclosing its analysis to investors to whom it sold the securities, and also securitized loans tainted by fraudulent information, without notifying purchasers of the fraud that was discovered and known to the bank." (*Id.*) Likewise, widespread evidence exists of substantial irregularities in the transfer of the Mortgage Loans to the Trusts that have precluded or delayed the Trusts from foreclosing on the Mortgage Loans causing significant losses to Certificate holders. (¶¶61-76).

Notwithstanding their knowledge of breaches of representations and warranties and defective Mortgages in connection with WaMu MBS and the failure of the Servicer, a WaMu affiliate, to enforce the resulting repurchase claims, the Trustee Defendants have taken no action to enforce the Seller's obligations to repurchase defective loans in the Covered Trusts, each of which has experienced a shortfall of principal. (¶60). The Trustee Defendants' conduct in this regard stands in stark contrast to that of Deutsche Bank, which serves as Trustee for other WaMu MBS Trusts, and which has commenced litigation against JPMorgan Chase, the successor-in-interest to WaMu, based on the same adverse public disclosures regarding WaMu MBS detailed in the SAC. (*See Deutsche Bank National Trust Company v. Federal Deposit Insurance Corp., et al.*, No. 1:09-cv-01656, ECF No. 32 ("*Deutsche Bank* Complaint") (D.C.C. Sept. 8, 2010), attached as Exhibit B to the Schwartz Declaration).

Defendants' refusal to act has had a significant, negative impact on the performance of the Covered Trusts. As detailed in the SAC, the Covered Trusts have reported tens or even hundreds of millions of dollars in recognized losses to date and staggering delinquency rates, indicating that substantial additional losses are likely. (¶58). These high loss and delinquency rates, which were tracked in the monthly reports that Defendants published, indicate that many of the underlying Mortgage Loans in the Covered Trusts are not of the quality that WaMu represented and warranted. Their pricing since 2008 similarly has reflected losses the Covered Trusts have and will continue to suffer.

### III.   ARGUMENT

**A.   The SAC States Claims for Breach of Contract**

To survive a motion to dismiss for failure to state a breach of contract claim, the plaintiff must plead: (1) the existence of a contract, whether express or implied; (2) a breach of an

obligation imposed by that contract; and (3) damage suffered by the plaintiff as a result.  *See VLIW Tech., LLC v. Hewlett-Packard Co.*, 840 A.2d 606, 612 (Del. 2003).  "In deciding a motion to dismiss, the trial court cannot choose between two differing reasonable interpretations of ambiguous provisions."  *Id.* at 615.  Rather, "[d]ismissal, pursuant to Rule 12(b)(6), is proper only if the defendants' interpretation is the *only* reasonable construction as a matter of law."  *Id.* (emphasis in original).  "Ambiguity exists 'when the provisions in controversy are reasonably or fairly susceptible of different interpretations.'"  *Id.*, quoting *Kaiser Aluminum Corp. v. Matheson*, 681 A.2d 392, 395 (Del. 1996).  As discussed below, the SAC adequately alleges each of those elements.

## 1.    The Court Correctly Ruled that Defendants Had Actual Knowledge

### a.    Defendants' Motion for Reconsideration of the December 7 Order Should Be Denied

Defendants seek reconsideration of that aspect of this Court's December 7 Order which held that the original Complaint plausibly alleged Defendants' actual knowledge.[7]  Defendants fail to address the relevant standard governing their motion, however, and with good reason.  Defendants have not even come close to satisfying the stringent standard for reconsideration set forth in Local Civil Rule 6.3.

A motion for reconsideration under Local Civil Rule 6.3 "will generally be denied unless the moving party can point to controlling decisions or data that the court overlooked – matters, in other words, that might reasonably be expected to alter the conclusion reached by the court."  *Shrader v. CSX Transp., Inc.*, 70 F.3d 255, 257 (2d Cir. 1995).  "Reconsideration is an extraordinary remedy to be employed sparingly in the interests of finality and conservation of

---

[7] ECF No. 61 at 14-21.

scarce judicial resources," and not "an invitation to treat the court's initial decision as the opening of a dialogue . . . ." *Gilmore v. Gilmore*, No. 09 Civ. 6230 (WHP), 2011 WL 5517832, at *1 (S.D.N.Y. Nov. 10, 2011) (internal quotation marks and citations omitted).

Rather than pointing to controlling decisions or provisions of the PSAs that were previously cited to but overlooked by this Court, Defendants simply recycle the same argument that this Court has rejected – *i.e.*, that the allegations of the prior Complaint and the SAC do no more than plead "constructive" rather than "actual" knowledge. But this argument was expressly made to and rejected by this Court.[8] Nor have Defendants cited any controlling authority overlooked by this Court. Instead, Defendants have substituted another string of inapposite cases for those cited in their prior motion, none of which require this Court to reconsider its ruling that Plaintiffs have sufficiently pled that Defendants had "actual knowledge".[9]

Likewise, nothing in Section 8.02(iv) of the PSA, which was previously cited to and specifically addressed by the Court, undermines this Court's finding that Defendants possessed actual knowledge of facts requiring them to act in accordance with their responsibilities under the PSAs.[10] Contrary to Defendants' contention,[11] it is Defendants' argument, not the Court's reasoning, that is circular with respect to this issue, as it proceeds from the erroneous premise that Defendants did not have actual knowledge as that term is defined in the PSAs. As this Court found in rejecting Defendants' reliance on Section 8.02(iv) of the PSA, Plaintiffs have plausibly alleged that the actual knowledge standard in the PSAs is satisfied, which required Defendants to

---

[8] *See* ECF No. 34 at 9-10.

[9] *Compare* ECF No. 34 at 10 *with* ECF No. 64 at 15-16.

[10] 2012 WL 6062544, at *13 n.22.

[11] *See* ECF No. 64 at 18.

comply with their contractual duty to give notice to the Servicer and Certificateholders. Defendants do not meet the standard for reconsideration and their motion must be denied.

### b.      The Court's December 7 Order Did Not Apply a Constructive Knowledge Standard.

In the December 7 Order, this Court held that "'[a] party discovers a breach when it knows *or should know* that the breach has occurred.'"[12]  This Court explained, "[a]lthough '[l]earning of facts merely suggestive of a breach would not require the Trustee to immediately raise a claim,' 'upon receipt of such notice, it becomes incumbent upon the [Trustee] to pick up the scent and nose to the source.'"[13]  Given Defendants' indisputable knowledge of "significant document (and other) deficiencies in loans securitized by WaMu,"[14] this Court concluded that Plaintiffs had plausibly alleged facts sufficient to find that the original Complaint alleged Defendants' "actual knowledge" of deficient Mortgage Files and/or breaches of the Seller's MLPA representations and warranties.

Defendants argue that this Court erred in its analysis by relying on two cases – *Morgan Guaranty Trust Co. of New York v. Bay View Franchise Mortg. Acceptance Co.*, No. 00 Civ. 8613(SAS), 2002 WL 818082 (S.D.N.Y. Apr. 30, 2002), and *MASTR Asset Backed Secs. Trust 2006-HE3 ex rel. U.S. Bank Nat'l Ass'n v. WMC Mortg. Corp.*, 2012 WL 4511065, at *7 (D. Minn. Oct. 1, 2012) – that applied a constructive knowledge or inquiry notice standard rather than an actual knowledge standard.  However, Defendants' assertion that this Court's December

---

[12] 2012 WL 6062544, at *13 (emphasis in original) (quoting *Morgan Guar. Trust Co. of N.Y. v. Bay View Franchise Mortg. Acceptance Co.*, No. 00 Civ. 8613, 2002 WL 818082, at *5 (S.D.N.Y. Apr. 30, 2002)).

[13] *Id.*, quoting *MASTR Asset Backed Secs. Trust 2006-HE3 ex rel. U.S. Bank Nat'l Ass'n v. WMC Mortg. Corp.*, Slip Copy, 2012 WL 4511065, at *7 (D. Minn. Oct. 1, 2012).

[14] *Id.*

7 Order erroneously conflated the concepts of constructive knowledge and actual knowledge evidences a fundamental misunderstanding of these terms. Constructive knowledge exists not in fact, but by operation of law – *i.e.*, a party has "*no* actual knowledge, but the ability to acquire knowledge by reasonably diligent inquiry."[15] Actual knowledge, in contrast, requires knowledge of *some* but not necessarily *all* facts. As the Second Circuit has instructed, a requirement that a defendant have "actual knowledge" does not permit a defendant an "ostrich defense." And this Court should certainly not credit such a defense as a matter of law on a motion to dismiss.[16] " "[T]he law . . . does not tolerate a person shutting his eyes to a fact . . . *after* realizing its high probability in order to deny that he acted with the requisite knowledge."[17]

Here, as this Court made clear in the December 7 Order, it cannot be said that Defendants had *no* knowledge of document deficiencies or breaches of the Seller's representations and warranties with respect to Mortgage Loans in the Covered Trusts. To the contrary, as this Court found, Defendants were necessarily aware of "the significant document (and other) deficiencies in loans securitized by WaMu" as a result of both public and private investigations and Congressional reports that had made these issues public.[18] Therefore, Defendants' contention that the Court applied a constructive knowledge standard is unavailing.

Further, as alleged in the SAC, these public disclosures coincided with increasing delinquencies and credit losses in the Trusts and accompanying ratings downgrades which were

---

[15] *Eckstein v. Balcor Film Investors*, 58 F.3d 1162, 1168 (7th Cir. 1995) (emphasis added).

