DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: MAY 0 6 2013

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
POLICEMEN'S ANNUITY AND BENEFIT FUND :
OF THE CITY OF CHICAGO, LABORERS'        :
PENSION FUND AND HEALTH AND WELFARE :
DEPARTMENT OF THE CONSTRUCTION AND   :
GENERAL LABORERS' DISTRICT COUNCIL OF :
CHICAGO AND VICINITY, IOWA PUBLIC        :
EMPLOYEES' RETIREMENT SYSTEM, and       :
ARKANSAS PUBLIC EMPLOYEES'                  :
RETIREMENT SYSTEM,                              :
                                                              :
                                 Plaintiffs,            :
                                                              :
                   -v-                                      :
                                                              :
BANK OF AMERICA, NA (as Trustee Under   :
Various Pooling and Servicing Agreements), and :
U.S. BANK NATIONAL ASSOCIATION (as      :
Trustee Under Various Pooling and Servicing  :
Agreements),                                            :
                                                              :
                                 Defendants.          :
------------------------------------------------------------------X

12 Civ. 2865 (KBF)

OPINION & ORDER

KATHERINE B. FORREST, District Judge:

At its core, this is a breach of contract case. The contract at issue defines the

parties' rights and obligations; plaintiffs assert that defendants failed to fulfill their

obligations and that they were damaged thereby. Rule 8 governs the pleading

standard plaintiffs must meet.

Determining whether plaintiffs in a breach of contract case have pled a claim

should not present unusual complexity. It is primarily a question of whether they

have pled sufficient plausible facts in support of their theory. Many contract cases

that do not survive this initial motion practice fail because the language of the

contract at issue simply does not impose the obligations alleged; or as a matter of law, the obligations could not be breached in the manner alleged. Neither of those scenarios is at issue here.

The complexity in this case comes not from the theory pled, but rather from the fact that the contract at issue is a Pooling and Servicing Agreement ("PSA") relating to mortgage-backed securities ("MBS"). Put more bluntly, defendants assert that allowing a contract claim to proceed on the theory plaintiffs here propose would open the floodgates to a new era of litigation relating to losses arising from MBS. It is not, however, the job of this Court to pass judgment on the desirability of a particular type of litigation – that is left to Congress. The job of this Court is to determine whether a set of facts states a plausible claim. Here, for the reasons set forth below, the answer is yes.

On December 7, 2012, this Court granted in part and denied in part a motion to dismiss the first amended complaint in this action. Thereafter, the existing plaintiffs joined additional plaintiffs, appended additional allegations, and filed a second amended complaint ("SAC"). Defendants also stated an intention to move for reconsideration as to the Court's December 7 decision. In light of the already inevitable motion practice with respect to the SAC, this Court said that it would allow and consider any reconsideration arguments in the context of defendants' motion to dismiss the SAC – that is, in one consolidated motion rather than two. Accordingly, pending before the Court is defendants' motion to dismiss the entirety of the SAC. To the extent that some of those arguments in effect "reargue" that

2

which this Court previously decided and allowed (that is, as the Court had suggested, combining the reconsideration motion), the Court's ruling here provides a single and integrated Opinion and Order.

## I. THE GOVERNING AGREEMENTS

Plaintiffs purchased and sold a number of MBS certificates issued by Washington Mutual Bank ("WaMu") or its affiliates. (Second Am. Comp. ("SAC") ¶ 1, ECF No. 57.) In total, plaintiffs' suit concerns 19 "substantially similar trusts" in which they invested (the "Covered Trusts"). (Id.) Bank of America ("B of A") and U.S. Bank are both sued in their capacities as trustees of the Covered Trusts ("Trustees"). B of A is the successor-in-interest by merger of LaSalle Bank National Association ("LaSalle"), the original Trustee of the Covered Trusts; U.S. Bank succeeded B of A as Trustee. (Id.)

Plaintiffs allege that various WaMu entities were involved in the creation, sale and servicing of the MBS here at issue. WaMu securitized a large number of mortgage loans (a number of which WaMu or affiliated entities also originated) into "bond-like" instruments referred to as MBS. (Id. ¶ 22.) WaMu then assembled groups of these mortgage loans into pools; the pools were then sliced and diced into separate securities (that is, a pool of mortgages was treated as a unit, and securities were developed based on that grouping as the underlying asset class). Through this process, a group of standalone mortgage loans was transformed into a "mortgage-backed" security. (Id. ¶¶ 23-25.)

The Covered Trusts at issue here were, like many such securities, further grouped into tranches. (Id.) Each tranche of a particular trust is associated with its own level of credit risk and reward (which plaintiffs refer to as the "interest" or "yield"). (Id.) Payments follow a "waterfall" structure in which the tranches are paid in order of credit risk, with the least risky paid first and the most risky paid last. (Id.) "At initiation of the Trust, the most senior and least risky tranches typically receive triple A ratings" from rating agencies. (Id.)

Another WaMu entity, the WaMu Acceptance Corp. ("WAAC"), was a special purpose entity formed to act as the "Depositor". (Id. ¶ 25.) The Depositor transferred the pool of mortgages to the Trustee; in exchange, the Trustee transferred the MBS to the Depositor.[1] (Id. ¶ 26.) The Depositor sold the MBS to an underwriter. In the instant case, that underwriter also happened to be a WaMu entity, WaMu Capital Corp. ("WCC"). (Id. ¶ 27.) The WaMu underwriter then marketed and sold the MBS to investors, including plaintiffs. (Id.)

