## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| POLICEMEN'S ANNUITY AND BENEFIT FUND OF THE CITY OF CHICAGO, LABORERS' PENSION FUND AND HEALTH AND WELFARE DEPARTMENT OF THE CONSTRUCTION AND GENERAL LABORERS' DISTRICT COUNCIL OF CHICAGO AND VICINITY, IOWA PUBLIC EMPLOYEES' RETIREMENT SYSTEM, ARKANSAS PUBLIC EMPLOYEES' RETIREMENT SYSTEM, VERMONT PENSION INVESTMENT COMMITTEE, WASHINGTON STATE INVESTMENT BOARD, ARKANSAS TEACHER RETIREMENT SYSTEM, PUBLIC EMPLOYEES' RETIREMENT SYSTEM OF MISSISSIPPI, CITY OF TALLAHASSEE RETIREMENT SYSTEM, and CENTRAL STATES, SOUTHEAST AND SOUTHWEST AREAS PENSION FUND,<br><br>                             Plaintiffs,<br><br>    - against-<br><br><br>BANK OF AMERICA, NA (as Trustee Under Various Pooling and Servicing Agreements), and U.S. BANK NATIONAL ASSOCIATION (as Trustee Under Various Pooling and Servicing Agreements),<br><br>                             Defendants. | **CASE NO. 1:12-CV-02865-KBF**<br><br><br>**CONSOLIDATED THIRD AMENDED CLASS ACTION COMPLAINT**<br><br><br><br>**JURY TRIAL DEMANDED** |

## SUMMARY OF THE ACTION

1.    Plaintiffs Policemen's Annuity and Benefit Fund of the City of Chicago ("Chicago Police") and Laborers' Pension Fund and Health and Welfare Department of the Construction, General Laborers' District Council of Chicago and Vicinity ("Chicago

Laborers' Funds"), Iowa Public Employees' Retirement System ("IPERS"), and Arkansas Public Employees Retirement System ("Arkansas PERS"), Vermont Pension Investment Committee ("VPIC"), Washington State Investment Board ("WSIB"), Arkansas Teacher Retirement System ("ATRS"), Public Employees' Retirement System of Mississippi ("Mississippi PERS"), City of Tallahassee Retirement System ("CTRS"), and Central States, Southeast and Southwest Areas Pension Fund ("Central States") (collectively "Plaintiffs"), bring this action, on their own behalf and on behalf of a class, against Defendants Bank of America, NA ("BOA") and U.S. Bank National Association ("U.S. Bank") in their capacity as the Trustee for 19 substantially similar trusts in which Plaintiffs and class members invested (collectively the "Covered Trusts"),[1] and that own residential Mortgage Loans that were originated or acquired by Washington Mutual Bank ("WaMu") or its affiliates and then bundled together and sold to investors as WaMu mortgage backed securities (the "WaMu MBS"). BOA is the successor-in-interest by merger to the original Trustee for the Covered Trusts, LaSalle Bank National Association ("LaSalle"). U.S. Bank succeeded BOA as Trustee of the Covered Trusts. A list of Plaintiffs' investments in the Covered Trusts — WaMu Mortgage Pass-Through Certificates Series 2005-AR15 Trust, WaMu Mortgage Pass-Through Certificates Series 2005-AR17 Trust, WaMu Mortgage Pass-Through Certificates Series 2005-AR19 Trust, WaMu Mortgage Pass-Through Certificates Series 2006-AR6 Trust, WaMu Mortgage Pass-Through Certificates Series 2006-AR8 Trust, WaMu Mortgage Pass-Through Certificates Series 2006-AR9 Trust, WaMu Mortgage Pass-Through Certificates Series 2006-AR10 Trust, WaMu

---

[1]    Plaintiffs have limited the claims in this amended complaint to comply with the Court's order dated December 7, 2012, including by limiting the claims to trusts in which Plaintiffs purchased certificates.  This amendment does not abandon claims pled in the complaint dated April 11, 2012, including claims asserted on behalf of other trusts, and loan pools, from which Plaintiffs did not purchase certificates.

Mortgage Pass-Through Certificates Series 2006-AR11 Trust, WaMu Mortgage Pass-Through Certificates Series 2006-AR12 Trust, WaMu Mortgage Pass-Through Certificates Series 2006-AR13 Trust, WaMu Mortgage Pass-Through Certificates Series 2006-AR14 Trust, WaMu Mortgage Pass-Through Certificates Series 2006-AR16 Trust, WaMu Mortgage Pass-Through Certificates Series 2006-AR17 Trust, WaMu Mortgage Pass-Through Certificates Series 2006-AR18 Trust, WaMu Mortgage Pass-Through Certificates Series 2006-AR19 Trust, WaMu Mortgage Pass-Through Certificates WMALT Series 2005-9 Trust, WaMu Mortgage Pass-Through Certificates WMALT Series 2006-2 Trust, WaMu Mortgage Pass-Through Certificates WMALT Series 2006-5 Trust, WaMu Mortgage Pass-Through Certificates WMALT Series 2006-AR1 Trust, WaMu Mortgage Pass-Through Certificates WMALT Series 2006-AR2 Trust, WaMu Mortgage Pass-Through Certificates WMALT Series 2006-AR3 Trust, WaMu Mortgage Pass-Through Certificates WMALT Series 2006-AR5 Trust, WaMu Mortgage Pass-Through Certificates WMALT Series 2006-AR6 Trust, WaMu Mortgage Pass-Through Certificates WMALT Series 2006-AR9 Trust, WaMu Mortgage Pass-Through Certificates Series 2007-OA3 Trust, WaMu Mortgage Pass-Through Certificates Series 2007-OA4 Trust, WaMu Mortgage Pass-Through Certificates Series 2007-OA5 Trust, WaMu Mortgage Pass-Through Certificates WMALT Series 2007-OA3, WaMu Mortgage Pass-Through Certificates WMALT Series 2007-HY2 Trust, WaMu Mortgage Pass-Through Certificates Series 2007-HY1 Trust, WaMu Mortgage Pass-Through Certificates Series 2007-HY2 Trust, WaMu Mortgage Pass-Through Certificates Series 2007-HY3 Trust, WaMu Mortgage Pass-Through Certificates Series 2007-HY4 Trust, WaMu Mortgage Pass-Through Certificates Series 2007-HY6 Trust, and WaMu Mortgage Pass-Through Certificates Series 2007-HY7 Trust — are attached as Exhibits A - J. Plaintiffs purchased and/or sold WaMu MBS and have been injured as a result of Defendants'

wrongdoing, and along with the class members (collectively, the "MBS holders"), have been beneficiaries of the Covered Trusts that held the Mortgage Loans.

2.      As the Trustees for the Covered Trusts, Defendants owed the MBS holders certain contractual duties, as well as duties imposed by the federal Trust Indenture Act of 1939, as amended, (the "TIA"), 15 U.S.C. §77aaa, *et seq.*, with respect to the Mortgage Loans held by the Covered Trusts.  These duties were spelled out in the Covered Trusts' Governing Agreements, called Pooling and Servicing Agreements ("PSAs"), which are substantially similar.  A copy of the Governing Agreement for WaMu Pass-Through Certificates WMALT Series 2006-5 in which Plaintiffs invested is attached as Exhibit K.  The PSA is incorporated by reference into this Amended Complaint as if set forth fully herein.

3.      The purpose of having a Trustee in MBS securitizations such as these is to ensure that there is at least one independent party to the Governing Agreements who, unlike the MBS holders, did not face collective action, informational, or other limitations, and as a result could effectively protect the trusts and their beneficiaries, the MBS holders.  Thus, the Governing Agreements, as modified by the TIA, imposed critical duties on Defendants as Trustees that directly impacted the value of the MBS.

4.      Among other things, the Governing Agreements require that the Trustee, or its agent, take physical possession of the Mortgage Files, evidencing the Trusts' ownership of the Mortgage Loans purportedly conveyed to them.  The Governing Agreements also required the Trustee or its agent to review the Mortgage Files for each of the Mortgage Loans, to identify any Mortgage Loans whose Mortgage Files were incomplete ("exceptions"), and to certify that the required documentation specified in the Governing Agreements for each of the Mortgage Loans was present.  Where documentation was missing or incomplete, the Trustee or its agent was

required to issue exception reports and then was required to ensure that the exceptions were either cured on a timely basis, or that the defective loans were substituted or repurchased.

5.      Incomplete and defective Mortgage Files with respect to Mortgage Loans transferred into the Trusts have delayed or legally precluded legal proceedings to foreclose delinquent Mortgage Loans, and have increased the severity of losses to the Trusts.  This was a systemic problem at WaMu as it rushed to securitize as many loans as possible, and thereby increase its "gain on sale" for loans it had originated, leaving it to Trustees of the MBS Trusts to attempt to correct the defects in title as the loans were foreclosed.  For example, in *Frost v. LaSalle Bank, N.A.*, No. 4D09-2668, 2010 WL 2862149 (Fla. App., 4th Dist. May 24, 2010), the plaintiff urged the court to reverse a previously entered order granting summary judgment in LaSalle's favor in a foreclosure action on the grounds that there was no proof LaSalle held the mortgage note with a valid endorsement on the date it brought the foreclosure action.   After the plaintiff filed a brief detailing numerous inconsistencies in the documentation that had been submitted to the Court regarding the trust's purported ownership of the mortgage loan in question, LaSalle Bank, as Trustee for a WaMu MBS trust, confessed error and agreed to vacate the final judgment of foreclosure that had been entered.   Similarly, in *Naranjo v. SBMC Mortgage*, No. 11–cv–2229–L(WVG), 2012 WL 3030370 (S.D. Cal. July 24, 2012), the court declined U.S. Bank's motion to dismiss plaintiff's claims that the purported assignment of her mortgage loan into a WaMu Trust was not completed by the date required by the Trust Agreement and, therefore, a subsequent assignment, substitution, and notice of default and election to sell was improper.

6.      Just as fundamental in an MBS securitization as the Covered Trusts' ability to foreclose on delinquent and defaulted Mortgage Loans conveyed to them is the credit quality of

the Mortgage Loans purportedly conveyed to the Covered Trusts.  For that reason, the Governing Agreements contain representations and warranties attesting to the characteristics of the borrower and collateral for the Mortgage Loans conveyed to the Covered Trusts, and that the Mortgage Loans complied with their underwriting criteria.  Ratings agencies assess the quality of the MBS based on those representations and warranties, and notably, the ratings agencies must be informed in the event of their breach.  The Governing Agreements therefore require the securitization's Sponsor (or Seller), in this case, WaMu or an affiliate, to cure, substitute, or repurchase any Mortgage Loans that materially breach those representations and warranties.  Particularly, upon discovery of a breach, the Governing Agreements require the Trustee to provide notice and then if the Servicer fails to timely cure the breach, the Trustee is to enforce the Seller's obligation to substitute or repurchase such Mortgage Loans as a prudent person acting in his own best interest would.

7.     As described more fully below, however, Defendants regularly disregarded their contractual and statutory duties to ensure that Mortgage Loans with incomplete or defective Mortgage Files, or those that breached the Seller's representations and warranties, were substituted or repurchased from the Trusts.

8.     Beginning in or about March and April 2008, the delinquencies in borrower payments for Mortgage Loans in the Covered Trusts began to increase as a result of the widespread defects in the underlying Mortgage Loans, and credit agencies began to downgrade the certificates of certain tranches in the Covered Trusts.  By June and July 2008, the payment delinquencies, credit losses and ratings downgrades for the Mortgage Loans in the Covered Trusts had sharply accelerated.  The Trustees were necessarily aware of these events as they monitored the performance of the Mortgage Loans in each of the Covered Trusts and published

monthly reports of the performance of the Mortgage Loans in each of the Covered Trusts, which included delinquent loans, loans that had gone into foreclosure and those which had realized losses upon the sale of their collateral.

