# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

POLICEMEN'S ANNUITY AND BENEFIT
FUND OF THE CITY OF CHICAGO,
LABORERS' PENSION FUND AND
HEALTH AND WELFARE
DEPARTMENT OF THE
CONSTRUCTION AND GENERAL
LABORERS' DISTRICT COUNCIL OF
CHICAGO AND VICINITY, IOWA
PUBLIC EMPLOYEES' RETIREMENT
SYSTEM, ARKANSAS PUBLIC
EMPLOYEES' RETIREMENT SYSTEM,
VERMONT PENSION INVESTMENT
COMMITTEE, WASHINGTON STATE
INVESTMENT BOARD, ARKANSAS
TEACHER RETIREMENT SYSTEM,
MISSISSIPPI PUBLIC EMPLOYEES'
RETIREMENT SYSTEM , CITY OF
TALLAHASSEE RETIREMENT SYSTEM,
and CENTRAL STATES, SOUTHEAST
AND SOUTHWEST
AREAS PENSION FUND,

                              Plaintiffs,

       - against-

BANK OF AMERICA, NA (as Trustee
Under Various Pooling and Servicing
Agreements), and U.S. BANK NATIONAL
ASSOCIATION (as Trustee Under Various
Pooling and Servicing Agreements),

                              Defendants.

Civil Action No. 1:12-CV-02865-KBF

**Honorable Katherine B. Forrest**

**PLAINTIFFS' MEMORANDUM OF LAW
IN OPPOSITION TO DEFENDANTS'
MOTION TO EXCLUDE THE DAMAGES
METHODOLOGY OPINION OF
MICHAEL L. HARTZMARK, PH.D.**

## TABLE OF CONTENTS

Page

I.      PRELIMINARY STATEMENT ...................................................................... 1

II.     BACKGROUND ............................................................................................ 2

    A.   Procedural Background of Defendants' *Daubert* Motion...................................... 2

    B.   Dr. Hartzmark Is Well Qualified to Render His Opinion ...................................... 3

    C.   Dr. Hartzmark's Methodology ............................................................................. 4

III.    LEGAL STANDARD.................................................................................... 11

IV.     ARGUMENT ................................................................................................ 13

    A.   Dr. Hartzmark is Well Qualified to Opine on the Calculation of Damages Arising from the Trustees' Breaches ......................................................................... 14

    B.   Dr. Hartzmark's Methodology is Reliable and Helpful....................................... 16

        1.   Dr. Hartzmark's Methodology Will Assist the Fact-Finder in Measuring Classwide Damages Related to Plaintiffs' Theory of Liability ................ 17

            a.   At Class Certification Dr. Hartzmark is Entitled to Assume that Plaintiffs will be Able to Prove Their Theory of Liability ........... 18

            b.   Dr. Hartzmark's Methodology Measures Only Those Damages Attributable to Defendants' Breach ............................................. 22

    C.   Dr. Hartzmark's Methodology Does Not Create Individualized Issues ............... 24

V.      CONCLUSION.............................................................................................. 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Amorgianos v. Nat'l R.R. Passenger Corp.*,
   303 F.3d 256 (2d Cir. 2002)............................................................................................12

*Apple Inc. v. Motorola Inc.*,
   Nos. 2012-1548, 2012-1549, 2014 WL 1646435 (Fed. Cir. Apr. 25, 2014) .........................12

*Avery Dennison Corp. v. Four Pillars Enter. Co.*,
   45 F. App'x 479 (6th Cir. 2002)........................................................................................18

*Bic Corp. v. Far E. Source Corp.*,
   23 F. App'x 36 (2d Cir. 2001)...........................................................................................19

*In re Blech Sec. Litig.*,
   No. 94 Civ. 7696 (RSW), 2003 WL 1610775 (S.D.N.Y. Mar. 26, 2003) (Sweet, J.) .............18

*Boyce v. Soundview Tech. Grp., Inc.*,
   464 F.3d 376 (2d Cir. 2006).............................................................................................21

*Cannon v. BP Prods. N. Am., Inc.*,
   No. 3:10-CV-00622, 2013 WL 5514284 (S.D. Tex. Sept. 30, 2013) ....................................17

*Comcast Corp. v. Behrend*,
   133 S. Ct. 1426 (2013).............................................................................................17, 22

*Concord Boat Corp. v. Brunswick Corp.*,
   207 F.3d 1039 (8th Cir. 2000) .........................................................................................18

*Contemporary Mission, Inc. v. Famous Music Corp.*,
   557 F.2d 918 (2d Cir. 1977).............................................................................................21

*Cura Fin. Serv. N.V. v. Elec. Payment Exchange, Inc.*,
   No. Civ.A. 18278, 2001 WL 1334188 (Del. Ch. Oct 22, 2001)............................................21

*Henkel Corp. v. Innovative Brands Holdings, LLC*,
   No. 3663-VCN, 2013 WL 396245 (Del. Ch. Jan. 31, 2013) ...........................................20, 22

*In re High-Tech Emp. Antitrust Litig.*,
   No. 11-CIV-02509 (LHK), 2014 WL 1351040 (N.D. Cal. Apr. 4, 2014)...............................13

*Highland Capital Mgmt., L.P. v. Schneider*,
   551 F. Supp. 2d 173 (S.D.N.Y. 2008)................................................................................11

*IBEW Local 90 Pension Fund v. Deutsche Bank AG*,
No. 11 CIV. 4209 KBF, 2013 WL 5815472 (Forrest, J.) (S.D.N.Y. Oct. 29, 2013)...11, 12, 16

*Island Intellectual Prop. LLC v. Deutsche Bank AG*,
No. 09 CIV. 2675 KBF, 2012 WL 526722 (S.D.N.Y. Feb. 14, 2012) (Forrest, J.)...........18, 22

*Kempner Mobile Elec., Inc. v. Sw. Bell Mobile Sys.*,
428 F.3d 706 (7th Cir. 2005) ..................................................................................18

*Liberty Media Corp. v. Vivendi Universal, S.A.*,
874 F. Supp. 2d 169 (S.D.N.Y. 2012).....................................................................12

*Lidle ex rel. Lidle v. Cirrus Design Corp.*,
No. 08 Cv. 1253 (BSJ)(HBP), 2010 WL 2674584 (S.D.N.Y. July 6, 2010) .........................17

*Maine State Ret. Sys. v. Countrywide Fin., et al.*,
No. 10-302 (C.D. Cal. filed Jan. 14, 2010).................................................................4

*MBIA Ins. Corp. v. Patriarch Partners VIII, LLC*,
No. 09 CIV. 3255, 2012 WL 2568972 (S.D.N.Y. July 3, 2012) ............................................11

*McCullock v. H.B. Fuller Co.*,
61 F.3d 1038 (2d Cir.1995).................................................................................11, 13

*Multimatic, Inc. v. Faurecia Interior Sys. USA, Inc.*,
358 F. App'x 643 (6th Cir. 2009) ..........................................................................16

*NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.*,
693 F.3d 145 (2d Cir. 2012) *cert. denied,* 133 S. Ct. 1624, 185 L. Ed. 2d 576 (U.S. 2013)...20

*New Jersey Carpenters Health Fund, et al. v. Residential Capital, LLC*,
No. 08-8781 (S.D.N.Y. filed Oct. 14, 2008)..............................................................4

*Policemen's Annuity & Benefit. Fund of City of Chicago v. Bank of Am., NA*,
943 F. Supp. 2d 428 (Forrest, J.) (S.D.N.Y. 2013)......................................5, 8, 9, 25

*Reserves Dev. LLC v. Crystal Prop., LLC*,
986 A.2d 362 (Del. 2009) ..................................................................................20

*Robinson v. Suffolk Cnty. Police Dep't*,
544 F. App'x 29 (2d Cir. 2013) ............................................................................17