[16] *In re Dreier LLP*, 452 B.R. 391, 450 (Bankr. S.D.N.Y. 2011).

[17] *Woodman v. WWOR-TV, Inc.*, 411 F.3d 69, 84 n.14 (2d Cir. 2005).

[18] 2012 WL 6062544, at *13.

necessarily known to Defendants from the monthly performance reports they published.[19]  At this point, given their role and responsibilities under the PSAs, and their knowledge that the Servicer was not enforcing the Covered Trusts' put back rights, Defendants could not sit back and do nothing, so that later they would be able to deny actual knowledge of defects in the loans in the Covered Trusts, while the Trusts suffered staggering credit losses and declines in market value.  Rather, as this Court found, it was incumbent upon Defendants to "pick up the scent and nose to the source,"[20] in this case, by giving notice to the Servicer and Certificateholders,[21] something that was admittedly not done here.

Significantly, none of the authorities cited by Defendants support their contention that this Court applied an erroneous constructive knowledge standard or that the factual allegations here are insufficient to survive a pleading motion governed by Fed. R. Civ. P. 8.  *LaScala v. Scrufari*,[22] *Gravatt v. City of New York*,[23] and *Zaccaro v. Shah*,[24] were decisions after bench trials or on summary judgment after discovery.  In *Janese v. Fay*,[25] the only case involving a Rule 12(b)(6) motion cited by Defendants, the Second Circuit held that the trial court *had erred* in dismissing ERISA claims as time-barred notwithstanding plaintiffs' allegations of fraudulent concealment.  Although the Second Circuit observed that such allegations were governed by Fed. R. Civ. P. 9(b) pleading standards, not the Rule 8 standards applicable to the claims here, it

---

[19] SAC ¶¶8-9, 58-59.

[20] 2012 WL 6062544, at *13.

[21] PSA §§2.07, 2.09, 7.01(ii).

[22] 479 F.3d 213 (2d Cir. 2007).

[23] 226 F.3d 108 (2d Cir. 2000).

[24] 746 F. Supp. 2d 508 (S.D.N.Y. 2010).

[25] 692 F.3d 221 (2d Cir. 2012).

14

nevertheless held that the resolution of whether the plaintiff had actual knowledge of the defendant's misconduct "was not proper at the pleading stage."[26]  Thus, *Janese* provides no support for dismissal here.

Defendants' efforts to distinguish the authorities cited by this Court are equally unavailing.  Defendants argue that in *Morgan Guaranty*, Judge Stein[27] "cited no contractual language defining the standard of knowledge for discovery" and imported a constructive knowledge standard drawn from a case involving rescission of a contract that is inapplicable here.  These arguments are unpersuasive for several reasons.  First, notwithstanding their criticism of Judge Stein in this regard, Defendants have not pointed to any language in the PSAs at issue here that defines the standard for showing the Trustee's actual knowledge.  Second, neither *Morgan Guaranty* nor the case it relied upon, *Banque Arabe Et Internationale D'Investissement v. Maryland Nat'l Bank*,[28] applied a constructive notice standard – *i.e.*, one that imputed knowledge by operation of law to a party that had none.  Rather, these decisions applied the well-settled rule that a party with some, but less than complete, knowledge must act promptly so as not to lose her claim.[29]

Further, while Defendants argue that decisions defining the quantum of knowledge necessary to trigger the "prompt notice clock" with respect to a claim for rescission are irrelevant to the claims here, in fact, they are highly instructive. The Trustee's knowledge of document

---

[26] *Id.* at 229.

[27] Defendants erroneously attribute the *Morgan Guaranty* decision to Judge Scheindlin.

[28] 850 F. Supp. 1199, 1211 (S.D.N.Y. 1994).

[29] *Morgan Guaranty*, 2002 WL 818082, at *7 (prompt notice clock does not commence running until party has received notice of facts suggesting a breach has occurred); *Banque Arabe*, 850 F. Supp. at 1211, quoting John M. Friedman, "Delay as a Bar to Rescission," 26 *Cornell L. Quarterly* 426, 428–29 (April 1941) ("'Full and complete knowledge of an alleged fraud or breach of contract is not essential to impose upon a would-be rescinder the necessity of acting promptly and diligently if he wishes to assert a rescission.'").

deficiencies and breaches of the Seller's MLPA representations and warranties and the Servicer's inaction triggers its duty to give prompt notice of the same the Servicer and Certificateholders. The district court's decision in *MASTR Asset Backed Securities Trust* illustrates the serious danger to MBS Trusts from Defendants' cramped reading of the "actual knowledge" standard in the PSAs.  In that case, the district court dismissed claims for breaches of representations and warranties brought by an MBS Trustee against a Seller on the grounds that the Trustee, who had waited until after properties had been foreclosed, had not provided notice of the alleged breaches before the loans were foreclosed, in violation of PSA provisions requiring prompt notice and an opportunity to cure.[30]

As was the case in *MASTR Asset Backed Securities Trust*, the PSAs at issue in this case require "prompt" notice to the Servicer of its failure to enforce repurchase claims, of breaches of representations and warranties, and of document deficiencies once the Trustee has actual knowledge of these issues.[31]  While Plaintiffs do not agree that repurchase claims are precluded once a property is foreclosed, the risk that the PSA's may be so interpreted illustrates that Defendants' narrow construction of the actual knowledge standard governing the Trustee's duty to give notice, which is unsupported by contractual language and contrary to law, would risk the loss of the Trusts' valuable repurchase claims.

---

[30] 2012 WL 4511065, at *7.  In view of the outcome in *MASTR Asset Backed Securities Trust*, it is ironic that Defendants have cited the amicus brief filed by The Association of Mortgage Investors (AMI) in *MASTR Adjustable Rate Mortgages Trust 2006-OA2 v. UBS Real Estate Sec. Inc.*, No. 12-cv-7322(HB) (S.D.N.Y. Dec. 13, 2012), since it was filed in response to an MBS sponsor's motion, based on the decision in *MASTR Asset Backed Securities Trust*, arguing that a Trust's repurchase claims had been asserted too late. Defendants cite AMI's statement that "before an event of default takes place, trustees are under no obligation to determine whether a loan is in breach of representations and warranties." *See* Dkt. No. 61 at 23.  Whatever the relevance of this statement to the issues in dispute in that case, it has no relevance here where Plaintiffs have plausibly alleged actual knowledge.

[31] PSA §§2.07, 2.09, 7.01(ii).

### c.   The SAC Alleges Facts Constituting a Breach of the Trustee's Duty to Give Notice

Defendants' argument that the SAC fails to allege facts constituting a breach of the Trustee's duty to give notice is predicated first and foremost on an erroneous view of Plaintiffs' pleading burden.  Pursuant to Fed. R. Civ. P. 8, a complaint need only "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"[32]  "Asking for plausible grounds does not impose a probability requirement at the pleading stage; it simply calls for enough fact[s] to raise a reasonable expectation that discovery will reveal evidence" to prove the claim.[33]  The issue is "not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims."[34]

By any reasonable measure, the SAC states claims for breach of contract that are plausible on their face.  Contrary to Defendants' contention, taken together, the detailed factual allegations in the SAC concerning the staggering and early losses in the Covered Trusts and the widespread public disclosures of WaMu's systematic fraud in connection with MBS securitizations are more than sufficient "to raise a reasonable expectation that discovery will reveal evidence" demonstrating that Defendants' actual knowledge.[35]  Indeed, the allegations in the SAC are even more detailed in this regard than those this Court previously found sufficient to allege Defendants' actual knowledge.

---

[32] *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 1949 (2009) (quoting *Bell Atl. Corp. v. Twombly* ("*Twombly*"), 550 U.S. 544, 570 (2007)).

[33] *Twombly*, 550 U.S. at 545.

[34] *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 511, 122 S.Ct. 992, 997 (2002).

[35] *Twombly*, 550 U.S. at 545.

Defendants' contention that Plaintiffs are required to plead Defendants' knowledge "of missing loan documents or Seller breaches of representations and warranties *with respect to the loans in the specific Trusts on which Plaintiffs sue*"[36] in order to plausibly allege actual knowledge on the part of the Trustee is unsupported by any citation to case law or the PSAs. The SAC's detailed allegations of staggering losses in the Trusts, WaMu's systemic origination and underwriting abuses, and document deficiencies in loan files with respect to WaMu originated loans in other WaMu MBS trusts at issue in numerous lawsuits, including Deutsche Bank's action in its capacity as trustee for 99 WaMu MBS trusts, all of which were known to Defendants, are more than sufficient to plausibly allege the Trustee's actual knowledge. To hold otherwise would require the Court to conclude (implausibly) that the 19 WaMu Trusts at issue in this action were somehow magically spared from the widespread and systematic misconduct alleged despite financial performance indicating quite the opposite.[37]

Defendants' argument that these allegations are insufficient because they plead no more than constructive knowledge fails for the reasons discussed above.[38]   Indeed, Defendants'

---

[36] ECF No. 61 at 18 (emphasis added).