An entity designated as the "Servicer" was responsible for the collection of mortgage payments and, if necessary, foreclosure or putback, of the underlying loans. (Id. ¶ 29.) Here, another WaMu entity was designated as the Servicer. As holders of the MBS, plaintiffs were entitled to cash flows generated from the underlying pool of mortgages. (Id. ¶ 28.) Plaintiffs hold what are referred to as "certificates" in the trusts consisting of MBS.

---

[1] Certain of the MBS are comprised of a mixture of pools of mortgages – with some pools acting as collateral as to other pools (referred to as cross-collateralization). (See id. ¶ 28.)

The Depositor, Trustee and the Servicer entered into a series of governing contractual documents, of which the PSA is the primary agreement. (Id. ¶ 32.) The Trustee and the WaMu Servicer also entered into a Custodial Agreement. (See, e.g., Custodial Agreement WaMu Mortgage Pass-Through Certificates Series 2006-AR16 Trust ("Custodial Agreement") at 1, Aff. of Irina Palchuck ("Palchuck Aff.") Ex. B., ECF No. 22.)  Pursuant to the Custodial Agreement, a WaMu entity was designated to act as the Custodian to fulfill various of the Trustee's obligations under the PSA.

Plaintiffs' contract claim is based on an assertion that defendants (as Trustees) breached their obligations under the PSA – obligations meant to ensure an independent actor would protect plaintiffs and the other investors in the MBS trusts.[2]

Several provisions of the PSA are particularly relevant here: Section 2.05 sets forth the Trustee's duties with respect to the delivery of mortgage files, § 2.07 relates to acceptance of those mortgage files by the Trustee, § 2.09 sets forth certain representations and warranties, § 8.01 sets forth the Trustee's pre-default duties, and § 8.02 sets forth other duties, including when the Trustee has a duty to investigate potential breaches or events of default. (See generally, Pooling and Servicing Agreement ("PSA"), SAC Ex. 5, ECF No. 57.)

Section 2.05 provides the Trustee authorization "to appoint on behalf of the Trust any bank or trust company . . . as Custodian of the documents or instruments referred to in this Section 2.05, in Section 2.12 or in Section 2.15, and to enter into a

---

[2] Plaintiffs allege that the PSAs relating to the various Covered Trusts here at issue are substantially similar. (SAC ¶ 32.)

Custodial Agreement for such purpose."[3] The "Custodian" for the Trusts is defined as "[t]he Initial Custodian and any other custodian which is appointed by the Trustee with the consent of the Servicer . . . [who] shall act as agent on behalf of the Trustee." (PSA § 1.01.) The "Initial Custodian" is defined as Washington Mutual fsb ("WaMu fsb"). (Id.) Despite appointment of a Custodian, however, the PSA makes clear that with respect to the duties set forth in PSA §§ 2.05, 2.12 and 2.15, "the Trustee shall be and remain liable for the acts and omissions of any such Custodian to the extent (and only to the extent) that it would have been liable for such acts and omissions hereunder had such acts and omissions been its own acts and omissions." (Id. § 2.05.)

Section 2.05 allows the Initial Custodian to "perform responsibilities of the Trustee on the Trustee's behalf with respect to the delivery, receipt, examination, custody and release of the Mortgage Files related to the Mortgage Loans." (Id.) Although PSA § 2.05 absolves the Trustee for "responsibility for the acts or omissions of the Initial Custodian" in that regard, the Trustee remains liable for "its own negligent action, its own negligent failure to act or its willful misconduct." (Id.)

Here, the Trustee (at the time, LaSalle) entered into a Custodial Agreement with WaMu fsb to act as Custodian "on behalf of the Trust and to perform the function of Custodian." (See, e.g., Custodial Agreement at 1.) In that agreement, the Trustee designated to WaMu fsb, as Custodian, the duties set forth in § 2.05 of

---

[3] The main duty set forth in PSA § 2.05 is WAAC's duty to "deliver to and deposit with, or cause to be delivered to and deposited with, the Trustee or the Initial Custodian the Mortgage Files, which shall at all times be identified in the records of the Trustee or the Initial Custodian, as applicable, as being held by or on behalf of the Trust." (PSA § 2.05.)

the PSA. (Id. at 2-6.) The Custodial Agreement limited the Custodian's duties to

those "specifically set forth" in that agreement, and explicitly noted that the

Custodian would be regarded as making no representations and having no

"responsibilities as to the validity, sufficiency, value, genuineness, ownership or

transferability of any Mortgage Loans." (Id. at 8.) The Custodial Agreement also

required the Custodian to indemnify the Trustee for any suit "arising out of the

negligent performance by the Custodian of its duties and responsibilities." (Id. at

9.)

PSA § 2.07 requires the Trustee to "acknowledge[ ] receipt . . . on behalf of the

Trust of the documents . . . referred to in Section 2.05 above, but without having

made the review required to be made within 45 days pursuant to this Section 2.07."