9.     The increasing delinquencies and credit losses in the Covered Trusts and accompanying ratings downgrades coincided with a steady stream of public disclosures regarding WaMu's systemic underwriting abuses.  In this regard, beginning in or about November 2007, as the then New York Attorney General, Andrew Cuomo (the "N.Y. Attorney General"), filed suit challenging WaMu's appraisal practices, press reports of WaMu's loan origination abuses began to circulate.  During the first seven months of 2008, WaMu reported its own growing credit losses from the poorly underwritten Mortgage Loans it kept on its books, and in May 2008 WaMu was sued for securities fraud in connection with alleged misrepresentations about these losses.  In September 2008, the FDIC seized WaMu and sold its business to JPMorgan Chase ("JPMC").  On December 30, 2008, the Trustee for approximately 100 other WaMu MBS Trusts filed claims with the FDIC receivership, and then in August 2009 sued the FDIC, and then JPMC to protect and preserve the repurchase rights of those Trusts.  A well-publicized Senate investigation studying the causes of the 2008 financial crisis and focusing upon WaMu's mortgage loan origination and securitization practices as a case study, as well as evidence submitted in opposition to a summary judgment motion filed in a Section 11 securities action brought on behalf of certain of the Covered Trusts, confirms the widespread and systemic underwriting abuses that occurred at WaMu.

10.     Exception reports prepared by the Trustee or its agent caused the Trustee Defendants to "find," as that term is used in the PSAs, deficient Mortgage Files.  In addition, all of the foregoing evidence regarding WaMu's systemic underwriting abuses and the accelerating

losses in the Covered Trusts caused the Trustee Defendants in this case to "discover," as that term is used in the PSAs, breaches of the representations and warranties regarding the Mortgage Loans WaMu securitized in the Covered Trusts, and imposed contractual and statutory duties on the Trustee Defendants to act to protect the Trusts' repurchase rights, which they failed to do. Instead, the Trustees stood by and did nothing.

11.     Under the PSAs, as Defendants found deficient Mortgage Files and discovered the breaches of representations and warranties, they had the duty to notify other parties to the PSAs (as well as MBS holders) about them, and when the violations went uncured, *i.e.*, when an "event of default" occurred, Defendants had to take the steps that a prudent person would to protect the Trusts and MBS holders.  These duties included (i) investigating the breaches through obtaining the Covered Trusts' loan origination files, (ii) filing a claim with the FDIC receivership, and (iii) pursuing litigation against WaMu, the FDIC and JPMC to enforce the Trusts' repurchase rights.

12.     The Mortgage Loans in the Covered Trusts have experienced high levels of payment delinquencies and defaults, lengthy delays in collection and foreclosure actions, and substantial credit losses which would not have occurred but for Defendants' failure to perform their responsibilities under the Governing Agreements and TIA.  These credit losses have resulted in the failure of payment of principal and interest to MBS holders, ratings downgrades, and losses in the value of certificates.  By failing to perform their contractual and statutory duties, Defendants have caused MBS holders to suffer hundreds of millions of dollars in losses.

## JURISDICTION AND VENUE

13.     This Court has jurisdiction over this action pursuant to 28 U.S.C. §1331 for violations of the TIA and supplemental jurisdiction over the contract claims.  It also has jurisdiction pursuant to 28 U.S.C. §1332(a).

14.      Venue is proper in this District under 28 U.S.C. §1391(b).

**PARTIES**

15.      Plaintiff Policemen's Annuity and Benefit Fund of the City of Chicago ("Chicago Police") is a state governmental pension fund authorized by statute under the laws of Illinois with the mission of providing retirement benefits to its members and their beneficiaries.  Chicago Police relies heavily upon the performance of its investments to fund benefits.  Exhibit A identifies the transactions in WaMu MBS in which Chicago Police has been injured.

16.      Plaintiff Laborers' Pension Fund and Health and Welfare Department of the Construction and General Laborers' District Council of Chicago and Vicinity, ("Chicago Laborers' Funds") is a Taft Hartley benefit fund.  Chicago Laborers' Funds' Trustees direct, control, and coordinate the Funds' activities from its principal place of business in Westchester, Illinois.  The purpose of the Chicago Laborers' Funds is to provide health and welfare and pension benefits to participants.  Exhibit B identifies the transactions in WaMu MBS in which Chicago Laborers' Funds have been injured.

17.      Plaintiff Iowa Public Employees' Retirement System ("IPERS") is a public pension fund for employees of the State of Iowa.  IPERS' Trustees direct, control, and coordinate the Funds' activities from its principal place of business in Des Moines, Iowa.  The purpose of IPERS Fund is to provide health and welfare and pension benefits to participants.  Exhibit C identifies the transactions in WaMu MBS in which IPERS has been injured.

18.      Plaintiff Arkansas Public Employees Retirement System ("Arkansas PERS") is a public pension fund for employees of the State of Arkansas.  Arkansas PERS' direct, control, and coordinate the funds' activities from its principal place of business in Little Rock,

Arkansas.  The purpose of the Arkansas PERS pension fund is to provide health and welfare and pension benefits to participants.  Exhibit D identifies the transactions in WaMu MBS in which Arkansas PERS has been injured.

19.     Plaintiff Vermont Pension Investment Committee ("VPIC") is the statutory pension investment committee responsible for the investment of the assets of the State Teachers' Retirement System of Vermont, the Vermont State Employees' Retirement System, and the Vermont Municipal Employees' Retirement System (together, the "Vermont Retirement Systems"), the public pension funds for teachers, State employees and municipal employees, respectively, of the State of Vermont.  The VPIC allocates and directs the investment of the assets of the Retirement Systems from its principal place of business in Montpelier, Vermont. The purpose of the VPIC is to invest the assets of the Retirement Systems.    The purpose of the Retirement Systems is to provide pension benefits to participants. Exhibit E identifies the transactions in WaMu MBS in which VPIC has been injured.

20.     Plaintiff Washington State Investment Board ("WSIB") is a public investment management organization that manages public pension funds.  WSIB Trustees direct, control and coordinate the funds' activities from its principal place of business in Olympia, WA. WSIB, through an external investment manager who was hired to make investment decisions for a pension account in the State's 'Commingled Trust Fund', invested in and sold WaMu MBS.  Exhibit F identifies the transactions in WaMu MBS in which WSIB has been injured.

21.     Plaintiff Arkansas Teacher Retirement System ("ATRS") is a public pension fund for public school and education employees of the State of Arkansas. ATRS Trustees direct, control, and coordinate the Fund's activities from its principal place of business in

Little Rock, Arkansas. The purpose of the ATRS public pension fund is to provide pension benefits to participants. Exhibit G identifies the transactions in WaMu MBS in which ATRS has been injured.

22.     Plaintiff Public Employees' Retirement System of Mississippi ("Mississippi PERS") is a public pension fund for public employees of the State of Mississippi. Mississippi PERS Trustees direct, control, and coordinate the Fund's activities from its principal place of business in Jackson, Mississippi. The purpose of the Mississippi PERS pension fund is to provide pension benefits to participants. Exhibit H identifies the transactions in WaMu MBS in which Mississippi PERS has been injured.

23.     Plaintiff the City of Tallahassee Retirement System ("CTRS") is a public pension plan for the benefit of current and former employees of the City of Tallahassee, Florida. CTRS Board and Committee Fiduciaries direct, control, and coordinate the Fund's activities from its principal place of business in Tallahassee, Florida. The purpose of the CTRS pension fund is to provide pension benefits to participants. Exhibit I identifies the transactions in WaMu MBS in which CTRS has been injured.

24.     Plaintiff Central States, Southeast and Southwest Areas Pension Fund ("Central States") is a trust fund established and maintained pursuant to Section 302(c)(5) of the Labor Management Relations Act, 29 U.S.C. S.186(c)(5), and is an employee benefit plan established and maintained pursuant to the Employee Retirement Income Security Act, 29 U.S.C. S.1001 et seq., for the purpose of providing pension benefits to eligible participants and beneficiaries. Central States maintains its principal place of business at 9377 W. Higgins Road, Rosemont, Illinois. Exhibit J identifies the transactions in WaMu MBS in which Central States has been injured.

25.     Other class members purchased the same or substantially similar WaMu MBS as Plaintiffs.  All WaMu MBS purchased by Plaintiffs and all other class members have or had Defendants as Trustees, the same Depositor, the same Servicer, substantially similar Governing Agreements, and were secured by mortgage loan collateral with substantially similar and systemic defects in their title and underwriting.  Defendants owed Plaintiffs and all other class members the same duties, and, as set forth herein, wholly failed to perform those duties—for all MBS holders in the Covered Trusts.  Accordingly, the violations of duty and pattern of wrongdoing by Defendants and the other parties to the Governing Agreements are part of a common scheme and course of conduct.  Thus, the class' claims against Defendants share the same character as, and are indeed virtually identical to, Plaintiffs' claims against Defendants, and Plaintiffs have standing, and are appropriate class representatives, to pursue these claims.

26.     Defendant BOA is a national banking association organized and existing under the laws of the United States with its principal offices in Charlotte, North Carolina.  In or about October 1, 2007, BOA acquired LaSalle, which was serving as Trustee for the Covered Trusts, and became successor Trustee by merger to LaSalle.  BOA does business throughout the United States and its principal office in New York State is in New York County.  As the Trustees for the Covered Trusts, LaSalle and BOA owed the MBS holders certain statutory and contractual duties with respect to the Mortgage Loans owned by the Covered Trusts, which duties LaSalle and BOA violated.

27.     Defendant U.S. Bank is a national banking association organized and existing under the laws of the United States with its principal offices in Minnesota.    In February 2009, BOA resigned as Trustee for at least the WMALT 2006-5 Trust and the WMALT 2006-AR5

Trust, and was succeeded by U.S. Bank.  Subsequently, in December 2010, Defendant U.S. Bank acquired BOA's securitization trust business and succeeded BOA as Trustee for the remaining Covered Trusts as well.  U.S. Bank does business throughout the United States, and its principal office in New York State is in New York County.  As the Trustee for the Covered Trusts, U.S. Bank owed the MBS holders certain statutory and contractual duties with respect to the Mortgage Loans owned by the Covered Trusts, which duties U.S. Bank violated.

## FACTUAL ALLEGATIONS

I.     **The Securitization Process For The WaMu MBS**

28.     WaMu, acting on its own and through its network of corporate affiliates, managed the securitization of the Mortgage Loans in the Covered Trusts, and in countless other MBS trusts.  Mortgage securitizations involve the conversion of illiquid whole loans into bond-like instruments, the MBS, that trade over the counter in capital markets.  By 2006, WaMu was the second largest non-agency issuer of MBS in the United States, behind Countrywide.  Indeed, between 2000 and 2007, WaMu and its subprime affiliate, Long Beach Mortgage Company ("Long Beach"), securitized over $77 billion in subprime home loans and billions more in other high risk home loans.

29.     WaMu, through its "Home Loans" group, controlled almost every aspect of the creation, issuance and servicing of the MBS – from setting the underwriting criteria and pricing the Mortgage Loans originated by WaMu; through pooling of the underlying Mortgage Loans by its affiliates; through the securitization and underwriting of the loans and the sale of the MBS representing interests in the Mortgage Loans to Plaintiffs and Class members; and then by servicing the loans in the Securitization Trusts.  David Beck ("Beck"), as the head of the WaMu

Home Loans Capital Markets division, an Executive Vice President at WaMu and as a Director, President and Executive Officer of WAAC, was personally involved in each of these aspects.

30.     The first step in creating the MBS was the origination of mortgages to borrowers purchasing homes.  WaMu originated or acquired from various "correspondent" and "conduit" mortgage lenders throughout the country billions of dollars of home loans.