*SEC v. Tourre*,
950 F. Supp. 2d 666 (Forrest, J.) (S.D.N.Y. 2013) ......................................................12

*Sinkov v. Americor, Inc.*,
419 F. App'x 86 (2d Cir. 2011) ...........................................................................18

*State of N.Y. v. Hendrickson Bros., Inc.*,
  840 F.2d 1065 (2d Cir. 1988)..................................................................................21

*Sys. Dev. Integration, LLC v. Computer Sci. Corp.*,
  886 F. Supp. 2d 873 (N.D. Ill. 2012) ......................................................................18

*Tyler v. Bethlehem Steel Corp.*,
  958 F.2d 1176 (2d Cir. 1992)........................................................................14, 15, 18

*In re U.S. Foodservice Inc. Pricing Litig.*,
  3:07-MD-1894 CFD, 2011 WL 6013551 (D. Conn. Nov. 29, 2011) *aff'd*, 729 F.3d 108 (2d
  Cir. 2013), *cert. denied*, No. 13-873, 2014 WL 271926 (U.S. Apr. 28, 2014)........................18

*Winn-Dixie Stores, Inc. v. Dolgencorp, LLC*,
  2014 WL 842949 (11th Cir. Mar. 5, 2014)..............................................................18

*In re Zyprexa Prods. Liab. Litig.*,
  489 F. Supp. 2d 230 (E.D.N.Y. 2007) ....................................................................15

**Other Authorities**

Fed. R. Evid. 702 ........................................................................................11, 12

I.      PRELIMINARY STATEMENT

Defendants seek to exclude the expert opinion of Dr. Michael L. Hartzmark on the misguided premise that Dr. Hartzmark is unqualified and his methodology is not helpful or reliable because Dr. Hartzmark has not fashioned a damages model consistent with Defendants' theory of Plaintiffs' claims.[1]

Defendants are wrong about Plaintiffs' theory of liability, which does not posit one exclusive way in which Defendants could have acted in a prudent fashion to protect the Covered Trusts,[2] but instead seeks a remedy for Defendants' failure to do anything at all in investors' name.  Defendants are also wrong to base a *Daubert* motion on disputes about assumptions and facts that are still being developed through ongoing discovery.  Such arguments go to the weight, not admissibility, of expert opinion.

Further, Defendants' attack on the qualifications of Dr. Hartzmark is vexatious and absurd.  Dr. Hartzmark is a University of Chicago-trained Ph.D. in economics, a former professor at the University of Michigan (in the Department of Economics and the business school) and a lecturer and visiting scholar in economics at the University of Chicago.  He is also a former CFO and CEO of publicly traded corporations.  As an economic consultant, Dr. Hartzmark has offered expert opinions on damages and causation issues for all types of complex financial instruments, including fixed income securities such as MBS, for some of the most sophisticated financial industry players in the world.  Dr. Hartzmark's opinions and methodology, as presented in the Hartzmark Report and the Hartzmark Rebuttal, are scientifically valid and fit the claims Plaintiffs make in this case. Dr. Hartzmark is fully qualified

---

[1] Dr. Hartzmark has submitted two reports in support of Plaintiffs' motion for class certification (ECF Nos. 162-165) in this matter: (1) the Expert Report of Michael L. Hartzmark, Ph.D. ("Hartzmark Report") (ECF No. 164, Ex. 32); and (2) the Rebuttal Report of Michael L. Hartzmark, Ph.D. ("Hartzmark Rebuttal") (ECF No. 226, Ex. 2).

[2] Even Defendants' expert, Dr. Christopher James, discusses at least three liability scenarios.  *See* March 17, 2014 Expert Report of Christopher M. James, Ph.D. ("James Report") (ECF No. 204, Ex. 26) at ¶¶ 110, 118, 120.

to give these opinions.  Indeed, notably missing from Defendants' motion is any contention that Dr. Hartzmark's damages methodology is not grounded in accepted principles of economics, finance and statistics.  Each of Defendants' arguments therefore lacks merit, as further described below.

## II.   BACKGROUND

### A.   Procedural Background of Defendants' *Daubert* Motion

Plaintiffs moved to certify two classes in this consolidated class action on January 17, 2014.  In support of Plaintiffs' motion for class certification, Dr. Hartzmark provided an opinion on a common methodology for calculating damages to class members arising from Defendants' breach of contract and breach of the Trust Indenture Act.  Defendants deposed Dr. Hartzmark on March 11, 2014.

In response to Dr. Hartzmark's opinion, on March 17, 2014, in support of Defendants' opposition to Plaintiffs' motion for class certification, Defendants offered the expert report of Dr. Christopher James, whose principal challenge to Dr. Hartzmark's work was that it supposedly created intra-class conflicts among Certificate holders who bought and sold at different points in time.  This challenge depends primarily on a series of counterfactual scenarios imagining what WaMu's and Chase's responses would have been had Defendants acted to protect Certificate holders' interests (which, of course, they have not done).

On April 17, 2014, Dr. Hartzmark filed the Hartzmark Rebuttal, which responded to Dr. James' criticisms and expounded upon the last step of his damages methodology.  That same day, even before receiving the Hartzmark Rebuttal, Defendants moved to exclude much of the January 17 Hartzmark Report under *Daubert*.  Then, after seeing the Hartzmark Rebuttal, Defendants moved to strike it on the grounds that it purportedly included "new" opinions.  On

April 29, 2014, Defendants took a second deposition of Dr. Hartzmark, focused on the Hartzmark Rebuttal.

### B.     Dr. Hartzmark Is Well Qualified to Render His Opinion

Dr. Hartzmark received a Ph.D. in economics from the University of Chicago, a Master's degree in economics from the University of Chicago, and a BA in economics from the University of Michigan.[3] Dr. Hartzmark has taught graduate level economics and finance courses both as a professor in economics at the University of Michigan and as a lecturer and visiting scholar in economics at the University of Chicago.[4] He was hired by Nobel Prize winning economist George Stigler to visit the University of Chicago and further develop his pioneering research on financial markets. Further, Dr. Hartzmark has published in top-tier, peer-reviewed academic journals on futures market activity, including topics such as pricing and investor performance. Recently, he has published in top business and law reviews on other topics directly related to fixed income securities. *See* Hartzmark Report at App'x A.

Dr. Hartzmark also has extensive relevant experience in the public and private sectors. As a financial economist at the Commodities Futures Trading Commission, he analyzed issues related to trading in various types of financial futures, including futures for Ginnie Mae Certificates and U.S. Treasury bonds. Hartzmark Mar. 11 Tr. at 48:21-50:17. In addition, Dr. Hartzmark has served as an executive of private and public corporations, as an investment advisor, a business consultant crafting strategic plans, cash flow and valuation analyses, and as an economic consultant for an array of sophisticated financial market clients. For example, as

---

[3] Dr. Hartzmark testified that "all of [his] coursework covered the foundations associated with evaluating instruments such as mortgage-backed securities." Transcript of Mar. 11, 2014 Deposition of Michael L. Hartzmark ("Hartzmark Mar. 11 Tr.") at 40:13-16, attached hereto as Exhibit A to the Declaration of Sharan Nirmul.

[4] Dr. Hartzmark testified that, while he did not teach classes focused on MBS, "all of the tools that I taught pertained specifically to MBS. The MBAs would learn the skills that would allow them to go and carry out the–their responsibilities for MBS." Hartzmark Mar. 11 Tr. at 57:3-9.

CEO of Cragar Corporation, he brought the company public and negotiated several asset-backed loans associated with the company's receivables, inventory and intangible assets. *Id.* at 63:20-64:2. Similarly, as acting CFO of Pacific Biometrics, Dr. Hartzmark negotiated asset-backed deals. *Id.* at 69:24-71:7.