[37] For this reason, Defendants' contention that the voluminous exception reports documented in the *Deutsche Bank* litigation have no relevance here is disingenuous. Further, while Defendants are correct that PSA §2.07 provides that exception reports constitute the notice of document deficiencies required to be given to the Servicer (ECF No. 64 at 21), Defendants ignore that, to the extent the exceptions are not cured by the Servicer, the Trustee is obligated to give notice of an Event of Default and to act as a prudent person in enforcing the Trusts' repurchase rights. In fact, although Defendant U.S. Bank implies that exception reports are snapshots at two moments in time (*see* Dkt. No. 61 at 21 n.14), the Custodian Agreements provide that "[t]he Custodian shall provide updated exception reports as requested by the Trustee (but no more than two (2) exception reports during any one month), at no cost to the Trustee, until all exceptions to the Mortgage Files have been cured." *See* Dkt. No. 22-5 at §1.2(b).

[38] Defendants also argue that the December 7 Order is inconsistent in holding that Plaintiffs had adequately alleged actual knowledge on the part of the Trustee while rejecting Plaintiffs' argument that they had standing to pursue claims with respect to Trusts from which they had not purchased certificates. While Plaintiffs respectfully disagree with this Court's ruling on standing, the two rulings are not inconsistent as the Court's ruling on standing was predicated on the fact that *investors' concerns* are narrowly focused on the loans backing their certificates. 2012 WL 6062544, at *10 ("[To the extent that any of the Trustee's alleged breaches caused diminution in the value of plaintiff's certificates (based on mortgagors' defaults in principal or interest payments), investors holding tranches

contention that they cannot be said to have "actual knowledge" of the contents of the monthly distribution reports they had a duty to make available to Certificate holders and the Ratings Agencies because the Trustee had "no duty to . . . even read[] such reports"[39] is illustrative of the unreasonably narrow construction of the actual knowledge standard that Defendants are asking this Court to adopt at the pleading stage without the benefit of discovery.  Further, Defendants dismiss these reports as irrelevant to the actual knowledge inquiry, arguing that the losses reflected in the reports could have been caused by something other than missing documents or the Seller's breaches.[40]   However, Plaintiffs, as the non-moving party, are entitled to all reasonable inferences from the facts alleged in the SAC, and it is certainly a reasonable inference that the Trusts' enormous losses were a direct result of the fact that substantial numbers of loans failing to meet the Seller's representations and warranties concerning loan quality had been placed in the Trusts in accordance with WaMu's well-documented abuses.[41]

This Court's decision that Plaintiffs have plausibly alleged Defendants' actual knowledge is consistent with the decisions of other courts which have held that resolving issues of actual knowledge is not appropriate at the pleading stage.  For example, in *In re National Century Financial Enterprises, Inc. Investment Litigation*,[42] a breach of contract action by bondholders against the trustee for failing to provide notice when it had actual knowledge of possible events

---

backed by the same loan group as plaintiff's tranches have the 'same set of concerns' as plaintiff in redressing those purported breaches.").

[39] ECF No. 61 at 19.

[40] *See Id.* at 18-19.

[41] Over the course of 18 months, WaMu repeatedly rebuffed Deutsche Bank's efforts to determine whether representations and warranties were breached. *See* Deutsche Bank Proof of Claim at 4.  The Seller's refusal to permit a due diligence review of the underlying loans further compels an inference at this stage of litigation that WaMu was covering up breaches of representations and warranties.

[42] No. 2:03-md-1565, 2006 WL 2849784 (S.D. Ohio Oct. 3, 2006).

of default, the district court denied the trustee's motion to dismiss reasoning that "resolving these issues [of actual knowledge and the existence of an event of default] is not appropriate on a motion to dismiss and that the complaints sufficiently state a claim for breach of the Trustees' duties regarding events of default."[43]   Similarly, in *MASTR Asset Backed Securities Trust*, recognizing the fact-intensive nature of the actual knowledge inquiry, the district court denied a motion for summary judgment prior to discovery on the issue of whether the trustee had given prompt notice of representation and warranty violations after discovering them, holding that "[i]t is possible that discovery would unearth further information as to precisely what the Trustee knew about the breaches and when, and depriving the Trustee of the opportunity to discover such information would be inappropriate."[44]

### d.   Plaintiffs Have Alleged Damages From the Trustee's Failure to Provide Notice.

Perhaps no argument is as indicative of the disdain with which Defendants have viewed their duties to Certificate holders as Defendants' cynical assertion that Plaintiffs cannot allege "but-for" causation of damages from the Trustee's failure to give notice because the Servicer already knew of the document deficiencies and Seller's breaches of representations and warranties.  Of course, what this argument conveniently ignores is that the Trustee's notice to the Servicer starts the clock running on the 60-day period for the Servicer to enforce the Seller's repurchase obligation which, if unremedied, gives rise to an Event of Default and the Trustee's obligation to enforce the Trusts' repurchase rights.[45]   Indeed, in this case, given that the Servicer

---

[43] *Id.* at *6.

[44] 2012 WL 4511065

[45] 2012 WL 6062544, at *13 n.22 (*citing* PSA §7.01(a)(ii)).

and the Seller were both WaMu affiliates, and the Certificate holders were shackled by the no

action constraints in the PSA, the Trusts' repurchase rights were only going to be asserted if the

Trustee took action.

## 2. Defendants Failed to Act Prudently in an Event of Default
### a. An Event of Default Occurred

The occurrence that gives rise to an Event of Default is a breach, by the Servicer, of its

obligations under the PSA.[46]  Such a breach occurred here, when the Servicer failed to enforce

repurchase claims for breaches of representations and warranties and document deficiencies.[47]

Defendants nevertheless counter that an Event of Default technically did not occur,

because, as a condition precedent to Event of Default, the Servicer must receive notice that it has

breached its duties, and the Servicer did not receive such notice.[48]  This argument fails for the

simple reason that the condition precedent did not occur *as a result of* Defendants' misconduct.

"It is an established principle of contract law that where a party's breach by

nonperformance contributes materially to the non-occurrence of a condition of one of his duties,

the non-occurrence is excused."[49]  Pursuant to the PSA, Defendants had a duty to notify the

Servicer of its breaches.[50]  Defendants failed to perform that duty in violation of the PSA.  Thus,

to the extent that notifying the Servicer is a condition precedent, its non-occurrence is excused by

Defendants' breach of their duty to provide that notice, and an Event of Default occurred.

---

[46] PSA §7.01(a)(ii).

[47] PSA §§2.07, 2.09.

[48] ECF No. 64, at 25-26.

[49] *E.g. WaveDivision Holdings, LLC v. Millennium Digital Media Sys., L.L.C.*, No. 2993-VCS, 2010 WL 3706624, at *14 (Del. Ch. Sept. 17, 2010) (internal citation omitted); *In re Bankers Trust Co.*, 450 F.3d 121, 128 (2d Cir. 2006).

[50] PSA § 7.01(ii).

Defendants' insistence that a condition precedent can only be excused by invoking the implied duty of good faith and fair dealing is simply wrong.[51]   Courts have repeatedly recognized, as an "established principle of contract law," that if a party does not perform a duty in breach of its contractual obligations, and if performance of that duty is a condition precedent to an additional contractual duty, then the condition precedent is excused, and the party can be held liable in a breach of contract claim for failing to perform the additional contractual duty.[52] The Restatement (Second) of Contracts §245 records this rule as well.  Further, §245 explains that in addition to excusing a condition precedent when a party fails to perform a duty "imposed by the terms of the agreement itself," a condition precedent will also be excused in the separate circumstance in which a party fails to perform a duty "imposed by a term supplied by the court." Thus *WaveDivision Holdings* sustained a breach of contract claim after excusing a condition precedent because a party failed to perform an express contractual duty – and then dismissed a claim for breach of the implied covenant of good faith and fair dealing because that claim repeated the express contractual duties at issue in the breach of contract claim.[53]  By contrast, *Mobile Communications Corp. of America v. MCI Commications Corp.*, No. 8108, 1985 WL 11574 (Del. Ch. Aug. 27, 1985), upon which Defendants rely, found that the party in question

---

[51] ECF No. 64, at 29-30.

[52] *E.g. WaveDivision Holdings*, 2010 WL 3706624, at *14; *In re Bankers Trust*, 450 F.3d at 128; *General Elec. Capital Corp. v. D'Agostino Supermarkets, Inc.*, No. 03-cv-8539-RO, 2005 WL 1683531, at *2 (S.D.N.Y. July 18, 2005).

[53] *Wavedivision Holdings*, 2010 WL 3706624, at *14, *19; *see also General Elec.*, 2005 WL 1683531, at *2, *3 (sustaining breach of contract claim after excusing non-occurrence of condition precedent, then separately addressing claim for breach of implied covenant of good faith and fair dealing).

did not breach an implied duty not to frustrate the occurrence of a condition precedent, and therefore refused to excuse the condition's non-occurrence.[54]

Next, Defendants insist that to excuse a condition precedent, it is not enough that they breached their contractual duty to notify the Servicer and trigger the condition; rather, Defendants maintain that they had to completely prevent the condition from occurring.[55] This argument has no legal basis. A party's failure to perform a condition precedent excuses the non-occurrence of that condition if the "nonperformance contributes materially to the non-occurrence," and regardless of whether the nonperformance is a "'but for'" cause of the non-occurrence.[56] Whereas, here, Defendants had the contractual duty to perform the condition precedent, such that had Defendants notified the Servicer the condition would have occurred, their nonperformance necessarily constitutes a material contribution to the condition's non-occurrence. That Certificate holders might have been able to notify the Servicer, as Defendants assert, is completely irrelevant. Overlooking for a moment the hurdles which make it extremely difficult for certificate holders to provide such notice, the PSA obligated Defendants to trigger the condition precedent, and contract law does not permit Defendants to violate that critical obligation.