(PSA § 2.07.) The Trustee is also required to

> review (or, with respect to the Mortgage Loans identified in the Initial
> Custodial Agreement, cause the Initial Custodian to review) each
> Mortgage File within 45 days after the Closing Date and deliver to the
> Company a certification (or cause the Initial Custodian to deliver to
> the Company and the Trustee a certification, which satisfies the
> applicable requirements of this Agreement . . . .)
>
> The Trustee shall not be required to make any independent
> examination of any documents contained in the Mortgage File beyond
> the review specifically required herein . . . .
>
> If the Trustee finds any document or documents required to be
> included in the Mortgage File or Mortgage Loan pursuant to the
> definition of "Mortgage File" not to have been executed and received,
> the Trustee shall promptly so notify the Servicer. An exception report
> delivered by the Custodian to the Servicer pursuant to the Custodial
> Agreement shall be deemed to constitute such notice. Upon notice from
> the Trustee or the Custodian of any document required to be included
> in the Mortgage File for a Mortgage Loan has not been executed and
> received, the Servicer shall promptly notify the applicable Seller of

7

such defect and take appropriate steps on behalf of the Trust to enforce such Seller's obligation, pursuant to Section 2.4 of the Mortgage Loan Purchase Agreement, to correct or cure such defect or repurchase or substitute for such Mortgage loan, in accordance with and subject to the time limitation set forth in such Section 2.4 . . . .

(emphasis added.) Section 2.09 governs the representations and warranties of the sellers regarding the mortgage loans. This provision states that

Upon discovery by any of the Company, the Servicer or the Trustee (in the case of the Trustee, having actual knowledge thereof) of a breach of any of the representations and warranties in respect of the Mortgage Loan . . . that materially and adversely affects the value of the related Mortgage Loans or the interests of the Trust in the related Mortgage Loans, the party discovering such breach shall give prompt written notice to the others.

. . .

The Servicer shall promptly notify the applicable Seller of such breach and take appropriate steps on behalf of the Trust to enforce the Seller's obligation . . . to cure such breach in all material respects or repurchase or substitute for the affected Mortgage Loan or Mortgage Loans . . . .

Article VII defines the Events of Default under the PSA and sets forth the remedies for those Defaults. Section 7.01 provides that if the Servicer defaults by, for instance, failing "duly to observe or perform in any material respect its obligations under the PSA, and such default is not remedied for a period of 60 days following written notice of such default (such notice given by the Trustee of holders of Certificates aggregating interests of not less than 25%)," then either the Trustee or the Certificate Holders may terminate all rights and obligations of the Servicer. (Id. § 7.01(a)(ii).)

8

Article VIII of the PSA independently discusses other matters
"[c]oncerning the Trustees." Section 8.01 specifies that the Trustee's duties
"prior to the occurrence of an Event of Default and after the curing of all
Events of Default which may have occurred" are limited to those specifically
set forth in the PSA. (Id. § 8.01(a).) That provision further provides that the
Trustee, "upon receipt of all resolutions, certificates, statements, opinions,
reports, [and] documents . . . shall examine them." (Id. § 8.01(b).) It further
states that "No provision of this Agreement shall be construed to relieve the
Trustee or the Delaware Trustee from liability for its own negligent action,
its own negligent failure to act or its own willful misconduct." (Id. § 8.01(c).)
However, "[p]rior to the occurrence of an Event of Default and after the
curing of all such Events of Default which may have occurred, the duties and
obligations of the Trustee shall be determined solely by the express
provisions of this Agreement . . . ." (Id. § 8.01(c)(i).) [4]

Section 8.02 provides that "[e]xcept as otherwise provided in Section 8.01"
neither the Trustee nor the Delaware Trustee shall have any obligation to
investigate "facts or matters" contained in documents provided to the Trustee
"unless requested in writing to do so by the holders of Certificates evidencing
Percentage Interests aggregating not less than 25% of REMIC III." (Id. § 8.02(iv).)
Further, the PSA requires the Trustee to have "actual knowledge" – or have

---

[4] Section 7.01 defines what occurrences constitute an "Event of Default" under the PSA. (PSA at 140-42.)

9

received written notice – with respect to "any matter, including without limitation an Event of Default." (Id. § 8.02(vi).)

The Custodial Agreement provides that WaMu accepts its appointment as Custodian for the Mortgage Files, accepts delivery of the Mortgage Files, and shall deliver to the Trustee a certification that states that, except as noted, all documents required pursuant to the definition of "Mortgage File" have been executed and received. (Custodial Agreement §§ 1.2(a), (b).) The Custodian also provides a representation and warranty that it holds the Mortgage Files and all related documents solely as Custodian for the benefit of the Trustee. (Id. § 2.2(f).)

## II. PLAINTIFFS' CLAIMS

Plaintiffs assert two causes of action. Both causes of action are based on a failure by the Trustee to provide notice to the certificate holders or the Servicer of breaches of the PSA. According to plaintiffs, had such notice been provided, the Servicer would have been required to take certain actions; the Servicer's failure to take those actions damaged plaintiffs.

Plaintiffs' First Cause of Action alleges that defendants violated statutory duties owed pursuant to the Trust Indenture Act of 1939 ("TIA"), 15 U.S.C. §§ 77aaa, et seq. This claim is premised on the assertion that the Certificates held by plaintiffs fall within the ambit of the TIA – a point which, as discussed below, defendants vigorously contest. Assuming the TIA applies to the Certificates, plaintiffs assert that defendants were under an obligation to notify the Certificate holders (that is, plaintiffs) of breaches in the governing agreements within 90 days

10

of their occurrence.  (SAC ¶ 102.)  According to plaintiffs, there were numerous instances of default – and therefore breach – such as incomplete mortgage files and a failure to substitute loans that conformed with underwriting guidelines for those that did not. (Id. ¶¶ 102-103.)

According to plaintiffs, in the case of a default, the TIA required that defendants act as prudent people would – and defendants did not. (Id. ¶ 103.) A prudent person would have "exercised all of his rights to, among other things, obtain complete Mortgage Files, cure any defects in the Mortgage Files and/or substitute conforming loans, and sue to require the repurchase of loans that breached their representations and warranties."5 (Id.)