31.     Second, WaMu or an affiliate,[2] referred to as a "Seller," would group the mortgages that WaMu had originated and purchased into a large pool, and then transfer, or sell, that pool to a "Depositor."  WaMu Asset Acceptance Corp. ("WAAC"), a special purpose entity, formed for the sole purpose of acquiring Mortgage Loans from the Seller and transferring the Mortgage Loans into the issuing Trusts, served the role of Depositor for the Covered Trusts. Depositors exist primarily to provide an intermediary between the Seller and the Trust in the chain of title to the Mortgage Loans because – if the Seller goes into bankruptcy, as many did and WAAC nearly did – the bankruptcy estate can rescind direct transfers made by the Seller. Thus, the Seller and the Depositor enter into a Mortgage Loan Purchase Agreement ("MLPA"), which governs the mechanics of the transfer, and states that the Mortgage Loan Files must be complete and may not have defective documents, such as imperfect assignments or endorsements.  In the MLPA, the Seller also: (i) makes representations and warranties concerning the quality of the Mortgage Loans in the mortgage pool; (ii) promises to cure,

---

[2]     WaMu was the Seller with respect to the WaMu 2005-AR15, WaMu 2005-AR17, WaMu 2005-AR19, WaMu 2006-AR6, WaMu 2006-AR8, WaMu 2006-AR9, WaMu 2006-AR10, WaMu 2006-AR11, WaMu 2006-AR12, WaMu 2006-AR13, WaMu 2006-AR14, WaMu 2006-AR16, WaMu 2006-AR17, WaMu 2006-AR18, WaMu 2006-AR19, WaMu 2007-HY1, WaMu 2007-HY2, WaMu 2007-HY3, WaMu 2007-HY4, WaMu 2007-HY6, WaMu 2007-HY7, WaMu 2007-OA3,  WaMu 2007-OA4, WaMu 2007-OA5, and WMALT 2007-OA3 securitizations.  A WaMu affiliate, Washington Mutual Mortgage Securities Corp., was the Seller with respect to the WMALT 2005-9, WMALT 2006-2, WMALT 2006-5, WMALT 2006-AR1, WMALT 2006-AR2, WMALT 2006-AR3, WMALT 2006-AR5, WMALT 2006-AR6, WMALT 2006-AR9, WMALT 2007-HY2, and WMALT 2007-OA3 securitizations.

substitute or repurchase mortgages that do not comply with those representations and warranties, or that do not have a valid transfer; and (iii) states that the Trustee will ultimately have the right to enforce those representations and promises.

32.     Third, the Depositor transferred the pool of mortgages to the Trustee, for the benefit of the Trust and the MBS holders, and in exchange the Trustee transferred the MBS to the Depositor.  As discussed in greater detail below, the Governing Agreements set forth the terms of this transfer and the operation of the Trust.  The Governing Agreements impose certain duties on the Trustee, in addition to those duties imposed by the TIA and Delaware law.  They also establish the Trust as a Real Estate Mortgage Investment Conduit ("REMIC") under the Internal Revenue Code, which enables the Trust to avoid tax liability on income generated from the underlying Mortgage Loans – if the Trust gains valid title over the underlying Mortgage Loans within three months of its creation and if certain other criteria are met.  Qualifying as a REMIC is critical to the Trust's ability to make the payments promised to MBS holders.  Importantly, the Governing Agreements also refer to and incorporate the MLPA.

33.     Fourth, the Depositor sold the MBS to an underwriter, in this case, WaMu Capital Corp. ("WCC"), another affiliate.  WCC officers reported up to Beck, as head of the WaMu Home Loans Capital Markets division.  The Depositor remits the money from that sale to the Seller, which may use it to originate or purchase more mortgages.  Meanwhile, the underwriter markets and sells the MBS to investors.  Here, the MBS were sold pursuant to Registration Statements, Prospectuses and Prospectus Supplements publicly filed with the Securities and Exchange Commission ("SEC").  At this point in the securitization process, the Seller is also sometimes referred to as the Sponsor, and issuer of the MBS.

34.     MBS entitle their holders to the cash flows generated from the Trust's pool of Mortgage Loans.  Certain MBS contain more than one pool of Mortgages and often, under the structure of the Trust, the Mortgage Loans of one pool collateralize the other pool(s).  The Trust, or issuing entity, is structured such that the risk of loss is divided among different levels, or "tranches."  Each tranche of the Trust has a different level of credit risk and reward (the interest or yield), including different levels of credit enhancement.  One form of credit enhancement is overcollateralization, which means that the total principal balance of the Mortgage Loans in the Trust exceeds the aggregate amount of securities issued and sold by the Trust.  Another example of credit enhancement is excess interest, which means that the amount of interest collected on the underlying Mortgage Loans for each payment period is expected to be greater than the interest distributable to the MBS holders and the expenses payable by the Trust during that period.  Typically, the Trust is structured to include a "waterfall" for payments of principal and interest in which credit losses are first allocated to the least senior tranches which also receive the highest rates of interest.  At initiation of the Trust, the most senior and least risky tranches typically received triple A ratings, and received the lowest interest rates.  As a result of the facts alleged herein, virtually all of the triple A certificates in the Covered Trusts have been re-rated.

35.     Following the sale of the MBS, the Servicer is responsible for the collection of mortgage loan payments from the underlying mortgagors and others, including through foreclosure or the put back of defective loans to the Seller, if necessary.  For the Covered Trusts, WaMu, or one of its affiliates, acting under the auspices of the WaMu Home Loans group, and particularly the Capital Markets division, acted as the Servicer.

36.     Thus, the value of the MBS, and their credit rating, depend primarily on the riskiness of the underlying mortgages, which is reflected in the Seller's representations and

warranties concerning the quality of loans in the pool and, secondarily, to the extent that borrowers default on their payments, on the Trust's ability to foreclose on the collateral and recover the unpaid loan balance.  If the loans underlying the MBS suffer payment defaults in excess of the assumptions built into their credit enhancement and securities' ratings, or the underlying properties' mortgages cannot be effectively foreclosed and the properties sold when borrowers fail to make their monthly mortgage payments, the securities will be re-rated and the value of the MBS will decline.

## II.    Defendants' Duties As Trustee For The Covered Trusts

37.    The purpose of having a Trustee in an MBS securitization is to ensure that there is at least one independent party to the Governing Agreements who, unlike the MBS holders, does not face collective action, informational, or other limitations, and as a result can effectively protect the trusts and the MBS holders.  Thus, the Governing Agreements, and the TIA, imposed critical duties on Defendants, as Trustee, that directly impacted the value of the MBS.

38.    The Covered Trusts' Governing Agreements set forth the Trustee's duties.  The Covered Trusts, including those that issued the MBS purchased by Plaintiffs, are governed by a PSA and certain related agreements that the PSA references and incorporates.  All of the Governing Agreements are substantially similar, and impose the same duties on the Trustee at issue here.  Accordingly, this Complaint primarily refers to the PSA for Washington Mutual Mortgage Pass-Through Certificates WMALT Series 2006-5 Trust as a representative example.

39.    While the Governing Agreements set forth certain rights and responsibilities in connection with the Covered Trusts, recognizing that previous abuses by trustees had adversely affected the national interest, Congress enacted the TIA to provide minimum federal protections to investors which are deemed to be incorporated into those Governing Agreements.

A.     The Trustee's Duties And Obligations Under The Governing Agreements

i.      *The Trustee's Duty To Enforce The Seller's Obligation To Cure, Substitute Or Repurchase Mortgage Loans With Incomplete Or Defective Mortgage Files*

40.     The Governing Agreements require the Trustee or its agent to take physical possession of the Mortgage Files evidencing the Trusts' ownership of the Mortgage Loans conveyed to it, including the Mortgage Note and the Mortgage, properly endorsed and assigned as specified by the PSA.  As set forth in PSA Section 2.05, WAAC is required to "deliver to and deposit with, or cause to be delivered to and deposited with, the Trustee . . . the Mortgage Files, which shall at all times be identified in the records of the Trustee . . .  as being held by or on behalf of the Trust."  The PSA defines the Mortgage File to include:

> (i)      The original Mortgage Note endorsed (A) in blank, without recourse, (B) to the Trustee, without recourse, or (C) to the Trust, without recourse, and all intervening endorsements evidencing a complete chain of endorsements from the originator to the endorser last endorsing the Mortgage Note . . . *provided*, *however*, that in the event that either (a) Washington Mutual Bank or Washington Mutual Bank fsb is the Seller of the Mortgage Loan or (b) Washington Mutual Mortgage Securities Corp. is the Seller of the Mortgage Loan and purchased the Mortgage Loan from Washington Mutual Bank or Washington Mutual Bank fsb, then the Mortgage Note need not be endorsed in blank or to the Trustee or the Trust as provided above, but, if not so endorsed, shall be made payable to, or properly endorsed to, Washington Mutual Bank or Washington Mutual Bank fsb, as applicable. . .

> (iii)     (1)(x)  the original recorded Mortgage with evidence of recording thereon for the jurisdiction in which the Mortgaged Property is located (which original recorded Mortgage, in the case of a MOM [MERS] Loan, shall set forth the MIN [Mortgage Identification Number] and shall indicate that the Mortgage is a MOM Loan), (y)  unless the Mortgage Loan is a MERS Loan, an original assignment of the Mortgage duly executed and acknowledged in recordable form (A) in blank, (B) to the Trustee or (C) to the Trust, and (z)  unless the Mortgage Loan is a MOM Loan, recorded originals of all intervening assignments evidencing

a complete chain of assignment from the originator to the person executing the assignment described in clause (y); or

(2)(x)   a copy (which may be in electronic form) of the Mortgage (which Mortgage, in the case of a MOM Loan, shall set forth the MIN and shall indicate that the Mortgage Loan is a MOM Loan) which represents a true and correct reproduction of the original Mortgage and which has either been certified (i) on the face thereof by the public recording office in the appropriate jurisdiction in which the Mortgaged Property is located, or (ii) by the originator, the Seller, the Servicer or the escrow or title company which provided closing services in connection with such Mortgage Loan as a true and correct copy the original of which has been sent for recordation, (y) unless the Mortgage Loan is a MERS Loan, an original assignment of the Mortgage duly executed and acknowledged in recordable form (A) in blank, (B) to the Trustee or (C) to the Trust, and (z)  unless the Mortgage Loan is a MOM Loan, true and correct copies, certified by the applicable county recorder or by the originator, the Seller or the Servicer as described above, of all intervening assignments evidencing a complete chain of assignment from the originator to the person executing the assignment described in clause (y); *provided, however,* that in the event that either (a) Washington Mutual Bank or Washington Mutual Bank fsb is the Seller of the Mortgage Loan or (b) Washington Mutual Mortgage Securities Corp. is the Seller of the Mortgage Loan and purchased the Mortgage Loan from Washington Mutual Bank or Washington Mutual Bank fsb, then the Mortgage File need not include an assignment of the Mortgage executed in blank or to the Trustee or the Trust as provided in clause (X)(iii)(1)(y) or (X)(iii)(2)(y) above, as applicable, but the Mortgage File shall, unless the Mortgage Loan was originated by Washington Mutual Bank or Washington Mutual Bank fsb, include a complete chain of assignments of the related Mortgage from the originator of such Mortgage Loan to Washington Mutual Bank or Washington Mutual Bank fsb, as applicable; and

(iv)  For any Mortgage Loan that has been modified or amended, the original instrument or instruments effecting such modification or amendment.

41.   In addition, PSA Section 2.07 ("Acceptance by Trustee") reinforces that the Trustee or its agent was required to take physical possession of the Mortgage Files for the exclusive use and benefit of all current and future MBS holders. It provides in relevant part:

> The Trustee acknowledges receipt . . . on behalf of the Trust of the
> documents (or certified copies thereof as specified in Section 2.05)
> referred to in Section 2.05 above . . . .