As an economic consultant and principal/director at Chicago Partners, later d/b/a Navigant Economics, Dr. Hartzmark provided consulting services and expert testimony concerning a variety of complex damages and causation issues related to all types of financial instruments, including fixed income securities. For example, fixed income giant PIMCO and its counsel Sidley Austin (BANA's counsel here) retained Dr. Hartzmark to provide expert opinion on causation and damages in *Kohen, et al. v. Pac. Inv. Mgmt. Co. LLP, et al.*, No. 05-4681 (N.D. Ill. filed Aug. 16, 2005), a complex action alleging manipulation of the futures market for U.S. Treasury notes.[5] And notably, since 2013, Dr. Hartzmark has provided damages analyses with respect to a multiplicity of MBS offerings in his ongoing role as an expert economic consultant to the New York Attorney General in numerous investigations and enforcement actions. Hartzmark Mar. 11 Tr. at 107:5-20; 112:25-113:9. This is in addition to the several disclosed cases in which Dr. Hartzmark has been retained to calculate investor damages or create damages allocation plans specifically related to MBS.[6]

C.    **Dr. Hartzmark's Methodology**

This action seeks to recover damages for investors who purchased MBS issued by the Covered Trusts and who suffered out-of-pocket losses from the Trustees' failure, in disregard of

---

[5] Similarly, in *Amaranth LLC et al. v. J.P. Morgan Chase & Co., et al.*, No. 603756/07 (NY Sup. Ct. filed Nov. 13, 2007), JP Morgan Chase retained Dr. Hartzmark to provide expert opinion and damages models related to an energy portfolio with over 3.8 million of futures, forward, option and swaption contracts, and a notional value of almost $200 billion, held in largely illiquid markets.

[6] These actions include: *In re Dynex Capital, Inc., Sec. Litig.*, No. 05-1897 (S.D.N.Y. filed Feb. 7, 2005); *Maine State Ret. Sys. v. Countrywide Fin., et al.*, No. 10-302 (C.D. Cal. filed Jan. 14, 2010); and *New Jersey Carpenters Health Fund, et al. v. Residential Capital, LLC*, No. 08-8781 (S.D.N.Y. filed Oct. 14, 2008).

their statutory and contractual duties, to act to remove defective loans from the Trusts. *Policemen's Annuity & Benefit Fund of City of Chicago v. Bank of Am., NA*, 943 F. Supp. 2d 428, 429-430 (Forrest, J.) (S.D.N.Y. 2013).  Plaintiffs bring claims for breach of contract and violation of the Trust Indenture Act, which creates liability for the same conduct as that supporting Plaintiffs' contractual claims. The remedy Plaintiffs seek for both the TIA and breach of contract causes of action is their out-of-pocket loss due to the Trustees' breach. *See id.* at 442.

In determining investor out-of-pocket losses due to the Trustees' breach, Dr. Hartzmark recognizes that there will be some starting date for the class – putatively November 1, 2007 – to be determined after further development of the facts, on which, for example, the Trustees knew sufficient information about the servicer's defaults to take effective action on behalf of the Trusts.  For Certificate holders who held as of that date, Dr. Hartzmark employs a five step methodology which measures the Trustees' liability for investor losses that resulted from the Trustees' failure to act to enforce the repurchase remedies available to them under the PSAs. Such investor losses consist of the diminished value of Certificates that investors sold or continue to hold, and are derived from both realized and projected principal losses on the defective loans that collateralize the Certificates.

**Step 1: The Extrapolation of Loss Information From the Re-Underwriting Sample:** The first step in Dr. Hartzmark's methodology is to assess the percentages of losses in a loan group, or cross-collateralized group, that are attributable to defective and non-defective mortgage loans underlying the Covered Trusts.  Applying the results of a re-underwriting conducted on a statistically valid sample of mortgage loans (which is performed by another of Plaintiffs' experts) to determine the number of defective loans in the sample already associated with realized losses, Dr. Hartzmark calculates a "Defective Loss ratio."  This ratio expresses the

proportion of realized losses from defective loans relative to all loans in the sample—and by extrapolation, the entire population of mortgage loans in the loan group. Second, Dr. Hartzmark calculates the "Defective Delinquency ratio" in the sample and the group by measuring the proportion (in dollars of outstanding principal amount) of defective loans that are delinquent, versus non-defective loans that are delinquent. Hartzmark Report at ¶ 31-32. Notably, Defendants' expert, Dr. James, does not suggest that Step 1 of Dr. Hartzmark's methodology is not a proper application of the principles of economics, finance or statistics to the available data.

**Step 2: Projected Losses:** In the second step, Dr. Hartzmark employs the Defective Delinquency ratio and generally accepted practices to model projected losses attributable to defective loans in the loan groups in question. Dr. Hartzmark uses the historical performance of loans within a mortgage loan group to model their future performance so as to measure projected losses. Projected collateral losses are based on a simple formula, which is the product of the following common variables: (a) the ***status*** of the mortgage loan (i.e., whether it is current, delinquent, in foreclosure, bankruptcy, or REO); (b) ***default rate*** (i.e., the likelihood that a given loan, in a given status, will default); and (c) ***loss severity*** (i.e., the proportion of a defaulted loan that will be lost when it is liquidated). These are formulaic calculations that are commonly performed by investors, bankers, academics and others, and are often incorporated in calculation to determine the current fair values of fixed income securities that trade over the counter for financial reporting purposes. The information needed to calculate Projected Collateral Losses for a mortgage loan group is widely available through sources such as Bloomberg and INTEX. Hartzmark Report at ¶ 33-34. Defendants' expert, Dr. James, does not suggest that Step 2 of Dr. Hartzmark's methodology is not a proper application of the principles of economics, finance or statistics to the available data.

**Step 3: Group-Level Losses Attributable to Defendants' Breach**: In Step 3, Dr. Hartzmark measures what proportion of realized losses and projected losses in mortgage loan groups are due to defective loans.  For each loan group or cross-collateralized loan group, Dr. Hartzmark calculates Realized Losses from defective loans by multiplying Realized Losses from all loans (as reported in the monthly remittance reports) by the Defective Loss ratio from Step 1. Dr. Hartzmark then calculates Projected Collateral Losses attributable to defective loans by multiplying Projected Collateral Losses from all loans from Step 2 by the Defective Delinquency ratio from Step 1. Hartzmark Report at ¶ 39.  Dr. Hartzmark is thus able to isolate the Realized and Projected Losses in each loan group that are due to defective loans and the realized and projected losses due to non-defective loans.  Defendants' expert, Dr. James, does not suggest that Step 3 of Dr. Hartzmark's methodology is not a proper application of the principles of economics, finance or statistics to the available data.

**Step 4: Tranche-Level Losses Attributable to Defendants' Breach**: In the fourth step, Dr. Hartzmark applies the aggregate losses for a mortgage loan group from defective and non-defective loans calculated in Step 3 to measure the losses for each tranche associated with that loan group, and, in turn, to each Certificate associated with those tranches.  He does this by running those losses through the relevant group's "waterfall", which is the contractual formula provided in each PSA for assigning losses to the various tranches in the Trust.  More specifically, because each mortgage loan group underlies certain tranches of a Covered Trust, and Certificates are defined interests in each of these tranches (with the waterfall applying income and losses to the tranches using algorithmic formulas), Dr. Hartzmark can apply the relevant waterfall to determine how the principal balance of each tranche is impacted by realized and projected losses from defective loans.  Hartzmark Report at ¶¶ 41-46.  The tranche-level impact from defective

loans in a loan group is calculated by first determining, through the application of the waterfall, which of the tranches tied to that group would have been wiped out by losses from non-defective loans regardless of losses from defective loans.[7]  Dr. Hartzmark then runs defective loan losses through the waterfall to determine the amount of any losses in the principal balances of each remaining tranche due to defective loans.   Hartzmark Report at ¶¶ 41-46.  Pursuant to the PSAs, each Certificate associated with an injured tranche shares a proportionate share of the tranche's principal loss from defective loans.  *Id.*  Defendants' expert, Dr. James, does not suggest that Step 4 of Dr. Hartzmark's methodology is not a proper application of the principles of economics, finance or statistics to the available data.