Finally, Defendants argue that the SAC does not plead an Event of Default, because, in their opinion, if the Servicer, Washington Mutual Bank, had received notice of its failure to enforce repurchase claims, it is implausible that the Servicer would have failed to enforce those

---

[54] The other cases upon which Defendants rely (Dkt. No. 64., at 27, 29-40) also involved an implied duty not to frustrate the occurrence of a condition precedent. *Thor Properties LLC v. Chetrit Group LLC*, 936 N.Y.S.2d 196, 198 (N.Y.A.D. 1 Dept 2012); *Consolidated Edison, Inc. v. Northeast Utilities*, 426 F.3d 524, 529 (2d Cir. 2005).

[55] ECF No 64, at 27.

[56] *WaveDivision Holdings*, 2010 WL 3706624, at *14; Restatement (Second) of Contracts §425.

claims against its close corporate affiliate Washington Mutual Mortgage Securities Corp, which sold the Covered Trusts the overwhelming majority of their mortgage loans.[57]   Despite Defendants' protest, courts have long recognized that it is not just plausible, but in fact likely that a person will not bring what amounts to claims against itself.[58]   The SAC alleges that enforcing a repurchase claim against Washington Mutual Securities Corp. would have amounted to the Servicer suing itself, as they were both operated under the auspices of WaMu's Home Loans Group, and shared many of the same officers, directors and employees.[59]   Further, when confronted by a trustee, Deutsche Bank, that sought to enforce repurchase claims for trusts substantially similar to those at issue here, the Servicer refused to enforce the claims and obstructed the trustee in its attempt to do so.  This alone demonstrates that SAC plausibly alleges that an Event of Default would have occurred had Defendants notified the Servicer.

Although Defendants do not, and cannot, dispute the close corporate relationship between the Servicer and the WaMu entities that sold the Covered Trusts the bulk of their mortgage loans, Defendants claim that the Servicer would have brought repurchase claims against its siblings, because if it did not do so it might have lost its rights under the PSAs.[60]  But, as discussed in the preceding paragraph, the SAC, alleges that whatever inconvenience WaMu might have experienced if it lost its servicing rights under the PSAs pales in comparison to the losses WaMu could suffer from repurchase claims, and it is therefore plausible that the Servicer would not

---

[57] ECF No. 64, at 27-28.

[58] *E.g., Cruden v. Bank of New York*, 957 F.2d 961, 968 (2d Cir. 1992) (holding that a "no action" clause did not apply to debenture holder suits against their trustee "as it would be absurd to require the debenture holders to ask the Trustee to sue itself").

[59] ¶83.

[60] ECF No. 64, at 28-29.

have brought repurchase claims had Defendants provided notice. [On a motion to dismiss, the Court must read these allegations in Plaintiffs' favor].

In addition, Defendants half-heartedly argue that, even if the Servicer would not have brought repurchase claims against WaMu entities, it might have brought repurchase claims against entities with which it had no corporate relationship.[61] Yet, this ignores that the Seller sold the mortgages into the Covered Trusts and that the Servicer was required to seek repurchase or cure from the Seller, even if it did not originate a particular loan.[62] Moreover, even assuming Defendants are correct, that is true, it does not change the fact the Servicer would not have fulfilled its obligation to bring repurchase claims for the overwhelming majority of mortgage loans in the Covered Trusts, namely those claims that would have been brought against another WaMu entity. That assumption is not true, however, as demonstrated by, among other things, the suit brought by Deutsche Bank, where WaMu would not pursue any repurchase claims, regardless of whether they were against itself or someone else. Indeed, it is Defendants' suggestion that the Servicer could as a practical matter pursue repurchase claims exclusively against entities with whom it had no corporate relationship that lacks plausibility.

Likewise, Defendants' claim that Plaintiffs are depriving the Servicer of a contractually specified opportunity to cure its breaches turns the actual sequence of events on its head.[63] The Servicer is a close corporate affiliate of the entity that sold defective mortgage loans to the

---

[61] ECF No. 64, at 29.

[62] Defendants are further incorrect in their assumption that the Servicer might have taken enforcement action against a non-WaMu entity. (*See* Mem. at 28-29). The Sponsor who purchased or originated each of the loans in the Covered Trusts was the same entity as the servicer, Washington Mutual Bank. *See* WaMu 2006-AR16 ProSupp, at 21  The PSAs each required the trust, in discovering a breach of the representations and warranties or a missing loan document to go back to Washington Mutual Bank to remedy the issue. *See* WaMu 2006-AR16 ProSupp, at s-42. Thus, the governing documents themselves never contemplated that the Servicer would have to seek out any party other than themselves to fulfill their obligation to notify. Furthermore, because the depositor was, of course, a WaMu entity as well, there would have been no non-WaMu entities involved.

[63] *Id.*

Covered Trusts.  As such, the Servicer was aware of those defective mortgage loans, had the opportunity to bring repurchase claims regarding those defective mortgage loans, and knew that by failing to bring repurchase claims it breached its obligations under the PSA.  Precisely in order to counter that situation, the Covered Trusts have an independent trustee, and the PSA requires the trustee to give notice both of breaches of representations and warranties and of breaches of the Servicer's obligation to enforce the resulting repurchase claims.  Defendants had actual knowledge of both sets of breaches, and as such had the duty to notify the Servicer of those breaches.  As discussed above, having, in violation of the PSA, failed to provide that notice and to give the Servicer a technical opportunity to cure its breaches, Defendants cannot rely on their own breach to argue that an Event of Default did not occur, unless as a condition precedent, the Servicer's technical cure period first commenced and then expired without a cure.  That is especially true here, given that, had Defendants notified the Servicer of its breaches, based on the Servicer's conduct with regard to the Covered Trusts and to similar trusts in the *Deutsche Bank* case, the Servicer would not have cured them.  Plaintiffs accordingly seek nothing more than to enforce the terms of the PSA and to hold Defendants liable for their breaches thereof.

For all of the foregoing reasons, the SAC adequately alleges that an Event of Default occurred.[64]

### b.    Defendants Failed to Act at All, Let Alone to Act Prudently

As a result of the Event of Default, Defendants had the obligation to act as a prudent person would under the circumstances.[65]  The circumstances facing Defendants were that, due to

---

[64] Defendants' selective quotation from paragraph 82 of the SAC does not undermine this conclusion. Paragraph 82 alleges, *in the alternative*, that "the Servicer may itself have been deemed to 'discover' the breaches of representations and warranties upon receiving the monthly reports published by the Trustee of the Trusts' spiking delinquencies and losses, so that an additional 'notice' was not required for there to have been an 'event of default' triggering Defendants' fuller obligations to protect the Trusts." Irrespective of whether the Court agrees with this interpretation of the PSA, the SAC still alleges an Event of Default for all the reasons set forth above.

the low-quality mortgage loans sold to the Covered Trusts in breach of representations and warranties and the Servicer's failure to have those mortgage loans repurchased, the Covered Trusts suffered enormous losses. These high losses began in 2008, and were accompanied by widespread rating downgrades.[66] Far from abating, the losses across the Covered Trusts have collectively ballooned to billions of dollars, with many individual trusts suffering over $200 million in losses.[67] Moreover, the Covered Trusts will continue to suffer significant losses, as a large proportion of their remaining mortgage loans are 90 days or more delinquent, which indicates that they are likely to default, not to mention the many additional mortgage loans in the Covered Trusts that are 30 to 89 days delinquent and also in danger of defaulting.[68]

Under these calamitous circumstances, a prudent trustee could not simply do nothing. For, as Judge Mukasey found, "[a]fter an event of default, 'it is . . . only the trustee who is able to act swiftly and effectively to assure . . . that the rights of the bondholders to recover what they are owed will ultimately be vindicated.'"[69]

Defendants here had the necessary power under the PSA to secure a recovery, such as the ability to pursue repurchase claims. Faced with the same circumstances as Defendants, and armed with the same powers, Deutsche Bank, the trustee of trusts substantially similar to the Covered Trusts, pursued repurchase claims, including against JP Morgan Chase as the successor to WaMu. As such, Defendants concede that pursuing repurchase claims would have been a

---

[65] PSA §8.01(a).

[66] ¶59.

[67] ¶58.

[68] *Id.*

[69] *LNC Investments*, 935 F. Supp. at 1347 (quoting *Beck*, 218 A.D.2d at 12, 632 N.Y.S.2d at 527).

prudent course for them to follow, and instead fault the SAC for failing to allege that "the *only* prudent course for [them] would have been to sue WaMu."[70] But Defendants did not just fail to pursue repurchase claims, as Defendants admit, they failed to take even a single step to address the defective mortgage loans plaguing the Covered Trusts.[71] This leaves Defendants with the untenable claim that, despite large and increasing losses, they acted prudently by putting their heads in the ground and doing nothing.

Defendants contend that Plaintiffs' allegations regarding the Deutsche Bank action are not sufficient to plausibly allege that a reasonably prudent trustee would have acted to enforce the Trusts' putback claims following an Event of Default because Plaintiffs have not alleged, as Deutsche Bank did, that the Trustee, bond insurers and Certificate holders were precluded by WaMu from performing due diligence with respect to the loans in the trusts.   However, Defendants offer no explanation why the absence of this specific allegation is fatal at the pleading stage given the plethora of other factual allegations supporting Defendants' actual knowledge including the widespread, public disclosures regarding WaMu's underwriting abuses which coincided with the staggering and early principal losses in the Covered Trusts. Nor is the absence of this specific allegation inconsistent with the Court's previous holding that Defendants had access to Mortgage Files as the Custodian Agreements previously submitted to the Court provide that the Custodian is required to release Mortgage Files to the Trustee within three business days of a written request from the Trustee.