Plaintiffs' Second Cause of Action is based on the same underlying conduct, but alleges breaches of the PSA resulting from that conduct.  (SAC ¶ 106.) In this regard, plaintiffs assert that the PSA required the Trustee to notify the Servicer of deficient Mortgage Files and loans which were in breach of the representations and warranties and the Trustee failed to do so. (Id.)  Plaintiffs further argue that the failure to provide such notice prevented them from exercising repurchase rights, thus exacerbating their losses. (Id.)

III. DEFENDANTS' POSITION

Defendants' primary argument in support of their motion to dismiss is that there are insufficient plausible allegations that the Trustee ever had actual notice of

---

5 The parties do not brief their positions as to the type of knowledge – actual, constructive, or some other concept – that is required to sustain a TIA claim.  However, as set forth below, plaintiffs state plausible facts alleging actual knowledge of defaults, so the Court need not analyze the issue further here.

any breach as to which it was required to provide notice; therefore, whether pled as a violation of the Trustee's duties to the Certificate holders under the TIA or those to the Servicer under the PSA, the claims must fail. Defendants point in particular to provisions in the TIA as well as the PSA which leave no doubt – nor do plaintiffs urge the contrary – that defendants' obligations are limited to those set forth in the PSA.

Defendants next argue that, under the PSA, the Trustee has no duty to investigate unless it has actual knowledge of a breach.[6]  Defendants assert that the allegations of the SAC do not plausibly allege any such actual notice; at most, the allegations allege constructive notice which is insufficient as a matter of law.

In addition, defendants argue that the TIA claim is subject to dismissal because the Certificates held by plaintiffs are subject to a specific exemption from that statutory scheme.

IV. STANDARD ON MOTION TO DISMISS

On a motion to dismiss, this Court must accept as true plaintiffs' well-pleaded factual allegations. See Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).  To avoid dismissal, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Id. (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007).  That is, "the plaintiff must provide the grounds upon which [its] claim rests through factual allegations sufficient 'to raise a right to relief above the speculative level.'"  ATSI Commc'ns,

---

[6] Section 8.02 of the PSA would also require the Trustee to perform an investigation if 25% or more of the Certificate Holders requested an investigation.  Plaintiffs do not allege that any such request occurred.

<u>Inc. v. Shaar Fund, Ltd.</u>, 493 F.3d 87, 98 (2d Cir. 2007) (<u>quoting</u> <u>Bell Atl. Corp. v.</u> <u>Twombly</u>, 550 U.S. 544, 555 (2007)); <u>see also</u> <u>Iqbal</u>, 556 U.S. at 678 (same). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." <u>Iqbal</u>, 556 U.S. at 678. "[M]ere conclusory statements" or "threadbare recitals of the elements of a cause of action" are insufficient. <u>Id.</u> If the court can infer no more than "the mere possibility of misconduct" from the factual averments – in other words, if the well-pleaded allegations of the complaint have not "nudged claims across the line from conceivable to plausible," dismissal is appropriate. <u>Twombly</u>, 550 U.S. at 570; <u>Starr</u>, 592 F.3d at 321 (<u>quoting</u> <u>Iqbal</u>, 556 U.S. at 680).

## V. THE TIA CLAIM

On this motion, defendants do not argue that the MBS underlying the Certificates are not debt.[7] Rather, they argue that the type of security here is a "certificate of interest" in debt; this categorization is important because certificates of interest are exempted from the TIA where they contain "two or more securities having substantially different rights or privileges." <u>See</u> TIA §§ 304(a)(1)(B), (b).

### a. <u>TIA Background</u>

The TIA covers a number of types of securities, but only two types – debt instruments and "certificates of interest" in debt – are at issue on this motion. Section 304 explains that, in general, both types are covered by the TIA. <u>See</u> TIA §§

---

[7] In its December 7 Order, this Court ruled that the certificates at issue are debt. <u>See</u> <u>Policemen's</u> <u>Annuity & Benefit Fund of City of Chicago v. Bank of Am., NA</u>, No. 12 Civ. 2865 (KBF), 2012 WL 6062544, at *16 (S.D.N.Y. Dec. 7, 2012). Defendants continue to disagree with that determination, and preserve those arguments on this motion, but do not seek to reargue the point.

304(a)(1)(A)(TIA applies to any "note, bond, debenture, or evidence of

indebtedness"), 304(a)(1)(B)(TIA covers any "certificate of interest or participation

in [a] note, bond, debenture, or evidence of indebtedness").

    The Congressional purposes underlying the TIA are also relevant to resolve

the instant motion.  Section 302 sets out that

> (1) Upon the basis of facts disclosed by the reports of the Securities Exchange
> Commission made to the Congress . . . it is hereby declared that the
> national public interest and the interest of investors in notes, bonds,
> debentures, evidences of indebtedness, and certificates of interest or
> participation therein, which are offered to the public, are adversely
> affected—
>
> (2) When the trustee does not have adequate . . . duties and responsibilities,
> in connection with matters relating to the protection and enforcement of
> the rights of such investors; . . . .

(Id. § 302(a)(2).)

    Congress made the above findings in the late 1930s partially on the basis of a

series of troubling reports it received from the SEC.  The SEC observed that it had

become standard practice for indentures to provide that trustees could shut their

eyes to the existence of a default, unless holders of a specified percentage of the

outstanding bonds formally notified the trustees of the default. (SEC, Report on the

Study and Investigation of the Work, Activities, Personnel and Functions of

Protective and Reorganization Committees 31-32, 38 (1936), Decl. of Max R.