42.     Likewise, PSA Section 2.11 ("Acknowledgement of Transfer of Mortgage Pool
Assets") states that:

> The Trustee hereby acknowledges and accepts on behalf of the
> Trust the transfer and assignment pursuant to Section 2.04 to the
> Trust of the Mortgage Pool Assets . . . and declares that as of the
> Closing Date it . . . holds and shall hold any documents
> constituting part of the Mortgage Pool Assets, and the Mortgage
> Pool Assets, as Trustee, in trust, upon the trust herein set forth . . . .

43.     Similarly, PSA Section 8.08 ("Successor Trustee") provides in relevant part that:

> The predecessor shall deliver to the successor trustee all Mortgage
> Files, related documents, statements and all other property held by
> it hereunder, and the Servicer and the predecessor trustee shall
> execute and deliver such instruments and do such other things as
> may reasonably be required for more fully and certainly vesting
> and confirming in the successor trustee all such rights, powers,
> duties and obligations.

44.     To ensure that the Mortgage Loans were properly conveyed to the Covered
Trusts, and that the Trusts had received perfected and enforceable title to the Mortgage Loans,
the Governing Agreements also required the Trustee or its agent to review the Mortgage Files for
each of the Mortgage Loans, to identify those loans lacking a complete chain of title or missing
documentation, and to certify that the documentation for each of the remaining loans was
accurate and complete.   This duty overlaps with and forms part of the requirements that the
Trustee must satisfy to properly take title to the Mortgage Loans.

45.     Accordingly, as set forth in PSA Section 2.07, the Trustee or its agent had to
create a "Certification" for the purpose of notifying the Servicer of deficient Mortgage Files as
follows:

> The Trustee shall review . . . each Mortgage File within 45 days
> after the Closing Date and deliver to [WAAC] a certification . . . to
> the effect that, except as noted, all documents required . . .
> pursuant to the definition of "Mortgage File" and Section 2.05
> have been executed and received, and that such documents relate
> to the Mortgage Loans identified in the Mortgage Loan Schedule.

The exceptions attached to the Certification constitute notice of document deficiencies. Thus,

upon being notified of exceptions, the Servicer was required to notify the Seller, who then must

timely cure the exceptions or substitute or repurchase the defective Mortgage Loans.

46.     This requirement is embodied in PSA Section 2.07, which states in relevant part

that:

> If the Trustee finds any document or documents required to be
> included in the Mortgage File for a Mortgage Loan pursuant to the
> definition of "Mortgage File" not to have been executed and
> received, the Trustee shall promptly so notify the Servicer. . . .
> Upon notice from the Trustee . . . that any document required to be
> included in the Mortgage File for a Mortgage Loan has not been
> executed and received, the Servicer shall promptly notify the Seller
> of such defect and take appropriate steps on behalf of the Trust to
> enforce the Seller's obligation, pursuant to Section 2.4 of the
> Mortgage Loan Purchase Agreement, to correct or cure such defect
> or repurchase or substitute for such Mortgage Loan, in accordance
> with and subject to the time limitations set forth in such Section
> 2.4 . . . .

47.     As set forth below, in the event the Servicer fails to provide notice to the Seller or

the Seller fails to cure or substitute as required by PSA Section 2.07 an "event of default" occurs

pursuant to PSA Section 7.01(a)(ii) and the Trustee must act prudently to protect the Trusts and

MBS holders as required by PSA Section 8.01(a).

> ii.     *The Trustee's Duty To Enforce The Seller's Obligation To Cure,*
> *Substitute Or Repurchase Mortgage Loans That Breach the Seller's*
> *Representations And Warranties*

48.     Just as fundamental in an MBS securitization as the Covered Trusts possessing

documentation evidencing the Trusts' ownership interest in the Mortgage Loans is the quality of

the Mortgage Loans to which the Covered Trusts purportedly receive title.  For that reason, the Governing Agreements contain "representations and warranties" attesting to the characteristics of the borrower and collateral for the Mortgage Loans conveyed to the Covered Trusts, and that the loans were made in accordance with their underwriting criteria.  Ratings agencies assess the quality of the MBS based on those representations and warranties, and notably, the ratings agencies must be informed in the event of their breach.

49.    The Governing Agreements therefore require the Seller to cure, substitute, or repurchase any Mortgage Loans that materially breach the Seller's representations and warranties concerning the quality of the Mortgage Loans conveyed to the Covered Trusts. Significantly, they also require the Trustee, among others, to enforce that obligation of the Seller.

50.    The Servicer has the duty to enforce the Seller's respective obligations to cure, substitute or repurchase defective Mortgage Loans at any point that a breach of the Seller's representations and warranties concerning the Mortgage Loans set forth in the MLPA is "discovered" – including by the Trustee who must then give written notice to the Servicer and the Seller.  Particularly, as set forth in PSA Section 2.09 ("Representations and Warranties of the Seller Concerning the Mortgage Loans"):

> Upon discovery by [WAAC], the Servicer or the Trustee (in the case of the Trustee having actual knowledge thereof) of a breach of any of the representations set forth in Section 3.1 of the Mortgage Loan Purchase Agreement . . . that materially and adversely affects the value of the related Mortgage Loans or the interests of the Trust in the related Mortgage Loans, the party discovering such breach shall give prompt written notice to the others. . . .  The Servicer shall promptly notify the Seller of such breach and take appropriate steps on behalf of the Trust to enforce the Seller's obligation, pursuant to Section 3.3 of the Mortgage Loan Purchase Agreement, to cure such breach in all material respects or repurchase or substitute for the affected Mortgage Loan or Mortgage Loans or any property acquired in respect thereof . . . .

51.     Where the Servicer does not then act to require the Seller to cure or repurchase, an "event of default" occurs.   In this regard, PSA Section 7.01(a)(ii) provides that an event of default occurs upon:

> Failure on the part of the Servicer duly to observe or perform in any material respect any other of the covenants or agreements on the part of the Servicer contained in the Certificates or in this Agreement which continues unremedied for a period of 60 days after the date on which written notice of such failure, requiring the same to be remedied, shall have been given to the Servicer by the Trustee, or to the Servicer and the Trustee by the Holders of Certificates evidencing Percentage Interests aggregating not less than 25% of REMIC III.

52.     Pursuant to PSA Section 8.01(a), once an event of default has occurred, the Trustee then assumes the duty to use all his powers under the PSA and at law to protect the Trusts and MBS holders, as a prudent person would in operating his own affairs.   Where, however, the Trustee fails to provide the notice of breaches it discovers, it cannot rely on its own failure to provide notice to avoid the occurrence of an event of default.

B.     The Trustee's Duties And Obligations Under The TIA

53.     Under the TIA, a trustee must "give to the indenture security holders. . . notice of all defaults known to the trustee, within ninety days after the occurrence thereof. . . ."  15 U.S.C. §77ooo(b) (citing 15 U.S.C. §77mmm(c)).   Defendants consequently had to inform MBS holders of breaches of the Governing Agreements within ninety days after their occurrence.

54.     In case of "default," which is defined by reference to the "indenture," here the PSA, the TIA mandates that a trustee must exercise "such of the rights and powers vested in it by such indenture, and to use the same degree of care and skill in their exercise, as a prudent man would exercise or use under the circumstances in the conduct of his own affairs."  15 U.S.C. §77ooo(c).

55.     In addition, the TIA provides that a trustee may not relieve itself from liability for its own negligent action, its own negligent failure to act, or its own willful misconduct.  15 U.S.C. §77ooo(d).

56.     As set forth below, Defendants are liable to Plaintiffs and Class members for failing to exercise their rights and powers under the Governing Agreements and the TIA.

## III.   Defendants Discovered That The Mortgage Loans In The Covered Trusts Were Materially Misrepresented

### A.   <u>Serious Defects Plague WaMu MBS Securitizations</u>

57.     The MLPAs, which are incorporated into and made part of the Governing Agreements for the Covered Trusts, contain significant representations and warranties by the Seller concerning title to the loans, the characteristics of the borrowers and collateral for the Mortgage Loans, and the credit criteria and underwriting practices for the origination of the loans.  For example, Article 3 of the MLPA for the WMALT Series 2006-5 Trust contains the following representations of the Seller:

> (i)     The information set forth in the Mortgage Loan Schedule delivered on the Closing Date was true and correct in all material respects at the date or dates respecting which such information is furnished;

> (ii)    [E]ach Mortgage relating to a Mortgage Loan . . . is a valid and enforceable . . . first lien on an unencumbered estate . . .;

> ***

> (iii)   Immediately upon the transfer and assignment contemplated herein, the Purchaser shall have good title to, and will be the sole legal owner of, each Mortgage Loan, free and clear of any encumbrance or lien (other than the lien under this Agreement);

> ***

> (vii)   Each Mortgage Loan at the time it was made complied with all applicable local, state and federal laws, including, without limitation, usury, equal credit opportunity,

disclosure and recording laws, and predatory and abusive lending laws applicable to the originating lender;

\*\*\*

(xvi) As of the Closing Date, each Mortgage and Mortgage Note is the legal, valid and binding obligation of the maker thereof and is enforceable in accordance with its terms, except only as such enforceability may be limited by laws affecting the enforcement of creditors' rights generally and principles of equity;

\*\*\*

(xix) Prior to origination or refinancing, an appraisal of each Mortgaged Property was made by an appraiser on a form satisfactory to Fannie Mae or Freddie Mac;

(xx) The Mortgage Loans have been underwritten substantially in accordance with the applicable Underwriting Standards[, which are defined as "the published underwriting standards of the Seller, or, if such Mortgage Loan was underwritten pursuant to underwriting standards other than the published underwriting standards of the Seller, then such other underwriting standards];

\*\*\*

(xxii) The Seller used no adverse selection procedures in selecting the Mortgage Loans from among the outstanding mortgage loans of the same type originated or purchased by it which were available for sale to the Purchaser and as to which the representations and warranties in this Section 3.1 could be made; and

\*\*\*

(xxix) No Mortgage Loan has a Closing Date Loan-to-Value ratio greater than 100%.

58. Defendants have "discovered" ample evidence that the foregoing representations and warranties were untrue. Among other things, each month, the Trustees published monthly reports, that were publicly filed with the SEC on Form 10-D, outlining the credit performance of

the Mortgage Loans in the Covered Trusts.  By about March and April 2008, the first harbingers of the violations of the representations and warranties regarding the credit quality of the Mortgage Loans started to appear.  The Trustees' monthly reports started to show increases in the trends of loan delinquencies, and by June and July 2008 these trends had become pronounced.  At the same time, the ratings agencies began to re-rate certain of the Trusts' certificates, and WaMu began reporting severe losses in the credit performance of the Mortgage Loans it had originated and held on its own books.

59.    The increasing delinquencies and credit losses in the Covered Trusts and accompanying ratings downgrades coincided with a steady stream of public disclosures regarding WaMu's systemic underwriting abuses.  In this regard, in November 2007 news reports of WaMu's underwriting abuses began to circulate, and intensified over the following nine months.  In May 2008 WaMu was sued for securities fraud in connection with its statements about its own mortgage loan credit losses, and on August 1, 2008, the first in a series of misrepresentation lawsuits brought under the Securities Act for misrepresentations in the offering documents for WaMu's MBS was filed.  On September 25, 2008 the FDIC seized WaMu and, pursuant to a Purchase and Assumption ("P&A") agreement signed that same day, sold to JPMC WaMu's banking operations, in a "whole bank" sales transaction.