**Step 5: Calculating Damages to Individual Certificate holders:**  Dr. Hartzmark's calculations through Step 4 provide a measure of the adverse impact on principal balances and cash flows caused by defective loans for every tranche at issue.   In Step 5, using actual transactions data received under subpoena from market makers, custodians, government-sponsored entities and fund managers, as well as publicly available data describing the performance of the various tranches, Dr. Hartzmark calculates each investor's out-of-pocket or accrued investment losses. After using a common formula to eliminate the investors' losses due to non-defective loans and exogenous factors, Dr. Hartzmark then calculates the injury to each individual investor caused by defective loans and Defendants' misconduct.

An investor's out-of-pocket and/or accrued investment losses are made up of both a Certificate's principal losses and its decline in market value.  Accordingly, determining the out-of-pocket loss for an investor who sold, or accrued loss for an investor who still holds, any given

---

[7] Contrary to Defendants' arguments, the calculation to exclude investors in the lower tranches that would have been wiped out by extraneous economic factors, is legally and scientifically appropriate because if any individual plaintiff investing in these lower tranches had brought its own lawsuit against the Trustee, it would have been met with the same causation defense – i.e., that extraneous economic events would have fully wiped out the value of its Certificate, had the Trustee acted timely.

Certificate involves a common profit and loss formula that is based on: (i) the price paid for the Certificate, (ii) the price at which it was sold (or continues to be held), (iii) the outstanding principal at the sale (or that exists currently), and (iv) the principal distributions made to the Certificate.[8]  Hartzmark Rebuttal at ¶¶ 54-55. If, after application of the formula, an investor has no out-of-pocket or accrued investment loss, it will not have Recoverable Damages in this action.

With respect to investors with out-of-pocket and/or accrued losses on their Certificates, Dr. Hartzmark determines what portion of those losses can reasonably be attributed to defective loans and Defendants' misconduct.  As Dr. Hartzmark has explained, under principles of bond-pricing theory, the fundamental value of a fixed income instrument is the present value of its future discounted cash flows, or its net-present-value ("NPV").  *Id.* at ¶ 50.  NPV may be impaired by reductions in expected cash flows due to the credit quality of the bond or by increases in discount rates on those cash flows due to additional risks. *Id.* at ¶¶ 52, 62.  The current market value of a fixed income instrument may also be impaired by dislocations (such as from illiquidity) in the market for such instruments.  *Id.*

Because bond-pricing theory dictates that, all else equal, the reduction in a Certificate's expected principal cash flows owing to credit losses (or increase in expected losses) will reduce its NPV, Dr. Hartzmark is able to determine and separate the impact to a Certificate's NPV of the reduced cash flows caused by credit losses from (a) non-defective loans, and (b) defective loans.   Dr. Hartzmark thus divides the non-defective and defective tranche-level loan losses calculated in Step 4 by the number of Certificates outstanding for the given tranche to impose a loss ceiling, which is the maximum impact of these losses with respect to the NPV of each

---

[8] This can be expressed as the following formula for out-of-pocket losses:   Out-of-Pocket Investment Gains/Losses = *Sale Proceeds – Purchase Amount + All Principal Distributions.*   For accrued (i.e., holder) losses, the formula is as follows: Accrued Investment Gains/Losses = *Current Value of the Certificates - Purchase Amount + All Principal Distributions.*

Certificate.  He further assesses the Certificate-level losses from non-defective and defective loans against respective investors' actual out-of-pocket losses to determine losses from defective loans.

If an investor's out-of-pocket losses do not exceed the credit losses that its Certificate suffered on account of non-defective loans (as determined in Step 4)—in other words, if the full amount of the reduction of the Certificate's NPV is due to non-defective loan losses—Dr. Hartzmark can conclude that the investor's out-of-pocket and/or accrued losses were not caused by the Trustee, because the investor would have suffered those losses on account of non-defective loans regardless of the Defendants' misconduct.  If, on the other hand, an investor has out-of-pocket and/or accrued losses in excess of the Certificate's non-defective loan losses, Dr. Hartzmark can conclude that at least some of the investor's losses (in excess of those non-defective loan losses) are attributable to defective loans which Defendants could have removed.

To isolate the portion of those losses due to defective loans from any portion that could be due to exogenous factors, Dr. Hartzmark employs a "CAP" that equals the credit losses that the Certificate suffered on account of defective loans (as determined in Step 4), and which imposes a ceiling on the amount of investor loss or reduction in the Certificate's NPV attributable to defective loan losses.  To be conservative, any out-of-pocket losses net of losses on non-defective loans that the investor experienced that are greater than the value of the defective loan losses, or CAP, are attributed to exogenous factors, because they imply greater credit losses than those for which the Trustee is accountable.  Accordingly, an investor's out-of-pocket loss attributable to Defendants' misconduct is the amount above the value of its Certificate's non-defective losses, but no greater than the value of its Certificate's defective losses.  Additionally, because Defendants could not have recovered more than the value of

defective loan losses under the PSAs, a point Defendants have made, if it turns out that the aggregate value of investors' losses attributable to Defendants' misconduct in a given tranche exceeds the value of the tranche's defective losses as calculated in Step 4, the losses attributable to the Defendants' misconduct are further limited and investors will recover pro-rata, based on their tranche's defective losses.

## III.   LEGAL STANDARD

Expert testimony is admissible under Federal Rule of Evidence 702 if it "both rests on a reliable foundation and is relevant to the task at hand." *Daubert*, 509 U.S. at 597. This standard implicates three inquiries: "(1) whether the proposed expert is in fact qualified to offer the opinions he or she is proffering; (2) whether each proposed opinion is based upon reliable data and methodology; and (3) whether the proposed testimony would be helpful to the trier of fact or to answer the factual question presented." *IBEW Local 90 Pension Fund v. Deutsche Bank AG*, 11 CIV. 4209 KBF, 2013 WL 5815472, at *13 (Forrest, J.) (S.D.N.Y. Oct. 29, 2013) (citing *Nimely v. City of New York,* 414 F.3d 381, 396–97 (2d Cir. 2005)).[9] "The law is well-settled that only serious flaws in an expert's reasoning or methodology will warrant exclusion." *MBIA Ins. Corp. v. Patriarch Partners VIII, LLC*, 09 CIV. 3255, 2012 WL 2568972, at *16 (S.D.N.Y. July 3, 2012); *accord Highland Capital Mgmt., L.P. v. Schneider*, 551 F. Supp. 2d 173, 186 (S.D.N.Y. 2008) ("[T]he general rule is that the balance should be struck in favor of admission.").

Disputes regarding the nature and strength of an expert's credentials go to the weight, not admissibility, of the expert's testimony. *McCullock v. H.B. Fuller Co.,* 61 F.3d 1038, 1044 (2d Cir.1995). "Whether a proposed expert has the requisite qualifications depends on his or her

---

[9] Unless otherwise noted, all emphasis is added, and all citations and internal quotation marks are omitted throughout this brief.

educational background, training, and experience in the field(s) relevant to the opinions he or she seeks to give." *SEC v. Tourre*, 950 F. Supp. 2d 666, 674 (Forrest, J.) (S.D.N.Y. 2013). "Courts have construed the inquiry into an expert's qualifications with an eye towards the 'liberal thrust' of the Federal Rules." *id.* at 674.

The *Daubert* reliability inquiry is "context specific," and asks, in essence, "does the proposed expert's proffered opinion(s) 'fit' the case at hand?" *IBEW Local 90*, 2013 WL 5815472, at *13; *accord Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 266 (2d Cir. 2002) ("Although Rule 702 sets forth specific criteria for the district court's consideration, the *Daubert* inquiry is fluid and will necessarily vary from case to case.") The touchstone for whether an expert opinion is helpful is its relevance: "the Rule's requirement that the testimony 'assist the trier of fact to understand the evidence or to determine a fact in issue' goes primarily to relevance by demanding a valid scientific connection to the pertinent inquiry as a precondition to admissibility." *Daubert*, 509 U.S. at 580.