Of course, Defendants cannot seriously argue that they did not act because there was no Event of Default and hence no duty requiring them to act, while at the same time claiming that

---

[70] ECF No. 64, at 31 (emphasis in original).

[71] ¶79.

they acted prudently by doing nothing.   That claim is little more than an after-the-fact rationalization.   In truth, Defendants hoped to justify their failure to act by pretending that they could avoid triggering an Event of Default in the first place.   Whether trustees of other MBS trusts took the same misguided approach is irrelevant, given that under very similar circumstances, Deutsche Bank pursued repurchase claims.   Courts reject the logic that one member of an industry may engage in misconduct, so long as other members engage in the same misconduct.[72]

It is therefore unsurprising that Defendants cannot offer any better explanation of their failure to act than the suggestion that, because one Plaintiff had brought a suit against WaMu involving a few of the Covered Trusts, their inaction "could be viewed" as a prudent conservation of trust resources.[73]   This suggestion lacks any substance, however, as Defendants also failed to bring repurchase claims on behalf of the many Covered Trusts not involved in that suit.

If it is prudent for Defendants to do anything other than pursue repurchase claims given the performance of the Covered Trusts and the circumstances that prevailed over the last several years, there is no point in having an indenture trustee at all.   Indeed, based on Deutsche Bank's action, it is at least plausible that Defendants acted imprudently by failing to bring repurchase claims.

## B.      The SAC States a Claim For Violation of the TIA

In the December 7 Order, this Court correctly held that the TIA applies to the Certificates and that Defendants violated the notice provision in §315(b).   Defendants now ask the Court to reconsider these holdings, yet once again fail to meet the high burden for the Court to do so.   In addition, the SAC

---

[72] *Newton v. Merrill, Lynch, Pierce, Fenner & Smith,* 135 F.3d 266, 274 (3d Cir. 1998).

[73] ECF No. 64, at 31.

plausibly alleges that Defendants also violated §315(c) by failing to act prudently in the face of an Event of Default.

1. **Congress Enacted The TIA To Prevent The Misconduct At Issue Here**

Congress enacted the TIA to provide minimum protections to investors in debt securities "because previous abuses by indenture trustees had adversely affected 'the national public interest.'" *Bluebird Partners, L.P. v. First Fid. Bk., N.A. New Jersey*, 85 F.3d 970, 974 (2d Cir. 1996) (quoting 15 U.S.C. §77bbb(a)). The TIA itself and its legislative history make clear that those abuses are the exact same ones at issue in this case. In this regard, Section 301(a)(2) of the TIA, 15 U.S.C. §77bbb(a)(2), provides in pertinent part that:

> (1) Upon the basis of facts disclosed by the reports of the Securities Exchange Commission made to the Congress . . . it is hereby declared that the national public interest and the interest of investors in notes, bonds, debentures, evidences of indebtedness, and certificates of interest or participation therein, which are offered to the public, are adversely affected --
>
> (2) when the trustee does not have adequate . . . duties and responsibilities, in connection with matters relating to the protection and enforcement of the rights of such investors; when, notwithstanding the obstacles to concerted action by such investors, and the general and reasonable assumption by such investors that the trustee is under an affirmative duty to take action for the protection and enforcement of their rights, trust indentures (A) generally provide that the trustee shall be under no duty to take any such action, even in the event of default, unless it receives notice of default, demand for action, and indemnity, from the holders of substantial percentages of the securities outstanding thereunder, and (B) generally relieve the trustee from liability even for its own negligent action or failure to act; . . .
>
> Significantly, the TIA finds that these abuses are "injurious to the capital markets, to investors,

and to the general public," and so declares "it . . . to be the policy of this subchapter, *in accordance with which policy all the provisions of this subchapter shall be interpreted*, to meet the problems and eliminate the practices, enumerated in this section, connected with such public offerings." Section 302(b), 15 U.S.C. §77bbb(b) (emphasis added).

The SEC Report that prompted the TIA essentially describes the relationship between Certificate holders and Defendants. Specifically, the SEC Report observed that due to collective action requirements "both in law and in practice, [the] reliance of the security holder upon the trustee for protection of his

investment [wa]s complete." (SEC Report, ECF No. 31-1, at 3). The SEC concluded that trustees had "neglected to perform even the negligible duties which the indenture place[d] upon them, *particularly in matters which [would] result in default of the issuer*," and that "[i]t [wa]s . . . virtually standard practice to provide in indentures that the trustee [could] shut its eyes to the existence of a default unless it [wa]s formally notified of it by holders of a specified percentage of the outstanding bonds," a difficult, if not impossible task. (*Id.* at 31-32, 38) (emphasis added). Even then, the SEC noted there was a "further barrier" because "the trustee h[ad] no obligation to take any action which in its opinion [was] likely to involve it in expense or liability unless the security holders furnish[ed] it with indemnity." (*Id.* at 43). Such inaction, the SEC observed, threatened security holders with "[i]rreparable loss . . . clearly traceable to the trustee's inaction." (*Id.* at 45, 47).

According to the SEC, "a more proper balance between the interests of investors and requirements of issuers [could] be had only by enlarging the definition of the trustee's duties in those cases where its failure to take swift and positive action [left] the investors without effective protection of their interests." (*Id.* at 6). Congress codified that balance in the TIA.

2. **Defendants Violated the TIA**
   a. **Defendants Failed to Give Notice as Required by §315(b)**

Section 315(b) of the TIA[74] requires the trustee to give certificate holders "notice of all defaults known to the trustee, within ninety days after the occurrence thereof." There is no dispute that Defendants failed to give Certificate holders notice of any kind, and the Court correctly held that Defendants thereby violated the TIA's notice provision.[75]

---

[74] The Trust Indenture Act is codified at 15 U.S.C. §77ooo(a), *et seq.*

[75] ECF No. 46, at 37.

In support of reconsideration, Defendants simply repeat the argument they made in their initial motion to dismiss that "default" under §315(b) means an Event of Default, and that no Event of Default occurred.[76] This argument ignores the TIA's plain language and statutory structure.

Section 315 is titled "Duties and responsibility of the trustee," and contains two subsections that explicitly refer to "Duties." The first is subsection 315(a), which is entitled "Duties prior to default," and which states that it refers to "default (as such term is defined in such indenture)." The second is subsection 315(c), which is entitled "Duties of the trustee in case of default," and which also states that it refers to "default (as such term is defined in such indenture)." These subsections invoke default as defined by the indenture, because they codify the rule that an indenture trustee does not have prudent person duties until an Event of Default occurs.

By contrast, subsection 315(b), which is entitled "Notice of defaults," has nothing to do with the degree of care that a trustee must exercise in order to fulfill its duties, but rather seeks to ensure that certificate holders receive critical information concerning the trusts. Accordingly, it does not refer to the singular incident of an Event of Default, but instead invokes a broader definition. This is evidenced by the fact that, unlike subsections 315(a) and 315(c), subsection 315(b) refers to "defaults" in the plural, and does not follow the word "defaults" with the language "as such term is defined in such indenture" or use this language at all. That Congress chose to repeat this language in both subsections 315(a) and 315(c), but not to use it in subsection 315(b), when it clearly knew how to and when that choice fits the statutory scheme, demonstrates that "defaults" as used in subsection 315(b) does not refer to an Event of Default.[77] Rather, "defaults" in subsection 315(b) has its ordinary meaning, namely, in the words of Black's Law Dictionary (9th ed. 2009), "[t]he omission or failure of a legal or contractual duty."

The SAC alleges such defaults. For example, as the Court found, the Seller's breaches of representations and warranties are defaults. Likewise, the Servicer's breach of its obligation to pursue repurchase claims are defaults. By failing to give notice of these defaults, Defendants violated §315(b).

---

[76] ECF No. 64, at 32-33.
[77] *See Barnhart v. Sigmon Coal Co., Inc.*, 534 U.S. 438, 452 (2002).

Furthermore, as alleged in the SAC and described at length herein, an Event of Default occurred.  There is no dispute that Defendants' failure to provide notice of that Event of Default also violated §315(b).

### b.  Defendants Failed to Act Prudently as Required by §315(c)

As noted above, §315(c) requires a trustee to act prudently in an Event of Default.  Defendants maintain that the prudent person analysis under the TIA is exactly the same as the prudent person analysis under the PSA.[78]  Assuming that is correct, which it is not, then, for the reasons set forth above, Plaintiffs have adequately pled a violation of §315(c).

The prudent person analysis mandated by the TIA is in fact slightly different from the analysis under the PSA.  While §315(c) does use default "as such term is defined in such indenture," and thereby adopts the underlying breach that gives rise to an Event of Default, such as a breach by the Servicer, other sections impose limits on the conditions that can be required before that underlying breach becomes an Event of Default, as well as limits on what conduct qualifies as prudent.