Schwartz ("Schwartz Decl."), ECF No. 31.)  The SEC therefore found it in the public

interest to "enlarge[ ] the definition of trustee's duties in those cases where a failure

to take swift and positive action [left] investors without effective protection of their interests." (Id. at 6.)

To that end, § 315 provides that the trustee must give holders of covered securities "notice of all defaults known to the trustee, within ninety days after the occurrence thereof." 15 U.S.C. § 77ooo(a) et seq. Section 315(c) requires a trustee to act prudently in the event of a default. That prudent person standard, plaintiffs argue – and the Court agrees – must be interpreted in light of § 302(b). As explained above, § 302(b) states Congress's intent to "meet the problems and eliminate the practices" that plagued Depression-era trustee arrangements, such as the trust agreements that absolved trustees from the responsibility to take action to protect certificate holders absent a technical notice of an event of default. See TIA § 302(b)(explaining purposes of Act in light of problems identified in § 302(a)).

b. Applicability of the TIA

Defendants argue that the TIA is inapplicable here. The Court notes that the applicability of the TIA presents an issue with implications beyond this case. The PSA here, similar to other PSAs, shields the Trustee from a mandate to conduct an investigation, except under limited circumstances that are difficult to achieve: actual notice of an event of default or a request by 25% or more of the Certificate Holders. If the Certificates here fall within the TIA, those PSA obligations must give way to the broader TIA obligations; this opens the question of whether actual or constructive notice governs what is considered "known" to the Trustee under § 315.

15

Defendants' statutory argument that the TIA does not apply here is twofold: they first argue that the Certificates at issue here are "certificates of interest" in debt, rather than "debt instruments."  Next, they acknowledge that the TIA applies to some certificates of interest, but argue that § 304(a)(2) of the TIA specifically exempts the Certificates here because they are "certificate[s] of interest or participation in two or more securities having substantially different rights or privileges."  15 U.S.C. § 77ddd(a)(2)(emphasis added).

Defendants' argument requires them to establish that the Certificates here are "certificates of interest" – covered by § 304(a)(1)(B) (and the exception, § 304(a)(2), that by its terms applies only to certificates of interest) – and cannot be "debt instruments" – covered by § 304(a)(1)(A); they fail to do so.

The TIA does not define the terms "certificate of interest" or "bond."  To advance their argument that the securities here at issue are "certificates of interest," defendants first point to the fact the Certificates here are called "certificates" and not "notes," "bonds", "debentures", "evidence of indebtedness" or some other title connoting a debt instrument.  They cite Supreme Court precedent characterizing a "certificate of interest" as a security providing for payment of proceeds "contingent upon an apportionment of profits."  Tcherepnin v. Knight, 389 U.S. 332, 339 (1967); see also Lanvin v. Data Sys. Analysts, Inc., 443 F. Supp. 104, 109 (E.D. Pa. 1977)(certificate of participation "refers to instruments that give the holder at least some rights to future profits").  They next cite an SEC no-action letter for the proposition that a certificate of interest can be a certificate entitling

16

the holders to "pro rata interests in the income on (i.e., the interest on), and the principal of, a portfolio of certificates of deposit." Merrill, Lynch, Pierce, Fenner & Smith, Inc., SEC No Action Letter 1982 WL 30517, at *1 (Oct. 28, 1982).  Because the Certificates here apportion the interest and principal payments on the underlying mortgage obligations, they are "certificates of interest".

Defendants' analysis merely begs the question; they state that a "certificate of interest" depends upon a "contingent . . . apportionment of profits" but fail to demonstrate that the payments for the Certificates are contingent or are characterized by profits.  Rather, the allegations in the complaint clearly state sufficient plausible facts to suggest that the instruments here are debt instruments rather than "certificates of interest in debt".  Plaintiffs allege that the Certificates are equivalent to bonds secured by the pools of mortgages (and their associated principal and accrued interest).  The Court agreed with this analysis in its prior opinion.  See Policemen's Annuity, No. 12 Civ. 2865 (KBF), 2012 WL 6062544, at *14-*15 (holding that Certificates here at issue are debt securities with the characteristics of bonds).  The Certificate holders lack the right to receive any payments in excess of the periodic mortgage obligations – so no contingent apportionment occurs, as would be required by a "certificate of interest" by defendants' own definition.  Plaintiffs therefore state at least a plausible allegation that the Certificates here are debt instruments under § 304(a)(1)(A), rather than certificates of interest in debt.  See also Ret. Bd. of the Policemen's Annuity & Ben. Fund of City of Chicago v. Bank of New York Mellon, No. 11 CIV. 5459 (WHP), 2012

WL 1108533 (S.D.N.Y. Apr. 3, 2012) reconsideration denied, 11 CIV. 5459 WHP,

2013 WL 593766 (S.D.N.Y. Feb. 14, 2013)(holding that "[b]ecause the [MBS]

certificates are debt securities, the TIA applies" and the § 304(a)(2) exception is

inapposite).  Merely labeling the securities here as "certificates" is insufficient to

make it so.

Even if the Court were to hold that the Certificates are "certificates of

interest" in debt, however, the TIA would nevertheless apply; contrary to

defendants' argument, the instruments here do not qualify for the § 304(a)(2)

exemption for certificates comprised of multiple, "substantially different" securities.

To analyze this question, the Court starts with the language and structure of the

TIA and of the Certificates as described in the PSA.