60.    A series of well-publicized public and private investigations have confirmed that WaMu systemically violated both legal requirements and its own underwriting guidelines for the origination and transfer of its mortgage loans, including those which it securitized.  Indeed, according to the Majority and Minority Staff Report of the Permanent Subcommittee on Investigations of the U.S. Senate's Committee on Homeland Security and Government Affairs (the "Senate Staff Report"), WaMu "polluted the financial system with mortgage backed

securities which later incurred high rates of delinquency and loss." *Id.* at 116.  In addition, the Senate Staff Report found that WaMu "securitized loans that it had identified as likely to go delinquent, without disclosing its analysis to investors to whom it sold the securities, and also securitized loans tainted by fraudulent information, without notifying purchasers of the fraud that was discovered and known to the bank." *Id.*

61.    Indeed, the Senate Staff Report found that WaMu was "repeatedly criticized by the bank's internal auditors and reviewers, as well as its regulators, OTS and the FDIC, for deficient lending and securitization practices." *Id.* at 122.  According to the Senate Staff Report, WaMu's "mortgage backed securities were among the worst performing in the marketplace due to poor quality loans that incurred early payment defaults, fraud, and high delinquency rates." *Id.*  Further, according to the Senate Staff Report, WaMu securitized not just poor quality loans, but also loans that its own personnel had flagged as containing fraudulent information.

62.    Investigations of these matters began as early as 2007.  In November 2007, in a suit filed against eAppraiseIT LLC and its parent, title insurance company First American Corp. ("First American"), the N.Y. Attorney General alleged that First American was pressured by WaMu to inflate home values in appraisals.  The following week, the Wall Street Journal disclosed that the SEC had opened an inquiry into whether WaMu had accurately disclosed to buyers of its MBS how its loans were appraised.

63.    More specifically, in recently concluded litigation against WAAC, WCC and certain of their officers, including David Beck, involving three of the Covered Trusts at issue in this case, the plaintiffs presented evidence based on a re-underwriting of a statistically significant sample of loans in the Covered Trusts that nearly 40% of the loans in the Covered Trusts at issue in that action violated the underwriting guidelines in place at the time of origination.  *See In re*

*Washington Mut. Mortgage Backed Sec. Litig.*, No. C09-37 MJP, 2012 WL 2995046, at *4 (W.D. Wash. July 23, 2012).   These findings were consistent with an internal WaMu review in February 2007 obtained in discovery in that action, which concluded that only 40 to 60 percent of loans originated had been underwritten on a satisfactory basis.  *Id*.  Other evidence describing a systematic loosening of the credit criteria and underwriting practices leading to large numbers of fraudulent or "liar loans" was also outlined in the court's opinion in that case denying defendants' motion for summary judgment and is incorporated herein.  The deposition testimony of David Beck reflects that as head of the Capital Markets division in WaMu Home Loans, he sat on the credit committee responsible for underwriting standards, priced the mortgage loans that were pooled into the securitizations, signed offering documents on behalf of WAAC and, later, reviewed the mortgage loans for repurchase.

B.   The Covered Trusts Have Experienced Significant Losses

64.   The Covered Trusts have performed very poorly, reporting tens or even hundreds of millions of dollars in recognized losses to date and staggering delinquency rates, some as high as nearly 50%, indicating that substantial additional realized losses are likely.  For example, (a) WaMu 2006-AR6 has recognized losses of almost $21 million and many delinquent loans, including over 11% of its remaining loans delinquent for more than 90 days; (b) WaMu 2006-AR8 has recognized losses of over $67 million and many delinquent loans, including over 15% of its remaining loans delinquent for more than 90 days; (c) WaMu 2006-AR9 has recognized losses of over $150 million and many delinquent loans, including over 24% of its remaining loans delinquent for more than 90 days; (d)  WaMu 2006-AR10 has recognized losses of more than $78 million and many delinquent loans, including over 11% of its remaining loans delinquent for more than 90 days; (e) WaMu 2006-AR11 has recognized losses of more than

$215 million and many delinquent loans, including over 23% of its remaining loans delinquent for more than 90 days; (f) WaMu 2006-AR12 has recognized losses of more than $109 million and many delinquent loans, including almost 17% of its remaining loans delinquent for more than 90 days; (g) WaMu 2006-AR14 has recognized losses of more than $115 million and many delinquent loans, including over 14% of its remaining loans delinquent for more than 90 days; (h) WaMu 2006-AR16 has recognized losses of over $98 million and many delinquent loans, including almost 16% of its remaining loans delinquent for more than 90 days; (i) WaMu 2006-AR18 has recognized losses of almost $110 million and many delinquent loans, including over 16% of its remaining loans delinquent for more than 90 days; (j) WaMu 2007-HY1 has recognized losses of more than $252 million and many delinquent loans, including almost 16% of its remaining loans delinquent for more than 90 days; (k) WaMu 2007-HY2 has recognized losses of over $252 million and many delinquent loans, including almost 14% of its remaining loans delinquent for more than 90 days; (l) WaMu 2007-HY3 has recognized losses of almost $210 million and many delinquent loans, including over 14% of its remaining loans delinquent for more than 90 days; (m) WaMu 2007-HY4 has recognized losses of over $133 million and many delinquent loans, including over 18% of its remaining loans delinquent for more than 90 days; (n) WaMu 2007-HY6 has recognized losses of more than $280 million and many delinquent loans, including over 17% of its remaining loans delinquent for more than 90 days; (o) WaMu 2007-HY7 has recognized losses of more than $298 million and many delinquent loans, including almost 18% of its remaining loans delinquent for more than 90 days; (p) WMALT 2006-5 has recognized losses of more than $207 million and many delinquent loans, including almost 25% of its remaining loans delinquent for more than 90 days; (q) WMALT 2006-AR2 has recognized losses of more than $219 million and many delinquent loans,

including over 21% of its remaining loans delinquent for more than 90 days; (r) WMALT 2006-AR5 has recognized losses of more than $296 million and many delinquent loans, including 35% of its remaining loans delinquent for more than 90 days; and (s) WMALT 2006-AR6 has recognized losses of more than $202 million and many delinquent loans, including over 32% of its remaining loans delinquent for more than 90 days.

65.     These high losses and delinquency rates, which were tracked in the monthly reports that Defendants published, indicate that many of the underlying Mortgage Loans in the Covered Trusts are not of the quality that WaMu represented and warranted.  Those reports show that aberrantly high delinquency trends for the Covered Trusts began to appear in about March and April 2008, and sharply accelerated by about June and July 2008.  Re-rating of certain tranches of MBS in the Covered Trusts also began about this time, and by June and July 2008, rating downgrades of the Covered Trusts' MBS were widespread.  Indeed, these loan performance issues coincided with the widely reported public evidence discussed above detailing systemically poor underwriting used to originate WaMu's Mortgage Loans conveyed to WaMu MBS Trusts.

66.     Nonetheless, Defendants failed to provide the required notice to the Servicer and Seller, and have, to this day, failed, to take any other action to enforce WaMu's obligation to cure, substitute or repurchase defective Mortgage Loans.  Even with public reports that another Trustee for other WaMu Trusts, Deutsche Bank, had acted to demand loan files and to put back defective loans, filed a protective claim with the FDIC receivership and sued the FDIC and JPMC, the Defendant Trustees in this case continued to do nothing to protect the Trusts or MBS holders.  In light of Deutsche Bank's experience, it is clear that had the Defendants given the Servicer the required notice when, in the first half of 2008, Defendants began to discover that the

publicly reported and systemic WaMu loan origination abuses had affected the credit performance of Mortgage Loans in the Covered Trusts, that WaMu and its affiliates, as Servicer and Seller, would not have cured the violations, and an "event of default" would have occurred – which is to say that, under well-established law, Defendants cannot stand behind their own failure to give notice as a defense to their duty to act prudently to protect the Trusts and MBS holders.

C.   Incomplete Documentation Has Delayed Or Precluded Foreclosure Of Delinquent Loans

67.   In addition to overwhelming evidence of widespread breaches of representations and warranties concerning the poor credit quality of the Mortgage Loans conveyed to the WaMu MBS Trusts, there is also substantial evidence of widespread deficiencies in Mortgage Files for the Mortgage Loans purportedly conveyed to the Trusts.

68.   MBS Trusts similar to those at issue here have been unable to foreclose on Mortgages due to irregularities in the chain of title. Defendants are well aware of this problem as they have served as Trustee of certain of these MBS Trusts. For example, in *Frost v. LaSalle Bank, N.A.*, No. 4D09-2668, 2010 WL 2862149 (Fla. App., 4th Dist. May 24, 2010), the plaintiff urged the court to reverse a previously entered order granting summary judgment in LaSalle's favor in a foreclosure action on the grounds that there was no proof LaSalle held the mortgage note with a valid endorsement on the date it brought the foreclosure action. After the plaintiff filed a brief detailing numerous inconsistencies in the documentation that had been submitted to the Court, LaSalle Bank, as Trustee for a WaMu MBS trust, confessed error and agreed to vacate the final judgment of foreclosure that had been entered. Similarly, in *Naranjo v. SBMC Mortgage*, No. 11–cv–2229–L(WVG), 2012 WL 303370 (S.D. Cal. July 24, 2012), the court declined U.S. Bank's motion to dismiss plaintiff's claims that the purported assignment of her

mortgage loan into a WaMu Trust was not completed by the date required by the Trust Agreement and, therefore, a subsequent assignment, substitution, and notice of default and election to sell was improper.

69.     Further, the Congressional Oversight Panel, which was established as part of the Emergency Economic Stabilization Act of 2008, issued a Report entitled "Examining the Consequences of Mortgage Irregularities for Financial Stability and Foreclosure."  It recounts widespread foreclosure abuses over the last several years – often in connection with mortgages that have been securitized – and the numerous Federal and State investigations that have detailed this problem.  Many of those abuses, such as forged or back-dated mortgage assignments, or the "robo-signing" of false affidavits used in foreclosure actions, arise from failures in the process of documenting and transferring Mortgage Loans from the originators, to the interim entities in the securitization process, and ultimately into the securitization trusts.  As the Report explains, irregularities in the chain of title between the originator and the Trust can have significant legal consequences that damage the Trusts and MBS holders.  These irregularities preclude or delay collection causing the severity of the Trusts' losses to increase.

70.     Every county in the country maintains records of who owns land within its borders, of transfers of ownership in real property, and of related mortgages or deeds of trust.  In order to protect ownership interests, take clear title to property, and adjust claims among competing creditors filing liens against the property, fully executed, original documents must be recorded in a county recording office, establishing the source and timing of a person's ownership interests in that property.  These documents must include a description of both the property and the parties that transfer the property.

71.     When an individual purchases a home using a Mortgage Loan, at least the following documents are created: (i) a promissory note establishing the mortgagor's personal liability ("Mortgage Note"); (ii) a mortgage evidencing the lender's interest in the underlying collateral ("Mortgage" or "Deed of Trust"); and (iii) if the mortgage is transferred, proper assignments of the Mortgage Note and the Mortgage.  Without the Mortgage Note, a Mortgage secures no debt, while without the Mortgage, the Mortgage Note is simply an unsecured debt obligation.

72.     As a general matter, there are several methods in which a Mortgage Note can be transferred, including: (i) via a contract and sale, which is governed by the common law of contracts; or (ii) if a Mortgage Note is considered a negotiable instrument (which is not clear as a matter of law), it could be negotiated via Article 3 of the Uniform Commercial Code ("UCC") – Article 3 requires endorsement and the physical delivery of the note.  However, under Delaware law, which applies to the Covered Trusts, the agreement that governs a transfer of debt can establish heightened requirements that must be complied with in order to affect the transfer.  As discussed above, the Governing Agreements dictate the terms of the transfer of the Mortgage Loans (including the Mortgage Note) from the Depositor to the Trustee; and the MLPA governs their transfer from the Seller to the Depositor.  These agreements purport to treat Mortgage Notes as negotiable instruments, but also impose heightened requirements that must be satisfied to complete their transfer.  The Mortgage itself is a transfer of an interest in real property, and must be assigned and recorded in accordance with the law of the place where the property is located.  States generally require a signed writing in order to transfer an interest in real property.