Courts exercise their "gatekeeper" authority under *Daubert* in light of the "liberal thrust" of the Federal Rules of Evidence. *See Daubert*, 509 U.S. at 588. Indeed, Rule 702 "favor[s] the admissibility of expert testimony, and [the court's] role as gatekeeper is not intended to serve as a replacement for the adversary system." *Liberty Media Corp. v. Vivendi Universal, S.A.*, 874 F. Supp. 2d 169, 172 (S.D.N.Y. 2012) (citation omitted); *see also Amorgianos*, 303 F.3d at 267 (same) (citing *Daubert*, 509 U.S. at 596)). "A judge must be cautious not to overstep its gatekeeping role and weigh facts, evaluate the correctness of conclusions, impose its own preferred methodology, or judge credibility, including the credibility of one expert over another. These tasks are solely reserved for the fact finder." *Apple Inc. v. Motorola Inc.*, Nos. 2012-1548, 2012-1549, 2014 WL 1646435, at *19 (Fed. Cir. Apr. 25, 2014).

## IV.    ARGUMENT

Neither Defendants nor their expert, Dr. James, have asserted that Dr. Hartzmark's methodology for calculating class-wide damages is comprised of models or elements that are economically unsound, or that Dr. Hartzmark proposes to apply improperly the principles of economics, finance and statistics to the data.    Nowhere do Defendants assert that Dr. Hartzmark's methodology fails to meet any of the guidelines set forth in *Daubert* for evaluating the reliability of a proposed expert methodology.  *See Daubert*, 509 U.S. at 580.

Rather, Defendants make the remarkable argument that, because Dr. Hartzmark's proposed damages methodology purportedly does not fit ***Defendants' version*** of Plaintiffs' theory of liability—in which, not surprisingly, BANA would be virtually liability-free, and USB would face at most speculative future liability after the resolution of a lawsuit that apparently will never occur—it is unhelpful and unreliable, and Dr. Hartzmark is unqualified to offer a damages opinion.   But Dr. Hartzmark's methodology arises directly from, and neatly fits, Plaintiffs' theory of liability. And Defendants' critique of the methodology at most concerns assumptions underlying it, not its economic validity.

More fundamentally, Defendants' attack on the qualifications of Dr. Hartzmark—a University of Chicago-trained Ph.D. economist with an array of relevant experience—to calculate damages related to the MBS Trusts at issue borders on the frivolous.  Disputes about the assumptions employed by an expert, *In re High-Tech Emp. Antitrust Litig.*, No. 11-CIV-02509 (LHK), 2014 WL 1351040, at *20 (N.D. Cal. Apr. 4, 2014) (citing *Bazemore v. Friday*, 478 U.S. 385, 400 (1986)), or an expert's credentials, *McCulloch*, 61 F.3d at 1044, go to weight, not admissibility. As such, Defendants' motion fails.

**A.     Dr. Hartzmark is Well Qualified to Opine on the Calculation of Damages Arising from the Trustees' Breaches**

Unable to assail his qualifications as an economist or an expert on complex fixed income damages issues, Defendants narrowly challenge Dr. Hartzmark's qualifications to offer an opinion on the calculation of *MBS* damages. The gravamen of their argument is that Dr. Hartzmark is not qualified to offer an opinion on MBS pricing or damages ***because his calculations do not employ an assumption pressed by Defendants***, but instead employ assumptions that correspond to Plaintiffs' theory of liability. That Defendants urge the use of a particular assumption could not possibly render Dr. Hartzmark unqualified to evaluate damages based on straightforward calculations of MBS pricing and realized losses. *See Tyler v. Bethlehem Steel Corp.*, 958 F.2d 1176, 1188 (2d Cir. 1992) (affirming denial of challenge to economist testimony on loss suffered by employee, where challenge was better addressed by jury because it went to facts on which opinion was based not witness' qualifications).

Dr. Hartzmark is amply qualified to opine on economic causation and damages issues related to MBS, based on his extensive academic and professional experience. In his career he has analyzed and constructed damages and pricing models related to a variety of fixed income instruments such as corporate bonds, U.S. Treasury bonds and asset-backed securities, including MBS. Moreover, the implicit premise of Defendants' argument—that for purposes of modeling pricing and damages, MBS are somehow fundamentally different than other types of fixed income securities—is neither economically valid nor supported at all in their brief. Finally, as discussed in Part IV.B, Dr. Hartzmark has not premised his methodology on faulty assumptions.

*First*, deep academic and professional experience undergirds Dr. Hartzmark's ability to analyze pricing, damages and other issues with respect to fixed income instruments including MBS. His credentials as an economist in these regards are set forth at length in Part II, and are

not disputed.  The strength of his qualifications to opine on complex fixed income issues is well demonstrated by the fact that since 2013, Dr. Hartzmark has provided MBS damages analyses for the New York State Attorney General's office in numerous investigations and enforcement actions regarding MBS issuers as an economic consultant, and that Dr. Hartzmark previously served as an economic damages and causation expert on behalf of PIMCO in a major market manipulation suit involving U.S. Treasury note futures.  Dr. Hartzmark is qualified.

*Second,* Defendants' argument wrongly implies that calculations related to MBS pricing, projected losses and damages require the application of different tools than those used to calculate similar metrics with respect to other types of fixed income instruments. Defendants, tellingly, set forth no support for the proposition that MBS pricing or damages analysis presents unique challenges.[10]  It is not true in any material respect. *See* Hartzmark Rebuttal at ¶¶ 50-52.

As Dr. Hartzmark explains, the value of an MBS Certificate is calculated in accordance with basic bond pricing theory. *Id.* That is to say, the price of an MBS Certificate is a function of its discounted cash flows. *Id.* at ¶ 50. This bedrock economic theory is in no way peculiar to MBS. *See, e.g.,* Hartzmark Rebuttal at ¶ 50, n.65.  Cash flows to MBS Certificates (both present and future) are, in turn, impacted when defective loans infect the pools which collateralize a given Trust or Certificate. *Id.* at ¶ 52.  The evaluation of MBS damages therefore presents no special issues.[11]

---

[10] Defendants' contention is further undermined by the fact that Defendants have not disputed the first four steps of Dr. Hartzmark's methodology.

[11] Should the Court somehow conclude that Dr. Hartzmark lacks MBS-specific experience, Dr. Hartzmark's related expertise regarding fixed income securities and markets, as set forth above, more than qualifies him to offer a damages opinion in an MBS matter. *See, e.g., In re Zyprexa Prods. Liab. Litig.*, 489 F. Supp. 2d 230, 282 (E.D.N.Y. 2007) ("If the expert has educational and experiential qualifications in a general field closely related to the subject matter in question, the court will not exclude the testimony solely on the ground that the witness lacks expertise in the specialized areas that are directly pertinent.").

*Finally*, Defendants' argument that Dr. Hartzmark's supposed "lack of meaningful experience with MBS," Def. Br. at 13, contributed to certain errors in his analysis is baseless. First and foremost, as already demonstrated, Dr. Hartzmark does not lack relevant knowledge. Nor does Dr. Hartzmark's analysis rest on faulty assumptions or assumptions that diverge from Plaintiffs' theory of liability, as Defendants contend.[12] As explained below and in Plaintiffs' class certification papers, Dr. Hartzmark's damages methodology is in fact consonant with Plaintiffs' theory of liability, that the Trustees' failure to take any action to remove defective loans from the Covered Trusts has caused avoidable losses in Class members' Certificates and so injured Class members. *See infra* at Part IV.B. Defendants' argument in this regard is irrelevant to the question of Dr. Hartzmark's qualifications.[13]

### B.      Dr. Hartzmark's Methodology is Reliable and Helpful

"[A] trial judge should exclude expert testimony based on reliability concerns only 'if it is speculative or conjectural or based on assumptions that are so unrealistic and contradictory as

---

[12] This argument (i.e., that a lawsuit was the one and only action by which Defendants could have discharged their obligations under the TIA and the PSAs) parrots arguments Defendants raised in their opposition to Plaintiffs' motion for class certification.  Plaintiffs incorporate by reference their arguments below and in their papers submitted in support of the pending class certification motion. Plaintiffs further note that Dr. Hartzmark addressed many of the issues raised by Defendants in the Hartzmark Rebuttal, which Defendants did not wait to see before filing the instant motion.