In that regard, § 302(a) states that Congress enacted the TIA specifically to preclude what Defendants have attempted to accomplish here by claiming that there is no Event of Default, and no obligation for them to take any action at all, unless certificateholders can overcome collective action problems, indemnification requirements and other hurdles, to make a demand that the Trustee considers adequate.  This Section makes clear that, even if certificate holders are permitted to give the notice that technically triggers an Event of Default, the parties to an indenture, including the trustee, cannot insist on such technicalities, or include similar trip wires that frustrate the substantive ability of certificateholders to rely on their trustees for necessary protection, by providing trustees an excuse to do nothing.  Moreover, §302(b) declares that the TIA's provisions must be interpreted in light of §302(a).  Thus §302's policy prohibiting trustees from doing nothing unless they receive a technical notice of Event of Default is incorporated into §315(c)'s prudent person duties.

---

[78] ECF No. 64, at 32-33.

33

Defendants' arguments concerning the Event of Default do not take into account the TIA. Thus they argue that under the PSA, they had no obligation to provide notice to the Servicer which technically triggers an Event of Default despite having actual knowledge of the Servicer's critical breaches. Similarly, they argue that it was prudent for them not to pursue repurchase claims, or take any action at all, despite the Covered Trusts' ever growing losses. Even if those arguments were valid under the PSA and state common law, which as discussed above they are not, based on the preceding analysis, they are no defense to Plaintiffs' TIA claim, for they are directly contrary to and precluded by §§302 and 315(c). Indeed, for purposes of the TIA claim, "[t]he interpretation of the indenture provisions mandated by the [Trust Indenture] Act does not depend on ordinary contract principles," but rather on statutory interpretation. *Bluebird Partners*, 85 F.3d at 974. Accordingly, even if Plaintiffs did not plead a prudent person violation under the PSA, they have pled a prudent person violation under §315(c).

### 2.    The Court Correctly Held That The TIA Applies To Certificates

Although Defendants seek reconsideration of the Court's holding that the TIA applies to MBS styled as "certificates," they cite no authority that the Court overlooked and instead recycle arguments previously rejected. By the plain language of §304(a)(1)(A), the TIA applies to any "note, bond, debenture, or evidence of indebtedness," and by the plain language of §304(a)(1)(B) it also applies to any "certificate of interest or participation in any such note, bond, debenture, or evidence of indebtedness." If securities are debt, then they are subject to the TIA under §304(a)(1)(A), and no further analysis is necessary. Alternately, if securities are certificates of interest, before concluding that the TIA applies to them under §304(a)(1)(B), it is necessary to determine whether, pursuant to §304(a)(2), they are certificates in "two or more securities having substantially different rights and privileges." The Court could have followed either route to conclude that the TIA applies to the securities at issue here. It followed the first, and correctly held that "[t]he PSA's definition of the certificates cannot, on its own,

34

exempt the certificates from the TIA" and that "a number of factors clearly indicate that the certificates are debt."[79]

### a.   MBS Styled As "Certificates" Are Debt

While Defendants claim not to "reargue" the Court's holding that certificates are debt, virtually every point they make depends on ignoring that holding and adopting their position that Certificates are anything other than debt.[80]   For that reason alone, the Court should reject Defendants' arguments for reconsideration.

As Plaintiffs previously explained, and the Court recognized, the Second Circuit, courts in this District, and other Circuits have all repeatedly found that MBS styled as "certificates" are debt.[81]   The SEC also recently reached the conclusion.[82]   Once again, Defendants cite no contrary authority.   Simply stated, Defendants' argument has been resoundingly rejected by courts that have considered the matter.

Further, as the Court held, a review of the factors that characterize debt clearly confirms that Certificates are debt.   Among those factors is the "obligation to pay a sum certain,"[83] which refers to the fact that a debt instrument lists a specific amount of money that a creditor is entitled to received, namely the amount of money that the creditor lent, *i.e.* the initial principal balance of the debt.   As such, if a venture performs better than expected, its debtholders are not entitled to any of the upside, but only to

---

[79] ECF No. 46, at 34, 36.

[80] ECF No 64, at 33.

[81] *Greenwich Fin. Servs. Distressed Mortg. Fund 3 LLC v. Countrywide Fin. Corp.*, 603 F.3d 23, 29 (2d Cir. 2010); *LaSalle Bank Nat. Ass'n v. Nomura Asset Capital Corp.*, 424 F.3d 195, 200 (2d Cir. 2005); *Ret. Bd. of the Policemen's Ann. & Ben. Fund of City of Chicago v. Bank of New York Mellon*, No. 11-cv-5459, 2012 WL 1108533, at *6 (S.D.N.Y. Apr. 3, 2012); *Ellington Credit Fund. Ltd. v. Select Portfolio Servicing, Inc.*, 837 F. Supp. 2d 162, 182 (S.D.N.Y. 2011); *Trust for Certificate Holders of Merrill Lynch Mortg. Pass-Through Certificates Series 1999-C1 v. Love Funding Corp.*, No. 04-cv-9890, 2005 WL 2582177, at *1 (S.D.N.Y. Oct. 11, 2005); *In re Security Capital Assur. Ltd., Sec. Litig.*, 729 F. Supp. 2d 569, 575 (S.D.N.Y. 2010) (MBS are "debt securities"): *CWCapital Asset Mgt., LLC v. Chicago Prop.. LLC*, 610 F.3d 497, 499 (7th Cir. 2010).

[82] *U.S. Sec. & Exch. Comm. v. Option One Mortgage Corp. n/k/a Sand Canyon Corp.*, No. 8:12-cv-00633-JST, ECF No. 1 at ¶20 (C.D. Cal. Apr. 24, 2012) (complaint): *see also* www.sec.gov./litigation/litreleases/2012/lr22344.htm.

[83] *Gilbert v. C.I.R.*, 248 F.2d 399, 402 (2d Cir. 1957).

their initial principal balance.[84]  Certificates are issued in specific "Authorized Denominations," with an "initial Certificate Principal Balance." (PSA §5.02, ECF No. 24-3 at 29, 136).  As the Prospectus neatly explains, "[d]istributions of principal will be made on each distribution date to the class or classes of securities [certificates] entitled to principal until the principal balance of that class has been reduced to zero." (Prospectus, ECF No. 22-8 at 221).  Thus, if the Covered Trusts perform better than expected, Certificate holders will still only receive their initial Principal Balance, plus the rate of interest specified in the PSA.  The initial Principal Balance of a certificate is, as with any other note or bond, the sum certain to which holders are entitled.

Another factor is that debt instruments include "interest" payments, and offer "greater interest to compensate for [a] greater risk."[85]  Certificates satisfy this factor as well. "Interest" accrues on unpaid principal, and they make interest payments at a specified "Interest Rate." (*See* PSA, ECF No. 24-3 at 14). Further, subordinated Certificates have a greater interest rate, along with a greater risk, than senior Certificates. (*See Id.*).

Debt also typically has "a repayment schedule including periodic interest and principal repayment at maturity."[86]  Once again, certificates have these characteristics, too, as evidenced by their "Final Maturity Date," and fixed "Distribution Date" on which principal and interest payments are made. (*See* PSA, ECF No. 24-3 at 14, 48).

In addition, certificates have various "Credit Enhancements" to help ensure that principal and interest payments are made. (Prospectus Supplement, ECF No. 22-8 at 20).  Likewise, certificates receive credit ratings from Ratings Agencies, and the Trustee or the Servicer must notify the Ratings Agencies of occurrences that affect the credit quality of the certificates, such as an Event of Default or the repurchase of any defective Mortgage Loan. (PSA §10.11, ECF No. 24-3 at 158-59).

---

[84] *See In re Med Diversified*, 461 F.3d 251, 256-57 (2d Cir. 2006)
[85] *See Antares Aircraft, L.P. v. Fed. Rep. of Nigeria*, 999 F.2d 33, 34-35 (2d Cir. 1993); *Fasolino Foods Co., Inc. v. Banca Nazionale del Lavoro*, 961 F.2d 1052, 1057 (2d Cir. 1992).

[86] *Antares Aircraft*, 999 F.2d at 34-35.

36

Against all of these factors indicating that certificates are debt, the best contrary arguments Defendants could muster is that because the underlying mortgages may not perform as expected, the certificate holders were never entitled to anything.  (ECF No. 29 at 31).  The Court easily dispatched this argument, and explained that "crediting it would ignore that the obligation to pay the certificate-holders <u>always</u> exists; that obligation, however, cannot be <u>met</u> if individual mortgagors default on their principal and interest payments."[87]  As an example, the Court noted that "no one could plausibly argue that a non-recourse loan" – such as the Certificates themselves or a mortgage loan – "is 'equity' even if the obligor defaults on the loan and the collateral backing the loan is worth nothing."[88]

For all of the foregoing reasons, the Court correctly held that certificates are debt.[89]

### b.    As Debt Instruments, The TIA Applies To Certificates

Defendants note that statutory analysis begins with the text, and that the words of a statute must be read in light of their place in the statutory scheme.[90]  Plaintiffs agree.

Section 304(a)(1), which describes the instruments subject to the TIA, divides into two subsections.  The first, subsection 304(a)(1)(A), states that the TIA applies to any "note, bond, debenture, or evidence of indebtedness."  The second, subsection 304(a)(1)(B), states that the TIA applies to any "certificate of interest or participation in any such note, bond, debenture, or evidence of indebtedness."  If a "note, bond, debenture or evidence of indebtedness" referred to the same thing as a "certificate of interest," then there would be no need for the two subsections.  Accordingly, under the principles of

---

[87] ECF No. 46, at 36-37 (emphasis in original).

[88] *Id.* at 37, n.24.