Defendants argue that the number and character of the underlying

mortgages distinguishes a certificate of interest covered under § 304(a)(1)(B)

(comprised of a single security, or several with substantially similar rights and

privileges) from an exempt certificate of interest under § 304(a)(2) (comprised of two

or more securities having "substantially different rights or privileges").  They argue

that the MBS Certificates here consist of more than two "substantially different"

securities because they each contain a pool of mortgages that relate to different

properties with different repayment terms, maturity dates, interest rates,

foreclosure triggers and other distinctions.

Defendants further argue that the legislative purpose of the TIA supports

exclusion of the certificates: it was enacted to prevent a single obligor from

structuring a debt instrument to the detriment of the investors in that instrument. See, e.g., 15 U.S.C.A. §§ 77bbb. According to defendants, here there are a multitude of obligors who face the collective action problems that would prevent them from structuring their instruments to the detriment of the investors.

Defendants also cite an SEC administrative statement in which the SEC indicated it would treat "pass-through certificates" as exempt under § 304(a)(2). The statement is set forth in a 1997 staff publication entitled "Manual of Publicly Available Telephone Interpretations (Trust Indenture Act of 1939)," Nos. 10-11 (July 1997), states: "Certificates representing a beneficial ownership interest in a trust are offered to the public pursuant to a registration statement under the Securities Act. The assets of the trust include a pool of mortgage loans with multiple obligors administered pursuant to a 'pooling and servicing agreement' . . . . The Certificates are treated as exempt from the Trust Indenture Act under Section 304(a)(2) thereof." Id.[8]

The Court finds that the SAC and documents incorporated by reference allege plausible facts that the Certificates here contain a single "interest in a security". Important to this analysis is Exhibit A to the PSA, a form of certificate entitled "WaMu Mortgage Pass-Through Certificate." (PSA Ex. A.) It has a single CUSIP number on the upper right hand side.[9] The certificate states that it is issued by

---

[8] Case law has recognized that the SEC has been granted the right to enforce the TIA. See, e.g., El Paso County, Texas v. Bank of New York Mellon, No. A-12-CA-705-SS, 2013 WL 285705 (W.D. Tex. Jan. 22, 2013).

[9] A CUSIP number is a unique identifier for securities (such as stocks and registered bonds), developed by the Committee on Uniform Security Identification Procedures. See About CUSIP Identifiers, at https://www.cusip.com/cusip/about-cgs-identifiers.htm (last visited April 29, 2013).

WaMu Mortgage Pass-Through Certificate Series 2006-AR16 Trust. This Certificate represents ownership of a "regular interest" in a "real estate mortgage investment conduit" as those terms are defined in Sections 860G and 860D, respectively, of the Internal Revenue Code of 1986 . . . ." (Id.)  The Certificate also states the principal balance in which an interest is held, the applicable interest rate, and the first and last scheduled distribution dates. (Id.)

The Court notes that each certificate does not state that it represents an interest in more than a single security. Instead, the face of the certificate explicitly defines itself in terms of the principal balance of one pooled obligation; Exhibit A sets forth the amount of $86,552,000.  (Id.) The question is therefore whether this single amount – a single payment obligation comprised of a pool of many individual mortgages – is more a "single interest" in a security, or multiple interests in the underlying mortgages.  Based on the structure of the MBS, which intentionally group a pool of mortgages into a single security with a single principal balance, the Court finds that there is only a single obligation.  While it is certainly true that there are numerous mortgages with different terms underlying the ultimate obligation, the security that has been carefully structured into the MBS as to which the certificates then issue, has a single outstanding balance amount and a single type of obligation.  Cf. Vidor v. Am. Int'l Grp., No. C 11-315 (SI), 2011 WL 2746848 (N.D. Cal. July 13, 2011) aff'd sub nom. Vidor v. Am. Int'l Grp., Inc., 491 F. App'x 828 (9th Cir. 2012) (where security included both a stock purchase contract and

multiple series of debentures, "[t]he mixed nature of the investment vehicle brings it under the explicit exemptions listed in TIA").

The MBS could have been structured differently.  However, the structure utilized intentionally eliminates the individuality of the loans.  It moves away from the very numerosity to which defendants point and combines all loans into a pool that becomes a single unit.  In addition, Congress's policy concern that a single entity could structure a debt instrument to the detriment of the investors is present here – WaMu is alleged to be responsible for the creation, sale and servicing of the Certificates at issue.

To the extent the SEC's "telephone guidance" suggests otherwise, it may be that it was analyzing a different MBS with a different structure.  Or, alternatively, this Court disagrees with its analysis.[10] In light of another case in this District, the SEC itself has acknowledged that its informal interpretation has been called into question.[11]

---

[10] When faced with a question of statutory interpretation, a court must first determine whether the statute is ambiguous before it resorts to extrinsic evidence. See Chevron, U.S.A., Inc. v. Natural Resources Def. Council, Inc., 467 U.S. 837, 842-43 (1984). Here, the statutory language is not ambiguous or even asserted to be so. The issue instead is whether the facts as to the type of MBS here at issue indicate a single or multiple obligations.  Answering that question does not require resort to statutory interpretation but rather analysis of facts against a statutory backdrop.  The SEC's informal interpretation – even assuming it is based on a sufficiently analogous situation – is only entitled to "respect proportional to its 'power to persuade[.]" U.S. v. Mead Corp., 533 U.S. 218, 235 (2001).  Here again, the issue is not so much of statutory interpretation – but facts. The SEC's guidance was issued in 1997, temporally distant from the events and development of the kinds of MBS here at issue.  The Court finds the SEC's barebones analysis to be outweighed by the facts suggesting the MBS here constitute a single security.