73.     If the Mortgage Note and Mortgage are not properly transferred to the Trust, then the Trust cannot foreclose on a borrower that falls into default.  This is because only the person

who (currently) holds both documents has standing to enforce the Mortgage in a foreclosure action.  It is therefore significant that a number of Courts have refused to recognize written assignments of the individual notes or Mortgages to a securitization trust that occur only after a foreclosure proceeding has begun.

74.     Additionally, if the transfer of a Mortgage is not recorded with the proper county authority, the holder of the Mortgage may then lose its place as the first lienholder on the underlying property.  This means that if there are junior mortgagees or other creditors who have properly recorded their liens, they will have the right to payment from a sale of the underlying property before the Trust can recover from the foreclosure sale.  As such, even if a note is properly transferred, it has value only if the corresponding Mortgage has been properly recorded.

75.     Moreover, as the Congressional Oversight Report describes, several other states have acted to prohibit, or limit, the foreclosure of Mortgages with irregularities that are similar to the irregularities in Mortgage Loans underlying the Covered Trusts:

- In New York, the court system now requires that those initiating residential foreclosure actions must file a new affirmation to certify that an appropriate employee has personally reviewed the documents and papers filed in the case and confirmed both the factual accuracy of these court filings and the accuracy of the notarizations contained therein.

- In California, a non-judicial foreclosure state, the attorney general sent a letter to JPMorgan Chase demanding that the firm stop all foreclosures unless it could demonstrate that all foreclosures had been conducted in accordance with California law.  The attorney general also called on all other lenders to halt foreclosures unless they can demonstrate compliance with California law.

- In Arizona, which is also a non-judicial foreclosure state, the attorney general sent letters to several servicers implicated in the robo-signing scandals to demand a description of their practices and any remedial actions taken to address potential paperwork irregularities.  The attorney general wrote that if any employees or agents used any of the questionable practices in connection with conducting a trustee's sale or a foreclosure in Arizona, such use would likely constitute a violation of the Arizona Consumer Fraud Act, and the attorney general would have to take appropriate action.

- In Ohio, in addition to his lawsuit against GMAC, the attorney general filed an *amicus curiae* brief in an individual foreclosure case asking the court to consider evidence that GMAC committed fraud that tainted the entire judicial process and to consider sanctioning GMAC.  The attorney general also sent a letter to 133 Ohio judges asking them for information on any cases involving the robo-signer Xee Moua.  In addition, he asked Wells Fargo Bank to vacate any foreclosure judgments in Ohio based on documents that were signed by robo-signers and to stop the sales of repossessed properties.

- In The District of Columbia, Attorney General Peter Nickles announced that foreclosures cannot proceed in the District of Columbia unless a mortgage deed and all assignments of the deed are recorded in public land records, and that foreclosures relying on MERS would not satisfy the requirement.  MERS responded the next day by issuing a statement that their procedures conform to the laws of the District of Columbia and encouraged their members to contact them if they experience problems with their foreclosures.

- In Connecticut, the attorney general started investigating GMAC/Ally and demanded that the company halt all foreclosures.  He also asked the company to provide specific information relating to its foreclosure practices.  In addition, the attorney general asked the state Judicial Department to freeze all home foreclosures for 60 days to allow time to institute measures to assure the integrity of document filings.  The Judicial Department refused this request.

76.     Similarly, as a result of a report by New Jersey Legal Services to the New Jersey Supreme Court documenting irregularities in foreclosure proceedings – which was supported by extensive depositions and documentary evidence, including from lawyers and other participants in the foreclosure of securitized loans – New Jersey issued an Administrative Order amending its Court rules, provided a warning to the foreclosure Bar and issued an order to show cause to the major servicers of securitized Mortgage Loans.  This report explained that many of the foreclosure abuses, such as robo-signing and the use of false affidavits, occurred to compensate for legal defects in the chain of assignments of securitized Mortgage Loans to their Trusts, and generally arose as the securitization participants cut corners to save costs.  As the report explained:

A foreclosing plaintiff must show (1) that it holds the note, and (2) that the mortgage was either made to it or assigned to it in writing.  N.J.S.A. 46:9-9. ***Lenders no longer routinely execute or record Assignments of Mortgage when a loan is transferred because they regard it as unnecessary unless there is a default and too costly and time consuming to do in every case.***  See Exhibit Q in which a foreclosure attorney explains in a submission to the Court that; "The assignee performs its due diligence, bulk transfer agreements are executed, money is wired, and on a date certain the proverbial 'switch is flipped' wherein the assignee takes over regardless of the execution of a formal, legal assignment for each and every loan.  By way of example, one large national mortgage servicer recently purchased 1.3 million loans from another large servicer.  Even if it took one minute per assignment to execute (which itself is a stretch) it would take over ten years to execute all the resulting assignments is [sic] same were executed at the rate of 40 hours per week."  ***So typically at the time the lender makes a decision to foreclose it is not the record mortgagee.  To correct that defect, the attorney for the foreclosing mortgagee or the servicer of the loan will create an Assignment of Mortgage for the purposes of litigation which is in turn signed by a robo-signer.  Documents recorded with a public official are self executing and have special evidential status and therefore are especially pernicious. Usually the assignment purports not only to assign the mortgage but also the note or underlying obligation.  The assignment of the note nearly always contradicts other documents which indicate that the note was transferred at different times and in different manners or not at all.***

(Emphasis added).

77.     One of the flawed practices for assigning mortgages cited by the New Jersey Legal Services report was where assignments appeared to have been executed and notarized in blank – a practice that appears to have been common for the transfer into the Covered Trusts.

78.     Likewise, a joint report entitled "Interagency Review of Foreclosure Policies and Practices" issued by the Federal Reserve, the FDIC, the Office of Thrift Supervision and the Office of the Comptroller further confirmed these abuses.  In the report, the regulators stated: "The Federal Reserve System, the Office of the Comptroller of the Currency (OCC), the Federal Deposit Insurance Corporation (FDIC), and the Office of Thrift Supervision (OTS), referred to as the agencies, conducted on-site reviews of foreclosure processing at 14 federally regulated mortgage servicers during the fourth quarter of 2010."  Significantly, in the report, the regulators

stated that its review of the mortgage servicers' loan files showed that there may be "***disputes over note ownership or authority to foreclose***." Report, at 6 (emphasis added). The regulators also noted "***concerns about the prevalence of irregularities in the documentation of ownership [that] may cause uncertainty for investors of securitized mortgages***." *Id.* (emphasis added).

79. Even more recently, an audit performed at the direction of the City and County of San Francisco's Office of the Assessor-Recorder, found that a majority of the Mortgage Loans examined had one or more of the following issues with respect to assignments:

- Two or more conflicting, recorded assignments of the Deed of Trust purporting to transfer ownership of the Deed of Trust to two or more separate entities, thereby undermining the legal validity of either assignment;

- Contradictions between documents filed in the County Recorder's Office and federal securities filings in connection with securitization transactions concerning who is the true, current owner of the loans;

- Assignments improperly executed by an employee of the Servicer or Trustee rather than the original or prior owner of the loan; and

- Assignments with respect to which the assignee also signed as assignor.

80. In the latter two cases, the audit stated that it was likely that "the chain of title to such loans ha[d] been broken and the written transfers from the original owners . . . d[id] not exist."

81. On September 29, 2010, the various investigations of foreclosure abuses including "robo-signing" led JPMC to suspend 56,000 foreclosures in the 23 states. On October 13, 2010 JPMC expanded its mortgage foreclosure suspensions to 41 states, and reported that the attorneys general of all 50 states were launching a joint investigation into its mortgage foreclosures. On April 13, 2011 JPMC entered into a consent cease and desist order with the OCC. By that order, the OCC found, *inter alia*, that JPMC had "litigated foreclosure proceedings and initiated non-judicial foreclosure proceedings without always ensuring that either the promissory note or the

mortgage document were properly endorsed or assigned and, if necessary, in the possession of the appropriate party at the appropriate time."

82.     LaSalle initially "found" deficiencies such as those described above in the Mortgage Files for the Mortgage Loans purportedly conveyed to the Covered Trusts when, at the Trusts' inception, it reviewed, or caused its agent to review, the Mortgage Files and lists of loan exceptions were prepared.   In a proof of claim filed with the FDIC as receiver for WaMu, Deutsche Bank as Trustee for 99 other WaMu MBS trusts, represented that, on an ongoing basis, WaMu had been provided with voluminous document exception reports with respect to missing or defective mortgage file documents with respect to Mortgage Loans in the trusts which had not been cured.   Given WaMu's well-documented, systemic loan origination and securitization abuses, there is every reason to believe that voluminous exception reports documenting Mortgage File deficiencies similar to those cited by Deutsche Bank were also provided to WaMu with respect to the Covered Trusts and that these deficiencies similarly went uncured.   BOA and U.S Bank "found" these deficient Mortgage Files when LaSalle and BOA, respectively, delivered "all Mortgage Files, related documents, statements and other property" to them as successor Trustees as required by PSA Section 8.08.

## IV.     Defendants Failed To Discharge Their Critical Duties

83.     Despite the Covered Trusts' high default rates and poor performance, and knowledge that this performance was likely attributable to the widespread public reports of WaMu's underwriting abuses, Defendants failed to perform critical duties necessary to protect the Covered Trusts, Plaintiffs and Class members.

Trusts' Repurchase Rights

84.     As set forth above, Defendants discovered the deficiencies in Mortgage Files, the breaches of WAAC's and the Seller's representations and warranties regarding the credit quality of the loans, and the harm that this has caused the MBS holders, from, among other things:

- reviewing the Mortgage Loan Files, preparing the initial certifications for the loan transfers and the loan exception reports, and/or from their attempts to foreclose on Mortgage Loans;

- the increase in the trends in Mortgage Loan delinquencies in the Covered Trusts during 2008, which indicated that the quality of the loans was less than represented and warranted.  This was reinforced as the credit ratings of the tranches were downgraded;

- press reports of a November 2007 complaint filed by the N.Y. Attorney General challenging WaMu appraisal practices, and later reports of wide-ranging mortgage loan underwriting abuses;

- WaMu earnings announcements reporting high credit losses on mortgage loans in WaMu's own portfolio, and the Bank's seizure by the FDIC in September 2008;

- securities fraud and misrepresentation complaints that began to be filed against WaMu in May 2008 in connection with misrepresentations regarding the origination practices for mortgage loans on its own books; and

- the August 26, 2009, complaint filed by Deutsche Bank, as Trustee for other MBS Trusts.

85.     Despite all of that, Defendants failed to provide notice to the Servicer and/or Seller and to take any action to protect the MBS holders, as they were required to do.   In particular, as explained more fully below, they did not sue to enforce the Covered Trusts' rights to have the Seller repurchase Mortgage Loans or notify MBS holders of the many defaulted obligations.

86.     Defendants breached their contractual duties under the Governing Agreements, and were negligent, by failing to demand that Mortgage File documentation exceptions identified on exception reports were cured, and then, when they were not, to sue to enforce the Trusts' repurchase rights.