[13] Defendants' reliance on *IBEW Local 90 Pension Fund v. Deutsche Bank AG* is misplaced. 2013 WL 5815472 (S.D.N.Y. Oct. 29, 2013) (Forrest, J.). In that case, this Court determined that a proffered expert was not qualified because, *inter alia*, (i) he had no relevant academic training and (ii) there were "flaws in the [the expert's] analysis," (above all, a failure to analyze the market that actually drove the prices of the securities at issue) that "demonstrate[d] his lack of true qualifications." *Id.* at *14.  Here, in contrast, Dr. Hartzmark has a superior academic background in economics and finance, as well as a variety of relevant professional experience in matters related to fixed income instruments, including MBS damages issues, and has analyzed and will employ strictly the agreements, performance data, and trading data related to the trusts and loan groups at issue in connection with his damages opinion.  Likewise, the Sixth Circuit's decision in *Multimatic, Inc. v. Faurecia Interior Sys. USA, Inc.*, 358 F. App'x 643, 654 (6th Cir. 2009), does not aid Defendants, because, above all, Dr. Hartzmark's qualifications were not called into question in that case.  Instead, the district court excluded Dr. Hartzmark's opinion for incorporating a flawed assumption instead of actual data, where the relevant party had refused to provide such data during the course of fact discovery. *Id.* at *654-55 (observing "[h]e asked for historical data, but *Multimatic* refused to provide it, likely because the company did not want to disclose it during discovery," and noting "the expert's efforts to do the best job he could with the limited data his client would provide").  This case is distinguishable because discovery that will confirm the appropriate inputs with respect to liability is ongoing, and because Dr. Hartzmark's methodology applies in the same fashion regardless of the date at which the trier of fact determines the breach occurred and defective loans would have been removed from the loan pools.

to suggest bad faith or to be in essence an apples and oranges comparison.'" *Lidle ex rel. Lidle v. Cirrus Design Corp.*, No. 08 Cv. 1253 (BSJ)(HBP), 2010 WL 2674584, at *4 (S.D.N.Y. July 6, 2010) (citing *Zerega Ave. Realty Corp. v. Hornbeck Offshore Transp., LLC*, 571 F.3d 206, 213-14 (2d Cir. 2009)). "[A]rguments that the expert's assumptions 'are unfounded go to the weight, not the admissibility, of the testimony.'" *Robinson v. Suffolk Cnty. Police Dep't*, 544 F. App'x 29, 32 (2d Cir. 2013) (citing *Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18, 21 (2d Cir. 1996)).

1. **Dr. Hartzmark's Methodology Will Assist the Fact-Finder in Measuring Classwide Damages Related to Plaintiffs' Theory of Liability**

Dr. Hartzmark's methodology is entirely "consistent with [Plaintiffs'] liability case" and will "measure only those damages attributable to [Plaintiffs'] theory" of harm. *Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1433 (2013). Now under the auspices of a *Daubert* challenge, Defendants again argue to the contrary, and again misstate Plaintiffs' theory of liability in so doing. Plaintiffs do not allege that a suit against the FDIC and JP Morgan was the only thing a prudent trustee could have done to protect Certificate holders' rights, but that such a suit was among several things a prudent trustee could have done, and that, having failed to take any action at all, Defendants are liable for damages caused by defective loans that, through Defendants' breaches, were allowed to remain in the Covered Trusts. Dr. Hartzmark's damages model calculates the harm to Certificate holders from Defendants' breaches by measuring only out-of-pocket losses caused by defective loans, and excluding "exogenous" factors (i.e., those which are not attributable to the Trustees' breach). Thus, Dr. Hartzmark's damages model satisfies the dictates of *Comcast* and will be helpful to the trier of fact.[14]

---

[14] The cases cited by Defendants are therefore distinguishable. In *Cannon v. BP Prods. N. Am., Inc.*, No. 3:10-CV-00622, 2013 WL 5514284, at *12 (S.D. Tex. Sept. 30, 2013), which involved diminution in property value, the proffered expert did not measure the value of the property at issue—he measured diminution in value to property in a different zip code from that which was pled in the complaint and included in the class definition. The other cases

**a.**     ***At Class Certification Dr. Hartzmark is Entitled to Assume that Plaintiffs will be Able to Prove Their Theory of Liability***

"It is entirely appropriate for a damages expert to assume liability for the purposes of his or her opinion." *Sys. Dev. Integration, LLC v. Computer Sci. Corp.*, 886 F. Supp. 2d 873, 882 (N.D. Ill. 2012) (further nothing that "[t]o hold otherwise would be illogical"); *see also In re Blech Sec. Litig.*, No. 94 Civ. 7696 (RSW), 2003 WL 1610775, at *25 (S.D.N.Y. Mar. 26, 2003) (Sweet, J.) ("There is further nothing improper for [the damages expert] to assume liability."). A damages expert may likewise rely on reasonable factual assumptions underpinning a plaintiff's liability theory. *See, e.g., Island Intellectual Prop. LLC v. Deutsche Bank AG*, 09 CIV. 2675 KBF, 2012 WL 526722, at *4-5 (S.D.N.Y. Feb. 14, 2012) (Forrest, J.) (finding that expert was permitted to rely on certain reasonable factual assumptions—"for instance, the timing, intended coverage, royalty-based and effective date"—regarding validity of an agreement); *see also Sinkov v. Americor, Inc.*, 419 F. App'x 86, 90 (2d Cir. 2011) (unless expert testimony is unreasonably speculative, "other contentions that the assumptions are unfounded go to the weight, not the admissibility, of the testimony").[15] These rules apply with particular force where, as here, an expert opinion is offered at the class certification stage, in the midst of ongoing fact discovery.   *See In re U.S. Foodservice Inc. Pricing Litig.*, 3:07-MD-1894 CFD, 2011 WL 6013551, at *16 (D. Conn. Nov. 29, 2011) *aff'd*, 729 F.3d 108 (2d Cir. 2013), *cert. denied*, No. 13-873, 2014 WL 271926 (U.S. Apr. 28, 2014).

---

cited similarly stand for the unremarkable premise that a damages expert must measure damages attributable to the claimed wrongdoing. *See Winn-Dixie Stores, Inc. v. Dolgencorp, LLC*, 2014 WL 842949, at *14-15 (11th Cir. Mar. 5, 2014); *Kempner Mobile Elec., Inc. v. Sw. Bell Mobile Sys.*, 428 F.3d 706, 712 (7th Cir. 2005) (same); *Concord Boat Corp. v. Brunswick Corp.*, 207 F.3d 1039, 1056 (8th Cir. 2000) (same).   Plaintiffs agree; Dr. Hartzmark's methodology measures damages attributable only to Defendants' breach.

[15] *See also Bethlehem Steel Corp.*, 958 F.2d at 1188   (arguments that an expert's conclusions are based on "unfounded assumptions" "are better addressed to a jury"); *Avery Dennison Corp. v. Four Pillars Enter. Co.*, 45 F. App'x 479, 487 (6th Cir. 2002) (affirming district court's denial of motion to exclude expert's testimony because "[t]he 'facts' challenged by FP here are not scientific facts to be evaluated under *Daubert,* but are rather the central questions of liability in the case, which were properly presented to the jury.").