[89] There are additional reasons why Certificates are debt, discussed in Plaintiffs' response to Defendants' first Motion to Dismiss. (ECF No. 30, at 26-31). Also, the Tax Reform Act for 1986 included REMIC provisions that were "designed to permit the issuer of multiclass MBS to qualify as a conduit (rather than a taxable corporation)." Richard S. Millerick, ARTICLE: FEDERAL INCOME TAX ASPECTS OF STRIPPED MORTGAGE-BACKED SECURITIES, 12 Va. Tax Rev. 219, 230 (Fall 1992). "REMIC regular interests are treated as debt of the REMIC for purposes of computing the taxable income of the holder of a regular interest, I.R.C. §860B(a), and for the purpose of computing taxable income or net loss of the REMIC itself, I.R.C. §860C(b)(1)(A)." *Id.*, n. 31. As the PSA and Prospectus Supplement state, Certificates are REMIC regular interests, and thus debt.

[90] ECF No. 64, at 35.

statutory interpretation cited by Defendants, that those two categories of instruments are addressed in different subsections indicates that, the TIA treats a debt instrument, such as a note or bond, as substantively different from a certificate of interest.

Nevertheless, Defendants assert that, "whether the Certificates are characterized as 'debt' or 'equity,'" they are exempt from the TIA pursuant to another Section,[91] 304(a)(2), that expressly applies only to "certificates of interest." This assertion contradicts the basic principles of statutory interpretation that even Defendants recognize. Section 304(a)(1) distinguishes debt instruments from certificates of interest. As such, debt instruments cannot be exempt from the TIA under another Section that only refers to "certificates of interest."

For Defendants to be correct, the substantive qualities of certificates would have to be irrelevant, and the only meaningful factor would be their name. But, as the Court correctly held, "[t]he PSA's definition of the certificates cannot, on its own, exempt the certificates from the TIA."[92] Indeed, as the Second Circuit explained in holding that a "lender cannot evade the usury statute by a disguise," "Courts never permit a form to shield illegality or statutes to be evaded by sham or pretense." *Topping v. Trade Bank of New York*, 86 F.2d 116, 118 (2d Cir. 1936). Allowing Defendants to evade the TIA by affixing the word "certificate" on a debt instrument would deprive debt holders of the very protections Congress enacted for their benefit, and expose the national interest to abuses by trustees – such as the well documented role that the hundreds of billions of dollars worth of MBS certificates have, due in part to the conduct of Defendants and other MBS trustees, played in the nation's recent economic crisis. This principle is incorporated into the TIA itself, which commands that its provisions "shall be interpreted, to meet the problems and eliminate the practices, enumerated in this section [§ 77bbb]." 15 U.S.C. §77bbb(b). Likewise, the TIA's legislative history affirms as much, and explains that Congress made certificates of interest subject to the TIA under 15 U.S.C. §77ddd(a)(1)(b) because, "[p]ractical

[91] *Id.* at 35.

[92] ECF No. 46 at 34.

considerations . . . demand their inclusion, [otherwise] adoption of the certificate of interest device would provide too easy a method of avoiding the requirements of the [TIA]." H.R. Rep. No. 1016 (1939). Ultimately, there would be little point in Congress enacting the TIA, or any other legislation, if its laws could be evaded by scribbling one name on an instrument as opposed to another.

Defendants acknowledge as much, when they concede that under the securities laws, notes and bonds are distinct from certificates of interest.[93] Their brief attempt to demonstrate that certificates are in fact certificates of interest, however, falls flat. According to Defendants, certificates of interest provide for "payment of proceeds contingent upon an apportionment of profits."[94] This just begs the question of whether the payments made by the Covered Trusts are an apportionment of profits, or simply the repayment of principal and interest that accrues on the outstanding principal. Without any analysis, or citation to a single case that involves mortgage-backed securities, Defendants conclude that because the Covered Trusts make payments to Certificate holders based on revenue collected from the underlying mortgage loans, those payments must be an apportionment of profits.[95] They completely ignore the factors discussed above, and the Court's finding based on those factors, that the payments made by the Covered Trusts are in fact the payment of principal and interest pursuant to a debt instrument.

Moreover, the mere fact that the Covered Trusts receive revenue from the underlying mortgage loans does not transform the payments made by the Covered Trusts into something other than principal and interest owed on the Certificates. Every entity that issues debt has to generate revenue somehow to service the debt. As an example, there is no dispute that MBS styled as "Notes," which are functionally indistinguishable from MBS styled as "Certificates," and which make payments based on revenue generated from underlying mortgage loans, are debt. (*See* ECF No. 30, at 29-30). To further elaborate the point, if a corporation issues $1 million worth of common stock and $1 million worth of bonds, and repays the bondholders with revenue that it generates, that does not mean that the bonds are equivalent to

---

[93] ECF No. 64, at 34.

[94] *Id.* (internal quotations omitted).

[95] *Id.*

stock, or that the bonds share in the apportionment of the corporation's profits. Likewise, if the corporation divides the $1 million worth of bonds into multiple classes with different levels of seniority and different interest rates, apportioning the corporation's revenue to make sure that each class of bonds receives the appropriate payments does not change the bonds into something other than debt.

Accordingly, given that Certificates are debt, and that Congress enacted the TIA to provide uniform minimum protections for debtholders, the TIA applies to Certificates pursuant to §304(a)(1)(A).

### c.   Section 304(a)(2) Does Not Apply To The Certificates

Section 304(a)(2) exempts any "certificate of interest or participation in two or more securities having substantially different rights and privileges" from the TIA. As discussed above, because Certificates are debt subject to §304(a)(1)(A), they are not exempt under §304(a)(2), which by its plain language applies only to instruments that are in fact "certificates of interest." Defendants' attempt to apply §304(a)(2) to Certificates at issue here therefore depends on ignoring the Court's holding that Certificates are debt. This is true both as a general proposition, and in regards to specific arguments they advance.

For example, Defendants claim that the TIA exempts instruments with more than one obligor, and that the Certificates have multiple obligors – purportedly the underlying mortgagors.[96] To claim that the Certificates have multiple obligors is, however, to assert that the underlying mortgagors owe payments directly to the Certificate holders, which are then apportioned among the Certificate holders as profits; and to deny that the Certificates are debt issued by the Covered Trusts, which each Covered Trust alone has the responsibility to repay (albeit on a non-recourse basis) with revenue generated from the underlying mortgage loans.

Even assuming that the Certificates were certificates of interest, which they are not, the TIA would apply to them under §304(a)(1)(B), which covers certificates of interest in any "note, bond, debenture, or evidence of indebtedness." Defendants argue that in that circumstance, the exception in

---

[96] ECF No. 64, at 36.

§304(a)(2) for certificates of interest in securities having "substantially different rights" would then exempt certificates from the TIA.[97]  This argument fails, as the fact that mortgages may not have the same scheduled payments or relate to the same property is immaterial as compared to the fact that they are all obligated to make interest payments to and face foreclosure from the Covered Trusts.  The rights provided by the mortgages are in truth substantially similar, in particular, the rights that determine whether the Covered Trusts will collect revenue to make the required principal and interest payments to Certificate holders.

In addition, to the extent Defendants assert that §304(a)(1)(B) applies only to certificates of interest in a single note, or mortgage,[98] their reading is undercut by §304(a)(2), which makes clear that the TIA applies to certificates of interest in multiple notes, or mortgages, so long as the notes do not have substantially different rights.

Thus, though the TIA properly applies to certificates as debt under §304(a)(1)(A), even if certificates were considered certificates of interest, the TIA would apply to them under §304(a)(1)(B), and would not exempt them under §304(a)(2).

> **d.     To the Extent the SEC Has Made Any Informal Interpretation Regarding the Applicability of the TIA to MBS Certificates, They Conflict with the TIA's Unambiguous Language as well as the SEC's Own Recent Statements, and Make No Attempt to Persuade**

Defendants assert that the SEC has, through informal actions, interpreted the TIA to exempt MBS certificates.[99]  When faced with a question of statutory interpretation, however, a court must independently determine whether the statute at issue is unambiguous.  *Chevron, U.S.A., Inc. v. Natural Resources Def. Council, Inc.*, 467 U.S. 837, 842-43 (1984) ("[a] court, as well as [an] agency, must give effect to the unambiguously expressed intent of Congress").  If it is unambiguous, and if an agency's "interpretation is inconsistent with the plain language of the [statute]," then the agency's interpretation is "not entitled to *Chevron* deference" or any other form of deference.  *Natural Resources Defense Council*

---

[97] *Id.* at 35.

[98] *Id.* at 35-36.

[99] ECF No. 64., at 37-39.

*v. Abraham*, 355 F.3d 179, 198-99 (2d Cir. 2004).  In interpreting the plain language of a statute, courts apply the traditional canons of construction and examine "the particular statutory language at issue, as well as the language and design of the statute as a whole, and, where appropriate, its legislative history." *Id.* at 198 (internal quotation omitted).  For the reasons discussed above, the TIA unambiguously applies to MBS styled as certificates, and the Court must not defer to any inconsistent SEC action or statement.