[11] See SEC, Trust Indenture Act of 1939: Questions and Answers of General Applicability § 202.01, at http://www.sec.gov/divisions/corpfin/guidance/tiainterp.htm (last accessed Apr. 29, 2013)("On April 3, 2012, a federal district court in the Southern District of New York ruled, in denying a motion to dismiss, that the Trust Indenture Act of 1939 applies to asset-backed securities in the form of certificates . . . . The staff is considering CDI 202.01 in light of this ruling.")(citing Retirement Board of the Policeman's Annuity and Benefit Fund of Chicago v. The Bank of New York Mellon, No. 11 Civ. 5459 (WHP), 2012 U.S. Dist. LEXIS 47133 (S.D.N.Y. Apr. 3, 2012)).

Nor is the Court persuaded by defendants' argument that applying the TIA to the Certificates would be "unworkable and at odds with the statutory framework." Defendants argue that were the TIA to apply to the Certificates here, each individual mortgage holder would become an obligor under TIA § 303(12), subject to the TIA's onerous reporting requirements – requirements the SEC has never (and could never) apply to individual homeowners.[12] This is analytically wrong. The MBS are structured as an obligation derived from mortgages, but the individual mortgagors play no role in the MBS securitization as to their mortgages. They are not the obligors of any MBS. The same analysis that finds that MBS are a single obligation determines that individual mortgages would not, therefore, fall within the reporting obligations.[13]

c. Breach of the Indenture

Determining that the TIA applies to the MBS here at issue is only the first step in the Court's analysis as to whether plaintiffs' first cause of action pleads a claim. Plaintiffs must also have pled plausible facts of breaches of the indenture – here the PSA – with respect to which the Trustee defendants should have, but allegedly did not, take action.

---

[12] Defendants suggest that if the Certificates are "certificates of interest," then the individual mortgagors would become obligors because § 303(12) defines an Obligor as "every person (including a guarantor) who is liable thereon, and, if such security is a certificate of interest or participation, such term means also every person (including a guarantor) who is liable upon the security or securities in which such certificate evidences an interest or participation; but such term shall not include the trustee under an indenture under which certificates of interest or participation, equipment trust certificates, or like securities are outstanding." TIA § 303(12)(emphasis added). There is no provision in any MBS certificate making a mortgagor an obligor for that certificate.

[13] The Court doubt the need to reach this question, however. As explained above, the Court finds that the Certificates here are debt instruments and not "certificates of interest" in debt. The issuer of the MBS security (rather than the individual mortgage holders) can therefore be the Obligor; § 303(12) does not bar such an arrangement. The mortgagors would thus not be subject to the TIA's regulatory requirements.

Plaintiffs do plead a violation of TIA § 315(b)'s duty of the Trustee to give "notice of all defaults known to the trustee." [14] TIA § 315(b). Defendants argue that, because only those "defaults as such term is defined in the [PSA]" constitute defaults under §§ 315(a) and (c), the PSA definition – narrower, they argue, than the plain meaning of "default" – must apply to defaults under § 315(b) as well.[15] Plaintiffs, say defendants, fail to plead an Event of Default as defined by the PSA.

The Court impliedly rejected this argument in prior opinion, see Policemen's Annuity, 2012 WL 6062544, at *17, and does so explicitly here: § 315(b) speaks of "defaults", without limiting that term to the defaults defined in the PSA. As plaintiffs argue, then, a default for the purposes of § 315(b) is "[t]he omission or failure of a legal or contractual duty." (See Pl.'s Br. at 32 (citing Black's L. Dict., 9th Ed. (2009)).

Plaintiffs plausibly allege such failures. The SAC states that "there were numerous events of default, including the failure of the Seller and the Depositor to cure defects in Mortgage Files and/or substitute conforming loans for the defective loans in the Covered Trusts, and the failure of the Servicer to enforce its repurchase obligations upon discovering breaches of representations and warranties relating to

---

[14] While the parties did not brief whether the words "known to the trustee" require the same showing of actual knowledge as that stated in the PSA, the Court need not analyze that issue. Even under a strict actual knowledge standard, plaintiffs plead a plausible § 315(b) cause of action.

[15] Because § 7.01(a)(ii) of the PSA requires, inter alia, that the Trustee or 25% of the Certificate holders notify the Servicer of any default and provide an opportunity to cure, the TIA incorporates that requirement as well. In addition, defendants argue that all five of the PSA § 7.01(a)(ii) conditions would have to be met for an Event of Default to occur, namely (1) the Seller breaches the representations and warranties, (2) The Servicer receives notice or otherwise becomes aware of the Seller's breaches, (3) the Servicer fails to enforce the Seller's obligations, (4) the Trustee or 25% of the Certificate holders provide written notice to the Servicer that it has failed to enforce the Seller's obligations, and (5) that the Servicer fails to cure this failure within 60 days.

the credit quality of the Mortgage Loans in the Covered Trusts." (SAC ¶ 102.) The allegations relating to actual notice of deficient mortgage files are supported by specific assertions of fact that the Trustee reviewed exception reports regarding deficiencies in the Mortgage Files and/or when the Mortgage Files were delivered to them yet failed to give notice to the Certificate holders. (Id. ¶¶ 10, 76, 78.)