87.     Likewise, Defendants are also liable for failing to exercise their powers under the Governing Agreements, where, as here, they had discovered wide-ranging breaches of representations and warranties about the quality and underwriting of the Mortgage Loans conveyed to the Covered Trusts.  Defendants have had notice that WaMu systemically violated its underwriting requirements from several sources and that those practices had, in particular, affected the Mortgage Loans in the Covered Trusts.  This was readily apparent from the monthly loan performance reports that the Defendant Trustees themselves published and which reflected sharply escalating trends in delinquencies and defaulted mortgages in the Covered Trusts. Nonetheless, the Servicer for the WaMu Covered Trusts, first an affiliate of WaMu and later of JPMC, did not act to put back the defective Mortgage Loans to the Seller.  Defendants have attempted to hide behind their own negligence, or failure to provide the technical notice of default which, under the literal language of the PSA, would have otherwise required them as Trustees to exercise additional powers as would a "prudent person" to fully protect MBS holders. Indeed, Defendants have not even provided notice of the defaults to MBS holders as required under the Governing Agreements, so that they could take steps to protect their own interests. Under well-established law, the failure to perform a pre-condition to a contract obligation cannot be used by the Defendant Trustees as a defense to their breach of contract.

88.     For example, pursuant to PSA Section 2.09, Defendants, as Trustees for the Covered Trusts, were required to give notice when they discovered breaches of representations and warranties regarding the credit quality of the Mortgage Loans, which began in the first half of 2008.  It is apparent from the experience of Deutsche Bank acting as Trustee for other WaMu MBS Trusts, and the fact that senior officers of WaMu Home Loans were well aware of the systemic breaches of representations and warranties in the Covered Trusts, that had the

Defendants in this case given the required notice, that the Servicer who was operated by the same people as the Seller, would not have acted to put back the defective loans, and that the Seller would not have repurchased the defective loans. In other words, even if Defendants had given notice as required, an "Event of Default" would have nonetheless occurred. Alternatively, the Servicer may itself have been deemed to "discover" the breaches of representations and warranties upon receiving the monthly reports published by the Trustee of the Trusts' spiking delinquencies and losses, so that an additional "notice" was not required for there to have been an "event of default" triggering Defendants' fuller obligations to protect the Trusts.

89.     That the failure by the Trustees to provide the technical notice provided under Section 2.09 does not prevent an "event of default" from occurring is further demonstrated by the practical futility of giving such a notice. Here, the originator of most of the Mortgage Loans in the Covered Trusts, the Seller or Sponsor of the Trusts and the Servicer were all affiliates being operated under the auspices of WaMu's Home Loans group. The affiliates shared many of the same officers, employees and directors. Thus, *e.g.*, David Beck was head of WaMu Capital Markets division within WaMu Home Loans group, Beck was paid his salary by WaMu, was a director and executive officer of WAAC and then worked closely with the affiliate that serviced the Mortgage Loans to process repurchase requests.

90.     As set forth above, pursuant to the language of the PSAs, an "Event of Default" triggers the Trustee's prudent person duties, including the duty to enforce repurchase claims against the Seller. (PSA Section 8.01(a)). Under well-established law, the Defendants in this case cannot evade their prudent person obligations through negligence, or by failing to satisfy the pre-condition to their performance – *i.e.*, by failing to provide the Section 2.09 notice once they discovered the breaches of representations and warranties.

91.   Deutsche Bank, for example, another trustee of WaMu MBS trusts not at issue here, has sought to enforce its contractual rights under the PSAs, including the right to access the full loan origination files and protect and enforce put back rights.   On December 30, 2008, following the FDIC's seizure of WaMu, Deutsche Bank, as trustee for 99 WaMu MBS trusts, filed a proof of claim with the FDIC, as receiver, on behalf of the trusts asserting that WaMu had breached the representations and warranties it had made to certificate holders regarding the mortgage loans in the trusts.   As support, Deutsche Bank cited a December 27, 2008, New York Times article titled "Saying Yes, WaMu Built Empire On Shaky Loans," which detailed abuses in WaMu's loan origination procedures.   The proof of claim also revealed that in violation of the access rights provided by the PSAs, WaMu had consistently refused the trustee access to the origination loan files to identify particular loans in the trusts that had breached particular representations and warranties.

92.   Thereafter, in August 2009, Deutsche Bank filed suit against the FDIC, as receiver for WaMu, asserting claims for breach of contract and declaratory judgment.   Deutsche Bank alleged that WaMu had breached its representations and warranties with respect to mortgage loans in the trusts, and the substantial levels of delinquencies and realized losses in the trusts.   An amended complaint filed in 2010 cited the record of the Senate Investigation and added JPMC as a defendant when the FDIC asserted that it had transferred WaMu's business, and its assets and liabilities, to JPMC in a "whole bank" sales transaction.

93.   WaMu was seized by the FDIC on September 25, 2008 and immediately sold to JPMC.   The deadline for filing claims with the FDIC as receiver for WaMu was December 30, 2008.   Although, by this time there had long been widespread reports of WaMu's shoddy origination practices by the press and in Company SEC filings and lawsuits, and the likely

breaches of its representations and warranties for the Mortgage Loans in the Covered Trusts had long been apparent to BOA from its monthly reports of their credit performance, BOA failed to file a claim with the FDIC by the deadline.  U.S. Bank, after it became Trustee, made no effort to invoke the FDIC's discretionary procedures for considering late-filed claims.  Neither BOA nor U.S. Bank has sued either the FDIC or JPMC, as successor – even though reports that Deutsche Bank had done so were widely reported in the press.

94.     With all this information, BOA and U.S. Bank sat on their hands, apparently believing that so long as they turned a blind eye to facts they were confronted with and refrained from sending out the required notices under Section 2.09, they had no duty to act to protect the Trusts from the enormous losses that they were incurring.  Having "discovered" the truth, however, both BOA and U.S. Bank were charged with the full "prudent person" duties that arise under the PSAs and TIA regardless of their self-interested failure to give the precipitating notice. Here, a prudent trustee would have commenced suit against both the FDIC and JPMC – as Deutsche Bank did.

95.     The failure by Defendants to act to enforce the Trustee's clear and unequivocal authority to pursue the Covered Trusts' repurchase rights left certificate holders without any effective means to protect their interests and enforce the Covered Trusts' rights against the Servicer and the Seller.  Certificate holders are barred from bringing any action against the Servicer or Seller to enforce repurchase claims unless they hold or can muster the requisite 25% interest required by the no action clause in the PSA, a task made even more difficult by Defendants' failure to give notice of the Servicer's numerous failures to comply with its contractual obligations to certificate holders and the ratings agencies as required by the TIA and the Governing Agreements.

## V.  Defendants Are Responsible To MBS Holders For The Credit Losses In The Trusts

96.    Defendants' failure to enforce the Covered Trusts' repurchase rights, and their violations of their other contractual and statutory duties, along with their negligence in performing and failing to perform these duties, have caused the MBS holders to suffer millions of dollars in losses.  Both the poor credit quality of the Mortgage Loans and the significant documentation deficiencies in the Mortgage Loan Files which have delayed foreclosures, contributing to delinquencies in the payments owed to the Covered Trusts, and increasing the severity of the Trusts' losses, have led to re-rating of the MBS and a decline in the value and prices of the WaMu MBS purchased by Plaintiffs and the Class.  In addition, these defects have led to defaults in the principal and interest payments owed to members of the class who continued to hold the MBS.

## VI.  MBS Holders May Sue Defendants As Trustee

97.    The Governing Agreements provide certain limitations on the rights of MBS holders, which are not, however, applicable to this lawsuit.  More specifically, PSA Section 10.03 purports to limit the right of MBS holders to bring a lawsuit relating to the Governing Agreements "unless such Holder previously shall have given the Trustee a written notice of default and of the continuance thereof, as hereinbefore provided, and unless also the Holders of certificates evidencing Percentage Interests aggregating not less than 25% of REMIC III shall have made written request upon the Trustee to institute such action, suit or proceeding in its own name as Trustee hereunder and shall have offered to the institution acting as Trustee, both in its individual capacity and as Trustee, such reasonable indemnity as it may require against the costs, expenses and liabilities to be incurred therein or thereby, and the Trustee, for 60 days after its

receipt of such notice, request and offer of indemnity, shall have neglected or refused to institute any such action, suit or proceeding."

98.     However, PSA Section 10.03 is not applicable to this lawsuit because, under the TIA and Delaware law, "no action" clauses do not apply to actions by MBS holders against Trustees for their own wrongdoing.   This is not a situation where the MBS holders are demanding that Defendants initiate a suit in their own name to enforce the rights and obligations under the Governing Agreements.   Rather, this is an instance where the MBS holders are bringing an action *against* Defendants for breaching their statutory and contractual obligations under the Governing Agreements, and for acting with gross negligence when performing these duties.   Because this is not an "action, suit or proceeding" that Defendants are capable of bringing in their own name as Trustee under the Governing Agreements, PSA Section 10.03 does not apply and does not bar Plaintiffs from proceeding with this lawsuit.

99.     Further, PSA Section 8.01(c) states that "[n]o provision of this Agreement shall be construed to relieve the Trustee . . . from liability for its own negligent action, its own negligent failure to act or its own willful misconduct."   The TIA includes a similar bar.

## CLASS ACTION ALLEGATIONS

100.    Plaintiffs bring this class action on behalf of a class consisting of all current and former investors who acquired the WaMu MBS for the Covered Trusts,[3] for which Defendants

---

[3]     Pursuant to the Court's Order of December 7, 2012, unless granted permission to do otherwise, Plaintiffs will only seek to include in the Class current or former investors who invested in MBS that are collateralized by the same Groups that collateralize Plaintiffs' MBS, or in MBS that are collateralized by Groups that are cross-collateralized with Plaintiffs' MBS. This encompasses current or former investors who purchased MBS in at least the following groups: (1) WaMu 2006-AR6, Groups 1 & 2; (2) WaMu 2006-AR8, Group 1 & 2; (3) WaMu 2006-AR9, Groups 1 & 2; (4) WaMu 2006-AR10, Groups 1 & 2; (5) WaMu 2006-AR11, Groups 1 & 2; (6) WaMu 2006-AR12, Group 1 & 2; (7) WaMu 2006-AR13, Group 1 & 2; (8) WaMu 2006-AR14, Group 1; (9) WaMu 2006-AR16, Groups 1, 2 & 3; (10) WaMu 2006-AR17, Groups 1 & 2; (11)

served as Trustee, and suffered losses as a result of Defendants' misconduct alleged herein (the "Class"). Excluded from the Class are Defendants, WaMu, WAAC, other WaMu affiliates, and JPMC, any of its related entities or affiliates, their officers and directors, their legal representatives, successors or assigns and any entity in which Defendants, WaMu, WAAC, other WaMu affiliates, or JPMC has or had a controlling interest.

101.    The members of the Class are so numerous that joinder of all members is impractical. While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are hundreds of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Defendants, or by others in the MBS market, and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

102.    Plaintiffs' claims are typical of the claims of the members of the Class as they all purchased MBS based upon a Governing Agreement substantially in the form of Exhibit K, and Defendants' misconduct was substantially the same with respect to all persons investing in the Covered Trusts, causing all members to suffer similar harm as a result. Thus, all members of the

---

WaMu 2006-AR18, Groups 1 & 2; (12) WaMu 2006-AR19, Groups 1 & 2; (13) WaMu 2007-HY1, Groups 1, 2, 3, 4 & 5; (14) WaMu 2007-HY2, Groups 1, 2 & 3; (15) WaMu 2007-HY3, Groups 1, 2, 3 & 4; (16) WaMu 2007-HY4, Groups 1 & 2; (17) WaMu 2007-HY6, Groups 1 & 2; (18) WaMu 2007-HY7, Group 3; (19) WaMu 2007-OA3, Groups 1 & 2; (20) WaMu 2007-OA4, Groups 1 & 2; (21) WaMu 2007-OA5, Groups 1 & 2; (22) WMALT 2005-9, Groups 1, 2, 3, 4 & 5; (23) WMALT 2006-2, Groups 1, 2, 3, & 4; (24) WMALT 2006-5, Groups 1, 2 & 4; (25) WMALT 2006-AR3, Group 1; (26) WMALT 2006-AR5, Groups 1, 2, 3 & 4; (27) WMALT 2006-AR6, Groups 1 & 2; (28) WMALT 2006-AR9, Groups 1 & 2; (29) WMALT 2007-HY2, Groups 1, 2 and 3; and (30) WMALT 2007-OA3, Groups 3, 4 & 5. Additionally, WaMu 2005-AR15, WaMu 2005-AR17, WaMu 2005-AR19, WMALT 2006-AR1 and WMALT 2006-AR2 are each comprised of one pool of loans and does not have Groups.