Defendants seek to exclude Dr. Hartzmark's methodology on the basis of certain assumptions that the methodology presently employs, an argument that goes to the weight to be accorded Dr. Hartzmark's opinion, not its admissibility. *See Bic Corp. v. Far E. Source Corp.*, 23 F. App'x 36, 38 (2d Cir. 2001) (absent bad faith or total lack of connection to claims contentions that expert's assumptions are unfounded go to weight not admissibility). Even if, however, the substance of Defendants' critique were to be considered now, it would fail because it depends on an unfounded premise. According to Defendants, Dr. Hartzmark's damages model does not fit Defendants' characterization of Plaintiffs' liability theory because it purportedly cannot calculate damages if an ongoing WaMu/JMPC lawsuit is assumed. Instead, Defendants maintain, Dr. Hartzmark's model depends on the contrary assumption that, on November 1, 2007, "all of the defective loans in each of the 34 trusts at issue would have been repurchased instantaneously." Def. Br. at 16. Defendants' entire argument depends on the accuracy of their characterization of Plaintiffs' claims and of Dr. Hartzmark's opinion. Defendants are wrong on both points.

*First*, Defendants' counterfactual WaMu/JPMC lawsuit was never advanced by Plaintiffs as the *only* thing a "prudent trustee" could have done to protect Certificate holders' interests. At the pleadings stage, before fact discovery, a *Deutsche Bank*-type suit was cited as an "example," TAC at ¶ 91, of steps a prudent trustee could have taken. As such, Dr. Hartzmark need not assume a WaMu/JMPC lawsuit to measure damages in a manner consistent with Plaintiffs' theory of liability—let alone one that has followed the exact course as the suit initiated by Deutsche Bank in 2009.

In the TAC, Plaintiffs set forth various, non-exclusive examples of how Defendants could have taken action consistent with their obligation to act as a prudent person to protect Certificate

holder interests, not limited strictly to a lawsuit against the servicer.  A prudent trustee with notice of defective or noncompliant loans could have also, *for example*, (i) investigated breaches through obtaining the Covered Trusts' loan origination files; (ii) enforced the repurchase rights provided for in the PSAs; (iii) filed a claim with the FDIC upon WaMu's bankruptcy; (iv) provided notice of defaults to Certificate holders so that they could take steps to protect their own interests; or (v) declared an Event of Default under § 7.01 of the PSA, and, if the Event of Default went uncured, appointed a new Servicer or assumed the duties of Servicer itself.  *See* TAC at ¶¶ 83-95.[16]  Another tangible course of prudent action is seen in the actions of Freddie Mac, which threatened JPMC with the termination of its servicing rights and thus secured an immediate $600 million payment in 2008-2009 in settlement of repurchase claims.  *See* Pl. Class Cert. Reply at 7-9 ("Reply Memorandum") (describing fact-based alternative examples of how Defendants could have caused the repurchase of defective loans from the Covered Trusts in 2007-2009).

But instead of taking any of these actions, Defendants have to this day done *nothing* to protect Certificate holders from injury from the known defective loans in the pools.  Defendants' utter inaction has left these loans undisturbed, allowing them, in turn, to cause realized losses and adverse price effects (based on losses expected to be realized in the future) with respect to the Certificates in issue, harming investors. Dr. Hartzmark's methodology quantifies these Class-wide and individual damages in accordance with the applicable out-of-pocket damages measure. *See NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.*, 693 F.3d 145, 166 (2d Cir.

---

[16] Plaintiffs' contention that Trustee action in compliance with contractual obligations short of a lawsuit could have caused the performance by the servicer to repurchase defective loans synchs with well-established principles of Delaware contract damages law, under which damages are to be analyzed as if all parties "fully performed" their duties under the agreement. *Reserves Dev. LLC v. Crystal Prop., LLC*, 986 A.2d 362, 367 (Del. 2009); *see also Henkel Corp. v. Innovative Brands Holdings, LLC*, C.A. No. 3663-VCN, 2013 WL 396245, at *4 (Del. Ch. Jan. 31, 2013) (same).

2012) *cert. denied,* 133 S. Ct. 1624, 185 L. Ed. 2d 576 (U.S. 2013) (holding plaintiffs had adequately alleged out-of-pocket damages at class certification because "it is not just plausible—but obvious—that mortgage-backed securities like the Certificates would suffer a decline in value as a result of (1) ratings downgrades and (2) less certain future cash flows.").[17]

As Dr. Hartzmark has explained, his methodology measures damages from defective loans based on the "actual world", such as the performance of the Certificates and the value of defective loans losses, Hartzmark Mar. 11 Tr. at 249:24-250:3; 279:25-11; 281:10-12, and he was entitled to do so.   It is Defendants attempt to impose impermissible, merits-based, assumptions about a "but-for world" that would minimize their liability which the Court should reject. *See Boyce v. Soundview Tech. Grp., Inc.*, 464 F.3d 376, 391 (2d Cir. 2006) (in breach of contract action, "where the existence of damage is certain, and the only uncertainty is as to its amount, the burden of uncertainty as to the amount of damage is upon the wrongdoer") (citations and quotations omitted); *cf. State of N.Y. v. Hendrickson Bros., Inc.*, 840 F.2d 1065, 1077 (2d Cir. 1988) ("the wrongdoer shall bear the risk of the uncertainty which his own wrong has created").[18]

*Second*, Defendants also incorrectly imply that Dr. Hartzmark's methodology relies upon any particular assumption as to the date of breach or the date when defective loans would have

---

[17] As Dr. Hartzmark explained in the Hartzmark Rebuttal, "whether the Trustee had the defective loans removed on the date of the initial offering or on any series of dates thereafter, the harm that could have been prevented and the tranche level losses that could have been eliminated are the same." Hartzmark Rebuttal at ¶ 25, n.43.  It is this harm from defective loans that trustee action could have prevented but did not prevent that constitutes Class-wide damages.

[18] "Doubts [about the extent of damages] are generally resolved against the party in breach.  A party who has, by his breach, forced the injured party to seek compensation in damages should not be allowed to profit from his breach where it is established that a significant loss has occurred."  *See Cura Fin. Serv. N.V. v. Elec. Payment Exchange, Inc.*, No. Civ.A. 18278, 2001 WL 1334188, at *19-20 (Del. Ch. Oct 22, 2001) (quoting the Restatement (Second) of Contracts § 352 cmt a (1981)) (bracketed text in court opinion); *see also Contemporary Mission, Inc. v. Famous Music Corp.*, 557 F.2d 918, 926 (2d Cir. 1977) (proving damages with "reasonable certainty" is an "estimate [that] necessarily requires some improvisation, and the party who has caused the loss may not insist on theoretical perfection").

been removed from the Trusts.  It does not.  Dr. Hartzmark's methodology is agnostic as to that date, and can be run under whatever date the fact-finder ultimately deems appropriate.  *See* Hartzmark Report at ¶ 39, n.38; Hartzmark Rebuttal at ¶ 25, n.23.[19]  Defendants' continued emphasis on the November 1, 2007 date Dr. Hartzmark presently employs is irrelevant.  That said, under well-established law, *see Island Intellectual*, 2012 WL 526722, at *4-5, it was proper for Dr. Hartzmark to employ Plaintiffs' claimed breach date of November 1, 2007 in presenting his methodology, *see Henkel*, C.A. No. 3663-VCN, 2013 WL 396245, at *7 (under Delaware contract law, damages are measured as of the date of the breach.).

        **b.**    ***Dr. Hartzmark's Methodology Measures Only Those Damages Attributable to Defendants' Breach***

Defendants next contend that Dr. Hartzmark's model is unreliable because it fails to separate exogenous factors from recoverable damages and because it does not properly measure seller losses.  Def. Br. at 16-19.  Defendants' arguments are unavailing.