Even assuming that the TIA is ambiguous, an informal interpretation by the SEC only merits "respect proportional to its 'power to persuade[.]'"  *U.S. v. Mead Corp.*, 533 U.S. 218, 235 (2001) (quoting *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944).  The persuasiveness of such an interpretation depends on "its writer's thoroughness, logic, and expertness, its fit with prior interpretations, and any other sources of weight." *Mead*, 533 U.S. at 235.  Under that standard, the Second Circuit has refused to defer to an agency that "offers no explanation of the considerations or reasoning underlying its practice, except perhaps [a] conclusory statement . . . ." *Boykin v. Keycorp*, 521 F.3d 202, 208-09 (2d Cir. 2008); *De La Mota v. U.S. Dept. of Educ.*, 412 F.3d 71, 80 (2d Cir. 2005).

First, Defendants contend that the Court should defer to a short, conclusory statement from the staff of the Division of Corporation Finance, which they refer to as a "Telephone Interpretation".[100] (Recon. Mem. at 15-16).  That interpretation was posted on the Division's website, after warnings that statements on the website "are not rules, regulations, or statements of the Commission," "do not necessarily contain a discussion of all material considerations necessary to reach the conclusions stated," and   thus   "are   not   binding   due   to   their   highly   informal   nature." (http://sec.gov/divisions/corpfin/cfguidance.shtml).   The Division could not have explained with any greater force that the statement merits no deference.  Notably, as discussed above, after *Bank of New York Mellon*, the SEC stated that MBS certificates are debt, and the SEC Division of Corporation Finance's website states that the staff is reconsidering the Telephone Interpretation in light of that decision.

---

[100] ECF No. 64, at 37.

Second, Defendants argue that the Court may draw an inference regarding the SEC's position on the TIA from MBS certificates that were not qualified under the TIA and that the SEC did not stop from being offered publicly.[101]   (Mem. at 35).   Assuming that the SEC actually made a decision not to stop those offerings, it was merely applying the unpersuasive interpretation of the Division of Corporation Finance that *Bank of New York Mellon* already found unworthy of deference.   Such a decision, unsupported by any other statement, has no additional power to persuade, and similarly merits no deference.   Nor does that decision merit deference simply owing to its repetition over the passage of time. Courts regularly deny deference to statements that are "longstanding" and "consistent" if they are not otherwise persuasive.   *St. Martin Evangelical Lutheran Church v. South Dakota*, 451 U.S. 772, 784 n.13 (1981); *S.E.C. v. Sloan*, 436 U.S. 103, 118 (1978) (refusing to defer to an interpretation that an agency held consistently for over 30 years, because the interpretation, "though of long standing, is . . . inconsistent with the statutory mandate").

Next, Defendants contend that several SEC "no action" letters conclude that the TIA does not apply to MBS certificates.[102]   (Mem. at 35-36).   As an initial matter, these letters merit no deference, as each one expressly states that it "only expresses the Division's position on [an] enforcement action and does not purport to express any ***legal conclusion*** with respect to the question presented."   *See, e.g.*, *Marion Bass Sec., Inc.*, 1984 WL 45531 (SEC No-Action Letter Jul. 9, 1984) (emphasis added).   In any event, none of the letters involve MBS, let alone support Defendants' contention that the TIA does not apply to MBS certificates[103].   *See also, Retirement Board of the Policeman's Annuity and Benefit Fund of the City of Chicago v. The Bank of New York Mellon*, Civ. No. 11-5459-WHP, Slip. Op., at 7 (S.D.N.Y. Feb. 14, 2013) (in factually similar TIA case, Judge Pauley rejected a similar argument, saying the cursory agency pronouncements on which [defendant] and its amici rely lack persuasive power").

---

[101] ECF No. 64, at 37-38.
[102] ECF No. 64, at 38.
[103] Plaintiffs set forth the shortcomings of all the No Action letters cited by Defendants in their Response to Defendants' initial Motion to Dismiss.   (ECF No. 30, at 36).

In addition, Defendants state in a brief footnote that the SEC's purported position merits deference.  As explained above, and at greater length in Plaintiffs' response to Defendants' initial Motion to Dismiss (*see* ECF No. 30, at 38), the highly informal interpretation and letters cited by Defendants do not merit deference, as, to the extent they even involve mortgage-backed securities, they make no attempt to persuade the reader that their reasoning is correct.

Finally, Defendants suggest that because the SEC has the power "by rules or regulations" to exempt securities from the TIA, that the Court should pretend that the SEC in fact issued such rules or regulations exempting certificates from the TIA, and further that the SEC did so pursuant to specific "procedures" that the SEC must follow to issue such rules and regulations.[104]  These procedures for formal rulemaking, of course, do not permit a regulated industry to lobby the SEC in an effort to deprive investors of critical protections without affording investors an opportunity to respond in open forum.[105] Significantly, as Defendants acknowledge, the SEC never issued rules or regulations exempting certificates from the TIA.[106]  Defendants could have petitioned for such rulemaking, but they did not do so.  They are thus forced to claim that they relied on highly informal and obscure statements, which warned that they should not be relied on.  Indeed, 15 U.S.C. §77sss(c), the Section of the TIA cited by Defendants for the proposition that they were entitled to rely on the SEC,[107] is expressly limited to acts done in conformity with formal SEC pronouncements.

Accordingly, the only issue before the Court is whether, as a matter of statutory interpretation, the TIA applies to certificates, and, as discussed above, it does.

### e.       Applying the TIA to MBS Is Readily Workable

---

[104] 15 U.S.C. §77ddd(d); ECF No. 64, at 38-39.

[105] *See* 6 Law Sec. Reg §16.36[2].
[106] ECF No. 64, 39.

[107] ECF No. 64, at 39.

Defendants repeat their claim that applying the TIA to certificates would render the Covered Trusts unworkable.[108] This claim lacks merit. If any specific TIA provision actually caused difficulties for trusts governed by PSAs, the Trusts can seek exemptions on a provision by provision basis. 17 C.F.R. §260.4d-7. In any event, the PSAs are, from an administrative standpoint, easily reconciled with the TIA as is demonstrated by the example Defendants claim is likely to pose a problem:

- Defendants suggest that, if the TIA applied to PSAs, the underlying mortgagors would become obligors and would have to fulfill certain duties under 15 U.S.C. §§77nnn(a) and 77nnn(d) with regard to the Trusts. (Mem. at 34-35). This assumes that the Certificates would be treated as certificates of interest, not debt with the trustee as the obligor. Moreover, §77nnn(a), which calls for an obligor to file annual reports, expressly permits the SEC to limit its application to those obligors who are "necessary and appropriate" to protect investors, taking into account the "nature of the business" of the obligors, which clearly does not apply to mortgagors.

By refusing to reconsider its holding that the TIA applies to Certificates, the Court will not affect the technical workings of the Covered Trusts, but will ensure that Certificate holders receive the substantive protections Congress enacted for their specific benefit.

## IV.     CONCLUSION

For the foregoing reasons, the Court should deny Defendants' Joint Motion to Dismiss.[109]

Dated: February 25, 2013                    SCOTT+SCOTT, ATTORNEYS AT LAW, LLP

/s/ Max R. Schwartz
David R. Scott (DS 8053)
Beth A. Kaswan (BK 0264)
Deborah Clark-Weintraub (DW 6877)
Max Schwartz (MS 2517)
Donald Broggi
The Chrysler Building
405 Lexington Avenue, 40th Floor
New York, NY 10174
Telephone: 212-223-6444
Facsimile: 212-223-6334

---

[108] ECF No. 64, at 40-41.

[109] Should the Court grant Defendants' Motion to Dismiss, Plaintiff respectfully requests leave to replead under Fed. R. Civ. P. 15.

Email:  drscott@scott-scott.com
        bkaswan@scott-scott.com
        dweintraub@scott-scott.com
        mschwartz@scott-scott.com
        dbroggi@scott-scott.com

*Counsel for Plaintiff Chicago Police*

COHEN MILSTEIN SELLERS & TOLL PLLC

Steven J. Toll
Julie Goldsmith Reiser
1100 New York Avenue, NW
Suite 500 West
Washington, D.C. 20005
Email: stoll@cohenmilstein.com
       jreiser@cohenmilstein.com
Telephone: (202) 408-4600
Facsimile: (202) 408-4699


- and-
Christopher Lometti
88 Pine Street
14th Floor
New York, NY 10005
Email: clometti@cohenmilstein.com
Tel: (212) 838-7797

Fax: (212) 838-7745
*Counsel for Plaintiffs Chicago Laborers' Funds, IPERS
and Arkansas PERS*

46

## CERTIFICATE OF SERVICE

I hereby certify that a true and accurate copy of the foregoing was served this 25th day of February, 2013 upon the following via ECF.

Kristin Linsley Myles
Munger, Tolles & Olson LLP
560 Mission Street
San Francisco, CA 94105
Email: Kristin.myles@mto.com

Marc T.G. Dworsky
Munger, Tolles & Olson LLP
355 South Grand Avenue, 35th Floor
Los Angeles, CA 90071-1560
Email: Marc.Dworsky@mto.com

David F. Graham
Sidley Austin LLP
One South Dearborn
Chicago, IL 60603
Email: dgraham@sidley.com

*Counsel for Defendant Bank of America NA*

John Michael Vassos
Michael Stephan Kraut
Morgan, Lewis and Bockius LLP
101 Park Avenue
New York, NY 10178
Email: jvassos@morganlewis.com
Email: mkraut@morganlewis.com

*Counsel for Defendant U.S. Bank National Association*

/s/ Max R. Schwartz
Max Schwartz (MS 2517)
500 Fifth Avenue, 40th Floor
New York, NY 10110
Telephone:  212-223-6444
Facsimile:  212-223-6334

*Counsel for Plaintiff*

47