In addition, plaintiffs make plausible allegations regarding the breaches in the representations and warranties relating to credit quality. They support these allegations by asserting that the Trustees had actual knowledge of deteriorating credit quality based on the downgrades of the certificates "of certain tranches in the Covered Trusts." (Id. ¶ 8.) The SAC asserts that "[b]y June or July 2008, the payment delinquencies, credit losses and ratings downgrades for the Mortgage Loans in the Covered Trusts had sharply accelerated. The Trustees were necessarily aware of these events as they monitored the performance and published monthly reports of the performance of the Mortgage Loans in each of the Covered Trusts, which included delinquent loans, loans that had gone into foreclosure and those which had realized losses upon the sale of their collateral." (Id.)

In addition to this specific notice, plaintiffs allege that it is implausible that defendants lacked actual knowledge that many loans breached the credit quality representations and warranties because of the "steady stream of public disclosures regarding WaMu's systemic underwriting abuses." (Id. ¶ 9.) And "[d]uring the first seven months of 2008, WaMu reported its own growing credit losses from poorly underwritten Mortgage Loans it kept on its books . . . ." (Id.; see also ¶¶ 52

24

(referring to Trustees' monthly reports and credit downgrades), 53 (steady stream of public disclosures regarding WaMu's systemic underwriting abuses), 54-57). In ¶ 57, plaintiffs allege that in unrelated litigation, information was developed relating to, inter alia, three of the Covered Trusts here at issue, which suggested that a significant percentage of the loans in those trusts violated the underwriting guidelines in place at the time of origination. Plaintiffs do not, however, connect the allegations in ¶ 57 to specific knowledge of the Trustees.

On a motion to dismiss, this Court must determine whether there are sufficient plausible allegations of breaches of the representations and warranties of which the Trustees were aware, such that they should have notified the certificate holders pursuant to § 315(b) of the TIA.  The Court finds that there are.

The allegations regarding the deteriorating credit quality go directly to the accuracy of the Trustees' representations and warranties.  While it is possible that the Trustees merely reported on increasing credit losses but did not actually know that these losses indicated that the loans did not meet the represented credit standards, it is certainly plausible that they actually knew that the representations had been breached.  The plausibility of this assertion is bolstered by the fact that plaintiffs allege that, at the same time as the losses were reported, WaMu's general underwriting standards were generally exposed as deficient.  Plaintiffs plausibly allege that WaMu's underwriting practices were consistent; a plausible inference can therefore be drawn that the Trustees had actual knowledge that loans originated by WaMu in the Covered Trusts were subjected to similarly deficient

25

practices and therefore breached the representations and warranties. Indeed, based on the allegations of the SAC, it would be implausible to assume that somehow all of the mortgage loans underlying the MBS miraculously avoided being originated with practices generally utilized throughout WaMu and its contracted affiliates at that time.

At the pleading stage, plaintiffs cannot be required to identify breaches of representations and warranties with respect to the individual loans in the specific trusts – such information is, at this stage, is uniquely in the possession of defendants. Rather, plaintiffs satisfy their burden where their allegations "raise a reasonable expectation that discovery will reveal evidence" proving their claim. See Swierkiewicz v. Sorema N.A., 534 U.S. 506, 511 (2002).

The parties do not dispute that plaintiffs make plausible allegations regarding the final elements of the TIA cause of action: that the Certificate holders were not notified of any breaches by the Trustees, and that failure to make such notification led to damages.

Accordingly, plaintiffs have plausibly alleged facts supporting their first cause of action.

V. THE BREACH OF CONTRACT CLAIM

As to the second cause of action – for breach of the PSA – plaintiffs also pass the plausibility pleading threshold.

The parties spent a significant portion of their submissions on this motion and at oral argument debating whether the sum and substance of the allegations in

26

the SAC is that the Trustees had constructive notice of breaches or whether they had actual knowledge.

There is no doubt that, by the terms of the PSA, a viable breach of contract claim depends on the Trustee's actual notice of a breach of the PSA and failure to take appropriate action in response thereto. The gravamen of defendants' argument is that plaintiffs have to be able to allege unequivocally that defendants had actual notice in order to state a claim. That, however, mistakes the standard of proof with the plausibility required at the pleading stage.

On this motion to dismiss, the question for the Court is not whether in fact the Trustees had actual notice – that is a factual determination left for trial. Instead, the question under the Rule 8 pleading standard – as elaborated by Twombly and Iqbal – is whether plaintiffs have pled plausible facts supporting allegations of actual notice. The Court finds they have.

It is certainly true that, as defendants argue, actual notice requires just that – actual notice, not constructive notice. As outlined above, however, plaintiffs here have pled actual notice in terms of (1) the Trustees' knowledge of deficiencies in the Mortgage Files (see, e.g., SAC ¶¶ 10, 76 and 78) and (2) plausible allegations leading to a sufficient inference of actual notice regarding breaches of the representations and warranties with respect to credit quality (see, e.g., id. ¶¶ 9, 52, 53). At this stage of the proceedings, this is sufficient.

This Court is not, however, stating that the existence of even pervasive practices will be sufficient evidence of actual knowledge at trial. This is the

27

pleading stage – and plausibility and Rules 8 and 11 are the governing standards. Trial standards as to what would or would not constitute actual knowledge necessarily depend on factual determinations that are too hypothetical at this point; these are not the questions now before the Court.

Accordingly, plaintiffs have stated a claim for breach of contract.

CONCLUSION

For the reasons set forth above, defendants' motions to dismiss is denied.

The Clerk of the Court is directed to terminate the motion at ECF No. 63. The parties shall appear at a status conference on May 14, 2013, at 11:30 a.m. (submitting a joint proposed schedule two days in advance) to set a schedule for further proceedings in this matter.

SO ORDERED:

Dated:      New York, New York
            May 6, 2013

_____
KATHERINE B. FORREST
United States District Judge