Class are similarly affected by Defendants' statutory and contractual breaches, as well as their negligence in performing their statutory and contractual duties, that are complained of herein.

103.    Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and MBS litigation.

104.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

- whether Defendants breached their contractual duties to MBS holders under the Governing Agreements by failing to enforce the Covered Trusts repurchase rights with respect to Mortgage Loans with deficient Mortgage Files;

- whether Defendants breached their contractual duties to MBS holders under the Governing Agreements by failing to provide notice of breaches of representations and warranties upon their discovery, and by failing to act as a prudent person to protect the Trusts, including by failing to sue to enforce the Trusts' repurchase rights.

- whether Defendants violated the TIA by:

  o failing to provide notice to parties to the PSA and MBS holders of breaches of the Governing Agreements; and

  o after an event of default, failing to exercise their rights and powers under the Governing Agreements as a prudent person;

- whether Defendants were negligent when carrying out their duties and obligations under the Governing Agreements; and

- whether and to what extent members of the Class have suffered damages as a result of Defendants' breach of their statutory and contractual duties and the proper measure of damages.

105.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all Class members is impracticable.  There will be no difficulty in the management of this action as a class action.

## CAUSES OF ACTION

## FIRST CAUSE OF ACTION

### (Violation of the Trust Indenture Act of 1939, 53 Stat. 1171)

106.    Plaintiffs repeat and reallege each and every allegation set forth in the preceding paragraphs above as if fully set forth herein.

107.    Congress enacted the Trust Indenture Act of 1939 ("TIA"), 53 Stat. 1171, 15 U.S.C. §77aaa, *et seq.*, to ensure, among other things, that investors in certificates, bonds, and similar instruments have adequate rights against, and receive adequate performance from, the responsible trustees.  15 U.S.C. §77bbb.  The Covered Trusts' Governing Agreements are "indentures," and each of the Defendants is an "indenture trustee," within the meaning of the TIA.  15 U.S.C. §77ccc(7), (10).  Moreover, the TIA applies to and is deemed to be incorporated into the Governing Agreements, and the related MBS.  15 U.S.C. §77ddd(a)(1).  Defendants violated multiple provisions of the TIA.

108.    First, the TIA requires that Defendants inform MBS holders of breaches of the Governing Agreements within ninety days after their occurrence.  15 U.S.C. §77ooo(b) (citing 15 U.S.C. §77mmm(c)).  Here, there were numerous events of default, including the failure of the Seller and Depositor to cure defects in the Mortgage Files and/or to substitute conforming loans for the defective loans in the Covered Trusts, and the failure of the Servicer to enforce those repurchase obligations upon discovering breaches of representations and warranties relating to the credit quality of the Mortgage Loans in the Covered Trusts.  Given the great importance of those defaults to the MBS holders' interests, Defendants had no good faith reason for failing to provide notice of those defaults.  Accordingly, by failing to provide such notice, Defendants violated the TIA.

109.    Second, in case of default, the TIA requires that Defendants exercise their rights and powers under the Governing Agreements as a prudent person would, under those circumstances, in the conduct of his own affairs.  15 U.S.C. §77ooo(c).  Again, given the obvious importance of the defaults set forth in the preceding paragraph and herein, which impaired the rights of MBS holders to collect their full principal and interest and which reduced the value of the MBS, any prudent person under those circumstances would have exercised all of his rights to, among other things, obtain complete Mortgage Files, cure any defects in the Mortgage Files and/or substitute conforming loans, and to sue to require the repurchase of loans that breached their representations and warranties,   Indeed, with the number of delinquent and defaulting mortgages in the Covered Trusts increasing, as a result, *inter alia*, of such defects, and the ultimate seizure of WaMu and transfer of its business, assets and liabilities to JPMC, the MBS holders could have been protected from the resulting losses only through the Trustee's exercise of those rights – which were designed precisely to limit the number of delinquent and defaulting mortgages in the Covered Trusts.  By failing to exercise their rights in those circumstances, Defendants violated the TIA.

110.    Defendants are liable to Plaintiffs and the Class for damages incurred as a result of their violations of the TIA.

## SECOND CAUSE OF ACTION

### (Breach of Contract)

111.    Plaintiffs repeat and reallege each and every allegation set forth in the preceding paragraphs as if fully set forth herein.

112.    As set forth in detail above, the MBS incorporated the Governing Agreements, and the Governing Agreements as a matter of law incorporate the provisions of the TIA.  Under

these contracts, and at common law, Defendants owed the MBS holders a duty to perform certain acts, including, without limitation, to notify the Servicer of Mortgage File deficiencies where documents were missing, incomplete and defective, and of breaches of representations and warranties.

113.   Defendants' breach of their duties set forth in the Governing Agreements as described above, meant that the valuable repurchase rights of the Covered Trusts were not pursued.  These violations reduced collections on the Mortgage Loans in the Covered Trusts, and increased the severity of the Trusts' losses, diminished the MBS' value, and caused Plaintiffs' and the Class' losses, including on sales of MBS, that Defendants rather than MBS holders should bear.

114.   In addition, once parties to the PSA discovered the breaches of the representations and warranties in the PSA which went uncured, and an event of default occurred under the Governing Agreements, or a default occurred under the TIA, Defendants had the obligation to exercise all rights and powers vested in them by the Governing Agreements and at law, and to use the same degree of care and skill in their exercise as a prudent man would, under those circumstances, in the conduct of his own affairs.

115.   An "Event of Default" occurs under several situations defined in the Governing Agreements, including PSA Section 7.01(a)(ii):

> Failure on the part of the Servicer duly to observe or perform in any material respect any other of the covenants or agreements on the part of the Servicer contained in the Certificates or in this Agreement which continues unremedied for a period of 60 days after the date on which written notice of such failure, requiring the same to be remedied, shall have been given to the Servicer by the Trustee, or to the Servicer and the Trustee by the Holders of Certificates evidencing Percentage Interests aggregating not less than 25% of REMIC III.

Where, however, the Trustee fails to provide the notice of breaches it discovers, it cannot rely on its own negligence, or failure to provide notice to avoid the occurrence of an event of default.

116.   There were material breaches of the Governing Agreements, including by the Servicer to, for example:

(a)   notify the Trustee and others of breaches of the representations and warranties that applied to the mortgages in the Covered Trusts;

(b)   maintain accurate and adequate loan and collateral files in a manner consistent with prudent mortgage servicing standards;

(c)   demand that deficient mortgage records be cured;

(d)   require the repurchase of mortgage loans that breached their representations and warranties; and

(e)   place the interests of the MBS holders before its own interests.

117.   Defendants, and their responsible officers, had notice of these and other defaults, through, among other things, defaults and delinquencies in the Covered Trusts, foreclosure actions brought on behalf of the Covered Trusts, news reports and related lawsuits.

118.   These Events of Default impaired the rights of MBS holders to collect their full principal and interest, and reduced the value of the MBS. Accordingly, under those circumstances, a prudent person would have exercised all of its rights to recover for those Events of Default.  By failing to take such action, Defendants breached the Governing Agreements, and damaged Plaintiffs and the Class.

119.   Defendants are liable to Plaintiffs and the Class for the losses they suffered as a direct result of Defendants' failure to perform their contractual obligations under the Governing Agreements.

**PRAYER FOR RELIEF**

**WHEREFORE,** Plaintiffs pray for relief and judgment, as follows:

A.      Awarding compensatory damages and/or equitable relief in favor of Plaintiffs and the Class against Defendants for breaches of their statutory and contractual duties in an amount to be proven at trial, including interest thereon;

B.      Awarding Plaintiffs their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

C.      Such other relief as the Court may deem just and proper.

**JURY DEMAND**

Plaintiffs demand a trial by jury on all claims so triable.

Dated: October 31, 2013                    SCOTT+SCOTT, ATTORNEYS AT LAW, LLP


                                           _____
                                           David R. Scott (DS 8053)
                                           Beth A. Kaswan (BK 0264)
                                           Deborah Clark-Weintraub (DW 6877)
                                           Max Schwartz (MS 2517)
                                           Donald Broggi
                                           The Chrysler Building
                                           405 Lexington Avenue, 40th Floor
                                           New York, NY 10174
                                           Telephone: 212-223-6444
                                           Facsimile: 212-223-6334
                                           Email: drscott@scott-scott.com
                                                  bkaswan@scott-scott.com
                                                  dweintraub@scott-scott.com
                                                  mschwartz@scott-scott.com
                                                  dbroggi@scott-scott.com

                                           *Counsel for Plaintiff Chicago Police and Central States, Southeast and Southwest Areas Pension Fund*

COHEN MILSTEIN SELLERS & TOLL PLLC

Steven J. Toll
Julie Goldsmith Reiser
1100 New York Avenue, NW
Suite 500 West
Washington, D.C. 20005
Email: stoll@cohenmilstein.com
          jreiser@cohenmilstein.com
Telephone: (202) 408-4600
Facsimile: (202) 408-4699

- and-

Christopher Lometti
88 Pine Street
14th Floor
New York, NY 10005
Email: clometti@cohenmilstein.com
Tel: (212) 838-7797
Fax: (212) 838-7745

*Counsel for Plaintiff Chicago Laborers' Funds,
IPERS and Arkansas PERS*

KESSLER TOPAZ
MELTZER & CHECK, LLP

Andrew L. Zivitz
Sharan Nirmul
Joshua E. D'Ancona
Tyler S. Graden
Jonathan F. Neumann
280 King of Prussia Road
Radnor, PA 19087
Tel: (610) 667-7706
Fax: (610) 667-7056
azivitz@ktmc.com
snirmul@ktmc.com
jdancona@ktmc.com
tgraden@ktmc.com
jneumann@ktmc.com

*Counsel for Plaintiffs Vermont Pension Investment
Committee, Washington State Investment Board,
Arkansas Teacher Retirement System, Public*

*Employees' Retirement System of Mississippi, and City of Tallahassee Retirement System*

## CERTIFICATE OF SERVICE

I hereby certify that a true and accurate copy of the foregoing was served this 31st day of

October, 2013 upon the following via Regular U.S. Mail and email.

Kristin Linsley Myles
Munger, Tolles & Olson LLP
560 Mission Street
San Francisco, CA 94105
Email: Kristin.myles@mto.com

Marc T.G. Dworsky
Munger, Tolles & Olson LLP
355 South Grand Avenue, 35th Floor
Los Angeles, CA 90071-1560
Email: Marc.Dworsky@mto.com

David F. Graham
Sidley Austin LLP
One South Dearborn
Chicago, IL 60603
Email: dgraham@sidley.com

*Counsel for Defendant Bank of America NA*

John Michael Vassos
Michael Stephan Kraut
Morgan, Lewis and Bockius LLP
101 Park Avenue
New York, NY 10178
Email: jvassos@morganlewis.com
Email: mkraut@morganlewis.com

*Counsel for Defendant U.S. Bank National
Association*

Max Schwartz (MS 2517)
SCOTT+SCOTT, ATTORNEYS AT LAW, LLP
The Chrysler Building
405 Lexington Avenue, 40th Floor
New York, NY 10174
Telephone:  212-223-6444
Facsimile:  212-223-6334

*Counsel for Plaintiff Chicago Police and Central
States, Southeast and Southwest Areas Pension
Fund*

55