Dr. Hartzmark's methodology isolates damages to the class from defective loans that the Defendants allowed to remain in the Covered Trusts and excludes losses from any other cause.  As such, Dr. Hartzmark's methodology will "measure only those damages attributable to [Plaintiffs'] theory" of harm, in accordance with *Comcast*. 133 S. Ct. at 1433. Dr. Hartzmark's model not only measures the loses due to defective loans and Defendants' misconduct, but properly accounts for (and eliminates) losses from non-defective loans and from exogenous factors, namely losses from any source other than defective loans.

As described in detail above, in Steps 1 and 2, Dr. Hartzmark will calculate aggregate principal, or credit losses (both realized and projected), which combine credit losses from defective and non-defective loans.  In Step 3, applying those results, Dr. Hartzmark separates the

---

[19] *See* Hartzmark Mar. 11 Tr. at 254:10-25.

aggregate losses due to defective and non-defective loans for individual groups (or cross-collateralized groups). In Step 4, Dr. Hartzmark determines losses at the tranche and Certificate level due to defective and non-defective loans by first running the losses from non-defective loans, followed by losses from defective loans (both calculated in Step 3) through each group's waterfall. Based on the calculation from Step 4, Dr. Hartzmark isolates the value of each Certificate's credit losses due to non-defective loans, and the value of each Certificate's credit losses due to defective loans.

Step 5 determines the impact of Defendants' misconduct on Class members by applying basic bond-pricing theory, which establishes the relationship between credit losses and the value of a bond, and allows Dr. Hartzmark to translate the impact of the credit losses identified in Step 4 onto the value of Certificates that that Class members purchased. Thus, only those out-of-pocket (or accrued) losses that a Class member suffers in excess of the value of its Certificate's credit losses from non-defective loans may be attributable to Defendants' misconduct, because the Class member would have suffered losses up to the amount of the non-defective losses irrespective of Defendants' misconduct.

However, Dr. Hartzmark then establishes a ceiling for those credit losses from defective loans, because based on Defendants interpretation of the PSAs, the Trustee could not have directly affected more than the value of the defective loans, whereas exogenous factors may also have driven the value of a Certificate down below the value of the Certificate's credit losses. Dr. Hartzmark thereby isolates the losses that defective loans and Defendants' misconduct caused Class members, while excluding the impact of non-defective loans and exogenous factors from Class members' damages calculation.[20]

---

[20] With respect to sellers specifically, Defendants also assert that "a sale price reduction caused by the lack of a pending suit by Defendants against WaMu and/or its alleged successors" is the "*only* possible loss of any kind that

### C.   Dr. Hartzmark's Methodology Does Not Create Individualized Issues

Finally, Defendants argue that Dr. Hartzmark's common damages methodology is neither reliable nor helpful to the Court because it "requires resolution of a numerous trust-specific and investor specific issues, rather than providing a method of determining damages on a class-wide basis." Def. Br. at 21. Defendants thus openly seek to reargue points concerning Rule 23 already lodged in connection with class certification. *See* Def. Br. at 22 (Dr. Hartzmark "cannot plausibly demonstrate that damages are susceptible to class-wide measurement for purposes of Rule 23(b)(3)."). But a *Daubert* motion is not a Trojan Horse for Rule 23 arguments.

Defendants' arguments fail here for all of the reasons discussed above, as well as in Plaintiffs' class certification briefing, and in the Hartzmark Rebuttal. Namely, that each Trust has a unique waterfall,[21] or is collateralized by different loans, does not alter the fact that Dr. Hartzmark uses the same methodology and "applies common factors, variables and formulas, using an algorithmic methodology, in a consistent manner across all 34 Covered Trusts and for each loan group, cross-collateralized loan group, tranche and Certificate holder based on the evidentiary record." Hartzmark Rebuttal at ¶ 26(d); *see also* Reply Memorandum at 28-35. Thus, although the inputs may vary, Dr. Hartzmark's methodology will remain constant.

Further, Defendants' insistence that Dr. Hartzmark will need to undertake a "sale-by-sale analysis," Def. Br. at 22, in order to account for the lack of a *Deutsche Bank*-type suit is wrong, since Plaintiffs' theory of liability does not depend on such a suit. Because Dr. Hartzmark's

---

Defendants' alleged breach (the failure to bring suit) theoretically could have caused" to a given investor. Def. Br. at 17 (emphasis added). Because, as discussed above, Plaintiffs' theory of liability is not dependent on such a hypothetical lawsuit, Defendants' argument fails factually to get off the ground.

[21] *See, e.g.,* Hartzmark Mar. 11 Tr. at 172:2-10 ("Q. So in step four would you actually use thirty-four different waterfalls, one per trust? A. Yeah, I would use whatever was in the prospectus. The waterfalls now are actually in some sense generally available in the sense of program but you'd have to, yes, use the ones specific to the particular trust."); *see also id.* at 396:17-21 (explaining that "the nature of the waterfall is basically a rule. I don't control it, it's black and white, it's an algorithm, and so that's in it's straightforward").

methodology is common and algorithmic, and because it does not create individualized issues,

Defendants' arguments should be rejected.

## V.    CONCLUSION

For the foregoing reasons, Defendants' motion should be denied.

Dated: May 5, 2014

**KESSLER TOPAZ MELTZER & CHECK, LLP**

<u>/s/Sharan Nirmul</u>
Andrew L. Zivitz
Sharan Nirmul
Joshua E. D'Ancona
Tyler S. Graden
Jonathan F. Neumann
280 King of Prussia Road
Radnor, PA 19087
Tel: (610) 667-7706
Fax: (610) 667-7056
Email: azivitz@ktmc.com
snirmul@ktmc.com
jdancona@ktmc.com
tgraden@ktmc.com
jneumann@ktmc.com
*Counsel for Plaintiffs Vermont Pension Investment*
*Committee, Washington State Investment Board,*
*Arkansas Teacher Retirement System, City of*
*Tallahassee Retirement System and Mississippi*
*Public Employees' Retirement System*

**SCOTT+ SCOTT,  ATTORNEYS AT LAW, LLP**

Deborah Clark-Weintraub (DW-6877)
Beth A. Kaswan (BK-0264)
William C. Fredericks (WF-1576)
Max Schwartz (MS-2517)
Donald Broggi (DB-9661)
The Chrysler Building
405 Lexington Avenue, 40th Floor
New York, NY 10174

Tel.: (212) 223-6444
Fax: (212) 223-6334
Email: dweintraub@scott-scott.com
bkaswan@scott-scott.com
wfredericks@scott-scott.com
mschwartz@scott-scott.com
dbroggi@scott-scott.com

*Counsel for Plaintiffs Policemen's Annuity and
Benefit Fund of the City of Chicago and Central
States Southeast and Southwest Areas Pension Fund*

**COHEN MILSTEIN SELLERS & TOLL PLLC**
Steven J. Toll
Julie Goldsmith Reiser
1100 New York Avenue, NW
Suite 500 West
Washington, D.C. 20005
Tel.: (202) 408-4600
Fax: (202) 408-4699
Email: stoll@cohenmilstein.com
jreiser@cohenmilstein.com

- and-

Daniel B. Rehns
88 Pine Street, 14th Floor
New York, NY 10005
Tel.: (212) 838-7797
Fax: (212) 838-7745
Email: drehns@cohenmilstein.com

*Counsel for Plaintiffs Laborers' Pension Fund and
Health and Welfare Department of the Construction
and General Laborers' District Council of Chicago
and Vicinity, Iowa Public Employees' Retirement
System and Arkansas Public Employees'
Retirement System*

## CERTIFICATE OF SERVICE

I hereby certify that on May 5, 2014, I filed a copy of the foregoing via the Southern

District of New York's CM/ECF System.   It was served via ECF and email to counsel of record

for Defendants.

Dated: May 5, 2014

<u>/s/Sharan Nirmul</u>
Sharan Nirmul